# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

**Ford Motor Company,**

       Plaintiff,

**v.**

**Versata Software, Inc., f/k/a Trilogy
Software, Inc., Trilogy Development
Group, Inc. and Trilogy, Inc.,**

       Defendants.

Case No. 15-10628-MFL-EAS

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, Plaintiff Ford Motor Company ("Ford") requests a Declaratory Judgment that Ford has not infringed any intellectual property rights owned by defendants Versata Software, Inc. f/k/a Trilogy Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (individually and collectively "Defendants").

Ford's Complaint for Declaratory Judgment is based on the following allegations:



## I.     THE PARTIES

1.     Ford is a Delaware corporation with its principal place of business at One American Road, Dearborn, Michigan.

2.     On information and belief, Versata is a Delaware corporation having its principal place of business in Austin, TX.

3.     On information and belief, Trilogy Development is a California corporation having its principal place of business in Austin, TX.

4.     On information and belief, Versata became a wholly-owned subsidiary of Trilogy Development in 2006, and Trilogy Development is the parent company of Versata and its subsidiaries.

5.     On information and belief, Trilogy, Inc. is a Delaware corporation having its principal place of business in Austin, TX.

## II.     JURISDICTION AND VENUE

6.     Ford incorporates the allegations of paragraphs 1-5.

7.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§1331, 1338, and 2201.

8.     As detailed below, an actual case and controversy exists concerning the alleged infringement of one or more of Defendants' patents, the alleged



misappropriation of Defendants' purported trade secrets, and Ford's obligations pursuant to a 2004 agreement with Defendants.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b).

### III.   BACKGROUND FACTS

10.     Ford incorporates the allegations of paragraphs 1-9.

*Ford's Early Vehicle Configuration Software*

11.     Ford is an Original Equipment Manufacturer ("OEM") of automobiles.

12.     Ford sells a wide range of vehicle lines in different vehicle categories, such as compact cars, SUVs, sedans and pick-up trucks.  Each vehicle line in each category has many different configurations and options.  For example, most vehicles are offered with more than one engine choice, more than one transmission choice, more than one wheel choice and several other configurations and options.

13.     Not all vehicle components are compatible with one another.  For example, a particular engine may not be compatible with a particular transmission. A particular transmission, however, may be compatible with several different (but not all) available engine selections.



14.     Given the complexity and options available on a particular vehicle, millions of configurations are possible for each vehicle line.

15.     Beginning in the 1990s, Ford developed the Marketing Feature Availability List ("MFAL") and the "Product Feature Database" ("PFDB") software to help Ford define and manage valid vehicle configurations within Ford.

***Defendants' Configuration Software***

16.     In October 1998, Ford licensed "SC Config" software from Defendants.  The SC Config software proved incapable of handling the complexity and volume of data required to support Ford's needs.

17.     Thus, at the same time Ford licensed SC Config, Ford and Defendants entered into in a Contract Services Agreement ("CSA") governing the development of customized software for Ford.

18.     The CSA states that Ford either owns, or has a royalty-free license to reproduce the software deliverables and customizations for the SC Config software.

19.     Between 1999 and 2004, Defendants and Ford jointly developed the "Automotive Configuration Manager" ("ACM") pursuant to the CSA.



20.     The ACM was an adaptation of SC Config for use within Ford. This was required due to the high levels of data volumes and the complexity of Ford's vehicle offerings.

21.     Ford paid Defendants tens of millions of dollars for the ACM development services pursuant to the CSA.

22.     In December 2004, Ford and Defendants entered into a Master Subscription and Services Agreement ("MSSA"), governing the licensing of, *inter alia*, the ACM software.

23.     Similar to the CSA, the MSSA included provisions establishing Ford's ownership, or license to reproduce, deliverables created under the MSSA.

***Defendants Unilaterally Declares The ACM Software "Obsolete" And Terminate Ford's Maintenance & Support For The ACM Software***

24.     In November 2010, Defendants informed Ford that the ACM software was "obsolete," and that Ford was required to license Defendants' new "cloud-based" computing platform going forward. For security reasons, Ford was not willing to move its proprietary vehicle configuration data off-premises to the "cloud," *i.e.*, the Internet.

25.     Prior to these discussions, Defendants threatened Ford with termination of the license for the original ACM software if Ford refused to move to the "cloud-based" platform.



5

26.    During subsequent discussions with Ford, however, Defendants later permitted Ford to continue using the "obsolete" ACM software at an annual license fee of several million dollars, but without Defendants' maintenance or support services.

27.    Because Ford needed maintenance and support for the ACM software, and because Defendants had previously threatened to terminate its license for the original ACM software, Ford entered into an addendum to the original ACM software licensee.

28.    In the addendum, Ford paid Defendants a substantial additional fee for an "Extended Support Term" for the original ACM software and for Defendants to waive their right to terminate the ACM license for convenience during the Extended Support Term.

***Defendants Terminated Ford's ACM License, And Described Their Exorbitant Licensing Fees As "Extortion"***

29.    Defendants notified Ford on October 7, 2014 that they were terminating Ford's ACM license, effective January 1, 2015.  Defendants' letter stated that Ford was to cease using the ACM software by January 1, 2015.

30.    On November 13, 2014, Defendants extended the termination date to January 15, 2015 and again stated that Ford was to cease using the ACM software by the extended date.



31.     However, Versata's demands were in direct violation to the terms of a 2011addendum. In this addendum, Versata waived its right to terminate Ford's right to sustained use through the end of 2015 in exchange for a fee.

32.     In parallel with these termination notices, Defendants presented Ford with unreasonable license terms for Defendants' "obsolete" ACM software Ford had been using since 2005.

33.     Defendants' new licensing proposal was 5 years at a dollar amount that is incrementally greater than the amount Ford would have paid for the exact same "obsolete" ACM software previously licensed to Ford on an annual basis.

34.     During a conference call regarding Defendants' new licensing proposal, a Defendant representative stated to Ford representatives that "we could have extorted a lot more money out of you three years ago."

35.     Ford did not accept Defendants' unreasonable license proposal.  On December 19, 2014, Ford notified Defendants that Ford would no longer be using the ACM software.

***Ford Research Engineers Invented, Developed And Patented Their Own Configuration Software; Defendants Forced Ford To Changeover***

36.     Beginning in 2010, engineers from Ford's Research and Advanced Engineering department were working to develop software that Ford might use in the future to determine which vehicle configurations sell the best.



37.    The objective of the new software was to determine, of the millions of possible vehicle configurations, which configurations were likely to sell the quickest to minimize the amount of time the vehicles sit in dealer inventory, referred to as "days on lot."

38.    To accomplish this objective, the engineers needed to swiftly define and analyze millions of possible vehicle configurations, all in an attempt to narrow the universe of possible configurations to those buildable configurations relevant to an individual dealer and further constrained to avoid combinations of options likely to lengthen the "days on lot."

39.    These research engineers ultimately invented software that managed the millions of possible vehicle configurations very reliably, and in a very efficient manner.  The engineers referred to their invention as the "super configurator."

40.    In parallel with Ford's efforts in research, Ford Product Definition engineers were trying to better understand vehicle complexity so that they could reduce number of manufactured configurations and ultimately reduce cost.  These efforts utilized the output of the Feature Query Validation (FQV) Service and data from ACM rule reports.  The efforts yielded some basic tools to assess complexity and some proofs-of-concept, but proved to be of limited broader use due to the computing power required.  Analyzing moderately complex programs required a



supercomputer to run for days and complex programs failed to complete processing.

41.    In 2011, Ford's Product Definition engineers and Research engineers recognized that the super configurator technology developed in Ford's research department was orders of magnitude more powerful than the approaches developed using FQV or ACM.  The super configurator was able to work successfully with vehicle programs of great complexity.  Also, with the greater processing power, the super configurator technology could enable many uses beyond the simple complexity assessments that were initially targeted by the Product Definition engineers.  The new technology could be used as the basis for a replacement for the ACM software – software that Defendants had declared "obsolete" and threatened to terminate.

42.    The two teams joined forces and, under the heading of Total Configuration Management (TCM), continued to improve the performance and extend the capabilities of the super configuration technology.

43.    Ford filed a patent application on its super configurator software in October 2011, and received a patent covering its invention in August 2014, U.S. Patent No. 8,812,375 (the '375 patent).

44.    As explained in the '375 Patent, Ford's invention approaches vehicle configuration very differently, and more efficiently, than Defendants do.



9

45.     Ford disclosed Defendants' configuration patents to the U.S. Patent & Trademark Office ("PTO") during examination of the '375 Patent.   The PTO allowed Ford's '375 patent over Defendants' patents because Ford's software operates fundamentally differently.

46.     From 2011 to 2014, Ford developed the "PDO" vehicle configuration software to replace the obsolete ACM software.   Ford's PDO software was constructed using Ford's patented super configurator invention, and provides several significant technical advantages over the ACM software.

47.     For example, the patented configuration engine used in Ford's PDO software is more accurate than the ACM software, providing Ford with higher data integrity than the ACM software.

48.     In addition, Ford's PDO software provides a foundation that is capable of managing in a coherent manner a broad range of related data including integrating data representing vehicle volumes, configuration mix and weight – something the ACM software cannot do.   The PDO software also provides the potential for extended analytic capabilities over the ACM software.

49.     Another significant advantage of Ford's PDO software over the ACM software is that PDO has been architected to support future extensions planned to enable Ford's business people to easily define vehicle configurations themselves, without requiring the expert configuration codification analysts that the ACM



10

software required.  This will dramatically increase the efficiency and utility of the configuration software within Ford.

50.    Ford's PDO software also allows Ford to develop and deploy reusable powerful global data services.  ACM was geared to support a small group of core codification analysts and was not capable of handling high volumes of complex real-time data requests.   PDO is architected to support hundreds of users interacting with PDO data services on a daily basis.

51.    From the hardware perspective, Ford's PDO software runs on a modern computing platform, which is more closely aligned with Ford's computing infrastructure strategy.

52.    Ford's PDO software is also scalable to meet Ford's global needs without a significant upgrade, unlike the ACM software.

53.    Driven by the technical drawbacks of the ACM software, Defendants' repeated termination notices, and their unreasonable unilateral escalation of license fees (which Defendants referred to as "extortion"), Ford was forced to incur costs to prepare and deploy the patented PDO software into production prior to January 1, 2015.

***Defendants Threatened Ford With Patent Infringement, Copyright Infringement, And Misappropriation of Trade Secrets, and Demanded an Audit of Ford's PDO Software and Ford's PDO Developers***



54.     In its termination letter sent October 7, 2014, Defendants attached a list of 86 U.S. patents and stated that Ford "has no right nor license to use any such claimed inventions outside of its now expiring licensed use of [Defendants'] Software."

55.     At a meeting in Dearborn, MI on December 19, 2014 between counsel and client representatives for Defendants and Ford, Ford notified Defendants of Ford's intention to switch to Ford's patented configuration software.  A representative of Defendants responded stating that Ford's replacement configuration software must infringe Defendants' intellectual property, including its patents, copyrights and trade secrets.

56.     On December 23, 2014, Defendants notified Ford of their "inten[t] to exercise its on-premises audit rights pursuant to Section 3.5 of the [MSSA]."  In particular, Defendants demanded an audit of "the development of an internal (or third party) Ford solution to replace [Defendants'] Software."

57.     Defendants' audit notice also requested interviews of "Ford personnel who at any time worked with any of [Defendants'] Software, Materials, Confidential Information and/or Intellectual Property and also who at any time worked on the development of a Ford internal (or third party) solution to replace [Defendants'] Software."



58.    According to Defendants' website, the following three patents cover their Automotive Configuration software: U.S. Patent No. 5,825,651 (the '561 Patent, Exhibit A), U.S. Patent No. 6,405,308 (the '308 Patent, Exhibit B), and U.S. Patent No. 6,675,294 (the '294 Patent, Exhibit C).

59.    These patents were included in the list of 86 patents that Defendants sent to Ford in its October 7, 2014 termination letter.  The '651 Patent was the first patent on the list.

60.    According to assignment records archived at the U.S. Patent & Trademark Office, these patents are currently assigned to Defendants.

**COUNT #1:**
**DECLARATORY JUDGMENT THAT FORD**
**DOES NOT INFRINGE THE '651 PATENT**

61.    Ford incorporates the allegations of paragraphs 1-60.

62.    As a result of threats Defendants made to Ford concerning Defendants' configuration patents, including the '651 Patent, and Defendants' demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to the '651 Patent.

63.    Ford's PDO software does not directly or indirectly infringe the '651 patent.



13

64.     Ford is entitled to a declaratory judgment that it has not infringed and is not infringing the '651 patent.

### COUNT #2:
### DECLARATORY JUDGMENT THAT FORD
### DOES NOT INFRINGE THE '308 PATENT

65.     Ford incorporates the allegations of paragraphs 1-64.

66.     As a result of threats Defendants made to Ford concerning Defendants' configuration patents, including the '308 Patent, and Defendants' demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to the '308 Patent.

67.     Ford's PDO software does not directly or indirectly infringe the '308 patent.

68.     Ford is entitled to a declaratory judgment that it has not infringed and is not infringing the '308 patent.

### COUNT #3:
### DECLARATORY JUDGMENT THAT FORD
### DOES NOT INFRINGE THE '294 PATENT

69.     Ford incorporates the allegations of paragraphs 1-68.

70.     As a result of threats Defendants made to Ford concerning Defendants' configuration patents, including the '294 Patent, and Defendants'



demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to the '294 Patent.

71.    Ford's PDO software does not directly or indirectly infringe the '294 patent.

72.    Ford is entitled to a declaratory judgment that it has not infringed and is not infringing the '294 patent.

### COUNT #4:
### DECLARATORY JUDGMENT THAT FORD OWNS, OR IS LICENSED TO REPRODUCE, SOFTWARE TRILOGY DEVELOPED PURSUANT TO THE 1998 CONTRACT SERVICES AGREEMENT

73.    Ford incorporates the allegations of paragraphs 1-72.

74.    As a result of threats Defendants made to Ford concerning infringement or misappropriation of Defendants' alleged intellectual property, and Defendants' demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to ownership of any intellectual property associated with the ACM software.

75.    In October 1998, Ford and Trilogy entered into the CSA governing, *inter alia*, title to Trilogy-developed software.

76.    Between 1999 and 2004, Ford paid Defendants tens of millions of dollars pursuant to the CSA to develop the ACM software.



77.     Ford is entitled to a declaratory judgment that, pursuant to the CSA, Ford either owns, or has the right to reproduce without accounting to Trilogy, all software and intellectual property developed for the ACM.

78.     To the extent Defendants own patents, trade secrets or copyrights covering functionality developed for the ACM under the CSA, Ford is entitled to a declaratory judgment that the CSA provides Ford at least a royalty-free license to practice and reproduce that intellectual property.

**COUNT #5:**
**DECLARATORY JUDGMENT THAT FORD OWNS,**
**OR IS LICENSED TO REPRODUCE, SOFTWARE**
**TRILOGY DEVELOPED PURSUANT TO THE 2004 MASTER**
**SUBSCRIPTION AND SERVICES AGREEMENT**

79.     Ford incorporates the allegations of paragraphs 1-78.

80.     As a result of threats Defendants made to Ford concerning infringement or misappropriation of Defendants' alleged intellectual property, and Defendants' demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to ownership of any intellectual property associated with the ACM software.

81.     In December 2004, Ford and Trilogy entered into the MSSA governing, *inter alia*, licensing and title to Trilogy-developed software deliverables.



16

82.     The MSSA states that Ford is either the owner of the software deliverables, or is licensed to reproduce, use and exploit the deliverables on a "royalty free" basis.

83.     Ford is entitled to a declaratory judgment that, pursuant to the MSSA, Ford either owns, or has the right to reproduce without accounting to Trilogy, deliverables for the ACM.

84.     To the extent Defendants own patents, trade secrets or copyrights covering deliverables developed under the MSSA, Ford is entitled to a declaratory judgment that the MSSA provides Ford at least a royalty-free license to practice and reproduce that intellectual property.

**COUNT #6:**
**DECLARATORY JUDGMENT THAT**
**FORD DID NOT MISAPPROPRIATE**
**DEFENDANTS' TRADE SECRETS**

85.     Ford incorporates it allegations in paragraphs 1-84.

86.     As a result of threats Defendants made to Ford concerning misappropriation of Defendants' alleged trade secrets in connection with Ford's development of the PDO software, and Defendants' demand to audit Ford's PDO code and interview Ford's PDO developers, an actual case or controversy exists with respect to Defendants' alleged trade secrets.



87.     At no time did Defendants provide Ford with the source code for the SC Config or ACM software.

88.     The software customizations for the SC Config or ACM software were either Ford specified, or jointly developed by Ford and Defendants for configuring vehicles within Ford and consistent with Ford's business practices.

89.     Pursuant to the CSA and MSSA, Ford either owns, or has a royalty-free license to reproduce the software deliverables and customizations for the SC Config and ACM software.

90.     Ford is entitled to a declaratory judgment that Ford did not misappropriate Defendants trade secrets to develop Ford's PDO software.

## COUNT #7:
### DECLARATORY JUDGMENT THAT DEFENDANTS ARE NOT PERMITTED TO INSPECT FORD'S PDO SOFTWARE OR INTERVIEW FORD'S PDO DEVELOPERS PURSUANT TO THE AUDIT PROVISIONS OF THE 2004 MSSA

91.     Ford incorporates the allegations of paragraphs 1-90.

92.     On December 23, 2014, Defendants notified Ford of Defendants' "inten[t] to exercise its on-premises audit rights pursuant to Section 3.5 of the [MSSA]."  In particular, Defendants demanded an audit of "the development of an internal (or third party) Ford solution to replace [Defendants'] Software."



93.     Defendants' audit notice also requested interviews of "Ford personnel who at any time worked with any of Defendants' Software, Materials, Confidential Information and/or Intellectual Property and also who at any time worked on the development of a Ford internal (or third party) solution to replace Defendants' Software."

94.     The MSSA does not permit Defendants to inspect Ford's PDO software, or interview Ford's PDO developers. The MSSA simply requires Ford to provide access to the licensed software and records.

95.     Ford's PDO software was developed by Ford independent of Defendants' ACM software.  Thus, Ford has no obligation to permit Defendants to inspect Ford's PDO software, or interview Ford's PDO developers.

96.     To fulfill its obligations under the MSSA, Ford has agreed to provide Defendants with an inspection of Ford's records pertaining to the licensed ACM software.  Ford has informed Defendants, however, that it will not permit Defendants to audit Ford's PDO software, or interview Ford's PDO developers.

97.     Because Ford contends that the requested audit of Ford's PDO software and developers is not permitted under the MSSA, and Defendants contend that such an audit is permitted, an actual case or controversy exists with respect to the MSSA, and Ford's obligations thereunder.



98.   While the parties' dispute arises from a contract provision concerning the scope of Defendants' audit rights under the MSSA, the underlying case or controversy between the parties involves a substantive matter of patent law.  As explained in detail above, Defendants' October 7, 2014 termination letter attached a list of 86 U.S. patents which Defendants stated Ford "has no right nor license to use any such claimed inventions outside of its now expiring licensed use of [Defendants'] Software."

99.   At a meeting in Dearborn, MI on December 19, 2014 between counsel and client representatives for Defendants and Ford, a Defendant representative stated that Ford's replacement configuration software must infringe Defendants' intellectual property, including its patents.

100.   Four days later, on December 23, 2014, Defendants demanded an audit of "the development of an internal (or third party) Ford solution to replace Defendants' Software" and interviews of "Ford personnel who at any time worked with any of Defendants' Software, Materials, Confidential Information and/or Intellectual Property and also who at any time worked on the development of a Ford internal (or third party) solution to replace [Defendants'] Software."

101.   Defendants' allegations and demands to Ford reveal a present case or controversy between the parties concerning the extent to which Ford's PDO



software practices Defendants' patents and other intellectual property.  That is the reason Defendants expressed for requesting the audit in the first place.

**COUNT #8:**
**BREACH OF CONTRACT**

102.   Ford incorporates the allegations of paragraphs 1-101.

103.   Ford and Versata entered into an enforceable contract granting Ford the right to use Versata's ACM software in exchange for a fee.

104.   Pursuant to a 2011 addendum to the MSSA, Versata waived its right to terminate the contract for convenience before January 15, 2015 in exchange for a fee.

105.   Ford paid the fee specified in the 2011 addendum and therefore satisfied all conditions precedent.

106.   Pursuant to a 2011 addendum to the MSSA, Versata waived its right to terminate our right to sustained use through the end of 2015 in exchange for a fee.  Versata's termination notices were in direct violation to the 2011 addendum, and prohibited Ford from exercising its option to continue use of the ACM software through December 31, 2015.

107.   Due to the termination notices, Ford was also forced to incur costs to complete and deploy the alternate PDO software prior to January 1, 2015.



108.   Versata's conduct constituted a breach of the MSSA.

109.   As a direct and proximate cause of Versata's breach of the MSSA, Ford has suffered damages including, but not limited to, the fees Ford paid to Versata for the waiver and the costs Ford wrongfully incurred to prepare and deploy the PDO software prior to January 1, 2015.

## IV.   RELIEF REQUESTED

Ford requests a trial by jury on any and all issues so triable, and an order declaring that:

a.  Ford does not infringe and has not infringed the '651 patent;

b.  Ford does not infringe and has not infringed the '308 patent;

c.  Ford does not infringe and has not infringed the '294 patent;

d.  Ford owns or has the royalty-free right to right to reproduce software that Trilogy developed pursuant to the 1998 Contract Services Agreement;

e.  Ford owns or has the royalty-free right to right to reproduce software that Defendants developed pursuant to the 2004 Master Subscription and Services Agreement;

f.  Ford has not misappropriated Defendants' trade secrets; and



g. Section 3.5 of the 2004 Master Subscription and Services Agreement does not authorize Defendants to inspect Ford's PDO source code or interview Ford's PDO developers.

h. Versata has breached the MSSA contract and Ford is entitled to damages suffered as a result of this breach.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b) and 5(d), Plaintiff demands a jury trial of all issues triable by jury.

Dated: March 16, 2015

Respectfully submitted,

By: /s/ John S. LeRoy
John S. LeRoy (P61964)
Frank A. Angileri (P45611)
Chanille Carswell (P53754)
John P. Rondini (P72254)
**BROOKS KUSHMAN P.C.**
1000 Town Center, 22nd Floor
Southfield, MI  48075
Tel.: 248-358-4400 / Fax: 248-358-3351
jleroy@brookskushman.com
fangileri@brookskushman.com
ccarswell@brookskushman.com
jrondini@brookskushman.com

*Attorneys for Plaintiff, Ford Motor Company*

