UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

    Plaintiff,

v.

VERSATA SOFTWARE, INC. *et al.*

    Defendants.
_____/

Case No. 15-cv-10628
(*consolidated with Case No. 15-11624*)
Hon. Matthew F. Leitman

### ORDER DENYING DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION ENJOINING PLAINTIFF FROM SEEKING *INTER PARTES* REVIEW (ECF #125)

In this action, Versata Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (collectively "Versata") allege that Ford Motor Company ("Ford") infringed Versata's software patents (the "Patents"). Ford denies Versata's allegations and has launched a two-pronged attack on the validity of the Patents. First, in this Court, Ford has asserted as an affirmative defense that the Patents are invalid. Second, on May 9, 2016, Ford filed petitions with the United States Patent and Trademark Office (the "USPTO") requesting *Inter Partes* Review of the Patents (the "IPR Petitions"). In the IPR Petitions, Ford asks the USPTO to invalidate the Patents.

Versata has now moved for a preliminary injunction barring Ford from proceeding with the IPR Petitions (the "Motion"). (*See* ECF #125.) According to

1

Versata, a 2002 agreement between the parties prohibits Ford from seeking to invalidate the Patents through the IPR Petitions. For the reasons explained below, the Court **DENIES** the Motion.

### I

### A

Ford is one of the world's largest automakers. In the late 1990s, Ford licensed from Versata certain automobile configuration software known as the "ACM" software. (*See* Declaration of Kenneth Ratton at ¶3, ECF #126 at 1, Pg. ID 5764.) In 2001, a dispute arose between Versata and Ford over, among other things, ownership of the ACM software. (*See id.*) Neither Ford nor Versata filed a lawsuit related to that dispute. Instead, they negotiated a business settlement and entered into a new "Software Subscription Agreement" on January 1, 2002 (the "SSA"). (*See id.* at ¶3, ECF #126 at 1-2, Pg. ID 5764-65.) Under the SSA, Versata continued to license the ACM software to Ford. (*See id.* at ¶¶ 3-4, ECF #126 at 1-2, Pg. ID 5764-65.)

In one provision of the SSA, Ford agreed to "provide reasonable assistance [to Versata] in perfecting and protecting [the ACM] software intellectual property" (the "Protection Provision"). (SSA at § 2F, ECF #126-2 at 3, Pg. ID 5769.) Ford re-affirmed this promise in several subsequent amendments to the SSA. (*See* ECF ## 126-3 – 126-7.)

In 2004, Ford and Versata entered into another software-related agreement, known as the "Master Subscription and Services Agreement" (the "MSSA"). (*See* ECF #132-3.) Like the SSA, the MSSA granted Ford a license to use the ACM software. (*See id.*) The MSSA provided that it "superseded" "all" previous agreements between Ford and Versata "regarding the subject matter hereof." (ECF #132-3 at ¶13.10, ECF #132-3 at 9, Pg. ID 5977.) The MSSA did not include a provision like the Protection Provision nor did it address that provision in any way.

## B

In 2014, Ford and Versata were unable to reach an agreement on a renewed license for the ACM software. At around this same time, Ford developed its own automobile configuration software to replace ACM. Versata accused Ford of infringing the Patents in the development of this new software.

In response, Ford filed this action in which it seeks a declaratory judgment that it did not infringe the Patents. (*See* Am. Compl. at ¶¶ 61-72, ECF #6 at 13-15, Pg. ID 162-64.) Versata has filed a counterclaim alleging that Ford infringed the Patents, stole Versata's trade secrets, and breached certain agreements, including the MSSA and SSA. (*See* Am. Counterclaim, ECF #163.) In one of its affirmative defenses to Verasata's infringement counterclaim, Ford asserts that the Patents "are invalid for failure to meet one or more of the requisite requirements and/or conditions for patentability under Title 35 of the United States Code, including

3

without limitation §§ 101, 102, 103, 112 and 116." (*See* ECF #68 at 71, Pg. ID 2241; ECF #166 at 82, Pg. ID 8866.)

On May 9, 2016, Ford filed seven IPR Petitions with the PTAB. (*See* ECF ## 108-3 – 108-9.) The IPR Petitions ask the PTAB to review the Patents at issue in this case and to declare them invalid. (*See id.*)

On July 18, 2016, Versata filed the Motion. (*See* ECF #125.) Versata argues that the SSA – and, more specifically, the Protection Provision – prohibits Ford from moving forward with the IPR Petitions. (*See id.*) The Court held a hearing on the Motion on October 4, 2016.

## II

In the Motion, Versata seeks a preliminary injunction. "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *LifeScan Scotland, Ltd. v. Shasta Techs.*, 734 F.3d 1361, 1366 (Fed. Cir. 2013) (internal quotation marks omitted); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (same). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*; *see also Leary*, 228 F.3d at 736 (same). "These factors, taken individually, are not dispositive; rather, the district court

must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001); *see also Leary*, 228 F.3d at 736 (same).

### III

Versata has failed to make a clear showing that it is entitled to preliminary injunctive relief.

### A

As an initial matter, Versata has failed to persuade that the Court that it is likely to succeed on the merits of its claim.

Versata is seeking to enforce a contractual provision – the Protection Provision – that, it insists, restricts Ford from challenging the validity of the Patents. Any analysis of an agreement that purports to limit a party from challenging the validity of a patent must begin with the Supreme Court's decision in *Lear v. Adkins*, 395 U.S. 653 (1969).

In *Lear*, an engineer named John Adkins ("Adkins") developed and patented a new method for constructing gyroscopes. *See id.* at 655. Adkins then entered into a licensing agreement with Lear, Inc. ("Lear"). *See id.* at 657. Lear agreed to pay Adkins royalties for the use of his process. *See id.* The relationship between Adkins and Lear soured, and Adkins sued in state court to recover allegedly-unpaid royalties. In defense of Adkins' claim, Lear asserted that Adkins' patent was

invalid. *See id.* at 660. The Supreme Court of California ruled that Lear could not attack the validity of the patent. That court invoked "'one of the oldest doctrines in the field of patent law [which] establishe[d] that so long as a licensee is operating under a license agreement, he is estopped to deny validity of his licensor's patent in a suit for royalties under the agreement.'" *Id.* (quoting *Adkins v. Lear, Inc.*, 435 P.2d 321, 325-26 (Cal. 1967)).

The United States Supreme Court reversed and rejected the licensee estoppel doctrine on which the California court had relied. The Supreme Court explained that the equities in favor of protecting a patent holder against attacks on the validity of his patent were "far from compelling":

> A patent, in the last analysis, simply represents a legal conclusion reached by the Patent Office. Moreover, the legal conclusion is predicated on factors as to which reasonable men can differ widely. Yet the Patent Office is often obliged to reach its decision in an ex parte proceeding, without the aid of the arguments which could be advanced by parties interested in proving patent invalidity. Consequently, it does not seem to us to be unfair to require a patentee to defend the Patent Office's judgment when his licensee places the question in issue, especially since the licensor's case is buttressed by the presumption of validity which attaches to his patent.

*Lear*, 395 U.S. at 670.

In addition, the Supreme Court recognized "an important public interest in permitting full and free competition in the use of ideas which are in reality a part of

6

the public domain." *Id.* at 670-71. And the court stressed that patent licensee's may often be best suited to protect that public interest:

> Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification.

*Id*. The court concluded that "the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." *Id.* at 671.

The decision in *Lear* requires a federal court to carefully consider the strong public interest in the free flow of ideas when confronted with an agreement that purports to limit a party's right to challenge the validity of a patent. Indeed, "*Lear* is notable not only for its particular holdings regarding the doctrine of licensee estoppel and the enforcement of contracts for royalties, but also for establishing a 'balancing test' for weighing the public interest in discovering invalid patents' against other competing interests." *Rates Technology, Inc. v. Speakeasy, Inc*., 685 F.3d 163, 168 (2d Cir. 2012) (quotation omitted).

When applying this balancing test, courts have distinguished between a no-challenge provision that is contained in a litigation settlement agreement and such a provision in a pre-litigation agreement. The decisions in *Flex-Foot Inc. v. CRP,*

7

*Inc.*, 238 F.3d 1362 (Fed. Cir. 2001) and *Rates Technology, supra*, best exemplify this distinction.

In *Flex-Foot Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001), the Federal Circuit Court of Appeals upheld the enforceability of a no-challenge provision in a litigation settlement agreement. The court acknowledged the strong public policy in favor of allowing challenges to patents, but it held that that interest was counter-balanced by the "strong public interest in settlement of patent litigation." *Id.* at 1368-69. The court also stressed that "upholding the terms of a settlement of litigation [barring challenges to patent validity] encourages patent owners to agree to settlements – thus fostering judicial economy." *Id.* The court ultimately concluded that a no-challenge provision may be enforced *if it is part of a settlement of ongoing litigation*:

> [o]nce an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

*Id.*

In *Rates Technology*, the Second Circuit declined to enforce a no-challenge provision in a pre-litigation settlement agreement. In a passage worth quoting at length, the court explained that absent a settlement of ongoing litigation, the strong

8

public interest in the free flow of ideas recognized in *Lear* tipped the scales against enforcing a pre-litigation no-challenge provision:

> If no-challenge clauses in pre-litigation agreements were held to be valid and enforceable, *Lear's* strong policy "favoring the full and free use of ideas in the public domain" could be evaded through the simple expedient of clever draftsmanship. 395 U.S. at 674, 89 S.Ct. 1902. The validity and scope of patents are often controversial, and any negotiation for a license agreement has the potential for the would-be licensee to raise questions about the patent's validity in order to secure a more favorable price. Creating a "good faith" dispute about patent validity that can be "settled" by a license including a covenant never to challenge the patent would rarely be an obstacle to parties seeking to evade the strictures of *Lear*. As a result, allowing such no-challenges whenever a license agreement is cast as a "settlement" could "close[ ] the doors of the courts to a large group of parties who ha[ve] sufficient interest in the patent to challenge its validity," [*Schlegel Mfg. Co. v. USM Corp.*, 525 F.2d 775, 781 (6th Cir. 1975)] and thereby render *Lear's* prohibition of licensee estoppel—a prohibition that the Supreme Court held was required by strong public policy considerations—a dead letter.
>
> [….]
>
> Thus, while we recognize the important policy interests favoring the settlement of litigation may support a different rule with respect to no-challenge clauses in settlements entered into after the initiation of litigation, *see [Warner–Jenkinson Co. v. Allied Chemical Corp.,]* 567 F.2d [184], [] 188 [(2d Cir. 1977)]; *Flex–Foot*, 238 F.3d at 1369–70,7 and we are conscious of the great costs that can be associated with patent litigation, we believe that enforcing no-challenge clauses in pre-litigation settlements would significantly undermine the "public interest in discovering invalid patents," *Idaho Potato*

> *Comm'n [v. M & M Produce Farm & Sales]*, 335 F.3d [130,] [] 135 [2d Cir. 2003]. We therefore hold that covenants barring future challenges to a patent's validity entered into prior to litigation are unenforceable, regardless of whether the agreements containing such covenants are styled as settlement agreements or simply as license agreements.

*Rates Technology*, 685 F.3d at 171-72. *See also Massillon–Cleveland–Akron Sign Co. v. Golden State Adver. Co*., 444 F.2d 425 (9th Cir. 1971) (holding pre-litigation no-challenge provision unenforceable under *Lear*). Taken together, *Flex-Foot* and *Rates Technology* provide strong support for the proposition that a no-challenge provision is enforceable if and only if it is contained in a litigation settlement agreement.

But not every federal court has recognized such a bright-line rule. Some courts have suggested that the Federal Circuit's post *Flex-Foot* decision in *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357 (Fed. Cir. 2010), allows for the enforcement of at least some pre-litigation no-challenge provisions. *See, e.g.*, *TMI Products, Inc. v. Rosen Electronics, L.P.*, 2013 WL 12114078, at **4-6 (C.D. Cal. Nov. 27, 2013) ("A covenant to waive an invalidity defense is more likely to be enforceable when it is contained in a settlement agreement, rather than a pre-litigation agreement.") In *Baseload*, the Federal Circuit said that "while the absence of a prior dispute and litigation as to invalidity is pertinent," those elements were not "determinative" with respect to whether a no-challenge

10

provision is enforceable. *Baseload*, 619 F.3d at 1363. The court added that "[i]n the context of settlement agreements … clear and unambiguous language barring the right to challenge patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated." *Id*. at 1363.[1]

After *Baseload*, some courts assessing the enforceability of no-challenge provisions have attempted to "balance the public interest in discovering invalid parents against two broad policy concerns promoted by contractual estoppel: (1) the interest in promoting the settlement of disputes; and (2) the policies underlying contract, including the enforcement of voluntary agreements." *TMI Products*, 2013 WL 12114078, at *5. "To assess the relative strength of these policy concerns," these courts have applied the following factors:

> (1) The existence and extent of prior litigation between the parties, including whether validity was challenged in the prior litigation; (2) whether there was an opportunity

---

[1] The Federal Circuit in *Baseload* ultimately concluded that the no-challenge provision in that case was unenforceable because the provision was not clear and unambiguous. *See Baseload*, 619 F.3d at 1363 (noting that the no-challenge provision at issue did not have "clear language" and did not include "specific language … making reference to invalidity issues"). Thus, the Federal Circuit did not actually reach or decide the issue of whether a pre-litigation no-challenge provision is enforceable, and its statements quoted above are likely dicta. *See Rates Technology*, 685 F.3d at 174 (identifying the statements from *Baseload* as *dicta*). Nonetheless, as described in text, some courts have attached significance to these statements.

11

> to take discovery; (3) whether the agreement waiving the invalidity defense settled the litigation; and (4) whether there is clear and unambiguous language waiving the invalidity claim.

*Id.*

In this case, Versata has failed to persuade the Court that the Protection Provision is enforceable under either of the approaches to no-challenge provisions described above. The Protection Provision appears unenforceable under the *Rates Technology* approach because it was not part of a litigation settlement. Likewise, Versata has not shown that the Protection Provision is enforceable under the multi-factor test applied in *TMI Products*. First, there was no "prior litigation between the parties" before Ford and Versata executed the Protection Provision. Second, Ford did not have any opportunity to "take discovery" with respect to the Patents prior to the execution of the provision. Third, the SSA, which contained the Protection Provision, did not "settle[]" any ongoing litigation. Finally, for the reasons stated below, Versata has not established that the Protection Provision clearly and unambiguously waives Ford's right to challenge the Patents through the IPR Petitions under the circumstances that exist here.

Simply put, Versata has thus far failed to persuade the Court that the Protection Provision is enforceable to the extent that it purports to bar Ford from

challenging the Patents in front of the PTAB.[2] Therefore, the Court cannot find that Versata has a likelihood of success on the merits.

**B**

For additional reasons, the Court is not yet convinced that Versata will prevail on the merits. First, Versata has not demonstrated that the Protection Provision is a "clear and unambiguous undertaking [by Ford] not to challenge validity and/or enforceability" of the Patents under the present circumstances. *Flex-Foot*, 238 F.3d at 1370 (describing requirements for enforcement of no-challenge provision). Indeed, the Court currently sees several potential ambiguities with respect to whether the provision applies under these circumstances. For instance, while the provision requires Ford to provide "reasonable assistance" in protecting the Patents, it may be "reasonable" for Ford to *withhold* assistance when, as Ford claims here, Versata is pursuing a baseless claim that Ford has infringed the Patents.[3] Furthermore, Ford's obligation to

---

[2] As Versata conceded at the hearing, it has not cited a single post-*Lear* case in which any court has enforced a pre-litigation no-challenge provision under circumstances like those presented in this case. (*See* 10/4/2016 Hearing Tr., ECF #173 at 10, Pg. ID 9056.)

[3] The Court is not holding that Versata's claims are baseless or making any determination with respect to the merits of Versata's infringement allegations. At this point, the Court does not have enough information to draw any conclusions about the strengths or weaknesses of Versata's infringement claims. Given the Court's uncertainty about the strength of these claims, the Court cannot yet conclude that Ford's obligation to provide "reasonable assistance" requires Ford to abandon the IPR Petitions.

provide "assistance" to Versata could perhaps suggest that Ford's obligations arise only when Versata needs help defending against a third party's attack on the Patents. Simply put, there seems to be a reasonable argument that if the parties had intended to bar Ford from challenging the Patents, they would have said so directly and with language that is much more precise than "reasonable assistance … in protecting" the Patents. These ambiguities as to whether the Protection Provision applies under the circumstances presented here dissuade the Court from finding, at this point, that Versata has established a likelihood of success.

Moreover, Versata has failed to offer a satisfactory interpretation of the Protection Provision. Versata insists that the Protection Provision bars Ford from challenging the validity of the Patents through the IPR Petitions. But Versata says that the Protection Provision does allow Ford to challenge the Patents by raising invalidity as an affirmative defense in this action. (*See, e.g.*, Versata Br. at 121, ECF #125 at 187 Pg. ID 5729). The Court finds Versata's reading of the provision to be internally inconsistent. It is not clear how the Protection Provision can reasonably be read to permit Ford to attack the validity of the Patents in one forum (before the PTAB in the IPR Petitions) but not in another forum (this action). The end result of either attack by Ford, if successful, would be the same: Versata would

not be able to enforce the Patents.[4]  Versata has not yet reconciled the tension in its interpretation of the Protection Provision, and Versata's failure to offer a satisfactory interpretation of the provision further persuades the Court that Versata has not yet shown a likelihood of success on the merits.[5]

Finally, the Court remains uncertain as to whether the Protection Provision remains in force.  The agreement containing the provision – the SSA – stated that it "shall terminate on December 31, 2006 and shall automatically renew annually

---

[4] If the PTAB rules in Ford's favor on the IPR Petitions, it will invalidate the some or all of the Patents; if Ford prevails on its affirmative defense of invalidity, Versata will be collaterally estopped from re-litigating the validity of some or all of the Patents. *See, e.g.*, *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 333 (1971) (holding that patent holder cannot re-litigate validity of patent if "patentee has had a full and fair chance to litigate the validity of his patent in an earlier case"); *Dana Corp. v. NOK, Inc.,* 882 F.2d 505, 508 (Fed. Cir. 1989) (same).

[5] In support of its reading of the Protection Provision, Versata cites two district court decisions from Florida for the proposition that even where a party has agreed not to challenge the validity of a patent, the party may raise invalidity as a *defense*. (Versata Br. at 11, ECF #125 at 18, Pg. ID 5729.)  But those decisions turned on the particular wording of the no-challenge provisions at issue in those cases; the decisions did not recognize a general rule allowing a party to a no-challenge provision to raise an invalidity defense. See *Indus. Eng'g & Dev.., Inc. v. Static Control Components, Inc.*, 45 F.Supp.3d 1311, 1319 (M.D. Fla. 2014) (holding that party to no-challenge provision could assert invalidity defense where provision stated that it did *not* "prevent either party from raising issues that may reflect on the validity of the other's patents … in defending their own patent positions in any proceeding in the U.S. Patent Office or courts"): *Mayo Clinic of Jacksonville v. Alzheimer's Inst. of Am.*, 683 F.Supp.2d 1292 (M.D. Fla. 2009) (holding that a "clumsily and ineffectively constructed" no-challenge provision did not prohibit a defendant from raising an invalidity affirmative defense).

thereafter unless terminated by either party in writing ….." (*See* SSA at § 4C, ECF #126-2 at 4, Pg. ID 5770.) In 2004, the parties executed the MSSA, and that agreement provides that it "superseded" "all" previous agreements between Ford and Versata "regarding the subject matter hereof." (ECF #132-3 at ¶13.10, ECF #132-3 at 9, Pg. ID 5977.) Versata acknowledges that the MSSA terminated at least part of the SSA, but Versata contends that the MSSA left the Protection Provision intact. (*See* 10/14/16 Hearing Tr., ECF #173 at 15-16, Pg. ID 9061-62.) The Court is not yet persuaded that the MSSA terminated some provisions of the SSA but not others as suggested by Versata. Versata candidly acknowledged at the hearing before the Court that its limited-termination argument relies upon evidence outside of the four corners of the SSA and MSSA (*see id.* at 16, Pg. ID 9062), and the Court cannot yet conclude that that evidence establishes that the parties intended to leave the Protection Provision in place after terminating the remainder of the SSA.[6]

---

[6] The Court's uncertainty concerning the scope and vitality of the Protection Provision is enhanced by Versata's own conduct in this litigation. Ford first mentioned its plan to file the IPR Petitions in December 2015 (*see* ECF #70 at 12, Pg. ID 2282), and Versata did not then assert that the Protection Provision barred Ford from doing so. Instead, Versata first raised the provision some seven months later when it filed the Motion. (*See* ECF #125). One could perhaps conclude that if, as Versata now contends, it has always believed that the Protection Provision barred Ford from prosecuting the IPR Petitions, it (Versata) would have at least mentioned the provision much earlier.

Given the uncertainty concerning the applicability and enforceability of the Protection Provision, Versata has failed to establish a likelihood of success on the merits of its claim that that the provision bars Ford from proceeding with the IPR Petitions.

### C

The balance of the remaining preliminary injunction factors also do not weigh in favor of granting Versata's requested relief.

Most importantly, Versata has not persuaded the Court that its proposed injunction would serve the public interest. As noted above, the Supreme Court in *Lear* recognized the "important public interest in permitting full and free competition in the use of ideas," *Lear*, 395 U.S. at 670-71, and that interest would be undermined if the Court barred Ford from proceeding with IPR Petitions under these circumstances (i.e., based upon a contractual provision whose applicability is not yet clear). There is no equally-strong countervailing public interest.

Moreover, Versata has not convinced the Court that it would suffer irreparable harm in the absence of a preliminary injunction. Versata insists that the IPR Petitions require it to litigate the validity of the Patents "in an entirely new forum and proceeding" and "expend resources and [] incur substantial costs it may not recover arising from a proceeding it did not agree to participate in." (Versata Br. at 12, 14, ECF #125 at 19, 21, Pg. ID 5730, 5732.) But Versata concedes that

17

even if Ford never filed the IPR Petitions, it would still have to litigate the validity of the Patents in this action (and would thus still face the risk of having the Patents invalidated). The fact that Versata may incur some amount of additional incremental expense by proceeding in front of the PTAB – expenses it may be able to recover from Ford in the event the Court ultimately concludes that the Protection Provision prohibits Ford from pursing the IPR Petitions – does not amount to sufficient irreparable harm to justify injunctive relief.

Finally, the Court does not believe the balance of the equities weigh in favor of granting Versata a preliminary injunction. At most, the balance of equities is in equipoise. Ford has an interest is pursuing its statutory right to challenge the Patents before the PTAB, and Versata has an interest in not defending the Patents before the PTAB. The balance of equities factor is, at best a "wash."

## IV

When the Court weighs all of relevant factors, it concludes that Versata has failed to establish a clear right to its requested preliminary injunctive relief. Accordingly, for the reasons stated above, **IT IS HEREBY ORDERED** that the Motion (ECF #125) is **DENIED**.

        s/Matthew F. Leitman
        MATTHEW F. LEITMAN
        UNITED STATES DISTRICT JUDGE

Dated: November 10, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 10, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda  
Case Manager  
(313) 234-5113
