## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**Ford Motor Company,**

      Plaintiff/
      Counter-Defendant,

**v.**

**Versata Software, Inc., f/k/a Trilogy Software, Inc., Trilogy Development Group, Inc. and Trilogy, Inc.,**

      Defendants/
      Counter-Plaintiffs**.**

**Case No. 15-10628-MFL-EAS**
***(consolidated with Case No. 15-cv-11624)***

**Hon. Matthew F. Leitman**

**JURY TRIAL DEMANDED**

## FORD MOTOR COMPANY'S
## MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

**NON-CONFIDENTIAL**



NON-CONFIDENTIAL

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.   Is Plaintiff Ford Motor Company ("Ford") entitled to summary judgment on Defendants' trade secret claims where Defendants disclosed the alleged secrets to more than 160 individuals around the world, and two Ford competitors, who were under no apparent obligation of confidentiality?

2.   Is Ford entitled to summary judgment on Versata's copyright and related breach of contract claim where Versata does not own the copyrights, and where Ford was licensed to use the software at the time of the alleged infringement?

3.   Is Ford entitled to summary judgment on Versata's patent claims where Ford does not infringe asserted claims, and where asserted claims are invalid?

Ford answers each:  **Yes.**



i

**NON-CONFIDENTIAL**

## CONTROLLING AUTHORITY

Fed. R. Civ. P. 56

Comp. Laws § 445.1901 *et seq.*

18 U.S.C. § 1836

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)

*Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F.Supp.2d 808 (E.D. Mich. 2000)

*Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003)

*Pfaff v. Wells Electronics*, 525 U.S. 55 (1998)

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014)

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011)



ii

NON-CONFIDENTIAL

# **TABLE OF CONTENTS**

CONCISE STATEMENT OF ISSUES PRESENTED ............................................. i

CONTROLLING AUTHORITY ...................................................................... ii

TABLE OF AUTHORITIES ....................................................................... vi

MOTION .......................................................................................... 1

BRIEF IN SUPPORT .............................................................................. 2

I.      BACKGROUND ........................................................................... 2

        A.      Summary of the Technology at Issue .................................... 2

        B.      The ACM Software Performed Poorly Since the Time it Was
                First Launched .............................................................. 3

        C.      Frustration Over ACM and MCA Performance Continued to
                Grow, And Versata Eventually Declared the Software
                "Redlining" and "End of Life" ........................................... 5

        D.      Ford Innovates to Build a Better Solution ............................. 6

        E.      Instead of Improving ACM/MCA, Versata Significantly Raised
                Ford's Fees and Then Terminated Ford's License ................... 7

        F.      Ford Employees Were Walled-Off From the ACM/MCA
                "Source Code" And No ACM/MCA Code Is Used in PDOR1 ........... 8

II.     SUMMARY JUDGMENT STANDARD ...................................................... 9

III.    ARGUMENT ............................................................................... 9

        A.      *Trade Secrets*:  Versata Cannot Prove It Took Reasonable
                Measures to Maintain Secrecy When Versata Disclosed
                ACM/MCA to at Least <u>160</u> Individuals But "Lost" Their
                Alleged Confidentiality Agreements ................................... 9



NON-CONFIDENTIAL

1. Versata Cannot Produce Confidentiality Agreements for at Least 160 Employees and Third-Party Developers ............. 11

2. Versata Cannot Produce Confidentiality Agreements with Ford Competitors to Whom It Disclosed ACM ....................... 15

3. Ford's Confidentiality Obligation on Information Disclosed to Ford Through December 10, 2004 (All of the Alleged Secrets) Expired December 10, 2007 ................... 16

4. Versata Published the ACM Screens and Software Functions in its Patents ............................................................ 19

B. *Trade Secrets:* Ford Paid For, and Owns, the Alleged Trade Secrets Developed Between 1999 and 2001 ....................................... 25

C. *Copyrights:* Defendants Do Not Own the Asserted Copyrights ........ 28

D. *Copyrights:* Ford Used the ACM/MCA/ACS Software Only When it Was Licensed to Do So ....................................................... 29

E. *Patents*: Ford Does Not Infringe Versata's Patent Claims, and Some of the Claims Are Invalid .......................................................... 32

1. U.S. Patent Nos. 7,200,582 and 7,464,064 Are Invalid and Not Infringed ..................................................................... 32

   a. Versata Violated the "On Sale Bar" Rendering the '582 and '064 Patents Invalid ....................................... 32

   b. PDOR1 Does Not Infringe the '582 and '064 Patents Because PDOR1 Does Not Use "set equations" to Represent "consistency error types" as Claimed in Those Patents. ......................................... 38

2. Ford Does Not Infringe U.S. Patent No. 7,739,080 Because Ford Does Not "extend" or "remove" Configuration Model Family Space ......................................... 40

3. Ford Does Not Infringe U.S. Patent Nos. 6,405,308 and 6,675,294 .......................................................................... 43

   a. "obtaining user input"/"sending user input" ................. 45



**NON-CONFIDENTIAL**

b.    "system" / "product"........................................................ 47

4.    The Asserted Claims of U.S. Patent No. 7,882,057 are Unpatentable Because They Are Directed to an Abstract Idea............................................................................................ 49

a.    *Alice* Step One: The '057 Patent Claims Are Directed to Unpatentable Abstract Ideas........................ 50

b.    *Alice* Step Two:  The '057 Patent Claims Do Not Include an "Inventive Concept" .................................... 54

IV.    CONCLUSION................................................................................55



NON-CONFIDENTIAL

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Allen Engineering Corp. v. Bartell Industries*,
    299 F.3d 1336 (Fed. Cir. 2002) ....................................................36

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S.Ct. 2347 (2014)............................................... 49, 50, 54, 55

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).......................................................................9

*Baystate Techs. Inc. v. Bentley Systems, Inc.*,
    946 F.Supp. 1079 (D. Mass. 1996).................................................19

*BDT Prod's, Inc. v. Lexmark Int'l*,
    274 F.Supp.2d 880 (E.D. Ky. 2003)..............................................14

*Best Hand Entm't LLC v. Wideawake-Deathrow Entm't, LLC*,
    2014 WL 1304623 (E.D. Mich. Mar. 31, 2014)...........................30

*Bilski v. Kappos*,
    561 U.S. 593 (2010).....................................................................49

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ....................................................50

*DB Riley, Inc. v. AB Eng'g Corp.*,
    977 F.Supp. 84 (D. Mass. 1997)...................................................19

*Dice Corp. v. Bold Techs.*,
    913 F. Supp.2d. 389 (E.D. Mich. 2012) .......................................10

*ECT Int'l, Inc. v. Zwerlein*,
    228 Wis.2d 343, 597 N.W.2d 479 (Wisc. Ct. App. 1999) ...........18

*Electromotive Div. of General Motors Corp v. Transportation Systems Division of General Electric Co.*,
    417 F.3d 1203 (Fed.Cir. 2005) ....................................................37



**NON-CONFIDENTIAL**

*Group One, Ltd. v. Hallmark Cards, Inc.*,
    254 F.3d 1041 (Fed.Cir. 2001) ...................................................................35

*In re Cygnus Telecomm. Tech., LLC Patent Litig.*,
    536 F.3d 1343 (Fed.Cir. 2008) ...................................................................37

*In re Kollar*,
    286 F.3d 1326 (Fed.Cir. 2002) ...................................................................35

*Kohus v. Mariol*,
    328 F.3d 848 (6th Cir. 2003) ............................................................... 28, 29

*Mas-Hamilton Grp. v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998) ..................................................................38

*Minton v. National Ass'n. of Securities Dealers*,
    336 F. 3d 1373 (Fed.Cir. 2003) ..................................................................35

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.*,
    298 F.3d 1290 (Fed.Cir. 2002) ...................................................................37

*Novak v. Farneman*,
    2010 WL 4643002 (S.D. Ohio 2010) .........................................................14

*Pfaff v. Wells Electronics*,
    525 U.S. 55 (1998)...................................................................... 32, 33, 36, 37

*Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*,
    93 F.Supp.2d 808 (E.D. Mich. 2000) ................................................... 14, 24

*Rogers v. Desa Internat'l, Inc.*,
    183 F.Supp.2d 955 (E.D. Mich. 2002) ........................................................14

*SEC v. Sierra Brokerage Servs., Inc.*,
    712 F.3d 321 (6th Cir. 2013) .......................................................................9

*Trilogy Software Inc. v. Selectica, Inc.*,
    405 F.Supp.2d 731 (E.D. Tex. 2005) .........................................................44



NON-CONFIDENTIAL

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ......................................................19

*Wahpeton Canvas Co. v. Frontier, Inc.*,
    870 F.2d 1546 (Fed. Cir. 1989) ....................................................38

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ......................................................30

*Zacharin v. U.S.*,
    213 F.3d 1366 (Fed.Cir. 2000) .....................................................36

## Statutes

18 U.S.C. § 1836 ...........................................................................25
18 U.S.C. §1839 ............................................................................10
35 U.S.C. §102 .................................................................. 32, 35, 37

## Other Authorities

Knuth, Donald A., *The Art of Computer Programming*,
    Vol. 4, Fascicle 1, Addison-Wessley, 2010 .....................................7
Mich. Comp. Laws § 445.1902 .................................................. 10, 14, 25
Milgrim on Trade Secrets, §1.03 Rel. 116-12/2017 ...............................15



NON-CONFIDENTIAL

## MOTION

Ford Motor Company ("Ford") requests summary judgment on Defendants' (collectively "Versata's") trade secret, copyright, contract and patent claims.

Versata's **_trade secret claims_** fail because Versata disclosed the alleged secrets to more than 160 individuals throughout the world, and multiple Ford competitors, who were under no apparent obligation of confidentiality.  In addition, Ford paid Versata ███████ for, and owns, a substantial portion of the alleged trade secrets developed between 1999 and 2001.

Versata's **_copyright claim_** and its related **_breach of contract_** claim fails because Versata does not own the asserted copyrights, because Ford was licensed to use ACM/MCA at the time of the alleged infringement, and because Ford never "reverse engineered" the ACM/MCA software.

Versata's **_patent claims_** fail because the accused PDOR1 software represents a substantial innovation over, and does not practice, the approach implemented in many of the asserted claims.  Other asserted claims are unpatentable and thus cannot be infringed as a matter of law.

For these reasons, and as set forth in greater detail in the accompanying Brief in Support, Ford is entitled to summary judgment on Versata's trade secret, patent, copyright and contract claims.



1

NON-CONFIDENTIAL

## BRIEF IN SUPPORT

## I.      BACKGROUND

### A.      Summary of the Technology at Issue

This case concerns computer software for keeping track of relationships among the various parts and features of a product, called "product definition" or "maintenance" software.  An automobile, for example, has thousands of interrelated parts and features.  Some parts (*e.g.*, an engine and a transmission) require one another to construct a buildable vehicle.  Other parts or features are optional, such as a moon roof or leather seats.

Users of the product definition software input thousands of "rules" to define these relationships.  Some vehicles have a few thousand rules.  Other vehicles have hundreds of thousands of rules.  And, when the rules are interacted with one another, an astounding number of buildable vehicle configurations may result.  For example, the 2015 Ford Transit has over 27,000,000,000,000,000 buildable combinations.

Product definition software is generally designed to receive the user-input rules, and output the rules and/or buildable combinations to other computer systems within an organization, such as manufacturing or sales systems.



**NON-CONFIDENTIAL**

**B.     The ACM Software Performed Poorly Since the Time it Was First Launched**

As explained in greater detail below, Versata developed product definition for Ford between 1999 and 2001 that was eventually named "ACM."  Versata asserts that it is an expert in "product definition" software, that the ACM software licensed to Ford performed exceptionally well, that Ford developed "copycat" software simply to avoid paying Versata annual license fees.  The contemporaneous record tells a very different story.

Early in the parties' relationship, Versata internally acknowledged that it "█████ ████████████████" developing the type of "███████████" or ███████████ software it was developing for Ford.  (Ex. 1, VRS855602.)[1] Dozens of contemporaneous documents over the years confirm Versata's early sentiment.  When the software was first launched, users reported ongoing ████████ and ████████ issues causing "████████████" and "██████████████████" to be ███████" (*Id.* at VRS351744; VRS348702-03.)  Because of the performance problems, users had to "come in over the weekend to get things done." (*Id.* at VRS348703.)  A Versata employee reported that "██████████████████████ ████████████████████." (*Id.* at VRS1016570.)  The employee also reported scenarios which "████████████████████████." (*Id.*)



---

[1] Documents assembled in Exhibits 1 and 2 are organized in Bates number order.



3

**NON-CONFIDENTIAL**

Another Versata employee acknowledged "███████████████████
███████████████████████████████." (*Id.* at VRS348702.) Other
Versata documents recorded "███████████" in the software. (*Id.* at
VRS33011.) A Ford employee involved in deploying the ACM software in Europe
reported "being bombarded with phone calls regarding performance." (*Id.* at
VRS207031.) Versata explained that ACM suffered performance problems because
"███████████████████████████████████████████
███████." (*Id.* at VRS152484.) That was a stunning revelation considering those
were the *primary* functions of ACM.

Recognizing these material performance problems, Versata negotiated certain
"███████████" for the ACM software beyond which the software "███████
███████████████████," and beyond which Versata
was "███████████████."



(Ex. 25, Subscription Schedule No. 4, at VRS3746.)



**NON-CONFIDENTIAL**

The problem with the "████████████," however, is that Ford has *many* vehicles which exceed them.  Ford has more than █ vehicles exceeding ████ rules, █ vehicles exceeding ██████ rules, and █ vehicles exceeding ██████ rules – *more than █ times ACM's "█████████."* (Ex. 2, FV128511.)

## C.  Frustration Over ACM and MCA Performance Continued to Grow, And Versata Eventually Declared the Software "Redlining" and "End of Life"

ACM's continued performance problems naturally led to frustration within Ford.  A 2005 account states "no improvements have been made to performance in over a year.  Performance continues to get worse." (*Id*. at FV1158332.)  Another frustrated employee stated "Sometimes I get the response that Trilogy does not know how to fix certain issues or does not want to spend time on them. Not my issue, we are the customer!" (*Id*.)  ACM users also testified at deposition about their experience with ACM performance problems.  Ms. Cabinaw testified that it took "two days" to export certain vehicle files out of ACM. (Ex. 5, Cabinaw Dep. Tr., p. 138.)  Marty Pipoly testified that "It was slow. Everything was slow." (Ex. 6, Pipoly Dep. Tr., p. 42.)

Separate from performance problems, ACM sometimes output inaccurate information.  One account explains that ACM "is not entirely error proof" and that "ACM returns false errors." (Ex. 2 at FV1217285.)  Another account explains "ACM may tell you something is buildable when in reality is not." (*Id*. FV1217283.)



**NON-CONFIDENTIAL**

In February 2011, Versata formally acknowledged the problems with the ACM (and MCA) software, stating that both applications were ███████████ and ████████



(Ex. 42, 2/11/11 ████ Presentation, at VRS6146.)

Versata declared the ACM software "███████████████") effective April 2011.  (*Id.* VRS6147.)  Versata later declared the MCA software "████████████" effective January 2013.  (Ex. 2 at FV111728.)

## D.    Ford Innovates to Build a Better Solution

Facing no practical path forward with ACM and MCA, Ford turned to its Research and Innovation Center for a better solution.  Based on a combination of



**NON-CONFIDENTIAL**

advanced mathematics, input from computer programming pioneer Donald Knuth,[2] and patented Ford innovation, Ford developed its new PDOR1 software to replace ACM/MCA. Ford's PDOR1 software can process in a fraction of a second complex relationships that the ACM/MCA software could never handle. For example, Ford's software can process more than 147,000,000,000,000 buildable vehicle combinations in less than 1/1000th of a second. (Ex. 2 at FV1196273.)

Ford has received four U.S. patents for its innovation: U.S. Patent No. 8,812,375, U.S. Patent No. 9,098,854, U.S. Patent No. 9,836,748, and U.S. Patent No. 9,852,429. (Ex. 7.) In issuing these patents to Ford, the Patent Office reviewed *all* of Versata's patents asserted in this case. (*Id.*, under "References Cited.") The Patent Office issued Ford's patents because they represent innovation over Versata's patents and the ▮▮▮▮ and "▮▮▮▮" approach used in ACM and MCA.

## E.   Instead of Improving ACM/MCA, Versata Significantly Raised Ford's Fees and Then Terminated Ford's License

After recognizing the performance problems and declaring ACM/MCA "▮▮▮▮▮," Versata dramatically *increased* Ford's license and maintenance fees. In 2011, Versata *tripled* Ford's annual maintenance fee from ▮▮▮▮ to ▮▮▮▮, but Versata never improved the software performance. In 2013, Versata *tripled*

---

[2] Knuth, Donald A., *The Art of Computer Programming*, Vol. 4, Fascicle 1, Addison-Wessley, 2010.



**NON-CONFIDENTIAL**

Ford's license fee for the MCA software from ████████ to ████████.  In 2014,

Versata *raised* it again, to ████████ – more than 5 times the original license fee.

In letters dated October 2014 and November 2014, Versata terminated Ford's

license to the ACM/MCA software effective January 15, 2015.  (Ex. 3; Ex. 4.)  Ford

decommissioned the ACM/MCA software in December 2014, and deployed its new

PDOR1 software.

**F.      Ford Employees Were Walled-Off From the ACM/MCA**
**        "Source Code" And No ACM/MCA Code Is Used in PDOR1**

Ford employees involved in the design and development of Ford's innovative

PDOR1 replacement software were walled-off from access to any ACM/MCA

"source code" – the human-readable version of the software.  The ACM/MCA

"source code" was maintained in an off-site escrow account accessible only under

certain circumstances.   (Ex. 15, MSSA §13.18 and Escrow Agmt., VRS4759-71.)

Ford never accessed the ACM/MCA source code.

After having reviewed Ford's PDOR1 replacement software in discovery,

Versata no longer asserts that Ford "copied" any ACM/MCA code into its PDOR1

replacement software.  (Ex. 8, Malek Dep. Tr., pp. 123-124.)



NON-CONFIDENTIAL

## II.    SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing Fed.R.Civ.P. 56(a) (quotations omitted)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 327. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.    ARGUMENT

**A.    *Trade Secrets*:  Versata Cannot Prove It Took Reasonable Measures to Maintain Secrecy When Versata Disclosed ACM/MCA to at Least <u>160</u> Individuals But "Lost" Their Alleged Confidentiality Agreements**

Versata's trade secrets claims fail as a matter of law because Versata cannot prove it took reasonable steps to maintain the secrecy of the ACM/MCA software Versata contends embodies the trade secrets.  To qualify as a "trade secret" under the Michigan Uniform Trade Secrets Act ("MUTSA"), Versata must show that it undertook "efforts that are reasonable under the circumstances to maintain []



NON-CONFIDENTIAL

secrecy." MCL 445.1902 (d)(ii);[3] *Dice Corp. v. Bold Techs.*, 913 F. Supp.2d. 389, 406 (E.D. Mich. 2012) ("To be a trade secret," ... "the information must, of necessity, be a secret: specifically, there must be evidence presented that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality.").

The record in this case proves that Versata did not take reasonable measures to maintain the secrecy of the alleged trade secrets. *First*, Versata cannot produce confidentiality agreements for at least *160* Versata employees and third-party software developers who were given access to the ACM/MCA software and documentation Versata contends embodies the trade secrets. *Second*, Versata cannot produce confidentiality agreements with Toyota and Nissan to whom Versata disclosed the ACM software. *Third*, Ford's confidentiality obligations expired on December 10, 2007 because Versata placed only a *three-year* confidentiality term for all "Confidential Information" that Versata disclosed to Ford between September 30, 1998 and December 10, 2004. All the alleged trade secrets were disclosed within that time period. *Fourth*, Versata has regularly published the ACM software screens and software functions in several patents.

---

[3] Versata also asserts trade secret claims under the federal Defend Trade Secrets Act ("DTSA"). (Dkt. #244, ¶¶160-166.) Similar to the MUTSA, the DTSA requires that the owner of the alleged secret "has taken reasonable measures to keep such information secret." 18 U.S.C. §1839(3)(B).



NON-CONFIDENTIAL

### 1. Versata Cannot Produce Confidentiality Agreements for at Least 160 Employees and Third-Party Developers

Versata and its expert agree that confidentiality agreements are standard in the software industry.   Versata's expert stated in his report that confidentiality agreements are "customary to the software industry to protect the secrecy of [] trade secrets."  (Ex. 11, Malek TS Rept., ¶411.)  He confirmed this at his deposition, testifying that confidentiality agreements are "standard in my opinion in the industry" and that "it's important for employees to sign confidentiality and NDA agreements and many companies do so."  (Ex. 8, Malek Dep. Tr., p. 40, 51.)

Versata's agreements with Ford confirm this industry practice.  In both its 1998 and 2004 license agreements with Ford, Versata expressly required that Ford obtain confidentiality agreements from *everyone* having access to the ACM/MCA software.  (Ex. 13, Section 4; Ex. 15, Section 7.5.)  Against this backdrop, one might expect that Versata practiced the level of confidentiality it demanded from Ford – but it did not.

Versata admits it has "employed at least 100 developers through the development of the software."  (Ex. 16, Versata's 11/21/17 Supp. Answer to Ford Int. No. 28.)  Versata's expert confirmed that "about a hundred developers that over the years have worked on ACM."  (Ex. 8, Malek Dep. Tr. at p. 45.)  Versata has produced approximately a dozen confidentiality agreements in connection with its



NON-CONFIDENTIAL

relevant employees and third-party contractors.  The record in this case, however, demonstrates that there are at least *160* Versata employees and third-party contractors who have had access to the ACM/MCA software and/or related documentation for which Versata has ***not*** produced any confidentiality agreement.  (Ex. 17, Nikkila Decl., ¶¶2-4, attaching F.R.E. 1006 Summary.)

Versata also hired third-party contractors located in foreign countries including Ukraine, United Arab Emirates, and India.  (*Id.*, ¶¶5-8.)  The following graphic shows the geographic location of the relevant "Versata" entities and Versata's third-party software development contractors (*i.e.*, "gDev," "DevFactory," "gTeam," and "SoftServe") to/through whom Versata has outsourced development of the ACM/MCA software at various times over the last 15 years.





NON-CONFIDENTIAL

In discovery, Ford requested that Versata identify all Versata employees and third-party contractors who had access to the ACM/MCA software, and produce each person's confidentiality agreement.   Versata objected, and refused to identify everyone who had access.[4]  (Ex. 18, Versata Ans. to Int. No. 34, pp. 5-6.)

Versata's highly-compensated[5] Rule 30(b)(6) representatives stated that "all" Versata employees and third-party contractors signed confidentiality agreements. But Versata's representatives left Versata years ago and admitted they have neither seen the missing agreements nor interviewed the individuals.  (Ex. 20, Krauss Dep. Tr., pp. 62-63; *see also* Ex. 19, Ratton Dep. Tr., pp. 15-16, 24, 30, 41-42.)  These witnesses cannot know whether the agreements existed, whether they contained confidentiality terms, nor whether they have expired over the last 15 years – something Versata's expert agrees is common.  (Ex. 8, Malek Dep. Tr., pp. 54-55.)

Even if *all* employees signed iron-clad confidentiality agreements with their respective employers as alleged, however, Versata still cannot show that it took

---

[4] Versata directed Ford to its other Interrogatory Responses, identifying only 36 Versata employees.  (*Id.* p. 6.)  As explained above, however, Versata and its expert admitted elsewhere that over 100 Versata developers worked on the ACM/MCA software.

[5] Mr. Ratton, an ex-Versata employee and fact witness, has been compensated ████/month since February 2017 in connection with this case, but has invested only 50 hours of his time; an effective hourly rate of ████/hr. (Ex. 19, Ratton Dep. Tr., p. 10.)  Mr. Krauss is also an ex-Versata employee and fact witness.  He has been compensated over ████ in connection with this case. (Ex. 20, Krauss Dep. Tr., pp. 17-18.)  He is unsure if he was compensated over ████.  *Id.*



NON-CONFIDENTIAL

reasonable steps to maintain secrecy.  ***Versata has not provided, and its corporate representative is unaware of, <u>any</u> confidentiality agreements between Versata and its various third-party contractors who worked on ACM/MCA.***  (Ex. 20, Krauss Dep. Tr., pp. 91.)  Versata has not produced confidentiality agreements with third-parties "gTeam," "DevFactory," "gDev" and "SoftServe" – all of whom have worked on the ACM/MCA over the last 15-years.

On this record, there is no genuine dispute that Versata has ***not*** undertaken "efforts that are reasonable under the circumstances to maintain [] secrecy."  MCL 445.1902; *see Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.*, 93 F.Supp.2d 808, 827 (E.D. Mich. 2000) (Rosen, J.) (granting defendants' motion for summary judgment where purported trade secret was disclosed to 39 entities *allegedly* subject to confidentiality obligations, but where only 6 such agreements were produced); *Rogers v. Desa Internat'l, Inc.*, 183 F.Supp.2d 955, 956-958 (E.D. Mich. 2002) (granting summary judgment where plaintiff allowed some people to access invention without confidentiality agreements, stating plaintiff's information "is not a trade secret because it was not subject to reasonable efforts under the circumstances to maintain its secrecy."); *BDT Prod's, Inc. v. Lexmark Int'l*, 274 F.Supp.2d 880, 895-896 (E.D. Ky. 2003) (granting summary judgment where alleged confidentiality agreement cannot be found and despite deposition testimony alleging its existence); *Novak v. Farneman*, 2010 WL 4643002, *4-5, (S.D. Ohio 2010) (denying motion



14

**NON-CONFIDENTIAL**

for preliminary injunction where alleged secrets were disclosed to third-parties and plaintiff was unable to locate "approximately fifty" non-disclose agreements that were allegedly signed); Milgrim on Trade Secrets, §1.03 Rel. 116-12/2017 ("disclosure of information to third parties without adequate confidentiality arrangements extinguishes the trade secret").

### 2. Versata Cannot Produce Confidentiality Agreements with Ford Competitors to Whom It Disclosed ACM

Versata's trade secrets claims also fail because Versata disclosed the ACM software to automotive OEMs Toyota and Nissan, but has not produced a confidentiality agreement with either company.  In particular, in November 2000, Versata gave Toyota access to the ACM application for a "████████████."  (Ex. 21, VRS960910; Ex. 19, Ratton Dep. Tr., p. 24.)  At that time, the ACM screens at issue lacked a "confidentiality" label.[6]  In January 2002, Versata provided Nissan with a set of PowerPoint slides describing the layout and functionality of the ACM screens in detail.  (Ex. 22, VRS1289693-713.)

---

[6] The ACM screens at issue in this case lacked a confidentiality label until April 2005 when ***Ford*** required a label be added to protect ***Ford*** confidential information.  (Ex. 23, FV1159272, FV1159301-304.)



**NON-CONFIDENTIAL**

### 3. Ford's Confidentiality Obligation on Information Disclosed to Ford Through December 10, 2004 (All of the Alleged Secrets) Expired December 10, 2007

Versata's trade secret claims also fail because Ford's relevant confidentiality obligations have long expired. On September 30, 1998, Versata executed the "Licensed Software Terms and Conditions" (the "1998 Master License Agreement or "MLA"), which set forth the terms on which Versata would license software and disclose "Confidential Information" to Ford. (Ex. 13.) The "CONFIDENTIALITY" section of the 1998 MLA states:



(Ex. 13, Section 4, VRS4795, emphasis added.)

The same day Versata executed the 1998 MLA, Versata executed a "Contract Services Agreement" ("1998 CSA") which set forth the terms on which Versata would provide software development services to Ford as set forth in "Assignment Orders" attached to the CSA. (Ex. 14, ¶ 1.) Similar to the 1998 MLA, the 1998 CSA included a "CONFIDENTIALITY" provision setting a ▇▇▇▇▇▇ confidentiality term following termination of the Agreement. On November 5, 1999, Ford and Versata agreed to Assignment Order No. 15 ("AO15") under the CSA. (Ex. 33.) Pursuant to AO15, Ford agreed to pay Versata ▇▇▇▇▇▇ to develop,



16

among other things, "product definition and configuration" software, *i.e.*, the software at issue in this case.  (*Id.*, VRS3947.)

The 1998 MLA and the 1998 CSA were the operative agreements between Versata and Ford until December 2004.  At that time, the parties renegotiated, resulting in the December 10, 2004 "Master Subscription and Services Agreement" (the "2004 MSSA").  Versata acknowledges that the 2004 MSSA "***specifically supersedes . . . all prior contracts between Ford and Versata***."  (Ex. 24, Versata's Ans. to Rog. No. 13 at p. 18, emphasis added.)

Like the 1998 MLA and the 1998 CSA, the 2004 MSSA included a "CONFIDENTIALITY" provision.  But the MSSA defined "Confidential Information" as "██████████████████████████████

████████████████████████████████████…."
(Ex. 15, ¶7.1.1, emphasis added.)  By its express language, therefore, the 2004 MSSA does *not* cover information Versata disclosed to Ford *before* December 10, 2004.  Those earlier disclosures were subject to the 1998 MLA and the 1998 CSA.

The 1998 MLA and the 1998 CSA thus terminated on December 10, 2004, and pursuant to those Agreements, Ford's confidentiality obligations with respect to



17

any software or information disclosed to Ford *before* December 10, 2004 expired December 10, 2007. [7]

There is no genuine dispute that Versata disclosed the alleged trade secrets to Ford *before* December 10, 2004. Versata's final set of trade secret contentions and Versata's expert confirm that each of the alleged ACM/MCA trade secrets were disclosed to Ford before December 10, 2004.[8] Pursuant to the express language of the 1998 MLA and the 1998 CSA, Ford's confidentiality obligations on that information expired December 10, 2007.

Through the " ███████ " expiration language in the 1998 MLA and the 1998 CSA, Versata relinquished its right to assert – more than 15 years later – that information disclosed to Ford under those agreements is trade secret. *See, ECT Int'l, Inc. v. Zwerlein*, 228 Wis.2d 343, 355-56, 597 N.W.2d 479 (Wisc. Ct. App. 1999) (affirming summary judgment in defendant's favor where relevant agreement included a one-year confidentiality term); *Baystate Techs. Inc. v. Bentley Systems,*

---

[7] Effective January 1, 2005 Versata *re-licensed* the ACM software under the 2004 MSSA. (Ex. 25, Subscription Schedule No. 4.) Versata previously licensed the ACM software under the 1998 MLA. (Ex. 26, Amendment No. 1 to License Schedule No. 2.) This further confirms that the 1998 MLA terminated December 2004.

[8] Ex. 11, Malek TS Rept., ¶¶114, 150, 198, 199, 227, 257, 279, 371, and 392; Ex. 27, Second Supp. TS Contentions dated 6/20/2017 at 4-16. Ford is not aware of an alleged trade secret that was disclosed to Ford for the first time *after* December 10, 2004.



NON-CONFIDENTIAL

*Inc.*, 946 F.Supp. 1079, 1093 (D. Mass. 1996) (finding no trade secret misappropriation in part because confidentiality agreement with a customer included an expiration date after which the alleged secrets would become "readily ascertainable," *i.e.*, not trade secrets under the applicable trade secret statute); *DB Riley, Inc. v. AB Eng'g Corp.*, 977 F.Supp. 84, 91 (D. Mass. 1997) (denying motion for preliminary injunction where relevant confidentiality term carried a 10-year expiration); *see generally* Julianne M. Hartzell, "Time Limits in Confidentiality Agreements," American Bar Association - Intellectual Property Litigation Quarterly, Spring 2009, Volume 20, No. 3. (Ex. 28).

### 4.    Versata Published the ACM Screens and Software Functions in its Patents

Versata's trade secret claims also fail because it published allegedly "secret" aspects of the at-issue software in its various patents.  Subject matter disclosed in a patent is not a trade secret.  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) (granting summary judgment of no misappropriation where patents published purported secrets).  Versata asserts that it patented many features and functions of the ACM/MCA software.   (Ex. 29, Versata's Ans. to Rog No. 3.)  In doing so, however, Versata has disclosed several alleged ACM trade secrets.  For example, Versata disclosed the ACM "grid" in U.S. Patent No. 7,953,779.  The ACM "grid" is Versata's lead "trade secret" because it is the primary user interface for the entire ACM application.  It was the lead trade



NON-CONFIDENTIAL

secret Versata identified early in discovery,[9] it was the primary focus for Versata's motion for preliminary injunction,[10] and it is the primary focus of Versata's expert report.[11]  The "grid" in ACM is where users input vehicle features and, in a row-column format.  The ACM grid alleged to be a trade secret is shown below.



(Ex. 30, VRS132180)

The ACM grid is *not* a trade secret because Versata *published* the ACM grid in 2011 in U.S. Patent No. 7,953,779:

---

[9] Ex. 65, Versata's 12/31/15 Contentions, Ex. I, p. 1.

[10] Dkt. #128, Versata's 7/18/16 Mot. for Prelim. Inj., pp. 7-9; Dkt. #129, 7/18/16 Krauss Decl., ¶¶16-30.

[11] Ex. 11, Malek TS Report, pp. 31-46.



**NON-CONFIDENTIAL**



(Ex. 31, '779 patent, Fig. 8.)

The ACM grid that Versata published has the *exact same* layout, the *exact same* menu selections across the top (User, Vehicle Line, Workspace, etc.), the *exact same* top and middle toolbars and associated icons, the *exact same* "Non-buildables" and "Overlay" menu headings, the *exact same* row/column format for specifying standard "S" and optional "O" between the listed vehicle features, and the *exact same* dialogue boxes on the bottom (Code, Description, Type).[12]

---

[12] The screen shots provide example vehicle feature codes (TRM, WHL, BAA, TRMAC), optionality (S/O) and other codes, but the codes themselves are not part of the ACM software or the alleged trade secret.



21

**NON-CONFIDENTIAL**

***Voluntarily publishing*** ACM user screens verbatim in the '779 patent is the ***opposite*** of taking reasonable measures to maintain the secrecy of the ACM user screens as the law requires for "trade secret" status.  And, Versata did more than simply disclose the ACM *screens* in its patents.  Versata also described alleged trade secrets relating to how ACM *operates*.  For example, Versata alleges that "█████ ██████████████████████" is a trade secret.  (Ex. 65, Versata's 12/31/15 Contentions, Ex. I, p. 2.)  Yet, Versata's expert admits that, at column 8 lines 40-48, Versata's '779 patent discloses rule splaying to avoid overlap.  (Ex. 8, Malek Dep. Tr., pp. 194-196.)  While Versata's expert alleges that the '779 patent "doesn't disclose the entirety of this aspect of the grid trade secret," he acknowledged that patent provides an "example" of the alleged trade secret.  *Id.*

In another example, Versata alleges that "████████" ████████████ ████████████ are a trade secret.  (Ex. 65, Versata's 12/31/15 Contentions, Ex. I, p. 3.)  Yet, Versata's expert admitted that "the basic concept of ████████ is disclosed" in the '779 patent.  (Ex. 8, Malek Dep. Tr., p. 245.)  Versata's expert asserts that there are other aspects to the trade secret, but once again, Versata published the "basic concept" of the alleged secret in its patents.

In another example, Versata alleges that ████████████████████ ████████████████████████████████████ ████████████████████ are trade secrets. (Ex. 65, Versata's 12/31/15



**NON-CONFIDENTIAL**

Contentions, Ex. I, p. 1.)  Yet, Versata expressly disclosed this technique in the '779 patent.  Figure 8 below (left) shows an *expanded* grid showing all rules (yellow) associated with the BAAAA feature (green).  Figure 6 (right), in contrast, shows each of the rules corresponding to the BAAAA vehicle feature "rolled up" into a single cell (blue) under the heading "ALL."

     

(Ex. 31, '779 patent, Fig. 8.)                    (Ex. 31, '779 patent, Fig. 6.)

The '779 patent explains that Figure 8 displays a "full grid" showing "all combinations" whereas compressed cell 608 in Figure 6 "displays the equivalent information." (Ex. 31, '779 patent, col. 9, lines 4-8.)  Thus, the '779 patent discloses ██████████████████████████████████████ that Versata contends are trade secrets. (Ex. 65, Versata's 12/31/15 Contentions, Ex. I, p. 1.)

Finally, Versata alleges that its use of a ███████████████████████ ██████████████████████████████████████████████████ ███████████.  (Ex. 11, Malek TS Report, pp. 93-96.)  Yet, Versata published the use of a TRIE data structure to determine buildable vehicle configurations in U.S.



Patent No. 8,370,408.  Inventor Shawn Smith testified that the '408 patent "████████

████████████████████████████████████████████████████████

██████████████████████████████████.″  (Ex. 32. Smith Dep. Tr., p. 30 noting "██████████

██████″)    Versata also published using the TRIE data structure and "TRIE

minimization" in the '779 patent mentioned above.  Specifically, Figure 11 of the

'779 patent "depicts a TRIE data structure in binary form," Figure 14 "depicts a

TRIE data structure in its minimized form with associated binary values," and Figure

15 "depicts a TRIE data structure minimization process.  (Ex. 31, '779 patent, col.

3, lines 52-57.)  The written description corresponding to Figures 11, 14 and 15

describes these figures in detail.  (*Id.*, col. 10, line 50 through col. 12, line 28.)

Collectively, these examples demonstrate that Versata routinely *published*

screens and technical details of the ACM software in its patents – the opposite of

taking reasonable steps under the circumstances to maintain secrecy.  *Ultimax*, 587

F.3d at 1355; *Rainbow Nails Enterprises*, 93 F.Supp.2d at 827 n.26 ("By claiming

that he had secured patents, Jacob effectively undermined his stated intention that

others should carefully safeguard the confidentiality of the information he was

disclosing.")



**B.** *Trade Secrets:* **Ford Paid For, and Owns, the Alleged Trade Secrets Developed Between 1999 and 2001**

Separate from Versata's inability to show that it took reasonable steps under the circumstances to maintain confidentiality, Versata cannot show that it owns alleged trade secrets developed between 1999 and 2001 because **Ford** owns them.

Under Michigan law, trade secret misappropriation requires "acquisition of a trade secret *of another*." Mich. Comp. Laws § 445.1902(b) (emphasis added). Similarly, the DTSA provides, "***An owner*** of a trade secret . . . may bring a civil action under this subsection." 18 U.S.C. § 1836 (b)(1) (emphasis added).

As explained above, the 1998 CSA provided the global terms under which Versata would provide software development services to Ford up until December 10, 2004 when the 2004 MSSA "superseded" the 1998 CSA. The CSA provided Ford broad rights to "████████████████████████████ ████████" developed under an Assignment Order. (Ex. 14, ¶6a.) If no special "████████████████████" was made in an Assignment Order, **Ford** owns the resulting software design, coding, user interfaces and data models. *Id.*

Pursuant to Assignment Order 15 ("AO15") under the CSA, Ford agreed to pay Versata ████████████ to commence a *two-year* project to develop "████████ ████████" including, among other things, "████████████████████████████" software. (Ex. 33, VRS3947.) By operation of CSA Paragraph 6, Ford owned all



25

**NON-CONFIDENTIAL**

"████████████████████████████████████████████" developed

under AO15.  (*Id*.; Ex. 14, ¶6a.)

According to a January 2000 "██████" project plan, ████████████

████████████████████████████████████████████████████

██████████████. (Ex. 34, VRS1313409.)  Technical specification documents

from March 2000 describe in detail the "████████████████████████

████████████████" (Ex. 35, VRS73855.)  In April 2000, Ford officially

renamed the ██████ project to ██████ ("████████████████"). (Ex. 36,

VRS1313544.)  Versata's corporate representative Kenny Ratton confirmed this

name change.  (Ex. 19, Ratton Dep. Tr., p. 144.)  In a June 2001 communication,

Versata admitted that the PROOF specifications were the "████████████

████████." (Ex. 37, VRS73851; Ex. 38, VRS97814.)

"ACM" eventually became Versata's marketing name for the ████████

software Ford paid Versata to develop.  Versata concedes that "████████████

████████████████████████████████████." (Ex. 39, Ans. to

Rog. No. 5, emphasis added.)[13]  As explained above, all of the alleged ACM trade

secrets were developed before the 2004 MSSA, *i.e.*, under the 1998 CSA.  Versata's

---

[13] Versata also states in its interrogatory answer that ACM may contain some
elements of Versata's legacy "SC Config" software and publicly-available "open
source" software.  Versata does not allege that its SC Config software practiced any
of the alleged trade secrets at issue.



**NON-CONFIDENTIAL**

expert confirmed that " ███████████████████████████

████████████████████████████████████████████ " and

" ████████████████████████████████████████████

████ ." (Ex. 40, Elson Report, p.6 n. 25.) These dates are consistent with the January

2000 ████████ project plan addressed above showing ████████████████████

████████ . (Ex. 34.) Throughout its work at Ford, Versata has equated the

ACM/MCA software with the " ████████████████ project at Ford. (Ex. 42,

VRS6146; Ex. 59, VRS145020.)

This record demonstrates that Ford paid Versata over ████████████ in

November 1999 to develop product definition software for Ford over the course of

a " ████████ " project. Versata's final set of trade secret contentions, and Versata's

expert, confirm that many of the alleged trade secrets were set forth in technical

documentation and disclosed to Ford during this period. (Ex. 11, Malek TS Report,

¶¶114, 150, 227, 257, and 371; Ex. 27, Second Supp. TS Contentions dated

6/20/2017 at 4-6, 9, and 13-14.) Numerous production documents further

demonstrate the scope and content of the software developed over the course of the

AO 15 project. (Ex. 17, Nikkila Decl., ¶9, attaching F.R.E. 1006 Summary.) The

1998 CSA, under which this development work was done, provides Ford unfettered

rights to all ████████████████████████████████████████████ "



NON-CONFIDENTIAL

developed under AO 15. As a matter of law, Versata cannot assert that this subject matter constitutes Versata "trade secrets" that Ford misappropriated.[14]

## C. *Copyrights:* Defendants Do Not Own the Asserted Copyrights

Versata's copyright claim fails at the threshold because it does not own the asserted copyrights. To establish a claim for copyright infringement, Versata must establish that it owns the copyrighted work. *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). Versata's counterclaim identifies five copyright registrations at issue in this case: (1) ACM Version 4.24.13.00 registered under TXu 1-937-188, (2) ACM version 02.02.16 registered under TXu 1-937-354, (3) ACM Version 1.0 registered under TXu 2-017-880, (4) ACS, version 02.02.16 registered under TXu 1-937-354, and (5) MCA version 02.02.14.01 registered under TXu 1-937-185 (collectively the "Copyright Registrations"). (Dkt. #244, Counterclaim ¶¶83-85.)

Versata Development Group, Inc. ("VDG") is the identified claimant for each of the Copyright Registrations attached to Versata's counterclaim, but VDG is not a party to this case. Versata contends in its recent "Motion to Modify Caption" that "[t]he corporation formerly known as Trilogy Development Group, Inc. is now known as Versata Development Group, Inc." (Dkt. #338, p. 1.) A close review of

---

[14] To the extent Versata asserts "ownership" of any physical software licensed to Ford pursuant to the 1998 MLA or the 2004 MSSA, it is undisputed that PDOR1 contains no software licensed from Versata. (Ex. 8, Malek Dep. Tr., pp. 123-24.)



NON-CONFIDENTIAL

the relevant corporate records reveals, however, that the "Trilogy Development Group, Inc." Versata identifies in its Motion is ***not*** the "Trilogy Development Group, Inc." named as a party in this case.[15]

Because Versata does not own the Copyright Registrations asserted in this case, it cannot enforce them against Ford.  *Kohus*, 328 F.3d at 853.

## D.   *Copyrights:*  Ford Used the ACM/MCA/ACS Software Only When it Was Licensed to Do So

Versata's copyright claim also fails because Versata has no evidence Ford used any ACM/MCA/ACS software after January 15, 2015 when Versata terminated Ford's license to use the software.  Versata contends Ford improperly used the software files (called "Jar" files)[16] in March 2012.  (Ex. 11, Malek TS Report, ¶428.) The Ford witness who used the files, Ganesh Alla, explained that he did so as part of "comparative testing" between Ford's old "FQV" software (which required the

---

[15] Ford sued "Trilogy Development Group, Inc.," a ***California*** corporation having file number C1509186 ("***TDG I***") (*Compare* Dkt. # 6 ¶3 *with* Ex. 60.)  ***TDG I*** merged into a Delaware corporation also named Trilogy Development Group, Inc. ("***TDG II***") having a file number 2291421.  (Ex. 61.)  Similarly-named Trilogy Development Group, Inc. ("***TDG III***") is a different Delaware corporation, however, having file number 2910800.  (Ex. 62.)  Neither ***TDG I*** (named party) nor ***TDG II*** into which it merged, was renamed "Versata Development Group, Inc." ("***VDG***") as Versata's Motion implies.  (*Compare* Ex. 63 *with* Ex. 64.)  Non-party ***TDG III*** was the entity renamed to non-party ***VDG***.  (Ex. 64.)

[16] A "Jar" file is a computer file (called an "executable" file or an "object code" file) comprised of 1s and 0s.  A Jar file does not contain human-readable "source code."  (Ex. 11, Malek TS Report, ¶427.)



NON-CONFIDENTIAL

ACM/MCA/ACS Jar files) and Ford's new "super configuration generator" used in Ford's PDOR1 replacement software. (Ex. 43, Alla Dep. Tr., p. 13.) Mr. Alla explained that FQV (using the Versata software) generated *incorrect* results, and that Ford's "super configuration generator" in its replacement PDOR1 software produced *correct* results. (*Id.* at 43-44.)[17]

Because Ford was licensed to use the ACM/MCA/ACS software at the time it was used, there can be no copyright infringement. *Best Hand Entm't LLC v. Wideawake-Deathrow Entm't, LLC*, 2014 WL 1304623, at *6 (E.D. Mich. Mar. 31, 2014) ("The existence of a license creates an affirmative defense to a claim of copyright infringement."), quoting *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).

Versata contends Ford breached Section 1.7 of the 2004 MSSA when it used the "Jar" files in 2012. But Section 1.7 prohibits "disassembly," "reverse engineering" and "decompiling" licensed software – something Ford never did (and had no interest doing). By simply comparing *Ford data* output from ACM/MCA to *Ford data* output from PDOR1, Ford has not performed any of the activities prohibited under MSSA Section 1.7.

---

[17] The "results" output by the ACM/MCA and PDOR1 software are Ford data. The 2004 Master License Agreement in place at the time of the comparisons states that Ford owns the "Ford data that may be used in the Software." (Ex. 15, MSSA ¶7.6.)



**NON-CONFIDENTIAL**

Versata's expert asserts that, with access to the "Jar" files, a Ford developer "*could* reverse engineer" the files. (Ex. 11, Malek TS Report, ¶436.) Versata's expert also asserts that having access to a *human-readable* version[18] of the "Jar" files might "*enable* Ford PDO developers to examine the logic behind the ACM code." (*Id.* at 437, emphasis added.) Despite these insinuations, there is no *evidence* that the Jar files at issue were ever "reverse engineered" or "decompiled" into a human-readable format, or used for any purpose other than the comparison testing.

In the end, Ford used the "Jar" files only to perform comparisons between *Ford data* while Ford was *licensed* to use the software. Ford did not perform any of the activities prohibited under Master Agreement Section 1.7. Ford is thus entitled to summary judgment on Versata's copyright claim.

---

[18] Versata's expert admits that "In their ordinary environment, these [JAR] files do ***not*** provide any human-readable information." (Ex. 11, Malek TS Report, ¶427, emphasis added.)



**NON-CONFIDENTIAL**

**E.   *Patents*:  Ford Does Not Infringe Versata's Patent Claims, and Some of the Claims Are Invalid**

   **1.   U.S. Patent Nos. 7,200,582 and 7,464,064 Are Invalid and Not Infringed**

   **a.   Versata Violated the "On Sale Bar" Rendering the '582 and '064 Patents Invalid**

The asserted claims[19] of U.S. Patent No. 7,200,582 (the "'582 patent") and U.S. Patent No. 7,464,064 (the "'064 patent) are invalid because Versata placed the claimed subject matter "on-sale" more than one year before the earliest effective filing date of the patents (called the "critical date").  35 U.S.C. §102(b).  The "on-sale bar" invalidates a patent claim if, before the critical date: (1) a product embodying the claimed invention was the subject of a commercial offer for sale, and (2) the invention was ready for patenting.  *Pfaff v. Wells Electronics*, 525 U.S. 55, 67 (1998).  "Ready for patenting" means (1) the invention was reduced to practice before the critical date, or (2) the inventor had prepared drawings or other descriptions sufficiently specific to enable a person skilled in the art to practice the invention.  *Id.* at 67-68.

Because March 31, 2003 is the earliest effective filing date of the '582 and '064 patents, the "critical date" is March 31, 2002.  There is no genuine dispute that,

---

[19] Versata asserts claims 1-3 of the '582 patent (Ex. 44), and claims 1, 2, 3, 9, 11, 12, 14, and 15 of the '064 patent (Ex. 45).  The '064 patent is a "continuation" of the '582 patent.  The two patents have the same written description, and very similar claims.



NON-CONFIDENTIAL

before the critical date, Versata (1) reduced to practice software embodying the '582 and '064 patent claims, and (2) commercially licensed that software to Ford rendering it "ready for patenting" under *Pfaff*.

Versata's expert concedes that on March 29, 2002 Versata released to Ford ACM Version 3.2 which practices all claims of the '582 and '064 patents:

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

████████

(Ex. 46, Shamos Dep. Tr., p. 144.)

Versata's expert also admits that the claims of the '582 and '064 patents were "reduced to practice" prior to the critical date:

██   ██████████████████████████████████████

████████████████████████████████████

██   ████████████████████████

(Ex. 46, Shamos Dep. Tr., p. 160.)

Against this record, there is no genuine dispute that the claimed subject matter of the '582 and '064 patents was "reduced to practice" and thus "ready for patenting" under *Pfaff* before the March 31, 2002 critical date.

There is also no genuine dispute that ACM Version 3.2 delivered to Ford and "████████████████" on March 29, 2002 was the subject of a "commercial offer for sale" before the critical date.  (Ex. 47.)  Versata's expert admits that ACM Version



NON-CONFIDENTIAL

3.2 was "████████████" released to Ford pursuant to the parties' software license agreement.  (Ex. 46, Shamos Dep. Tr., p. 157.)  Versata's expert acknowledged that "██████████████████████████" and that Versata was "██████████ ████████████████."  (*Id.* at 157-58.)  Pursuant to License Schedule No. 2 to the 1998 MLA, Versata agreed to license the ACM software to Ford in exchange for substantial annual license fees.  (Ex. 26, Amendment No. 1 to License Schedule No. 2, VRS4948.)  Thus, consistent with Versata's expert's admission, the ACM software delivered to Ford on March 29, 2002 was "████████████."

The parties' software license agreements are consistent with internal documents Versata created confirming that the March 29, 2002 release of ACM 3.2 to Ford was a commercial software release.  Multiple Versata documents confirm that Versata's March 29, 2002 release to Ford of ACM 3.2 was a "██████ ████████████ commercial software release.  (Ex. 48, VRS147273; Ex. 49, VRS198803 including Excel attachment.)  The terms "Generally Available" and "GA" are terms of art in the software industry.  Versata documents describe a ████ software release as follows:

████████████████████████████████
████████████████████████████████
██████████████████████

(Ex. 50, VRS855329.)  The parties' respective experts describe the term "██████ ████████" in a similar manner.  (Ex. 46, Shamos Dep. Tr., p. 156; Ex. 66, Myer's



**NON-CONFIDENTIAL**

102(b) Reply Expert Report, ¶¶14-15.)  Versata communications confirmed that once "█████████" is delivered to Ford, "██████████████████ ██████" (Ex. 51, VRS1243922-25.)

This record firmly supports Versata's expert's admission that the subject matter of the asserted claims was "reduced to practice" and delivered as "licensed" software to Ford more than one year before the filing date of the '582 and '064 patents.

Software that is the subject of a commercial software license is "on-sale" for purposes of 35 U.S.C. §102(b):

> a commercial transaction arranged as a license or a lease of a product or a device ... may be tantamount to a sale (e.g., a standard computer software license), whereupon the bar of § 102(b) would be triggered because "the product is ... just as immediately transferred to the 'buyer' as if it were sold"

*In re Kollar*, 286 F.3d 1326, n.3 (Fed.Cir. 2002) *quoting Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1053 (Fed.Cir. 2001); *Minton v. National Ass'n. of Securities Dealers*, 336 F. 3d 1373, 1378 (Fed.Cir. 2003).

In *Minton*, Minton conveyed "a fully operational computer program implementing and thus embodying the claimed method." *Id.*  The Federal Circuit held that "Minton's lease of TEXCEN, thereby enabling Starks to practice the invention, was an offer for sale within the meaning of the on-sale bar." *Id.*  Versata, like Minton, conveyed to Ford "a fully operational computer program implementing



NON-CONFIDENTIAL

and thus embodying the claimed method," on March 29, 2002, more than one year before Versata filed its application for the '582/'064 patents.  Those patents are therefore invalid under the on-sale bar.

Versata contends that its March 29, 2002 delivery of ACM 3.2 to Ford was not a commercial offer for sale because the software was released to Ford for "Integration and Test" (at Ford).  But **Ford's** "Integration and Test" procedure of ACM 3.2 is irrelevant to whether **Versata** placed ACM 3.2 "on-sale" under §102(b) and *Pfaff*.  Versata's "Integration and Test" argument is irrelevant for two different reasons.  **First**, Versata's expert admits that Versata/Smith had already reduced the claimed aspects of the software to practice on March 29, 2002.  As a matter of law, testing (by anyone for any purpose) following reduction to practice of the claimed subject matter is irrelevant.  *Zacharin v. U.S.*, 213 F.3d 1366, 1369 (Fed.Cir. 2000) ("[O]nce … [the] invention is reduced to practice, there can be no experimental use."); *Allen Engineering Corp. v. Bartell Industries*, 299 F.3d 1336, 1354 (Fed. Cir. 2002).

**Second**, Versata presents no evidence that Versata or Ford tested the subject matter of the '582/'064 patent claims after Versata's March 29, 2002 release to Ford – the only relevant subject matter in a 102(b) analysis.[20]   Versata contends that Ford

---

[20] To the extent Versata is asserting the "experimental use" exception to the on-sale bar, the Federal Circuit has held that "experimental use cannot occur after a reduction to practice."  *In re Cygnus Telecomm. Tech., LLC Patent Litig.*, 536 F.3d



NON-CONFIDENTIAL

was not even aware that ACM 3.2 released March 29, 2002 practiced the subject matter of the '582/'064 patents.  (Ex. 67, Shamos Rebuttal Rept., ¶294.)  The Federal Circuit "has effectively made [inventor] control and customer awareness dispositive" in experimental use cases.  *Electromotive Div. of General Motors Corp v. Transportation Systems Division of General Electric Co.*, 417 F.3d 1203, 1214-15 (Fed.Cir. 2005) (affirming E.D. Mich. grant of summary judgment of invalidity for on sale bar).  Here, Versata can show neither inventor control over, nor customer awareness of, any alleged testing of the claimed subject matter – there was none after the ACM software was "███" and released to Ford on March 29, 2002.

On this record, there is no genuine dispute that before the critical date, Versata sold (licensed) to Ford software embodying the '582 and '064 patent claims and that the software was ready for patenting.  The '582 and '064 patent claims are therefore invalid under the "on sale" bar.  35 U.S.C. §102(b); *Pfaff*, 525 U.S. 55, 67 (1998).

---

1343, 1356 (Fed.Cir. 2008); *New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297-98 (Fed.Cir. 2002).  ("Once an inventor realizes that the invention as later claimed indeed works for its intended purpose, further 'experimentation' may constitute a barring public use.")



NON-CONFIDENTIAL

### b. PDOR1 Does Not Infringe the '582 and '064 Patents Because PDOR1 Does Not Use "set equations" to Represent "consistency error types" as Claimed in Those Patents.

Ford does not infringe the asserted independent claims of the '582 and '064 patents because the accused PDOR1 software does not practice the "set equation" limitation recited in those claims. *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) ("If even one limitation is missing or not met as claimed, there is no literal infringement."). Because PDO does not infringe the asserted independent claims, it cannot infringe the asserted dependent claims as a matter of law. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).[21]

The '582 and '064 patents relate to "consistency checking" – a process for making sure relationships between vehicle features are consistent with one-another according to pre-defined error types. In a simple example, each vehicle requires one and only one steering wheel. Thus, user input defining two steering wheels for a single vehicle, or no steering wheel at all, would be a consistency error.

Versata's '582 and '064 patents acknowledge that Versata did not invent consistency checking. (Ex. 44, '582 patent, col. 2, line 58-col. 3, line 11, Figs. 1, 2a and 2b.) Instead, the patents claim a specific approach to consistency checking –

---

[21] Ford does not repeat this authority for its other non-infringement assertions in this Brief, but the law applies equally to all non-infringement arguments.



NON-CONFIDENTIAL

one that uses "set equations" to define the various types of consistency errors.  The

'582 and '064 patents provide examples of "set equations":

- [F1] = -[SOML-R]

- [F2a] = ([SML-R])

- [F2c] = ([ML-R]^[O-R])

(Ex. 44, '582 patent, col. 7, line 56 through col. 8, line 31.)

The asserted claims each require a "set equation."  The agreed construction of

the term "'set equation" is "one or more equations that operate on sets." (Dkt. #181,

at 48-49 emphasis added.)   Thus, to prove infringement, Versata must demonstrate

that Ford's PDOR1 software includes "one or more equations that operate on sets."

Versata cannot establish infringement because PDOR1 does not use

"equations that operate on sets."  While Versata asserts "literal" infringement of this

claim limitation,[22]   Versata's expert does not show a literal "set equation" in the

PDOR1 software.  Instead, he makes the generalized conclusion that "java methods"

in PDOR1 "*correspond to* equations." (Ex. 12, Malek Patent Report, ¶¶294, 301,

354, emphasis added.)  He reaches this unfounded conclusion without *any* support,

and the '582/'064 patents do not mention "java methods," let alone equate such

---

[22]  Ex. 12, Malek Patent Report at ¶¶7-8; Ex. 9, Malek Dep. Tr., 372:17-21.
Versata has not asserted infringement of the "set equation" limitation under the
Doctrine of Equivalents (a very different legal analysis), and the deadline for doing
so was December 30, 2015.  (Dkt. #71, p. 2-3.)



NON-CONFIDENTIAL

methods with the claimed "set equation." As a matter of plain English, a "method" is not an "equation." Versata's reliance on the vague "correspond to" language tacitly admits that Ford's PDOR1 software does not literally include a "set equation."

During his deposition, Versata's expert asserted that the claimed "set equation" was located within two pages of the PDOR1 "source code." (Ex. 10, lines 50-156; Malek Dep. Tr., 335:17-336:16, 505:21-506:2.) A simple review of the source code he identified confirms that there is no "equation" (let alone the claimed "set equation") in the PDOR1 software. (*Id.*, *see also* Ex. 52, Myers Report, ¶¶194, 217.)

Because PDOR1 does not practice the "set equation" limitation of the asserted independent claims of the '582 and '064 patents, Ford does not infringe those claims.

## 2. Ford Does Not Infringe U.S. Patent No. 7,739,080 Because Ford Does Not "extend" or "remove" Configuration Model Family Space

Ford does not infringe the asserted claims[23] of U.S. Patent No. 7,739,080 (the "'080 patent") because the accused PDOR1 software does not perform the "extending" and "removing" limitations of each asserted independent claim. As explained in the Background, *supra*, the software at issue relates to modelling relationships between vehicle components and features, referred to as "product

---

[23] Versata asserts claims 1, 3, 11-13, and 18 of the '080 patent.



NON-CONFIDENTIAL

definition." The '080 patent relates to *combining* different product definition models together, which can sometimes create conflicts between the underlying relationships. The '080 patent acknowledges that Versata was not the first to combine product definition models. (Ex. 53, '080 patent, col. 3, line 51 through col. 7, line 2, Figs. 5 and 6.) Instead, the '080 patent describes and claims a specific approach for doing so, which includes identifying "conflicts" between the models and then resolving them in a very specific way:

> (1) **extending at least one of the ancestor configuration model family spaces** of the conflicting configuration models so that the ancestor configuration model family spaces of the first and second conflicting configuration models represent the same ancestor configuration model family space.

> (2) **removing from the child configuration model family space any configuration space extended in the ancestor** of the child configuration family space.

(*Id.*, '080 patent at claims 1, 3, 4, 11-13 (through claim 3), 18 (through claim 4), emphasis added.)

As claimed, the "extending" step requires *adding* "spaces" to the "model family," and the "removing" step requires *removing* "space" from the "model family." As shown in Figure 8 of the '080 patent below (color annotations added), the patent discloses an example of combining configuration model families, which *adds* configuration space (*i.e.*, extends) to one family (the ancestor configuration model family space), and then *removes* the added space from a different family (the



41

NON-CONFIDENTIAL

child configuration model family space). (*Id.*, '080 patent at 9:4-24, Fig. 8, claims 1, 3 and 4 (18).)



Versata asserts that Ford's PDOR1 software meets the claimed "extending" and "removing" limitations simply by *re-ordering* information within Ford's data model, called an "MDD." (Ex. 12, Malek Report, ¶¶450-453; Ex. 9, Malek Dep. Tr., 272:22-273:3.)  Again, Versata's expert uses wiggle words to show "literal" infringement where none exists.  He asserts that the "move" functions used to *re-order* information Ford's MDDs "**has the effect**" of extending.  (Ex. 12, Malek Report at ¶449, emphasis added.)  When moving family levels in Ford's software,



42

NON-CONFIDENTIAL

however, the configuration spaces within the MDD and the family levels remain the same. ***Versata's expert admitted that the information and values in Ford's MDDs do not change simply by moving the family levels.*** (Ex. 9, Malek Dep. Tr., 297:5-298:4.) This admission confirms that Ford's PDOR1 software does not literally infringe the asserted claims of the '080 Patent because "space" is never *added* to Ford's MDD (the "extending" step) or *removed* from Ford's MDD (the "removing" step) as recited in each asserted claim.

### 3. Ford Does Not Infringe U.S. Patent Nos. 6,405,308 and 6,675,294

Ford does not infringe the asserted claims[24] of U.S. Patent No. 6,405,308 (the "'308 patent") and U.S. Patent No. 6,675,294 (the "'294 patent) because the accused PDOR1 software does not perform the claim limitations pertaining to product "configuration." The '308 and '294 patents relate to a method for "defining" relationships between features of a product (sometimes referred to as "product definition" or "maintenance"), and a method for "configuring" a particular product based on the product definition. As illustrated below in Figure 2 of the '308/'294 patents, the "Maintenance" function is distinct from, and generally precedes, the

---

[24] Versata asserts claims 1, 2, 7, 8, 18, 22, 23, 24, and 28 of the '308 patent, and claims 1, 2, 7, 8, 9, 21, 22, 23, 24, 25, 26, and 31 of the '294 patent. The '294 patent is a "continuation" of the '308 patent. The two patents have the same written description. (Ex. 54.)



NON-CONFIDENTIAL

"Configuration."   The Configuration is based on the "Part Relationships" and "Product Definition" generated in the Maintenance function.



The patents detail the distinction between the "Maintenance" and "Configuration" functions.[25]  The distinction between Maintenance and Configuration was also the focus of two separate claim construction orders.  (Dkt. #181, at 9-10; *Trilogy Software Inc. v. Selectica, Inc.*, 405 F.Supp.2d 731, 736-737 (E.D. Tex. 2005).

While the asserted claims use somewhat differing terminology addressed below, Ford's non-infringement positions arise from the settled *distinction* between the Maintenance-related steps and the Configuration-related steps recited in the asserted claims.   As explained below, Ford's PDOR1 software performs only "Maintenance" functions (creating the product definition through feature relationships), ***not*** the subsequent product "configuration" functions.

Each asserted independent claim of the '294 and '308 patents requires at least one of the following limitations or steps associated with product "Configuration" (as

---

[25] Ex. 54, '308 patent, col. 2, line 40 through col. 3 line 2.)



NON-CONFIDENTIAL

distinct from "Maintenance"): (1) obtaining/sending "user input," and (2) "system"/"product." The table below identifies which asserted independent claims include which limitations.

| Patent/Claims | "obtaining user input" "sending user input" | "system"/"product" |
|---|---|---|
| '294 Claims | 1, 21 | 1, 21, 26 |
| '308 Claims | 1 | 1, 18, 28 |

### a.    "obtaining user input"/"sending user input"

Ford does not perform the "obtaining user input" and "sending user input" claim limitations as the Court has construed them.  In the claim construction Order, the Court *distinguished* these limitations from the "Maintenance" function during which the product definition is created.  More specifically, the Court construed these terms to require that "the ***definition*** of a 'system' or the ***definition*** of a 'product' must exist ***prior to*** the step of 'obtaining' or 'sending' the user input (although the definition may be modified thereafter)." (Dkt. #181, at 28, emphasis added.)  In other words, the claimed "user input" is not part of the product definition process.

Versata contends that a user's interactions with the "Rule Authoring Table" in Ford's PDOR1 software satisfy these limitations. (Ex. 12, Malek Report at ¶¶111-112, 149-152, 214-216.)  But users interact with Ford's Rule Authoring Table only to define relationships between vehicle features, *i.e.*, the "Maintenance" a/k/a "product definition" function described in the patents.   Versata's expert



NON-CONFIDENTIAL

acknowledges that the PDOR1 Rule Authoring Table exists to create rules for product definition:

- "A Rule Authoring Table is used to create and edit rules." (Ex. 12, Malek Report, ¶205.)

- "the PDO user creates and edit rules using the rule authoring table." (*Id.* at ¶211.)

- "The definition is then rendered in the rule authoring table by PDO." (*Id.* at ¶242.)

Thus, Ford's Rule Authoring Table does not receive "user input" ***after*** creation of the definition as the Court's construction expressly requires.  This sequence, and the distinction between the Maintenance and Configuration, was the whole focus of the claim construction dispute that this Court resolved.  (Dkt. #181, at 22-28.)

Versata also contends that the "mouse clicks within the Rule Authoring Table Setup. . .tab" constitute the claimed "user input." (Ex. 12, Malek Report, ¶¶112, 215.)  But those mouse clicks create and edit product definitions – the definitions do not exist ***prior to*** the mouse clicks as the Court's claim construction requires.  This is true even if information is input into the Rule Authoring Table to edit a pre-existing definition.  That input remains part of the definition, albeit a new part – it is not the *claimed* user input that must *follow* the definition.



**NON-CONFIDENTIAL**

For these reasons, PDOR1 does not practice the "obtaining user input"/"sending user input" limitations of the asserted claims of the '294 and '308 Patents.

### b. "system" / "product"

Ford does not perform the "system" and "product" claim limitations as the Court has construed them.  Like the previous limitations, these limitations are distinguished from the "Maintenance" function during which the product definition is created.  The Court construed the term "system" as "a collection of components, combined to form a ***particular*** product or service." (Dkt. #181, at 36, emphasis added.) The Court emphasized that the claimed "system" is something specific, "which results from a ***configuration process*** for that specific thing." (Dkt. #181 at 36, emphasis added.)

The Court also concluded that the claim terms "system" and "product" are interchangeable and are synonymous with one another. (Dkt. #181 at 2, 8, 11-12 and 34-35.) The Court equated "system" and "product" in several instances:

- "As with 'configuration user,' however, . . . the definition of a '***system***' or definition of a '***product***'. . ." (Dkt. #181 at 28, emphasis added.)

- "The term '***system***' means 'a collection of components combined to form a particular ***product*** or service." (*Id.* at 36, emphasis added.)



NON-CONFIDENTIAL

Thus, to establish that PDOR1 meets the "system" and "product" limitations of the asserted claims, Versata must prove that PDOR1 configures a ***particular product or service*** – something that "results from a ***configuration process*** for that specific thing." (Dkt. #181 at 36, emphasis added.)

Like the previous claim limitations, Versata contends that the PDOR1 "Rule Authoring Table" satisfies the "system" and "product" limitations.  (Ex. 12, Malek Report, ¶¶173, 188-189, 242-246.)  But the Rule Authoring Table in PDOR1 is never used to configure a "***particular*** product or service" as construed or as part of a ***configuration*** process."  Versata's expert admits that the PDOR1 Rule Authoring Table is used, as its name implies, to input *relationships* between vehicle *features* (product definition), not to determine a particular configuration for any "particular" product or service based on that product definition as construed.  (Ex. 12, Malek Report, ¶¶205, 211; *see also* Ex. 52, Myers Report, ¶¶82-83, 97-98, 113, 129-150.)  As explained above, this is the fundamental *distinction* between the Maintenance and Configuration aspects of the '308/'294 patents.

For these reasons, PDOR1 does not infringe the asserted claims of the '308 and '294 patents.



48

NON-CONFIDENTIAL

### 4. The Asserted Claims of U.S. Patent No. 7,882,057 are Unpatentable Because They Are Directed to an Abstract Idea

The asserted claims[26] of U.S. Patent No. 7,882,057 (the "'057 patent") are invalid because they recite unpatentable subject matter. The Supreme Court defines three subject matter categories that are *not* patentable: laws of nature, physical phenomena, and abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). "The 'abstract ideas' category embodies the longstanding rule that '[a]n idea of itself is not patentable.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). In *Alice*, the Court described a two-step framework "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S.Ct. at 2355.

In the ***first step***, "we determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* "If so, we then ask, '[w]hat else is there in the claims before us?'" *Id.* In the ***second step***, "we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* This second step of the analysis is "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure

---

[26] Versata asserts claims 1, 18, 19, 21, 22, 23, 25, and 27 of the '057 patent. (Ex. 57.)



NON-CONFIDENTIAL

that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*.

For the reasons below, the *Alice* analysis demonstrates that the asserted '057 claims recite unpatentable subject matter.

### a. *Alice* Step One: The '057 Patent Claims Are Directed to Unpatentable Abstract Ideas

A claim is abstract under *Alice* when "[a]ll of [the claim's] method steps can be performed in the human mind, or by a human using a pen and paper." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

As shown below, the asserted '057 claims recite the abstract concept of answering a query by dividing the query and an associated data model into sub-queries and sub-models, answering the sub-queries using the sub-models, and combining the answers to generate a response to the original query.

Each step of the asserted '057 claims can be performed in the human mind and/or by a human using a pen and paper.  Nathan Little, one of the inventors of the '057 patent, agrees that the example from the '057 patent discussed below could be performed by a human using pen and paper.  (Ex. 55, Little Dep. Tr., pp. 43-64.) Similarly, Versata's expert witness, Dr. Wilson, agreed that the example provided below (and by Ford's expert witness Deborah McGuiness) can be performed by a human with pen and paper.  (Ex. 56, Wilson Dep. Tr., 56:12-20.)



NON-CONFIDENTIAL

Claims 1 and 18 recite the following steps implemented on a generic computer:

[a.] receiving one or more configuration queries representing one or more questions involving parts and part relationships in a configuration of a configurable product;

and performing with the computer system:

[b.] dividing one or more configuration queries into multiple configuration sub-queries, wherein the multiple configuration sub-queries represent the one or more configuration queries;

[c.] processing each sub-query using at least one configuration sub-model per sub-query, wherein each configuration sub-model collectively models the configurable product and each configuration sub-model includes data to define compatibility relationships between parts included in the configuration sub-model and each configuration sub-model (i) represents a portion of a configuration model of the configurable product and (ii) allows answers from each configuration sub-model to be combined to provide a consolidated answer to the one or more configuration queries;

[d.] generating a response to the one or more configuration queries based upon the processing of each sub-query using at least one configuration sub-model per sub-query;

[e.] and providing the response to the one or more configuration queries as data for display by a display device.

(Ex. 57, '057 patent, claims 1 and 18.)

As explained below, the '057 patent specification demonstrates that a human can perform each of the claim limitations using pen and paper.

**Limitation [a]:** The '057 Patent demonstrates that a human could receive a conventional query such as: "Are A1, B1 and X1 buildable together?" (Ex. 57, '057



NON-CONFIDENTIAL

patent at 7:64.) In this example, the "conventional query" represents the claimed questions involving the claimed parts (A1, B1 and X1) and part relationships. (Ex. 58, McGuinness Dec., ¶¶17, 26-27.)

**Limitation [b]:** The '057 Patent demonstrates that a human could write the "conventional query" as divided-up sub-queries. The '057 Patent discloses dividing the "Conventional Query" into three sub-queries: (1) "Is A1 buildable?;" (2) "Are A1 and B1 buildable together?;" and (3) "Is X1 buildable?"  (Ex. 57, '057 patent at 8:35-37; Ex. 58, McGuinness Dec., ¶¶20, 26-27.)

**Limitation [c]:** The '057 Patent demonstrates that a human could then write out the steps of processing the sub-queries using sub-models, which represent a portion of a model for a configurable product.  A human could take a "conventional model" (Table 2 below) and divide the model into three sub-models (Tables 3-5 below), which collectively models the configuration of the "conventional model," and includes compatibility relationships between parts (*e.g*., B2 S (standard) to A2 in the Family B sub-model). (Ex. 58, McGuinness Dec., ¶¶18-19, 26-27.)



(Ex. 57, '057 patent at 7:54-66, 8:5-27 (annotated).)



**NON-CONFIDENTIAL**

As shown below, the '057 Patent further demonstrates that a human using pen and paper could answer (*i.e.*, process) each divided-out sub-query using the sub-models disclosed in Tables 3-5. (Ex. 58, McGuinness Dec., ¶¶21, 26-27.)



**Limitations [d] and [e]:** The '057 Patent demonstrates that a human using pen and paper could use the answers to the various sub-queries from Table 6 to prepare a response to the "conventional query" (limitation [d.] above). Specifically, **Sub-query 1 (yes)** + **Sub-query 2 (yes)** + **Sub-query 3 (yes)** = **Conventional Query (yes)**. (Ex. 58, McGuinness Dec., ¶¶21, 26-27; Ex. 57, '057 patent at 8:48-52.) The human could then write down the answer to the "conventional query" for display (limitation [e.] above) as: "A1, B1 and X1 are buildable together." (Ex. 58, McGuinness Dec., ¶¶26-27.)

Nathan Little, one of the inventors of the '057 patent, agrees that the example from the specification discussed above could be performed by a human using pen and paper. (Ex. 55, Little Dep. Tr., pp. 43-64.) Further, Dr. Wilson, Versata's expert witness, agreed that Ford's expert analysis (Ex. 58, McGuinness Dec., ¶26)



NON-CONFIDENTIAL

demonstrated that the example in the '057 Patent can be performed by a human with pen and paper. (Ex. 56, Wilson Dep. Tr., 56:12-20.) There is thus no genuine dispute that the subject matter of claims 1 and 18 can be performed on pen and paper.

Accordingly, the steps of claims 1 and 18 of the '057 Patent constitute abstract steps, which could be done by a human in either the mind or using pen and paper.[27]

### b. *Alice* Step Two:  The '057 Patent Claims Do Not Include an "Inventive Concept"

In the Second Step, the Court must determine whether the claims have an inventive concept, *i.e.*, an element or combination of elements sufficient to ensure that the patent in practice amounts to significantly more than a patent on the abstract idea itself. *Alice*, 134 S.Ct. at 2358.  The Supreme Court in *Alice* cautioned that merely limiting the use of an abstract idea "to a particular technological environment" or implementing the abstract idea on a "wholly generic computer" is not sufficient as an additional feature to provide "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Id.* at 2358.

The independent claims of the '057 Patent add nothing inventive to the abstract steps discussed above.  Indeed, the "divide and conquer" approach recited

---

[27] Dependent claims 19, 21-23, 25 and 27 are also directed towards abstract ideas which can be carried out on pen and paper.  (Ex. 58, McGuinness Dec., ¶¶30-38, 42-52, 55, 58-59.)



NON-CONFIDENTIAL

in the claims – breaking problems into sub-problems – is a common approach to problem solving.  (Ex. 58, McGuinness Dec., ¶53, and exhibits 057-2 and 057-3 thereto.)

Whether the elements of the '057 claims are considered separately or as an ordered combination under *Alice*, they add nothing beyond implementation of an abstract idea on a generic computer.  (Ex. 57, '057 Patent at 11:57-60; Ex. 58, McGuinness Dec., ¶¶28, 37, 43, 46, 50, 52, 59.)   The '057 claims are thus unpatentable as both abstract and without an inventive concept.

## IV.   CONCLUSION

For the above reasons, Ford is entitled to summary judgment on Versata's trade secret, copyright and patent claims.

Respectfully submitted,

Dated:  February 1, 2018       By: /s/ John S. LeRoy
                               John S. LeRoy (P61964)
                               Thomas A. Lewry (P36399)
                               Frank A. Angileri (P45611)
                               Chanille Carswell (P53754)
                               Christopher C. Smith (P73936)
                               John P. Rondini (P72254)
                               Jonathan D. Nikkila (P75666)
                               1000 Town Center, 22nd Floor
                               Southfield, MI  48075
                               Tel.: 248-358-4400 / Fax: 248-358-3351
                               jleroy@brookskushman.com
                               tlewry@brookskushman.com



NON-CONFIDENTIAL

fangileri@brookskushman.com
ccarswell@brookskushman.com
jrondini@brookskushman.com
jnikkila@brookskushman.com

James P. Feeney (P13335)
**DYKEMA GOSSETT PLLC**
39577 Woodward Ave, Suite 300
Bloomfield Hills, MI 48304
Ph: 248-203-0841
jfeeney@dykema.com

*Attorneys for Plaintiff, Ford Motor
Company*



**NON-CONFIDENTIAL**

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on February 1, 2018, I electronically filed a **REDACTED NON-CONFIDENTIAL** copy of **FORD MOTOR COMPANY'S MOTION AND BRIEF IN SUPPORT FOR SUMMARY JUDGMENT and all NON-CONFIDENTIAL Exhibits in Support** with the Clerk of the Court for the Eastern District of Michigan using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:  Rodger D. Young at efiling@youngpc.com; James P. Feeney at jfeeney@dykema.com, srobb@dykema.com & docket@dykema.com; Steven Mitby at smitby@azalaw.com; Martha J. Olijnyk at mjo@millerlawpc.com & aad@millerlawpc.com; Lanny J. Davis at ldavis@lannyjdavis.com; Stephen W. King at sking@kingandmurray.com; Iftikhar Ahmed at IftiAhmed@azalaw.com; Sharoon Saleem - sharoon.saleem@jonesspross.com; Jaye Quadrozzi – efiling@youngpc.com; Kyril Talanov – ktalanov@azalaw.com; M. Jason Ballard – mjballard@azalaw.com.

I also certify that on the above date, I electronically filed **UNREDACTED CONFIDENTIAL** copies of **FORD MOTOR COMPANY'S MOTION AND BRIEF IN SUPPORT FOR SUMMARY JUDGMENT and all CONFIDENTIAL Exhibits in Support** using the Court ECF System's SEALED DOCUMENT EVENT which will send notification to the above identified registered participants of the ECF System.  I have also submitted paper copies of all sealed documents via electronic means to counsel using the following information:

> *Counsel for Defendants:*
> *Versata Software, Inc., f/k/a Trilogy Software, Inc., Trilogy Development Group, Inc. and Trilogy, Inc.*
>
> AZA-Versata-Ford@AZALAW.COM
> (which includes all the ECF Registered users listed above)

   /s/ John S. LeRoy
John S. LeRoy (P61964)

