UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

     Plaintiff/Counter-Defendant,

v.

VERSATA SOFTWARE, INC., F/K/A
TRILOGY SOFTWARE, INC., TRILOGY
DEVELOPMENT GROUP, INC. AND
TRILOGY, INC.,

     Defendants/Counter-Plaintiffs.

CASE NO. 15-10628-MFL-EAS

(Consolidated with
Case No. 15-11624-MFL-EAS)
Hon. Matthew F. Leitman

_____

**VERSATA DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT - CORRECTED**

**<u>FILED UNDER SEAL</u>**

# REDACTED

## CONCISE STATEMENT OF THE ISSUE PRESENTED

Should the Court grant partial summary judgment for defendants Versata Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc., on the following issues:

- Ford's request for a declaratory judgment that it owns or has a perpetual license to ACM, because the parties' contracts demonstrate that Versata owns ACM and Ford's license was for a limited term only?  (Ford's Causes of Action 4-5)
- Ford's request for a declaratory judgment that its contract with Versata does not permit Versata to inspect Ford's software programs or interview its personnel, when the plain language of the contract provides otherwise? (Ford's Cause of Action 7)
- Ford's claim for breach of contract for improper termination, because the contract language allowed termination and also Ford has no evidence of damages?  (Ford's Cause of Action 8)
- Ford's claim that Versata's patents are unpatentable and invalid, because Ford has offered no evidence to show that the patents are not directed to patentable subject matter under 35 U.S.C. § 101?  (Ford's Causes of Action 9–16)
- Ford's claim that Versata breached the parties' contract by not paying a refund due only if other manufacturers subscribed to ACM from 2002–04, when no other manufacturers subscribed to ACM over that period?  (Ford's Cause of Action 17)
- Versata's claim for infringement of the '582 and '064 patents, because Ford's only argument against infringement relies on claim construction that is different from the court's claim construction?  (Versata's Counterclaims 5–6)
- Versata's claim for breach of contract, because Ford reverse engineered ACM in violation of the parties' contract?  (Versata's Counterclaim 11)
- Versata's claim for copyright infringement, because the undisputed facts show that Ford engaged in unauthorized distribution and use of Versata's copyrighted materials?  (Versata's Counterclaim 14)

Plaintiff answers:  No

Defendants answer:  Yes

The Court should answer:  Yes

ii

## CONTROLLING AUTHORITY

In accordance with L.R. 7.1(d)(2), the following is the most important authority relevant to the relief sought:

- Fed. R. Civ. Pro. 56.

- *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

- *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

- *Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74 (2016).

- *Webster v. Edward D. Jones & Co.*, 197 F.3d 815 (6th Cir. 1999).

- *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).

- *SAS Inst., Inc. v. World Programming, Ltd.*, 874 F.3d 370 (4th Cir. 2017).

# TABLE OF CONTENTS

CONCISE STATEMENT OF THE ISSUE PRESENTED ..................................... ii

CONTROLLING AUTHORITY ........................................................................ iii

TABLE OF CONTENTS ................................................................................... iv

INDEX OF AUTHORITIES .............................................................................. vi

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 2

   I.   Versata provided Ford cutting-edge product definition and configuration software. ............................................................................................................ 2

   II.   Factual background regarding Versata's patents. ..................................... 11

   III.   Claim construction of the asserted patents. ............................................ 12

   IV.   Summary Judgment Evidence. .................................................................. 13

LEGAL STANDARD ....................................................................................... 13

ARGUMENT ..................................................................................................... 14

   I.   Versata is entitled to summary judgment on Ford's claim for Breach of Contract for improper termination. (Ford's COA 8) ........................................... 14

      A.   Versata was entitled to terminate under the plain language of the MSSA. 15

      B.   Ford has failed to show any damages for termination. ........................... 16

   II.   Under the 1998 CSA and SLA, the 2002 SSA, and the 2004 MSSA, Versata owns ACM (Ford's COA 4 & 5). ............................................................ 17

   III.   Ford reverse engineered ACM in violation of the MSSA. (Versata's Counterclaim 11) ........................................................................................... 19

      A.   Ford reverse engineered ACM and MCA using .jar files. ...................... 21

      B.   Ford reverse engineered ACM and MCA using Comparator Tools and Excel macros. .................................................................................................. 22

   IV.   There is no genuine issue of material fact as to Ford's infringement of Versata's copyright. (Versata's Counterclaim 14) ........................................... 25

   V.   There is no genuine issue of material fact as to Ford's infringement of the

'582 and '064 patents.  (Versata's Counterclaim 5–6) ........................................29

    A.   Ford's PDO software infringes claim 1 of the '582 patent. .....................32

    B.   Ford's construction of "set equation" is inconsistent with the Court's construction. ...................................................................................................33

VI.   Ford cannot show facts sufficient to support its invalidity claims.  (Ford's COA 9–16) ...............................................................................................................35

    A.   Ford has offered no evidence of invalidity for the '080, '651, '825 patent claims and the dropped claims from the remaining asserted patents. .............35

    B.   Ford has offered no evidence that Versata's patent claims are not directed to patentable subject matter. ..........................................................................37

    C.   Ford has offered no evidence of invalidity of the '582 and '064 patent claims. .................................................................................................................44

    D.   Ford has offered no evidence of invalidity of the '057 patent claims because Dr. Greenspun fails to identify any disclosure of dividing a configuration query in either of the prior art references..................................47

VII.   Versata has a contractual right to an audit.  (Ford's COA 7) .................50

VIII.   Versata did not breach the SSA. (Ford's COA 17)...................................51

CONCLUSION ...................................................................................................52

PROOF OF SERVICE ........................................................................................54

# INDEX OF AUTHORITIES

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ....................................................................... 38, 43, 44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ......................................................................................35

*Bank of America, NA v. First American Title Ins. Co.*,
  499 Mich. 74, 100, 878 N.W.2d 816 (2016) ................................................14

*Becton Dickinson & Co. v. C.R. Bard, Inc.*,
  922 F.2d 792 (Fed. Cir. 1990) .....................................................................31

*Bilski v. Kappos*,
  561 U.S. 593 (2010) .......................................................................................38

*Calibrated Success, Inc. v. Charters*,
  72 F. Supp. 3d 763 (E.D. Mich. 2014) .........................................................28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 S. Ct. 2548; 91 L.Ed. 2d 265 (1986) ......................................13

*Core Wireless Licensing v. LG Elecs., Inc.*,
  No. 2016-2684, 2018 WL 542672 (Fed. Cir. Jan. 25, 2018) .......................40

*Corel Corp. v. Ford Motor Co.*,
  No. 05-71130, 2006 WL 680846 (E.D. Mich. Mar. 15, 2006) ....................28

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ....................................................................39

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245  (Fed. Cir. 2014) ...................................................................43

*Diamond v. Diehr*,
    450 U.S. 175, 188 (1980) ..............................................................................38

*Edge Sys. LLC v. Aguila*,
    No. 2016-2189, 2017 WL 3971469 (Fed. Cir. Sept. 8, 2017)......................32

*FenF, LLC v. Healio Health Inc.*,
    No. 5:08CV404, 2009 WL 10688713, (N.D. Ohio Sept. 4, 2009)...............28

*Gottschalk v. Benson*,
    409 U.S. 63 (1972)..........................................................................................39

*In re Independent Servs. Organizations Antitrust Lit.*,
    864 F. Supp. 1469 (D. Kan. 1997) ................................................................26

*In re Smith Trust*,
    745 N.W. 2d 754, 757-758 (Mich. 2008) .....................................................15

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
    637 F.3d 1314 (Fed. Cir. 2011) ............................................................. 32, 33

*JCW Software, LLC v. Embroidme.com, Inc.*,
    No. 10-80472-CIV, 2011 WL 13225174 (S.D. Fla. July 26, 2011)..............26

*Lisle Corp. v. A.J. Mfg. Co.*,
    289 F. Supp. 2d 1048 (N.D. Ill. 2003), *aff'd* 398 F.3d 1306
    (Fed. Cir. 2005)..............................................................................................31

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289  (2012)..................................................................................38

*Microsoft Corp. v. I4I Ltd. Partn.*,
    564 U.S. 91 (2011).........................................................................................35

*Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*,
   236 F.3d 312 (6th Cir. 2004)........................................................................27

*Nat'l Presto Indus., Inc. v. W. Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996). ...................................................................35

*Oravec v. Sunny Isles Luxury Ventures, L.C.*,
   527 F.3d 1218 (11th Cir. 2008) ..................................................................26

*Regents of Univ. of Minnesota v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013) ....................................................................46

*Service & Training, Inc. v. Data General Corp.*,
   963 F.2d 680 (4th Cir. 1992) ......................................................................25

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
   665 F.3d 1269 (Fed. Cir. 2012). .................................................................36

*Streetwise Maps, Inc. v. VanDam, Inc.*,
   159 F. 3d 739 (2nd Cir. 1998) ....................................................................26

*Stromback v. New Line Cinema*,
   384 F.3d 283 (6th Cir. 2004 .......................................................................25

*TechSearch, LLC v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002) ..................................................................46

*Tiseo Architects, Inc. v. SSOE, Inc.*,
   431 F. Supp. 2d 735 (E.D. Mich. 2006) .....................................................25

*Ward v. Knox County Bd. of Educ.*,
   612 Fed. Appx. 269 (6th Cir. 2015) ...........................................................28

*Webster v. Edward D. Jones & Co.*,
   197 F.3d 815 (6th Cir. 1999) ......................................................................14

*Wilcom Pty. Ltd. v. Endless Visions*,
128 F. Supp. 2d 1027 (E.D. Mich. 1998) ......................................................28

**Rules**

FED. R. CIV. P. 56 ......................................................................................................13

## INTRODUCTION

The parties' contracts are clear and unambiguous.  Versata owns ACM. Despite its current "litigation claims," Ford "irrevocably acknowledged" that Versata owns ACM; indeed, Ford intended that ███████████████████████ ████████████████████████████████████████████████████ Ford paid millions of dollars in license fees to license Versata's cutting-edge software, including ACM, which became the "heart of Ford's enterprise systems."

ACM allowed Ford to manage and validate product definitions (valid combinations of features) containing hundreds of thousands of rules and trillions upon trillions of feature combinations.  Although Ford was satisfied with ACM, Ford decided to build a "like-for-like" replacement in secret.  This replacement was called PDO.  In order to replicate ACM's and companion product MCA's technology, Ford compared the run inputs through Versata's software and Ford's intended replacement, seeking to ensure that its replacement software would produce the same results as Versata's software. Similarly, Ford placed Versata's ACM code into its PDO development environment to compare the interactions between ACM and downstream systems with the interactions between PDO and downstream systems. Ford's studying of Versata's software and its code are prohibited by the parties' contracts and infringe on Versata's copyrights in its software.

In connection with Versata's work on product definition and configuration

software, Versata received numerous patents.  Unsurprisingly, Ford's "like-for-like" replacement infringes on certain Versata patents.  These patents were issued by the U.S. Patent and Trademark Office and are valid—even though Ford has unsuccessfully filed 16 sixteen different petitions with the Patent Office seeking to invalidate them.

Because these contractual, patent, and copyright causes of action involve undisputed facts and can be decided as a matter of law, Versata moves for summary judgment on these issues.

## STATEMENT OF FACTS

### I.  Versata provided Ford cutting-edge product definition and configuration software.

Every Ford vehicle consists of numerous characteristics, or features.[1]  Features can be physical parts, such as wheels, engines, transmissions, and air bags, or features can be marketing items, such as option packages, trim, and market.  When designing vehicles, Ford needs to know how these different features work together and which features will sell well together.  The process of creating rules defining the relationships between features is known as product definition.

Because Ford vehicles have many different types of features (or feature families), and each feature family has many different options, the product definition of Ford

---

[1] Dkt. #226 at 3–4.

2

vehicles can become very complex.[2]  For example, Ford has identified certain models that have more than ██[36] unique configurations.[3]  In the 1990s, Ford's process of creating and validating product definitions was largely manual.[4]  This manual process was time consuming and error prone, resulting in vehicle recalls and misbuilds.[5]

Ford selected Versata (then known as Trilogy), a pioneer in product configuration software,[6] to address its product definition and configuration problems.  In September 1998, Ford and Versata entered into two contracts: the Software Licensing Agreement (SLA) and the Contract Services Agreement (CSA).[7]  The SLA governed the terms under which Ford licensed Versata's proprietary software, and the CSA governed consulting services that Versata performed on a time-and-materials basis for Ford (including work such as installing and customizing Versata's software products for use at Ford).[8]

Under the SLA, Ford licensed several Versata software programs, including SC Config.[9]  The SLA described the licensed products in License Schedules, which

---

[2] *Id.*

[3] *See* Declaration of Steve Mitby, at Ex. 60, p.65 (██████ White Paper).

[4] *See* Ex. N, Cabinaw Dep. at 70:4-71:13.

[5] *See* Ex. A-61, 45343-46 (Business issue #2); Ex. Q, FMS, Sullivan Dep. at 35:16-36:12

[6] *See* Ex. H, '651 patent.

[7] *See* Ex. A-25, (*herein* SLA); *Id.* at Ex. A-4, (*herein* CSA).

[8] *See* Ex. A-4 [CSA]; Ex. A-25 [SLA].

[9] *See* SLA; Ex. A-11 (License Schedule), *herein* LS1; Ex. A-12 (License Schedule

the parties entered into from time to time, as Versata updated its product line, and Ford began to license additional software products from Versata. *See*, *e.g.*, LS 1; LS 2. The parties referred to the proprietary software Ford licensed from Versata (including documentation) as "Software." *See* SLA at preamble. Ford acknowledged that the Software belonged to Versata, agreeing that it would "not make any claim contrary to [Versata's] ownership of the Software," and that it would not reverse-engineer the Software. *Id.* at §§ 6 and 4. Versata provided maintenance, updates, and support for the Software. SLA § 8.

Under the CSA, Versata and Ford set out the terms under which Versata would provide professional consulting services to Ford, such as installation, customization, and training. *See generally* CSA; *see also* SLA § 23 (noting that all "professional consulting services performed by [Versata] for Ford shall be in accordance with" the CSA). When Ford wished Versata to perform consulting work, the parties would agree on an "Assignment Order" describing the services to be performed. To the extent those services involved developing software beyond what Ford had licensed under the SLA, such as user interfaces and installation tools, Section 6 stated that the ownership of such custom code would be designated in the relevant Assignment Order. CSA § 6.a. Ford and Versata clarified in the CSA that other than those custom portions, Versata retained "all rights, title and interest in and to the software

---

#2), *herein* LS2.

4

and/or related documentation provided to [Ford] by [Versata] … [including] all copyright, trade secret, and other rights relating thereto." CSA § 6.b. Moreover, Ford acknowledged that Versata owned any element of custom portions that "is not specific to, or can be made nonspecific to" Ford. CSA § 6.b. Unlike with the Software licensed under the SLA, Versata had no obligation to provide support or maintenance for software developed under the CSA. CSA § 6.c.

In November 1999, the parties executed License Schedule 2. *See* LS2. License Schedule 2 maintains the distinction between Versata's proprietary Software, managed under the SLA and paid for by a subscription payment, and custom code, developed for Ford under the CSA and paid for by time-and-materials pricing.[10] It was around this time—late 1999—that the parties began referring to "Deliverables" in their contracts with each other. While the parties later fell into a pattern whereby "Deliverables" typically referred to custom code developed under an Assignment Order (or later, a Statement of Work), at this time the parties used the term both to refer to Versata proprietary software ("Core Deliverables") as well as custom code ("Custom Deliverables"). LS2 ¶ 4; *see also* ¶ 10 (assigning ownership to Versata of all intellectual property relating to Ford's contributions "with regard to the development of the Core Deliverables"). Ford understood, and intended, that the software would be owned and maintained by Versata. *See* Ex. Q,

---

[10] *See* Ex. A-13 [LS2] ¶ 4.

FMS 5/25/17, at 252:22-256:11 ██████████████████████████

████████████████████████████████████████████████████

████

     In 2001, Versata introduced ACM, its flagship rule authoring and configuration software.[11]  By December 2001, ACM maintained the product definition of all market models.[12]  The improvement over Ford's prior systems was so stark that Ford modelers called Trilogy "a new star in our sky."[13]  Ford models that had previously had numerous errors now had zero errors.[14]

     Soon thereafter, in January 2002, Ford and Versata entered into a Software Subscription Amendment ("2002 SSA"), under which Ford licensed ACM—which the parties also referred to as GPD—including the Engineering view of rule-authoring and configuration.[15]  The 2002 SSA maintained the parties' previous practice whereby Ford subscribed to Versata's major, proprietary Software, and purchased (under time-and-materials pricing) custom work, such as installation and customization, which were still handled under the CSA.  Ex. A-1, 2002 SSA §§ 2.E,

---

[11] *See* Ex. A-23, Myers Trade Secret Rebuttal, at ¶25.
[12] *See* A-62 ACM at Ford
[13] *See* Ex. C, Kenny Ratton Declaration VKR, at Ex. C-1, (email from Kenny Ratton to Versata); *see also* Ex. Q, FMS 5/25 at 308:8-15; 310:8-13 (indicating that ACM reduced manual validation of data at Ford.)
[14] Ex. C, VKR, at Ex. 1, (email).
[15] *See* Ex. A-1 2002 SSA, at §§ 2, 2.B; and its exhibit A.; *see also* Ex. A-23 Myers Trade Secret Report, at ¶ 37 (acknowledging "GPD" as an early name for ACM).

2.F, 4.A.   Ford additionally covenanted to "provide reasonable assistance in perfecting and protecting GPD Software intellectual property for Trilogy." *Id.* § 2.F. Also consistent with the parties' previous practice, Versata provided maintenance services for the licensed Software, as opposed to the custom-developed code, which it did not support.   *Id.* § 4.B; Ex. A-4, CSA § 6.c.   █████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ 2002 Ex. A-1 SSA §

2.A.   The discount was dependent on other automobile original equipment manufacturers ("OEMs") subscribing to ACM, which unfortunately did not occur during the pendency of the 2002 SSA.  *See id.* at 2.E.

Two years later, in December 2004, the parties entered into a new agreement: the Master Subscription and Services Agreement ("MSSA").[16]   The MSSA superseded all the previous software agreements between Ford and Versata relating to ACM, MCA, and services relating to those software suites, including the prior agreements relating to software licensing (such as the SLA and 2002 SSA) and contract services (including the CSA).[17]

---

[16] *See* Ex. A-21, (MSSA).
[17] *See* Ex. A-21, MSSA § 13.10; Ex. C-2, Kenny Ratton Declaration, (MSSA Subscription Schedule #1), *herein* SS#1 (licensing MCA and ACS); Ex. C-3, Kenny Ratton Declaration (MSSA Subscription Schedule #4), *herein* SS#4 (licensing ACM); Ex. A-21 (MSSA Subscription Schedule #7), *herein* SS#7 (licensing ACR); Ex. A-63 (MSSA Subscription Schedule #121031), *herein* SS#121031 (licensing MCA and ACS).

The MSSA contains several key provisions worth highlighting. First, the MSSA maintains the distinction between (1) Versata proprietary software, licensed to Ford and set out in Subscription Schedules (referred to, together with its documentation and support releases, as the "Software"), and (2) consulting services ("Work")—including the development of custom software elements specifically for Ford—paid for on a time-and-materials basis ("Deliverables"). Ex. A-21, MSSA at 1; § 1; § 5. The licensed, proprietary Software included ACM and MCA. Ex. C-3, SS4; Ex. C-2, SS1. As before, Versata generally agreed to provide support and enhancements for the licensed Software, but not for the Deliverables. Ex. A-21, MSSA § 4; *see also* § 8.1 (only Software is warranted).

The parties reiterated in the MSSA that Ford's license to the Software was for a fixed term, extended only to the object code version of the Software, and permitted Ford to use the Software solely to perform the intended functions of the Software (as set out in the documentation). Ex. A-21, MSSA § 1.1. It further prohibited Ford from using the Software in any operating software environment other than the ones specified in the applicable Subscription Schedules. Ex. A-21, MSSA § 1.5. Importantly, the MSSA prohibited Ford from reverse engineering the software— specifically including "**studying the Software's behavior in response to a variety of inputs**." *Id.* at § 1.7(iii).

The parties explicitly reaffirmed Versata's sole ownership interest in the

licensed Software as well, agreeing that Ford "**irrevocably acknowledges** that, subject to the licenses granted herein, **Ford has no ownership interest in the Software**," and that "**Nothing in this Agreement shall be construed to convey any title or ownership rights to the Software or other Trilogy Confidential Information to Ford** or to any patent, copyright, trademark, or trade secret embodied therein, or to grant any other right, title, or ownership interest to the Trilogy Confidential Information." Ex. A-21, MSSA §§ 6.1, 7.4 (emphasis added); *see also* § 7.6 ("Subject to the licenses granted herein, Ford has no ownership interest in the Software"). And the parties agreed that upon termination of the MSSA or any license thereunder, Ford's rights to the affected Software would cease. Ex. A-21, MSSA § 11.4.

During this time, the U.S. Patent and Trademark Office ("PTO") awarded numerous patents to protect Versata's revolutionary configuration technology, including US Patents 7,200,582 (the '582 Patent); US 7,464,064 (the '064 Patent); US 7,739,080 (the '080 Patent), and US 7,882,057 (the '057 Patent).[18] In 2006, Trilogy Development Group, Inc. changed its name to Versata Development Group, Inc.[19]

Versata's revolutionary ACM technology became the "heart of [Ford's]

---

[18] *See* Ex. G (the '582 Patent); Ex. E (the '064 Patent); Ex. I (the '080 Patent), and Ex. D (the '057 Patent).
[19] *See* Ex. A-3, (certified name change).

enterprise systems."[20] Ford could not ████████████████████████████ ████████████████ Perhaps because Ford became reliant on Versata, Ford developed a plan to replace ACM (and MCA) with PDO in secret.[22] Ford wanted PDO to provide "like-for-like" functionality to Versata's software.[23] In order to achieve this "like-for-like" functionality, Ford relied heavily on its knowledge of Versata software. Ford studied ACM and MCA outputs, or exports, to validate that its replacement software would generate results consistent with ACM.[24] Ford also placed Versata .jar files in its PDO development environment for the purposes of doing "side-by-side" comparisons of ACM outputs to PDO outputs.[25]

On October 7, 2014, after the breakdown of the parties' negotiations on terms for further licensing, Versata sent a letter to Ford notifying it that Versata was terminating Subscription Schedules 1, 4, 7, and 121031 (including the subscriptions to ACM and MCA).[26] Shortly thereafter, Versata requested an audit of Ford's

---

[20] Ex. A-64 at 99242, (PDO Plans)

[21] *Id.*

[22] Ex. M, Deposition of David Baxter, at 21:19-23:15.

[23] *See* Ex. A-65 (EPIC-PDO Presentation) at 1181866 ("PDO-R1 is a like-for-like toolset change"); Ex.A-66 (PDO Test Strategy) at 5 (indicating that Ford intended a "like-for-like intent of imported PDO data with [ACM]").

[24] *See* Ex. Q, Sullivan Dep. at 109:16-119:22; *see also* A-66 (PDO Test Strategy) at 13 (Compare PDO and Legacy export files using BeyondCompare); Ex. A-2 (Comparison Files).

[25] *See* Ex. A-23 Myers Trade Secret Report at ¶¶ 706-08.

[26] *See* Ex. A-67 (10/7/14 Termination letter); *see also* Ex. A-68 (11/13/14 Termination letter).

records to verify Ford's compliance with the termination, as provided by Sections

3.5 and 12.2 of the MSSA.[27]  Despite clear contractual language granting ACM audit

rights, Ford refused to allow Versata to perform an audit.  Dkt. 226 at ¶ 96.

## II.    Factual background regarding Versata's patents.

Versata asserts that Ford's Accused Software infringes certain patents

("Asserted Patents") and specifically certain claims of these patents ("Asserted

Claims").[28]  The '651 Patent, '308 Patent, and '294 Patent are held by Versata

Software, Inc.[29]  The remaining Asserted Patents are held by Trilogy Development

Group, Inc., which is now known as Versata Development Group, Inc.[30]

In support of their allegations of invalidity for the Asserted Claims, Ford relies

upon the expert reports of Dr. Philip Greenspun and Dr. Rajeev Surati.  Neither of

---

[27] *See* Ex. A-69 (11/20/14 audit request).

[28] Versata's Asserted Claims are:
- **US Patent 6,405,308:** Claims 1, 2, 7, 8, 18, 22, 23, 24, and 28;
- **US Patent 6,675,294:** Claims 1, 2, 7, 8, 9, 21, 22, 23, 24, 25, 26, and 31;
- **US Patent 7,200,582:** Claims 1, 2, and 3;
- **US Patent 7,464,064:** Claims 1, 2, 3, 9, 11, 12, 14, and 15;
- **US Patent 7,882,057:** Claims 1, 18, 19, 21, 22, 23, 25, and 27; and
- **US Patent 7,739,080:** Claims 1, 3, 4, 11, 12, 13, and 18.

At the time that Versata served its opening expert reports, Versata dropped its infringement allegations as to certain claims of the Asserted Patents and dropped infringement allegations of two additional patents: U.S. Patent 5,825,651 and 8,805,825.

[29] These patents were assigned in 1996 to Trilogy Development Group, Inc., which changed its name to Trilogy Software, Inc., which changed its name to Versata Software, Inc.  *See* Ex A-29, (VSI History).

[30] These patents were assigned to Trilogy Development Group, Inc. which changed its name to Versata Development Group, Inc.  *See* Ex. A-28 (VDG History)

these experts, however, submitted a report regarding the '080 patent.

Ford separately alleges that the Asserted Claims are not directed to patentable subject matter under 35 U.S.C. § 101, for which Ford relies upon the expert report of Dr. Deborah McGuinness.

## III.    Claim construction of the asserted patents.

The Special Master issued a report and recommendation as to claim construction of the Asserted Patents. Dkt. 181. The Court entered an order adopting the Special Master's constructions and incorporating additional claim terms that had been construed in a prior litigation involving some of the Asserted Patents. Dkt. 317. The Court's relevant constructions are:

I.    The '651 Patent Family[31]

- "Configuration user"—"a person using a computer to configure a system."

II.    The '582 Patent Family[32]

- "Set equation" - "one or more equations that operate on sets."

III.    The '057 Patent

- The "processing" within the term "processing each sub-query using at least one configuration sub-model per sub-query" must be performed entirely by the computer system, and not by a human.

---

[31] The '308 and '294 Patents are continuations of the '651 Patent. (Ex. J & Ex. K)
[32] The '064 Patent is a continuation of the '582 Patent. (Ex. E)

IV.   The '080 Patent

- The step of "extending at least one of the ancestor configuration model family spaces" must be substantively performed by the computer or computer system, not by a human.

  The step of "removing [the added space] from the child configuration model family space . . ." must be substantively performed by the computer or computer system, not by a human.

## IV.   Summary Judgment Evidence.

For the purposes of this motion, Versata relies upon and incorporates by reference the attached exhibits A through R (including their attachments).

## LEGAL STANDARD

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(a).  If the non-moving party bears the burden of proof on a disputed issue, the moving party does not need to support its motion "with affidavits or other similar materials *negating* the opponent's claim."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; 106 S. Ct. 2548 (1986) (emphasis in original).  Instead, the movant may meet its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325; FED. R. CIV. PRO. 56(c)(1)(B).

# ARGUMENT

I.    **Versata is entitled to summary judgment on Ford's claim for Breach of Contract for improper termination. (Ford's COA 8)[33]**

To prevail on a claim for breach of contract, the claimant "must establish by a preponderance of the evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of America, NA v. First American Title Ins. Co.*, 499 Mich. 74, 100, 878 N.W.2d 816 (2016); *see also Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999) ("To recover for breach of contract under Michigan law, [the plaintiff] had to prove: 1) the existence of a contract between [defendant] and himself, 2) the terms of the contract, 3) that [defendant] breached the contract, and 4) that the breach caused [plaintiff's] injury.").

Under the plain language of the MSSA, Versata was entitled to terminate any Ford Subscription Schedule by providing sixty days' notice, which the parties agree was provided.  Therefore, Versata's termination was effective and Ford's license was terminated at the end of January 14, 2015.  Additionally, Ford documents show that, well before Versata provided a termination notice, Ford anticipated its licenses expiring and intended to launch its PDO replacement in December 2014, and it did so.  Therefore, even assuming arguendo that Versata's termination was improper,

---

[33] Complaint, Dkt. 226 at ¶ 35.

Ford has not shown damages resulting from Versata's termination. For these reasons, the Court should grant the Versata's summary judgment on Ford's breach of contract claim for improper termination.

### A. Versata was entitled to terminate under the plain language of the MSSA.

Under Michigan law, a contract should be read according to its plain and ordinary meaning. *In re Smith Trust*, 745 N.W. 2d 754, 757-758 (Mich. 2008). Pursuant to the MSSA between Versata and Ford, either party could terminate a Subscription Schedule at will by providing written notice sixty days prior to the Annual Renewal Period. Ex. A-21, MSSA at § 11.2. Due to failed negotiations with Ford regarding the renewal of Ford's licenses, Versata provided notice to Ford on October 7, 2014 and again on November 13, 2014, of its intent to terminate Subscription Schedules 1, 4, 7, and 121031, covering ACM, MCA, and ACS, and ACR.[34] The Annual Renewal Period for each of these Subscription Schedules ran from January 15 – January 14 of the following year.[35]

In 2011, Ford and Versata entered into an Addendum to Subscription Schedule #4 (the "Addendum") in which Versata waived its right to terminate the contract for convenience "*[d]uring the Extended Support Term.*"[36] Pursuant to the

---

[34] *See* Termination letters at fn. 26, *supra*.
[35] *See* Subscription Schedules at fn. 17, *supra*.
[36] *See* Ex. A-72, Addendum.

Addendum, the Extended Support Term "commences on September 1, 2011 and ends on January 14, 2015." Ex. A-72, Addendum at ¶ 12. Thus, on January 14, 2015, the Extended Support Term ended and Versata had a contractual right to terminate for convenience, which it exercised.

When Versata terminated the Subscription Schedules, Ford maintained its licenses to the Software covered by those schedules "until the expiration of the then current Annual Renewal Period." Ex. A-21, MSSA at § 11.2. Therefore, when Versata exercised its right to terminate, Ford's license to the covered Software expired with the "then current Annual Renewal Period," at the end of January 14, 2015. *See* Ex. A-21, MSSA at § 1.1.

### B.    Ford has failed to show any damages for termination.

Ford has failed to show any damages from Versata's termination, an essential element of its breach of contract claim. *Bank of America*, 878 N.W.2d at 829. Ford admits that it terminated the agreement when it "did not accept Defendants' unreasonable license proposal." (Dkt. 226 at ¶ 35). Indeed, on December 19, 2014, Ford notified Versata that it would no longer be using the software. *Id.* This is further supported by Ford documents showing that Ford intended to discontinue the use of Versata's software at the end of 2014, well before Versata sent its letter to Ford indicating that it intended to terminate Agreement.[37] Thus, even if the Court

---

[37] *See* Ex. A-37 (FV1089020); *Id.* at Ex. A-38, FV1001141.

16

were to conclude that Versata's termination of Ford's license were improper, Ford documents conclusively show that Ford was not damaged, because Ford intended to discontinue use of the ACM software before its license expired.

## II. Under the 1998 CSA and SLA, the 2002 SSA, and the 2004 MSSA, Versata owns ACM (Ford's COA 4 & 5).

In its fourth and fifth causes of action, Ford seeks a declaratory judgment that it owns ACM (or is entitled to a perpetual, royalty-free license to ACM) pursuant to the parties' series of agreements. But those agreements are uniform and clear: Versata owns the proprietary Software that Ford licensed, the licenses are for a fixed term, and that proprietary, fixed-term licensed Software includes ACM. SLA preamble and § 6 (acknowledging Versata's ownership of the licensed Software); Ex. A-1, 2002 SSA §§ 2, 2.B., 2.F; Ex. A-21, MSSA at 1 ("Software" includes "Applications" described in Subscription Schedules), § 1.1 (license is for a fixed term and requires payment of subscription fees), § 6.1 (Ford irrevocably acknowledges Versata's ownership of the Software), § 7.4 (reiterating that Ford has no title or ownership interest in the Software), § 7.6 (again specifying that Versata owns the licensed Software); SS4 (ACM is "Software"). Ford cannot point to anywhere in the SLA, CSA, 2002 SSA, or MSSA that says that Ford paid Versata to develop ACM and MCA on Ford's behalf, particularly since (as cited above) those contracts repeatedly and explicitly stated that Versata owned the Software listed in the subscription schedules. As Ford's corporate representative Mike Sullivan

17

testified, Ford *intended* for Versata to own ACM.[38]

Even if Ford believed—for whatever reason—that ACM had been developed for Ford under the CSA, Ford abandoned that claim in the MSSA. *See* MSSA § 13.10 (integration clause providing that the MSSA "shall constitute the entire agreement between the parties regarding the subject matter hereof and supersede all proposals and prior discussions and writing between the parties with respect thereto.") and § 6.1 (in which Ford "**irrevocably acknowledges** that, subject to the licenses granted herein, **Ford has no ownership interest in the Software**") (emphasis added). Additionally, the MSSA is clear that Ford's license to the Software is not a perpetual, royalty-free license, but is instead for a fixed term, ending with the termination of the applicable Subscription Schedules. See MSSA § 1.1.

The parties' actions back this up. If Ford indeed believed that it had paid Versata "tens of millions of dollars pursuant to the CSA to develop the ACM software" between 1999 and 2004, or that Ford was entitled to a perpetual, royalty-free license, why did Ford spend the next ten years paying Versata tens of millions of dollars more to license ACM? *See* Dkt. 226 at 15 ¶ 76. Why would Mike Sullivan and Samantha Balinski ███████████████████████████████████

---

[38] Ex. Q, [Sullivan Dep. at 252:22-256:11].

███████████████████[39]  Why is it that the first time Ford claimed that it owned or had a perpetual license to ACM was when Versata caught Ford copying its software, and Ford filed its declaratory judgment action?  The answer is that Ford and Versata both clearly understood and intended—as the contracts reiterate—that Versata owned ACM, and that Ford's license required the payment of subscription fees and was only valid until the license agreements were terminated.  Ford's argument to the contrary is merely after-the-fact lawyer creativity.  Because the contracts clearly provide that Versata, not Ford, owns ACM, and that Ford's license was for a fixed term that ended with the termination of the relevant Subscription Schedules in January 2015, Versata is entitled to summary judgment on Ford's fourth and fifth causes of action.

## III.   Ford reverse engineered ACM in violation of the MSSA.  (Versata's Counterclaim 11)

Ford breached the MSSA with Versata by reverse engineering Versata's ACM, MCA, and ACS licensed Software.  The MSSA prohibits Ford from reverse engineering Versata's Software. Ex. A-21, MSSA § 1.7.  The MSSA gives several examples of "reverse engineering" including "studying the Software's behavior in response to a variety of inputs."  *Id.*  Studying software outputs is a recognized form of reverse engineering.  *See SAS Inst., Inc. v. World Programming, Ltd.*, 874 F.3d

---

[39] *See* Ex. A-5 (Decommissioning Doc) (telling "former PDO team members" to delete Versata's "licensed and proprietary" documents and .jar files.)

370, 382 (4th Cir. 2017) ("It is clear that WPL violated the unambiguous reverse engineering prohibition. By all accounts, WPL analyzed the Learning Edition to learn how it worked in order to better recreate its functionality in its own products."). Notably, the Fourth Circuit rejected the district court's holding that reverse engineering requires access to source code. *Id.* ("That WPL did not access the Learning Edition's source code is simply insufficient to overcome the ample evidence that WPL analyzed the broader 'design' of the Learning Edition.").

Ford admits that it studied ACM and MCA outputs for the purpose of ensuring that its replacements produced identical outputs. Ford's corporate representative admitted that Ford would compare PDO outputs with ACM outputs, or exports, to "ensure [the PDO outputs] were accurate on the way out."[40] These comparisons were a part of Ford's validation process for PDO.[41]

Ford's documents show that Ford's analysis of ACM's behavior in response to inputs was widespread at Ford. Ford PDO developers were "trying to figure out given an [ACM] input x what will be the value of y."[42] Mike Sullivan told PDO developers that it was appropriate for Ford to derive requirements by "modifying input and view [*sic*] the output as this can be used to determine how the code is

---

[40] *See* Ex. Q, FMS, Sullivan Dep. at 109:16-22; *Id.* at 109:16-119:22.

[41] *Id.* at 113:4-22.

[42] Ex. A-56 email re: meeting minutes. *FV1102606.* Ford frequently referred to ACM as "Legacy." *See* Ex. A-57 (ACM Legacy Docs).

currently handling scenarios that requirements are unknown."[43]  Mr. Sullivan further indicated that "[f]rom inputs and outputs you are ok to assess what the business rules are for creating the exports."[44]  However, this type of input/output analysis is expressly prohibited by the MSSA.[45]

Ford's reverse engineering took numerous different forms: (1) use of ACM .jar files, (2) use of comparator tools, and (3) use of Excel macros.  Indeed, as early as 2009, Ford planned to compare ACM-generated results with the results of replacement prototypes to ensure that the "rule writing format and consistency logics conform[] to existing ███████████████████."[46]

## A.    Ford reverse engineered ACM and MCA using .jar files.

As noted by Seth Krauss and by Versata's technical expert, Dr. Sam Malek, Ford placed ACM jar files in its PDO repository in Accurev.[47]  Ganesh Alla, a Ford employee and PDO developer, admitted that these .jar files were used for testing PDO.[48]  Ford's technical expert, Monty Myers, acknowledged that these .jar files were placed in its PDO environment so that ACM's and PDO's outputs to

---

[43] *Id.*

[44] Ex. A-58, Sullivan Comparison Email, FV1018350.

[45] Ex. A-21 [MSSA] § 1.7.

[46] Ex. A-59, Ford Testing Email, FV1032443.

[47] *See* Doc. 129, Krauss Declaration (PI); Ex. A-23, Ex. A-22, Myers Report at ¶70-72.

[48] *See* Ex. L, Ganesh Alla Dep., at p.23:21-25:11.

downstream systems could be "compared side-to-side."[49]    Similarly, Ford used ACM .jar files so that its outputs to FQV could be "compared side-by-side" to PDOR1 outputs to FBI, Ford's FQV replacement.[50]    Ford understood that these .jar files were a licensed part of Versata's Software.[51]    These side-by-side comparisons are precisely the type of behavior that is prohibited by the MSSA.[52]

### B.    Ford reverse engineered ACM and MCA using Comparator Tools and Excel macros.

Ford's studying of ACM and MCA outputs was so widespread at Ford that Ford developed software programs for the sole purpose of comparing ACM's and MCA's outputs with their PDO replacements.

For example, Ford developed an "MCA Comparator Tool" as a part of its PDO development.  The purpose of the MCA Comparator Tool was to "compare the Legacy MCA response file with the PDO MCA response file in order to prove that PDO is producing valid answers to MCA requests."[53]  Using the MCA Comparator Tool, the "PDO and Legacy Response files relating to a single request are retrieved for comparison."[54]  The MCA Comparator Tool would generate a report "showing

---

[49] Ex. A-23 Myers Trade Secret Rebuttal at ¶ 709.
[50] *Id.* at ¶ 707.  This was a part of a regular pattern at Ford. *Id.* at ¶¶706-711.
[51] *See* Ex. A-5, Decommissioning Doc, *supra*, at fn. 39.
[52] *See* Ex. A-15, VSM, Ex. A-16, Trade Secret and Copyright report of Dr. Sam Malek.
[53] *See* Ex. A-39 MCA Comparator Tool, at p. 8552.
[54] *Id.* at 8553.

the differences between" the Legacy MCA response and the PDO MCA response.[55] This report was designed to "provide a detailed level of comparison results."[56] Other documentation similarly shows that the purpose of the MCA Comparator tool was to compare the outputs of Versata's MCA with the outputs of PDO MCA in response to a single output, indicating that "the MCA comparator tool will receive two response files generated by a single request. These structurally identical files will be compared and any differences in data will be reported."[57]

This MCA Comparator tool was implemented and used at Ford.[58] Ex. A-14, [Malek Report]. Numerous Ford documents show that Ford performed such comparisons generated by the MCA Comparator tool. For example, a Ford document shows Ford assessing the risks of differences between Versata MCA results and PDO MCA results.[59] Numerous other documents show Ford studying the results of Versata MCA-generated feature strings and PDO MCA-generated feature strings.[60]

---

[55] *Id.* at 8558.

[56] *Id.*

[57] *See* Ex. A-40 MCA Comparator Iteration 45815.

[58] *See* Ex. A-41, PDO developer .jar files, at FV0038369; FV53164, FV53167, FV53181, FV53184, FV53186, FV53197, FV 1017199-204, FV1021980.

[59] *See* Ex. A-41, PDO developer .jar files, at FV0038369; FV53164, FV53167, FV53181, FV53184, FV53186, FV53197, FV 1017199-204, FV1021980; Ex._ A-45 (Ford spreadsheet analyzing differences between Versata MCA and PDO MCA); *see also* Ex. A-23, Myers Trade Secret Report at ¶ 622 (confirming this spreadsheet is a comparison between Versata MCA and PDO MCA outputs).

[60] Ex. A-46, FV1089182 (stating that Ford "took the MCA-generated maximally

Ford performed similar testing on ACM, in addition to the .jar file testing. Indeed, Ford documentation shows Ford's intent to "come up with the strategy for Comparing Export Files between [ACM] and PDO."[61] Ford developed numerous tools for this purpose.  For example, a spreadsheet produced by Ford includes instructions to compare "Legacy Feature" with "PDO Vehicle Line" files.[62]

Ford also built a tool for comparing ACM outputs with PDO outputs, called the "Export Validation Tool."  Like the MCA Comparator Tool, the Export Validation Tool was to perform "automated rule validation of only rule files between PDO/Legacy."[63]  This tool would generate comparison reports between ACM Export and PDO Export by comparing ACM's exported rules with PDO's exported rules and identifying any mismatches.[64]  In addition to Mike Sullivan's admissions that Ford compared PDO outputs to ACM outputs, numerous Ford documents show that this comparison tool was in wide use at Ford.[65]

Versata is entitled to summary judgment that Ford breached the MSSA with Versata by reverse engineering Versata's ACM, MCA, and ACS.

---

standard configuration" and compared to the "Super-Configuration Based maximally standard [] configuration."); Ex. A-47, [FV46210 – Comparing to hand calculated results]; Ex. A-48, FV0047314.

[61] *See* Ex. A-49, Comparing Export Files at 20644.

[62] *See* Ex. A-50, Feature File Comparison FV0020176.

[63] *See* Ex. A-51, Export Validation Tool at 005607(8)

[64] *Id.* at FV0056079-80.

[65]*See* Ex. A-8

## IV. There is no genuine issue of material fact as to Ford's infringement of Versata's copyright. (Versata's Counterclaim 14)

A claim of copyright infringement under federal law "requires proof that (1) the plaintiff had a valid copyright in the work allegedly infringed and (2) the defendant infringed the plaintiff's copyright" by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the copyright holder. *See Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004). Versata has registered copyrights on ACM 1.0, ACM 4.23.13.01, ACS 02.26.01, and MCA 02.02.14.01 that are presumed to be valid. Ex. A-31 through A-36; *see Tiseo Architects, Inc. v. SSOE, Inc.*, 431 F. Supp. 2d 735, 740–41 (E.D. Mich. 2006) (in a claim for copyright infringement, a copyright registration is *prima facie* evidence that provides a presumption of validity") (citing *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 688 (4th Cir. 1992)).

These or earlier versions of this software was provided by Versata to Ford.[66] The copyrighted software was provided to Ford in form of Java "jar" files, including the following jar files: ███████████████████████████████████████

████████████████████████████████.[67] Under the effective registration doctrine,

---

[66]*See* Ex. B VSK, Krauss Decl., at ¶ 9; Ex. A-31-36 Copyright Registrations to ACM, ACS, and MCA.

[67] *See* Ex. B. VSK, Krauss Decl., at ¶¶ 9, 10. The following .jar files are associated with and included in the ACM application: trie.jar, cm.jar, acmui.jar, cmresources.jar, acmuiresources.jar, and testcore.zip. ███████████████
███████████████████████████████████████████████████████████████

Versata's registration of these versions of the software are sufficient to cover its earlier versions of the software. *See Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1229 (11th Cir. 2008) (registration of the derivative work has been deemed sufficient to permit a claim based on the underlying work, even if that work was not registered); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F. 3d 739, 747 (2nd Cir. 1998) ("[B]ecause Streetwise is the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work."); *JCW Software, LLC v. Embroidme.com, Inc.*,  No. 10-80472-CIV, 2011 WL 13225174, at *6 (S.D. Fla. July 26, 2011) (allowing plaintiff to pursue its copyright infringement claims for a later unregistered version based on plaintiff's registration of earlier version of the same software); *In re Independent Servs. Organizations Antitrust Lit.*, 864 F. Supp. 1469, 1473 (D. Kan. 1997) ("Xerox's registration of the derivative works is sufficient to allow an infringement claim based on copying of material, either newly added or contained in the underlying work.").

There is ample direct evidence of Ford's unauthorized copying and use of

---

the following .jar files are associated with and included in MCA: mca.jar, mcamonitoringtool.jar, trilcommons.jar, mcaresources.zip, mca_test_data.zip, mca_test.jar.  *Id.*

Versata's copyrighted software.[68]  *See Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.*, 236 F.3d 312, 316 (6th Cir. 2004) ("the central question on a copyright infringement claim is whether the defendant 'copied' the plaintiff's copyrighted creation").  As noted above, Ford admits that it placed .jar files in it PDO repository to perform input/output testing, in violation of the MSSA.[69]  Ford developers had unauthorized access to Versata code in a format that could allow for easy reverse engineering of Versata's software, including well after Ford's license to use the software had been terminated.

In addition, these .jar files became human-readable when placed in Ford's PDO repository, allowing Ford's software developers to examine and understand the logic behind the code.[70]  Versata .jar files were made available to Ford as part of the licensed software in order to enable execution of the license software.[71]  If used in the licensed manner, Ford would never have had access to Versata's source code in a format that human-readable. *See* Ex. B, Krauss Dec.  Ford does not deny that it placed these files in its PDO repository.  *See* Ex. A-23, Myers [706-708][72]

Ford was never authorized to make copies of these files in a development

---

[68]  The versions of the software provided to Ford overlap functionally with the versions that Versata registered with the Copyright Office.  *See* Ex. B, Krauss Decl.
[69]  *See* Section III, *supra*.
[70] *See* Ex. B, Krauss Decl.
[71]  *See* also Ex. A-15, Dr. Malek Report, at ¶¶ 427-37.
[72]  *See* also Ex. A-15, Dr. Malek Report, at ¶428 (citing screenshots *from* Ford's repository, attached as Ex. A-54, - FORD_SOURCECODE_000510, 600, 601)

environment to permit readable access to Versata's code.[73]  Nor was Ford authorized to place them in a central repository allowing distribution of these files to anyone who had access to the Ford computer network and repository.  It is undisputed that numerous developers who authored the Ford infringing software, PDO, had these .jar files saved on their computers.[74]   Moreover, these .jar files existed in Ford's PDO environment after its license to the ACM software expired.[75]

No genuine issue of material fact exists as to Ford's unauthorized distribution and use of these copyrighted materials.  *See Ward v. Knox County Bd. of Educ.*, 612 Fed. Appx. 269, 277 (6th Cir. 2015) (affirming a grant of summary judgment of infringement where the evidence in the record does not create a genuine dispute of material fact regarding copying); *Calibrated Success, Inc. v. Charters*, 72 F. Supp. 3d 763, 773 (E.D. Mich. 2014); *Wilcom Pty. Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027, 1031–32 (E.D. Mich. 1998); *FenF, LLC v. Healio Health Inc.*, No. 5:08CV404, 2009 WL 10688713, at *3 (N.D. Ohio Sept. 4, 2009); *Corel Corp. v. Ford Motor Co.*, No. 05-71130, 2006 WL 680846, at *3 (E.D. Mich. Mar. 15, 2006) ("If Ford's use of the FlowCharter software exceeds its license in that Ford has copied the software on more desktops than it has paid a license fee, . . . Corel may

---

[73]  *See, e.g.*, Ex. A-55, FORD_SOURCECODE_001589 (showing human readable version of a .jar file); Ex. A-21, MSSA 1.7 (prohibition on reverse engineering)
[74] *See* Ex. A-41, PDO developer .jar files.
[75] *See* Dkt. 129, Krauss Dec. ISO of Preliminary Injunction at ¶ 118; Dkt. 201, Krauss Supplemental Declaration ISO Preliminary Injunction at ¶ 3.

be able to establish its copyright infringement claim.").  Accordingly, Versata is

entitled to summary judgment on its copyright infringement claim.















**VI.  Ford cannot show facts sufficient to support its invalidity claims.  (Ford's COA 9–16)**

Ford has the burden, under section 282 of the Patent Act, to prove its invalidity defense to be proved by clear and convincing evidence.  *See Microsoft Corp. v. I4I Ltd. Partn*., 564 U.S. 91, 97 (2011).  In deciding a motion for summary judgment of invalidity the burden of proof must be considered.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Nat'l Presto Indus., Inc. v. W. Bend Co*., 76 F.3d 1185, 1189 (Fed. Cir. 1996).

**A.  Ford has offered no evidence of invalidity for the '080, '651, '825 patent claims and the dropped claims from the remaining asserted patents.**

As discussed above, at the time of opening reports, Versata dropped infringement allegations as to two of the previously asserted patents, and some of the claims originally asserted from the Asserted Patents.[97]  Versata provided Ford

---

[97] Versata's reduction of asserted claims was in part due to the stipulation entered into by the parties to reduce asserted claims and invalidity reference. See Dkt. 123.

with a list of the Asserted Claims in Dr. Malek's report.[98]

Neither Dr. Greenspun nor Dr. Surati submitted an expert report as to the invalidity of the '080 patent under 35 U.S.C. §§ 102, 103. And although Ford's invalidity experts, Dr. Greenspun and Dr. Surati, offered opinions as to invalidity of the '651 and '825 patents (no longer asserted) as well as a larger set of asserted claims, they later limited their expert opinions to the Asserted Claims.[99] The only claims that Ford's experts no offer invalidity opinions are those asserted by Versata, *i.e.*, the Asserted Claims. Ford cannot raise a genuine issue of material fact as to the validity of the '080, '651, and '825 patent or as to any claims other than those presently asserted by Versata. Further, as the Special Master found with regard to claims that Versata previously dropped in the case, there remains no active case or controversy as to the validity of these claims.[100] As a result, Versata asks the Court enter a partial summary judgment of validity and patent-eligibility as to claims of the '651 and '825 patents, and all claims other than the Asserted Claims of the '294, '308, '057, '080, '582, and '064 patents as well as summary judgment of patent validity as to claims of the '080 patent.[101]

---

[98] Ex. A-14, Malek Patent Rep. at 4.

[99] *See* Ex. O, Greenspun Dep. at 9:16-10:24; Ex. R, Surati Dep. at 8:17-9:7.

[100] *See* Dkt. 181, at 41-48 (relying on *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269 (Fed. Cir. 2012).

[101] Specifically, these claims are claims 3-6, 10-21, 25-27, 29-36 of U.S. Patent 6,405,308; claims 3-6, 9-17, 19-21, 30, 32-33 of U.S. Patent 6,675,294; claims 4, 5 of U.S. Patent; 7,200,582; claims 4-8, 10, 13, 16-27 of U.S. Patent 7,464,064; and

**B.    Ford has offered no evidence that Versata's patent claims are not directed to patentable subject matter.**

For each of the Asserted Claims, Ford's expert, Dr. McGuiness opines that each of the claimed invention can be performed with a pen and paper, and are "mental processes" that should each be considered an abstract idea.  With regard to the '308 and '294 patents, Dr. McGuinness opines that an automobile seller's use of a Ford Explorer Brochure could perform each functional element of each of the asserted claims of those patents.[102]  On the '582, '064, '080 and '057 patent claims, Dr. McGuinness opines that the examples provided in the patent specification show that a human being, using pen and paper, can perform the claimed invention.[103]  For each of the Asserted Claims, Dr. McGuinness states in conclusory fashion that because generic computer system and components add nothing to the claim limitations, the claim does not provide any technological improvement or innovation.[104]

---

claims 2-17, 20, 24, 26, 28-46 of U.S. Patent 7,882,057; claims 2, 5-10, 14-17, 19-22 of U.S. Patent 7,739,080.  Ford's amended complaint (Dkt. 161) includes eight causes of action (Nos. 9-16) and eight counterclaims (Nos. 1-8) relating to invalidity of Versata's patents.  Ford patent-eligibility expert, Dr. McGuiness does offer opinions as to the '080 patent claims, which Versata addresses below.

[102] *See, e.g.*, Ex. A-19, McGuinness '651 Report at 25-33 ('308 patent, claim 1).

[103] *See, e.g.*, Ex. A-18, McGuinness '582 Report at 6-10 ('582 patent, claim 1); Ex._ A-16, McGuinness '057 Report at 7-17 ('057 patent, claim 1); Ex. A-17, McGuinness '080 Report at 2-12 ('080 patent, claim 1).

[104] *See, e.g.*, Ex. A-19, McGuinness '651 Report at 33; Ex. A-18, '582 Report at 10; Ex. A-16, McGuinness '057 Report at 17; Ex. A-17, McGuinness '080 Report at 12.

37

Patentable subject matter under § 101 broadly encompasses processes, machines, manufactures, and compositions of matter but is subject to exceptions for "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). These exceptions are applied narrowly because "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

In step one of the Supreme Court's *Alice* analysis, the court determines "whether the claims at issue are directed to one of th[e] patent-ineligible concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). The claim must be viewed as a whole, and all claim limitations must be considered. *See Diamond v. Diehr*, 450 U.S. 175, 188 (1980).

If the court finds an abstract idea at step one, it proceeds to step two, where it examines whether the claim contains an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. The claim limitations must be considered both individually and "as an ordered combination." *Id.* at 2359.

### 1.   Ford's analysis as to Step 1 of the *Alice* Analysis for each of the Asserted Claims is deficient.

For each of the Asserted Claims, Ford does not allege that the claim is directed toward a conventional idea that had long been performed with pen and paper that Versata's patents simply implemented using a generic computer. Instead, Ford's

38

allegation is, based on its expert's incorrect opinions, that each of the asserted claim can be performed "mentally or with pencil and paper," and thus the claims are each directed at an abstract idea.  Ford misapplies law related to a narrow subcategory of patents directed at unpatentable mental processes to Versata's computer-centric inventions.  "[M]ental processes are not patent-eligible subject matter because the application of only human intelligence to the solution of practical problems is no more than a claim to a fundamental principle."  *CyberSource Corp. v. Retail Decisions, Inc*., 654 F.3d 1366, 1371 (Fed. Cir. 2011) (citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).  In *Benson*, for example, the unpatentable method was directed to converting binary-coded decimals numbers into pure binary through the use of a mathematical algorithm.  *Id*.  The Federal Circuit has applied this reasoning to a narrow set of inventions that can be performed *entirely* in the human mind.  In *CyberSource*, for example, the Court found a method directed to detecting fraud based on the internet address data relating past transactions to be "a method that can be performed by human thought *alone*."  *Id*. at 1373 (emphasis added).    Citing *Benson*, the court explained:

> Methods which can be performed entirely in the human mind are unpatentable not because there is anything wrong with claiming mental method steps as part of a process containing non-mental steps, but rather because computational methods which can be performed *entirely* in the human mind are the types of methods that embody the "basic tools of scientific and technological work" that are free to all men and reserved

39

exclusively to none.

*Id*. (emphasis in original).

Versata's patent claims are directed at specific and detailed improvements to configuration systems and can hardly be considered the basic tools of technological work.[105]  More importantly, the claims recite limitations that are inherently tied to a computer and cannot be performed in the human mind.

### a.  *The '308 and '294 Patent Claims*

Each of the Asserted Claims recite limitations clearly directed at computer components.  For example, the claims recite the term "graphically displayed," "conveyed graphically," "display," "displayed by a first computer system" or even "displaying on a display of a first computer system."[106]  When read in context of the claims and the specification, these limitations are necessarily implemented on a computer, not in the human mind.  Contrary to Ford's allegation, the Federal Circuit has specifically held that inventions directed at user interface improvements—one aspect of the claimed inventions here—are indeed patent eligible.  *See Core Wireless Licensing v. LG Elecs., Inc.*, No. 2016-2684, 2018 WL 542672, at *4 (Fed. Cir. Jan. 25, 2018).  Other '294 patent claims require transmission of data between two

---

[105] Dr. Wilson's report details the flaws in Ford's approach.  Ex. A-30, Wilson Report at 17-39 ('651 patent family), 58-63 ('582 patent family), 71-75 ('080 patent), 97-106 ('057 patent).

[106] *See* independent claims 1 and 18 of the '308 patent (Ex. J) and independent claims 1, 21 and 26 of the '294 patent (Ex. K).

computers.[107]  Ford's step one analysis improperly ignores each of these limitations to conclude—as its expert does—that the inventions are merely computational methods which can be performed *entirely* in the human mind.

### b.  *The '582 and '064 Patent Claims*

The asserted claims of these two patents are directed to methods and systems for detecting consistency errors.  Even a cursory review of these patents makes clear that these are improvements to a configuration system used to define product configuration.[108]  The last limitation of the independent claims requires providing data to the user indicating consistency error that has been detected.  The '064 patent claims expressly recite providing such error data "to a computer system for display by a display device."[109]  The purpose of detecting errors is to fix them.  Ford's reading of the claims, excluding the computer related limitations, once again renders the claims meaningless.

### c.  *The '057 Patent Claims*

Ford's claim that the '057 patent claims can be performed by a human are surprising.  At claim construction, Ford argued that at least one of the limitations of the independent claims of this patent cannot be performed by humans.  *See* Dkt. 181,

---

[107] *See, e.g*., independent claims 21 and 26. (Ex. K)
[108] *See, e.g.,* Ex. G, '582 patent, Abstract.
[109] *See, e.g.*, Ex. E, '064 patent, claims 1, 9.

at 50.   After all, Ford argued, the only support in the specification for the claim limitation requires that the processing step be performed on a computer.  *Id.* at 51. Versata as well as the Special Master generally agreed that the substantive processing of the claim has to be done by a computer, not a human, and the Special Master therefore construed the claim accordingly.  *Id.* at 52.  Ford now makes a U-turn on its own argument, claiming that the '057 claims can be performed ***entirely*** in the human mind.  Not only does it contradict the claim construction, which the parties agreed to adopt, and the Court entered an order doing so,[110] but also ignores numerous limitations in the claims that expressly recite a computer system or aspects of a computer system such a processor, a storage medium, and a display device.[111]

### d.   *The '080 Patent Claims*

Ford's patent ineligibility allegation as to the '080 patent claims is just as remarkable at that for the '057 patent.  Here too, Ford argued for, and obtained a claim construction limiting the independent claims to be performed by the computer or computer system.  *See* Dkt. 181, at 56-62.  And like the '057 patent claims, the '080 patent claims expressly recite "performing with a computer system," as well as use of specific computer components.[112]   Ford's allegation that these are systems and methods that can be performed entirely in a human mind is unsupported.

---

[110] *See* Stipulation and Order Regarding Claim Construction, Dkt. 317.
[111] *See, e.g.*, independent claims 1, 18. (Ex. D)
[112] *See, e.g.*, independent claims 1, 3, 4. (Ex. I)

### 2. Ford has offered no evidence of as to Step 2 of the *Alice* Analysis

As discussed above, Dr. McGuinness offers a single conclusory statement as to *Alice* step 2. The statement follows her conclusion that each of the claimed invention can be performed using pen and paper:

> As established above, the steps of claim 1, considered separately, are conventional steps that can be done by a person either in the mind or using pen and paper. Viewed as a whole, with the steps considered in the order presented in the claim, generic computer system and components add nothing that is not already present when the steps are considered separately or when the steps are considered in the order presented, so the claim does not provide any technological improvement or innovation.[113]

Even if Dr. McGuinness is correct on her claim that each of the claimed inventions can be done by humans using a pen and paper—and she is not—there can be no question that each of the asserted claims recite an "***inventive concept***," particularly in light of the evidence that demonstrates how the patented inventions revolutionized configuration systems. The Supreme Court has made clear that claims that solve "technological problems," "improve the functioning of a computer itself," or "effect an improvement in other technology or technical field" likely meet this test. *Alice*, 134 S. Ct. at 2359; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014). Here, the evidence of the novelty of the patented

---

[113] *See, e.g.*, Ex. A-19, McGuinness '651 Report at 33.

inventions' improvement to configuration systems refutes any argument that the patents are no more than an ineligible concept itself. This includes not just the intrinsic evidence (the claims, specification, and prosecution history) but also opinions provided by Dr. Wilson as to the claims of each of the Asserted Patents, explaining inventive concepts found in each of the claimed inventions.[114]

Moreover, this inquiry differs from, and is in fact a lower bar than, novelty and non-obviousness in that it focuses on whether the claims "purport" to set forth a technological solution or improvement rather than focusing on the question of whether, in light of the prior art, the patent actually does set forth a novel improvement over the prior art. *Alice*, 134 S. Ct. at 2359. Dr. McGuinness' single conclusory statement gives short shrift to the step two analysis and is insufficient to meet Ford's burden of clear and convincing evidence as to its challenge to § 101 eligibility of Versata's patents.

Versata asks the Court to reject Ford's expert's paper and pen arguments as to Versata's inventions and enter summary judgment that each of the Asserted Claims is directed to patentable subject matter.

### C. Ford has offered no evidence of invalidity of the '582 and '064 patent claims.

As discussed above, each of asserted claims of the '582 and '064 patent

---

[114] Ex. A-30, Wilson Report at 39-47 ('651 patent family), 51-58 ('582 patent family), 76-77 ('080 patent), 106-108 ('057 patent).

require that a consistency error type be represented by a ***set equation — equations that operate on sets***.[115] Ford alleges that these claims are anticipated or rendered obvious by two nearly identical references, namely, Felfernig 1999 and Felfernig 2000.[116] Ford's expert, Dr. Surati, identifies a single disclosure in Felfernig 2000[117] as meeting the "set equation" limitation:

> e1$^+$ = {∃ (PC, MB, SOS): type(PC, pc). type(MB, motherboard-3). type(SOS, server-os-1). conn(PC, motherboard-port, MB, pc-port). conn(PC, server-os-port, SOS, pc-port).}

This is not an equation that ***operates on*** anything. Dr. Surati admits that the symbol *"∃"* is used to connote "there exists."[118]   Felfernig explains that this statement signifies that e1+ represents the proposition that "there exists"—*a PC(personal computer), MB(motherboard), and SOS(server operating systems) such that the PC is the type pc, the MB is the type motherboard-3, the SOS is type server-os-1, the PC's motherboard-port is connected to the MB's pc-port, and the PC's server-os-port is connected to the SOS's pc-port*.[119]  A statement that declares that something exists, does not "operate on" that something.  The only disclosure

---

[115] The Court has construed a "set equation" as "one or more equations that operate on sets."

[116] Ex. A-27, Dr. Surati Rep. at ¶ 23-26.

[117] Ex. A-6, Felfernig at 180-181.  Ex. A-27, Dr. Surati Rep. at ¶¶ 96-99.

[118] Ex. R, Surati Dep. at 151-159.

[119] Ex. R, Surati Dep. at 152:24-153:24.

that Dr. Surati relies on therefore does not meet the "set equation" limitation.[120]

What that statement instead connotes is that a specific configuration *exists*. Felfernig calls these statements, ($e1^+$ and $e1^-$) "examples"—assertions of configurations describing a set of parts being combined to form a product.[121] There are valid and invalid "example" configurations that define possible valid or invalid configurations as permitted by the product definition.[122] The two example configurations serve complementary purposes. The goal of the positive examples in $E^+$ is to check whether the knowledge base will accept correct configurations. Conversely, a negative example in $E^-$ serves to check that the knowledge base will not accept an incorrect configuration. A configuration is in no sense an "equation," Felfernig does not refer to them as such, and does not disclose them as operating on anything—they serve merely as a comparison tool. The only evidence that Ford has to offer are unsupported opinions that contradict the clear disclosure of the actual references. Ford cannot escape summary judgment by offering such conclusory opinions of invalidity. *See Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."); *see also TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) ("A party may not overcome a grant of

---

[120] Ex. R, Surati Dep. at 159.
[121] Ex. A-6, Felfernig 2000 at 180.
[122] Ex. A-6, Felfernig 2000 at 181

summary judgment by merely offering conclusory statements.").

**D.    Ford has offered no evidence of invalidity of the '057 patent claims because Dr. Greenspun fails to identify any disclosure of dividing a configuration query in either of the prior art references.**

The '057 patent claims methods for answering complex configuration queries by *dividing* the query into subqueries. Ford relies on a combination of two references—Loomans[123] in view of Stahl[124]—to claim that the '057 patent claims are obvious.[125]

All of the asserted claims of the '057 patent require "dividing one or more configuration queries into multiple configuration sub-queries, wherein the multiple configuration sub-queries represent the one or more configuration queries."[126] Neither of the references relied on by Ford *expressly* disclose a configuration query, let alone sub-queries or the dividing step as claimed. Ford's expert instead argues that when the references are combined, viewed from a person of skill in the art's perspective, and a series of inferences are drawn based on how the systems disclosed in each reference may (or may not) operate, the "dividing" limitation is disclosed somewhere.[127] This can be hardly sufficient to meet Ford's burden, to show by clear

---

[123] Ex. F, U.S. Patent 7,873,503.
[124] Ex. A-26, Stahl, et.al, A Customization Approach for Structured Products in Electronic Shops.
[125] Ex. A-9, Greenspun '057 Rep. at pg.35..
[126] Ex. D, '057 patent.
[127] Ex. A-9, Greenspun Rep. at ¶¶103-112.

and convincing evidence, that each of the limitation is present in the prior art.

On the Stahl reference, Dr. Greenspun points to Figure 3 as disclosing "partitioning a query into sub-problems (*i.e.*, sub-queries)."[128]



*Figure 3: An Example Query*

First, even a cursory reading of Stahl, an English reference by three German authors, reveals that the word "query"[129] is a result of a mistranslation—a "query" in Stahl refers to "an incomplete product description."[130]  Regardless, even if the Court were to agree that an incomplete product description can be a "query," nowhere does Stahl discuss "dividing" this incomplete product description into subqueries.  Rather, "[t]he starting point of the configuration process is the query represented by an incomplete instantiation of the compositional structure."[131]  In

---

[128] Ex. A-9, Greenspun Rep. at ¶103.

[129] Ex. A-71, Merriam-Webster's Dictionary defines "query" as a question or inquiry, which is what any English speaker would understand the word to mean. *See* Merriam-Webster.com, Merriam-Webster, n.d. Web. 31 Jan. 2018.  Notably, Ford did not seek a construction of the term as something different than its plain and ordinary meaning.

[130] Ex. A.-26, Stahl at 4; Figure 3 reproduced above itself looks nothing like a question, let alone a configuration question.

[131] *id.*

other words, Stahl begins with an already partitioned compositional data structure. There is no need to divide anything. Dr. Greenspun's analysis that the "dividing" limitation is disclosed to a person of skill in the art is far and divorced from both the claim language and the purpose of the '057 patent—which is to solve complex configuration questions—and cannot raise a genuine issue as to the lack of disclosure of this limitation.

Dr. Greenspun's claims as to Loomans disclosing a "query" and the "dividing" limitation is even more baffling.[132] Loomans does not even mention the word "query."[133] Instead, Dr. Greenspun opines that the disclosure relating to **building** sub-models and models implicitly discloses queries, subqueries, and anything else that the claim may require.[134] This is clear from the Dr. Greenspun statements—he does not state Loomans expressly discloses "dividing," but instead that a query **would be needed** and that it **would need to be** divided. *Id.* Once again, when divorced from the language and purpose of the claims as well as from express statements in the prior art, one could imagine any disclosure. That however cannot be enough to create a genuine issue of material fact barring summary judgment.

---

[132] Ex. A-9, Greenspun Report at ¶107-111.
[133] It mentions "queried" in reference to a child sub-model querying its parent model for information about itself but that's not the disclosure that Greenspun relies on. Ex. F, Loomans at 4:59-67.
[134] Ex. A-9, Greenspun Report at ¶109-110.

## VII.   Versata has a contractual right to an audit.  (Ford's COA 7)

Ford also seeks a declaratory judgment that the provisions of the MSSA do not permit Versata to inspect Ford's PDO software or interview Ford's PDO developers.  Dkt. 226 at 18.  But the MSSA verification provision provides that Versata is entitled to inspect "records pertaining to the Software licensed hereunder or other Trilogy Confidential Information."  MSSA § 3.5.  Section 12.2 elaborates on the audit right, stating that "Ford will, upon reasonable request, reasonably make available to Trilogy certain of its facilities, computer resources, **software programs**, networks, **personnel**, and business information **as are required to perform any** Work, service, or other **obligation hereunder**."  Ex. A-21, MSSA § 12.2.

Because Ford had the obligation to permit Versata to inspect records pertaining to Versata's Confidential Information and the licensed Software, because Ford's obligation included providing access to its software programs and personnel, and because Versata sought to inspect a software program (PDO) and interview personnel (PDO developers) in furtherance of its right of inspection, the MSSA permits the requested inspection and interviews.  To be entitled to its declaratory judgment, Ford would need to present evidence that Versata's request was unreasonable.  Ford has presented no such evidence.  Versata is entitled to summary judgment on Ford's seventh cause of action.

## VIII.  Versata did not breach the SSA. (Ford's COA 17)

In its seventeenth cause of action, Ford claims that Versata breached the 2002 SSA by not paying an annual refund to Ford for its ACM subscription fees.  Dkt. #226 at 24.  As an initial matter, Ford claims—and Versata agrees—that the MSSA superseded the 2002 SSA as to issues covered by the MSSA, such as pricing, and the refund provision of the SSA is no longer enforceable.  *Id.* at 25 ¶¶ 128–29; *see* Ex. A-21, MSSA § 13.10 (integration clause providing that the MSSA "shall constitute the entire agreement between the parties regarding the subject matter hereof and supersede all proposals and prior discussions and writing between the parties with respect thereto.").  Therefore, Versata is entitled to summary judgment on this basis alone.

Moreover, the discount provision applies only if Ford, *in its discretion*, participated in Trilogy marketing initiatives, and a non-Ford automobile OEM became an ACM customer.   Ex. C-2, SSA 2.A.  Ford has provided no evidence that it participated in Trilogy marketing initiatives. Nor has Ford provided any evidence that a non-Ford OEM became an ACM customer during the relevant time period. The 2002 SSA provides that the refund is contingent on another OEM subscribing to ACM.  Ex. C-2, SSA § 2.E.  That, however, did not occur during the pendency of the SSA, and Ford has not provided any evidence to the contrary.  Therefore, on either ground, Versata is entitled to summary judgment on Ford's seventeenth cause

of action.

## CONCLUSION

For the reasons set forth above, Versata respectfully requests this Court to grant partial summary judgment, as described above, in Versata's favor on counts 4, 5, and 7–17 of Ford's second amended complaint (Dkt. 226) and counterclaims 5, 6, 11, and 14 of Versata's answer to Ford's second amended complaint (Dkt. 244).

Date: February 13, 2018        Respectfully submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING P.C.

*/s/ Steven J. Mitby*
Steven J. Mitby
Texas State Bar No. 24037123
smitby@azalaw.com
Reed N. Smith
Texas State Bar No. 24067875
rsmith@azalaw.com
Iftikhar Ahmed
Texas State Bar No. 24064795
iftiahmed@azalaw.com
Kyril Talanov
Texas State Bar No. 24075139
ktalanov@azalaw.com
Matthew Caldwell
Michigan State Bar No. P79462
mcaldwell@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 (Phone)
(713) 655-0062 (Fax)

Sharoon Saleem
Texas State Bar No. 24072321
Jones Spross, PLLC
1605 Lakecliff Hills Lane, Suite 100
Austin, Texas 78732
(713) 446-0217
sharoon.saleem@jonesspross.com

Rodger D. Young
Jaye Quadrozzi
Young & Associates
27725 Stansbury Blvd., Suite 125
Farmington Hills, Michigan 48334
(248) 353-8620
efiling@youngpc.com

**ATTORNEYS FOR DEFENDANTS
VERSATA SOFTWARE, INC., F/K/A
TRILOGY DEVELOPMENT GROUP,
INC., AND TRILOGY, INC.**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

FORD MOTOR COMPANY,                    CASE NO. 15-10628-MFL-EAS

      Plaintiff/Counter-Defendant,        (Consolidated with
                                      Case No. 15-11624-MFL-EAS)
v.                                     Hon. Matthew F. Leitman

VERSATA SOFTWARE, INC., F/K/A
TRILOGY SOFTWARE, INC., TRILOGY
DEVELOPMENT GROUP, INC. AND
TRILOGY, INC.,

      Defendants/Counter-Plaintiffs.

---

## PROOF OF SERVICE

    Rodger D. Young certifies that on February 13, 2018, he served the Versata

Defendants' Motion for Summary Judgment – Corrected and this Proof of Service

upon all counsel of record via electronic filing.

    I declare under the penalty of perjury that the statements made above are true

to the best of my knowledge, information, and belief.

                              **YOUNG & ASSOCIATES**

                              */s/ Rodger D. Young*
                              Rodger D. Young (P22652)
                              27725 Stansbury Blvd., Suite 125
                              Farmington Hills, MI 48334
                              248.353.8620
                              efiling@youngpc.com