UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

     Plaintiff,                  Case No. 15-cv-10628

                                  (*consolidated with Case No. 15-11624*)

v.                             Hon. Matthew F. Leitman

VERSATA SOFTWARE, INC. *et al.*,       **FILED UNDER SEAL**

     Defendants.

_____/

**OPINION AND ORDER (1) GRANTING PLAINTIFF'S MOTIONS TO EXCLUDE THE EXPERT TESTIMONY OF JAMES MARTIN (ECF #348), THE EXPERT TESTIMONY OF CHRISTOPHER BOKHART (ECF ## 346, 351), THE TRADE SECRET DAMAGES OPINIONS OF CRAIG ELSON (ECF ## 347, 349), AND THE COPYRIGHT INFRINGEMENT OPINIONS OF DR. SAMUEL MALEK (ECF ## 344), AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MONTY MYERS (ECF # 352)**

**I**

In 1998, Plaintiff Ford Motor Company hired Defendants Versata Software, Inc., Versata Development Group, Inc., and Trilogy, Inc. (collectively, "Versata") to develop computer software that would allow Ford to more efficiently configure the millions of cars it manufactures each year. Versata created that software, called "ACM," and it licensed ACM and other related software to Ford for millions of dollars per year in licensing fees. In 2014, Ford and Versata could not agree on the terms of a renewed software license, and Ford developed its own automotive configuration software. Ford called its replacement software "PDO." Versata insists

1

that when Ford created PDO, Ford copied and stole many proprietary features of Versata's software.  Ford denies those allegations.

On February 19, 2015, Ford filed this action.   Ford seeks a declaratory judgment that it did not infringe and/or misappropriate certain of Versata's patents, copyrights, and trade secrets. (*See* Sec. Am. Compl., ECF #226.)  Versata has filed counterclaims for infringement of the same patents and copyrights and misappropriation of the same trade secrets. (*See* Ans. and Counterclaims, ECF #244.)  Versata seeks over one billion dollars in damages. (*See id.*)

Currently before the Court are four motions filed by Ford and one motion filed by Versata requesting the exclusion, in whole or in part, of the testimony of five expert witnesses.  The motions are:

- Ford's motion to exclude the testimony of damages expert James Martin (ECF #348);

- Ford's motion to exclude the testimony of patent damages expert Christopher Bokhart (ECF ## 346, 351);

- Ford's motion to exclude the trade secret damages opinions of  expert Craig Elson (ECF ## 347, 349);

- Ford's motion to exclude the copyright infringement opinions of expert Dr. Samuel Malek (ECF #344); and

- Versata's motion to exclude the rebuttal testimony of expert Monty Myers (ECF #352).

2

The Court held a hearing on all of these motions on April 24, 2018. (*See* 4/24/18 Hearing Tr., ECF #472.)  For the reasons that follow, the Court **GRANTS** Ford's motions and **GRANTS IN PART AND DENIES IN PART** Versata's motion.

## II

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702.

District courts have "broad discretion as [] 'gatekeeper[s]' to determine the admissibility" of expert testimony. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).  Among other things, district courts must determine whether an expert is sufficiently qualified.  "A witness is [not] an expert simply because he claims to be."

3

*Id.* at 577. Instead, the proponent of expert testimony must "qualify [its] expert with reference to his 'knowledge, skill, experience, training or education.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th. Cir. 2007) (quoting FRE. 702). Courts must then "determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony." *Berry v. Crown Equipment Corp.*, 108 F.Supp.2d 743, 749 (E.D. Mich. 2000).

In addition, courts must "determine whether [expert] evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th. Cir. 2012) (quoting *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "The relevance requirement ensures that there is a 'fit' between the testimony and the issue to be resolved by the trial. The reliability requirement is designed to focus on the methodology and principles underlying the testimony." *Greenwell v. Boatwright*, 184 F.3d 492, 496-97 (6th. Cir. 1999) (internal citation omitted). "An expert who presents testimony must 'employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Newell Rubbermaid*, 676 F.3d at 527 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The proponent of expert testimony has the burden of "establish[ing] its admissibility by a preponderance of proof." *Nelson v. Tennessee Gas Pipeline, Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). "Red

flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid*, 575 F.3d at 527. "No matter which factors are used" to determine the admissibility of expert testimony, "the key question remains the same: Does the expert possess 'specialized knowledge' that will aid the trier of fact in determining a fact in issue, and is the proposed testimony the product of sufficient research that was conducted pursuant to reliable methods?" *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, 690 F.Supp.2d 622, 635 (E.D. Mich. 2010).

## III

## A

The Court first turns to Ford's motion to exclude the testimony of James Martin, a financial expert whom Versata retained to provide background support for its damages theory. (*See* Martin Mot., ECF #348) Martin is a corporate consultant and accountant for Cendrowski Corporate Advisors, a financial and litigation consulting firm based in Bloomfield Hills, Michigan. (*See* Martin Rpt., ECF #350 at Pg. ID 18196.) Martin graduated with an accounting degree from Eastern Michigan University in 1995, and he obtained a Masters of Science degree in Accounting Information Systems from Eastern Michigan University in 1997. (*See id.*) He is a

Certified Management Accountant, Certified Internal Auditor, and Certified Fraud

Examiner. (*See id.*)

In Martin's expert report, he explained that after Ford began using Versata's

ACM (and related) software, Ford experienced substantial cost savings from a

decrease in errors during production:

> Based on analysis of publicly available data, contemporaneous news reports, and research reports, product definition errors experienced by Ford Motor Company were reduced significantly after the implementation of the ACM system.
>
> The reduction of product definition errors resulted in cost savings to Ford in the area of parts cost savings, warranty claims, and reduction in recall campaigns.
>
> Additionally, Ford's Six Sigma analysis of the ACM implementation showed a significant reduction of vehicle configuration errors over the prior system, confirming tremendous benefit was realized by Ford.

(*Id.* at Pg. ID 1817.)

Martin also offered an "overview of the automobile manufacturing process"

and explained "the potential business benefit of an accurate configuration

management process" in the automotive industry. (*Id.* at Pg. ID 18178-84.) Finally,

Martin described how a reduction in product errors could save automotive

manufacturers substantial time and money from reduced product recalls, warranty

claims, and mistakes during production. (*See id.* at Pg. 18187.)

**B**

Ford asserts that the Court should exclude Martin's testimony on several grounds. (*See* Martin Mot., ECF #348; Martin Reply Br., ECF #452.)  Ford argues, among other things, that much of Martin's proposed testimony adds nothing to, and is cumulative of, the data upon which he relies.  Ford also says that many of the sources that Martin based his opinions on are irrelevant and unreliable.  Finally, Ford challenges Martin's qualifications.  The Court shares Ford's view that Martin's testimony is inadmissible, and it will therefore preclude Martin from testifying at trial.

**C**

The Court declines to admit Martin's proposed testimony that Ford experienced fewer product definition errors and achieved cost savings after Ford implemented ACM because that testimony is cumulative of Versata's other evidence, is not proper opinion testimony or testimony based upon specialized knowledge, and would not be helpful to the jury.  As Versata acknowledged at the *Daubert* hearing, much of Martin's proposed testimony about error rates and cost savings consists of restating data that is available in publicly-available documents (and other documents) that may be admitted at trial.  This proposed testimony reporting cost savings and other benefits to Ford neither consists of opinions nor is it based upon specialized knowledge, and thus it is not admissible under Federal

7

Rule of Evidence 702. Moreover, Martin's testimony reporting this data would be cumulative of the underlying documents and evidence from which the data come, and the Court is convinced that the jury could understand the underlying data – which does not appear to be highly technical in nature – without the need for Martin to present the data orally. Martin's proposed testimony would therefore be needlessly cumulative of other evidence and would not assist the trier of fact. *See Bowman v. Corrections Corp. of America*, 350 F.3d 537, 547 (6th Cir. 2003) (affirming exclusion of expert testimony and recognizing that "[a] district court is free to exclude any expert testimony [...] if the testimony is cumulative or redundant under Fed.R.Evid. 403") (internal quotation marks omitted).

In addition, the Court is not persuaded that Martin gathered all of the data he reported in reliable manner. For example, in an effort to "estimate Ford's success" in reducing the number of product recalls it experienced after it implemented ACM, Martin "located a website with recall data by model year. From [that] data, [Martin] created a summary of recall campaigns by model and year." (Martin Rpt., ECF #350 at Pg. ID 18188.) Martin contended in his report that this "data show[s] a decrease in the average number of recalls per model year after the vehicles were configured in ACM." (*Id.*) But the "website" Martin "located" was not the website for the National Highway Traffic Safety Administration (the "NHTSA"). Instead, it was a website called "FordProblems.com" which is operated by a private company,

"Autobeef, LLC." As Versata acknowledged during the *Daubert* hearing, the website has a "critical" "view" of Ford. (4/24/18 Hearing Tr. at 157-58, ECF #472 at Pg. ID 39225-26.) And there is no evidence in this record that Martin made any effort to verify the data reported on this anti-Ford website.[1] Martin therefore did not engage in a reliable method of gathering and reporting data when – without undertaking any independent verification efforts – he relied, at least in part, on data reported by a website that, as Versata recognized, "doesn't think very highly of Ford." (*Id.* at Pg. ID 39226.)

For all of these reasons, the Court declines to admit Martin's testimony concerning cost savings and reduced product definition errors.

## D

Versata contends that, at a minimum, the Court should allow Martin to present general, background testimony, including an "overview of [the] automobile manufacturing process" and the "role" and benefits of "configuration management" in automotive manufacturing. (Martin Rpt., ECF #350 at Pg. ID 18178-84.) The Court concludes that Martin is not qualified to offer this testimony.

---

[1] On its home page, FordProblems.com purports to report recall information from NHTSA's website, but there is no evidence in this record that Martin ever cross-checked the FordProblems.com data with official statistics from the NHTSA. And once Martin saw on FordProblems.com's home page that it was merely reporting information from NHTSA, he should have ceased reliance on FordProblems.com and gone directly to the authoritative NHTSA website.

Martin is not an engineer, nor has he ever been directly involved in the automotive manufacturing process. He is an accountant with both undergraduate and graduate degrees in accounting. (*See id.* at Pg. ID 18196.) He also has three specialized certifications, but they are in accounting or finance; none relate to manufacturing. (*See id.*) And Martin has spent most of his career working as an accountant or in other related financial positions.

Versata insists that Martin is qualified, in part, because he "has over ten years of direct automotive sector experience working for two of the 'Big 3' automotive manufacturers." (Versata Resp. Br., ECF #410 at Pg. ID 23611-12.) But that experience was not centered around the manufacturing process. For example, Martin's work at Chrysler Corporation focused on "[d]ealer development, financial anlaysis[,] and capital lending." (Martin Rpt., ECF #350 at Pg. ID 18196.) Martin also acted as a "liaison" between Chrysler's information technology staff and its finance staff. (*See id.*) This experience does not qualify Martin to offer expert testimony about the automotive manufacturing process.

Versata further maintains that Martin is qualified because he has worked on at least one accounting project that related to automotive manufacturing and because he attended "high level, 'meet the engineer' type seminars" that provided him a sufficient background to "understand[] the financial implications of product definition errors in the automotive industry." (Versata Resp. Br., ECF #410 at Pg.

ID 23611.)  But the Court is not convinced that these isolated, "high level" experiences, some of which took place more than fifteen years ago, qualify Martin to provide background testimony about automotive manufacturing.  The Court therefore declines to allow Martin to offer background testimony about the automotive industry and the manufacturing process generally.

## IV

## A

The Court next addresses Ford's motion to exclude the testimony of patent damages expert Christopher Bokhart. (*See* Bokhart Mot., ECF #346.)  Bokhart is a Vice President of Charles River Associates, a global consulting firm. (*See* Bokhart Rpt., ECF #346-25 at Pg. ID 17696.)  Bokhart has "over 30 years of experience in intellectual property (IP) and business valuation," and "he assists companies and counsel in transactional, strategy, litigation, and financial reporting matters involving patents, trademarks, trade secrets, copyrights, and business interests." (*Id.* at Pg. ID 17696.)

Versata hired Bokhart to provide expert testimony with respect to "the amount of economic damages due to Versata as a result of Ford's alleged infringement of the patents-in-suit."[2] (*Id.* at ¶2, Pg. ID 17649.)  Bokhart used a "reasonably royalty"

---

[2] Bokhart has not offered any opinions "as to Versata's claims against Ford related to trade secret misappropriation, copyright infringement, or breach of contract." (Bokhart Rpt. at ¶2, ECF #346-25 at Pg. ID 17649.)

model of damages. He determined the reasonably royalty by constructing a hypothetical negotiation between Ford and Versata to license the relevant patents. (*See id.* at ¶12, Pg. ID 17651.) Bokhart concluded that this hypothetical negotiation would result in "ongoing annual lump sum payments [from Ford to Versata] of ███

███ (*Id.*) Bokhart calculated this amount based principally on (1) prior negotiations between Ford and Versata and (2) software and patent licensing agreements between a Versata affiliate and ███ that Bokhart believed were comparable to the hypothetical license between Ford and Versata. (*See id.* at ¶148, Pg. ID 17693.)

## B

Ford moves to exclude Bokhart's testimony because his "proffered reasonable royalty opinion is neither reliable nor relevant." (Bokhart Mot., ECF #346 at Pg. ID 17502.) Among other things, Ford argues that Bokhart "fail[ed] to apportion damages to the patents that remain at issue" in this action. (*Id.* at 17501.) Ford insists that because Bokhart did not "separate out the value of the six patents-in-suit from the unasserted patents, trade secrets, and copyrights," his reasonable royalty analysis is invalid and unreliable. (*Id.*) Ford further maintains that Bokhart's reliance on the ███ license agreements in his royalty calculation was unreliable because Bokhart did not sufficiently analyze whether the ███ licenses were comparable to the

12

hypothetical license between Ford and Versata. (*See id.* at 17510-14.) The Court

agrees and therefore will preclude Bokhart from testifying at trial.

## C

### 1

Upon a finding of patent infringement, a "court shall award the claimant

damages adequate to compensate for the infringement, but in no event less than a

reasonable royalty for the use made of the invention by the infringer. 28 U.S.C.

§ 284. "The most common method for determining a reasonable royalty is the

hypothetical negotiation approach, which attempts to ascertain the royalty upon

which the parties would have agreed had they successfully negotiated an agreement

just before infringement began." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308,

1326 (Fed. Cir. 2014) (internal quotation marks omitted).

"No matter what the form of the royalty, a patentee must take care to seek

only those damages attributable to the infringing features. Indeed, the Supreme

Court long ago observed that a patentee 'must in every case give evidence tending

to separate or apportion the defendant's profits and the patentee's damages between

the patented feature and the unpatented features.'" *Id.* (quoting *Garretson v. Clark*,

111 U.S. 120, 121 (1884)). In other words, where, as here, "the accused technology

does not make up the whole of the accused product," "apportionment" between the

patented and unpatented features of the product "is required." *Finjan, Inc. v. Blue*

*Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018). *See also Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (noting that damages under Section 284 "must reflect the value attributable to the infringing features of the [accused] product, and no more").

In light of these settled rules, patent damages experts must apportion claimed damages between patented and unpatented features of an allegedly-infringing product. Indeed, "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features [of the accused product] from the value of all other features [of that product]." *Commonwealth*, 809 F.3d at 1301 (citing *VirnetX*, 767 at 1329). *See also Nortek Air Solutions, LLC v. Energy Lab Corp.*, 2016 WL 3856250, at *4 (N.D. Cal. July 15, 2016) (excluding expert patent damages testimony because expert "did not engage in any apportionment or attempt to separate the value of the patented features from the unpatented features"); *Helios Software, LLC v. Awareness Technologies, Inc.*, 2015 WL 12806482, at *5 (D. Del. Apr. 13, 2015) (excluding expert patent damages testimony due to failure to apportion and holding that "[b]ecause it is uncontested that the accused products comprise both patented and unpatented features, [the expert] needed to apportion profits and damages between the patented and unpatented features of the accused product to render a reliable damages analysis").

**2**

In this case, Bokhart did not attempt to satisfy the apportionment requirement even though he concedes that the accused software at issue is comprised of both patented and unpatented features. (*See* Bokhart Dep. at 83-84, ECF #346-24 at Pg. ID 17638-39.)  Indeed, Bokhart testified that he never "segregat[ed] … [the] value only to [the] patents [at issue]." (*Id.* at 84, Pg. ID 17639.)  Because Bokhart did not apportion Versata's alleged damages attributable from the asserted patents from the damages attributable to the unpatented features of Versata's software, he did not apply the correct legal standard when conducting his analysis.  The Court therefore excludes his opinions. *See Commonwealth, Nortek Air*, and *Helios Software*, *supra*.

**3**

The Federal Circuit recognizes a "narrow" exception to the apportionment requirement known as the "entire market value" exception, *Commonwealth,* 809 F.3d at 1301-02, but that exception does not apply here. Under the "strict requirements" of this exception, "[a] patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Virnetx*, 767 F.3d at 1326 (quoting *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis in original)).  In this case, Bokhart has conceded that he did not conduct an entire market value analysis. (*See* Bokhart

Dep. at 15, ECF #346-24 at Pg. ID 17621). Therefore, the entire market value exception does not apply, and Bokhart was required to apportion damages.

**4**

Versata contends that Bokhart's analysis fits into a second exception to the apportionment requirement. Versata says that under this second exception, an expert need not apportion damages where he uses a comparable license to "arriv[e] at his reasonabl[e] royalty opinion." (Versata Resp. Br., ECF #412 at Pg. ID 23720.) Versata finds this exception in the Federal Circuit's decision in *Commonwealth*, *supra*.

The Court does not believe that *Commonwealth* excuses Bokhart's failure to apportion damages. In *Commonwealth*, the Federal Circuit explained that a royalty rate may be based on a comparable license so long as (1) "the licenses employed are sufficiently comparable" and (2) the valuation analysis "accounts for the differences in the technologies and the economic circumstances of the parties." *Commonwealth*, 809 F.3d at 1303. But the court did *not* say that apportionment is unnecessary when a royalty rate is determined in this way. On the contrary, the Federal Circuit in *Commonwealth* stressed that the damages model used by the district court in that case – of which the Federal Circuit approved – "did not violate apportionment principles" because that model "built in apportionment." *Id.* at 1303. It did so by focusing on prior negotiations that "centered on … the value of the asserted patent,

16

and no more." *Id.* (internal quotation marks omitted). *Commonwealth* therefore does not stand for the proposition that an expert may avoid apportioning damages if the expert uses a comparable-license analysis to determine the reasonable royalty rate. And Versata has not cited any other binding or published authority that stands for that proposition. The Court remains convinced that Bokhart was required to apportion the damages claimed here.

Furthermore, even if Bokhart was not required to apportion damages because he used the comparable-license approach, the Court would still exclude Bokhart's testimony because he did not reliably employ that approach. He failed to show – indeed, did not even attempt to show – that the ███████ licenses that he relies upon are sufficiently comparable to the hypothetical Ford-Versata license at issue here. Bokhart did not analyze, among other things, (1) the similarity of the technologies at issue, (2) any indicia of economic comparability between the licenses, and (3) any alleged differences between the ██████ agreements and the hypothetical Ford agreement. Instead, his analysis of the ██████ licenses consisted of nothing more than a recitation of the factual background of the ██████ negotiations and the general terms of those licenses. (*See* Bokhart Rpt. at ¶¶ 111-116, 147, ECF #346-25 at Pg. ID 17682-83, 17692). That is not enough to reliably establish that the ███████

Case 2:15-cv-10628-MFL-EAS ECF No. 535, PageID.40864 Filed 07/09/18 Page 18 of 54
Case 2:15-cv-10628-MFL-EAS ECF No. 557 PageID.49864 Filed 07/09/18 Page 18 of 54
Page 18 of 54

licenses are sufficiently comparable to the hypothetical license here.[3]  *See Commonwealth*, 809 F.3d at 1303 n.2 (noting that the Federal Circuit has "often excluded proffered licenses as insufficiently comparable").

Bokhart's failure to explain how the ██████ licenses are sufficiently comparable to the hypothetical license here was no mere trivial oversight.  As Ford has demonstrated, that there are numerous potentially important differences between the respective licenses. First, the ██████ licenses concerned different software – a standardized, pre-existing software called SalesBuilder. (*See id.* at ¶111, Pg. ID 17682.)  The hypothetical license here, in contrast, relate to ACM and a second software program called MCA, which were specifically created for Ford.  Second, the ██████ licenses were negotiated at different time periods (1994 and 2006) than the hypothetical negotiations between Ford and Versata.  And finally, the ██████

---

[3] Bokhart's failure to analyze the comparability of the licenses at issue here contrasts sharply with the comparability analysis found sufficient in *Intel Corp. v. Future Link Sys., LLC*, 2017 WL 2482881 (D. Del. June 1, 2017) – a decision upon which Versata relies.  In *Intel Corp.*, the court allowed an expert to testify as to damages under the comparable-license approach without apportioning damages where the expert carefully demonstrated that the "licensed patents had 'extraordinarily similar technology' to the technology of the patents being asserted [in that case]," and where he "also identified indicia of economic comparability between the comparable license agreements and the hypothetical licenses involved [], as well as any effect of alleged differences between them." *Id.* at *2.  Even if this Court agreed with the *Intel Corp.* court that apportionment is not necessary where an expert employs a comparable-license approach (which the Court does not), the Court would still exclude Bokhart's testimony because he did not conduct the type of comparability analysis deemed sufficient in *Intel Corp.*

negotiations and licenses involve different patents than the hypothetical Ford-Versata negotiations.  Given these potentially important differences between the ▇▇▇ licenses and the hypothetical Ford-Versata license, it was incumbent upon Bokhart to explain why he could rely on the ▇▇▇ licenses as sufficiently reliable comparators.  His failure to do so renders his comparable-license analysis unreliable.

For all of the reasons stated above, the Court excludes Bokhart's report and his testimony at trial.

## V

## A

The Court now turns to Ford's motion to exclude the trade secret damages opinions of James Elson. (*See* Elson Mot., ECF #347.)  Like Bokhart, Elson is a Vice President of the consulting firm Charles River Associates. (*See* Elson Rpt. at ¶1.2, ECF #347-4 at Pg. ID 17831.)  Elson has "substantial prior experience performing valuation and damages-related analyses, including analyses performed in connection with the assessment of damages in the context of complex commercial disputes." (*Id.*)

Versata hired Elson to "assess Versata's damages … as measured by the economic benefits enjoyed (and reasonably expected to be enjoyed prospectively) by Ford … as a result of Ford's alleged trade secret misappropriation." (*Id.* at ¶1.1, Pg. ID 23611.)  Stated another way, Versata hired Elson to quantify the extent to

Case 2:15-cv-10628-MFL-EAS  ECF No. 535  PageID.40866  Filed 07/09/18  Page 20 of 54
Case 2:15-cv-10628-MFL-EAS  ECF No. 535  SEALED  Filed 07/09/18  Page 20 of 54
Page 20 of 54

which Ford has been unjustly enriched as a result of Ford's alleged misappropriation of Versata's trade secrets.

Elson first determined that Ford's use of Versata's technology – which included Versata's trade secrets – saved Ford ████████ per year. (*See id.* at ¶¶ 5.2, 5.8, Pg. ID 17861, 17901.)  Elson then determined that based on these savings, Ford owes Versata (1) ████████ in unjust enrichment damages for Ford's use and alleged misappropriation of its trade secrets during the time period from January 14, 2015, through August 31, 2018 (the date when Elson assumed trial would conclude[4]) and (2) an additional ████████ to ████████ in unjust enrichment damages that could extend through the year 2026 "depending on the assumed amount of time required by Ford (post-trial) to develop and implement replacement functionality in a non-infringing way." (*Id.* at ¶2, Pg. ID 17833.)  Thus, Elson concluded that Versata is entitled to over ████████ in unjust enrichment, trade secret misappropriation damages.

Elson's estimate of ████████ per year in unjust enrichment damages far eclipses the amount that Versata actually required Ford pay in order to reap the benefits of the software that included Versata's alleged trade secrets.  Over the course of the parties' relationship, Ford paid Versata approximately ████████

---

[4] At the time Elson drafted his expert report, it was possible that this case would proceed to trial in the time-frame Elson referenced.  This case is now unlikely to proceed to trial until 2019.

including expenses, to develop the MCA and ACM software programs and between ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ per year to license the software programs. (*See* ECF #347-3 at Pg. ID 17824; ECF #347-8 at Pg. ID 17948; ECF #347-12 at Pg. ID 17964; ECF #347-19 at Pg. ID 17987; ECF #347-20 at Pg. ID 17990.) Then, in 2014, during negotiations for a renewed software license, Versata offered to license ACM and MCA to Ford for an additional five years at a licensing fee of ▮▮▮▮▮ per year. (*See* ECF #347-21 at Pg. ID 17992.) Thus, while Elson opined that Ford unjustly benefited from the use of Versata's software and technology in an amount equal to ▮▮▮▮▮ per year, Versata licensed its software to Ford (and offered to continue licensing its software to Ford) for a fraction of that amount.

## B

Ford moves to exclude Elson's trade secret damages opinions. (*See* Elson Mot., ECF #347.) Ford argues, among other things, that Elson's opinions are unreliable and inadmissible because he "failed to … apply the proper measure of damages." (*Id.* at Pg. ID 17787.) According to Ford, the value of Versata's trade secrets was set by the parties' prior licensing negotiations and agreements, and the "royalty rate" established between the parties "should be used as the basis for trade secret damages." (*Id.* at Pg. ID 17796.) Ford insists that Elson's unjust enrichment damages model is fundamentally flawed because it yielded a damages calculation "13 times higher than the rate the parties agreed upon." (*Id.* at Pg. ID 17806.) Ford

further maintains that Elson "failed to limit [his] damages [calculation] to the asserted trade secrets," that Elson wrongly "base[d] his opinion on unverified, outdated data," and that Elson's "hypothetical future unjust enrichment damages" are speculative and unreliable. (*Id.* at Pg. ID 17787.) The Court agrees and will therefore exclude Elson's trade secret damages opinions.

## C

## 1

## a

The Court excludes Elson's proposed testimony because he applied a damages model that is not an appropriate fit for this case. As noted above, Elson purported to measure the unjust enrichment to Ford from its use of the software that included the trade secrets at issue.[5] Under Elson's damages model, the unjust enrichment to Ford equals the value of the benefits Ford received – such as cost savings – from its use of Versata's software. He pegged the unjust enrichment at ███████ per year.

That cannot possibly be a reasonable measure of unjust enrichment damages here. Simply put, the model is flawed because it measures Ford's enrichment rather

---

[5] As discussed in more detail in section V(C)(2) below, a substantial flaw in Elson's analysis is that he accounts for damages related to Ford's use of Versata's *software* writ large, instead of the damages related to Ford's use of the *trade secrets* at issue here.

than Ford's *unjust* enrichment. Indeed, the whole point of Versata's software was to confer upon Ford important and valuable benefits, including costs savings and increased manufacturing efficiencies, in exchange for payment of the license fee. Versata touted its software to Ford precisely because it allowed Ford to reap these benefits. And Versata believed that it was "just" for Ford to receive those benefits in exchange for far less than ████████ per year. In fact, Ford and Versata's licensing history (described above) demonstrates Versata's belief that there was nothing *unjust* about Ford's receipt of the software's benefits so long as Ford paid Versata, at most, ████████ per year to license the software.

The Court rejects Elson's damages model because it would award Versata far more than the fair price it deemed Ford should pay in exchange for the software's benefits. As a result, the jury's reliance on the model would confer upon Versata a huge and undeserved windfall.[6]

---

[6] Versata highlights that during its relationship with Ford, it received from Ford far more than just software licensing fees. Versata notes that from 2000-2015, Ford paid an additional ████████ for "consulting and support work." (Versata Resp. Br., ECF #416 at Pg. ID 24720.) Versata contends that over its fifteen-year relationship with Ford, it received a total of roughly ████████ in compensation from Ford (consisting of the license fees plus fees for numerous other services). (*See id.*) If Versata's numbers are correct, Ford paid Versata an average of ████████ per year ████████ divided by fifteen years) to obtain the benefits of Versata's software and services. That amount pales in comparison to the ████████ per year that Versata seeks under Elson's unjust enrichment model of damages and further underscores the unreasonableness of awarding damages under that model here.

**b**

In order to avoid such a windfall, Versata's trade secret damages in this case must be measured with reference to the parties' licensing history. This measure of damages in widely accepted in trade secret misappropriation cases. Indeed, in "most cases," the "proper measure" of trade secret misappropriation damages involves "calculat[ing] what the parties would have agreed to as a fair price for the licensing the defendant to put the trade secret to the use the defendant at the time the misappropriation took place." *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974). As the Sixth Circuit has explained, the "best evidence" of the value of misappropriated trade secrets – and thus the best measure of the damages owed to a plaintiff in a misappropriation case – are the "established royalties" and/or "agreement[s] in principle" between the parties to license those secrets. *Vitro Corp. of America v. Hall Chemical Co.*, 292 F.2d 678, 683 (6th Cir. 1961).

The Sixth Circuit's decision in *Vitro Corp.* confirms that Versata's trade secret misappropriation damages are properly measured with reference to the parties' licensing history. In *Vitro Corp.*, a declaratory judgment defendant and the plaintiff had agreed in principle that the defendant would to allow the plaintiff to use the defendant's proprietary reclamation process in exchange for a $100,000 one-time payment and a yearly payment of at least $50,000 for a period of six years. *Vitro*

*Corp.*, 292 F.2d at 680.  Before the agreement could be finalized, the plaintiff's "chemists spent approximately one week" at the defendant's laboratory, during which time the defendant "fully disclosed his process" to the plaintiff's scientists. *Id.* The negotiations between the parties broke down before the agreement could be completed, and the defendant later accused the plaintiff of stealing the secret process. *See id.* at 681.  After judgment was entered in favor of the declaratory judgment defendant, the trial court turned to the issue of damages.  The court assigned that task to a special master, and he "determined that the proper method [of determining the damages owed to the defendant] … was an 'established royalty' computation and that this royalty would be determined by using the minimum amounts established by the parties themselves in the 'agreement in principle.'" *Id.* at 682.

On appeal, the plaintiff "vigorously urge[d] that it was erroneous for the master to base his award on the 'agreement in principle.'" *Id.* The Sixth Circuit rejected that argument.  It held that the "best evidence" of the value of the trade secrets, and thus the damages owed to the plaintiff as a result of the misappropriation, was "the payments agreed upon in the 'agreement in principle.'" *Id.* The court therefore affirmed the use of the value the parties had agreed upon as the basis for the defendant's trade secret damages.

The Sixth Circuit reached a similar result in *Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005).  In *Mid-Michigan*, the

25

plaintiff licensed certain software to the defendant for use in the defendant's pharmacies. *See id.* at 507. Years later, the plaintiff accused the defendant of stealing and reconstructing the source code for that software for defendant's own purposes, and the plaintiff brought a trade secret misappropriation claim. *See id.* at 507-08. The jury later awarded $2 million in damages based on a "reasonable royalty approach" – one that rested, in part, upon the licensing rates previously agreed upon by the parties. *See id.* at 509-10. The defendant challenged the damages award on appeal. The Sixth Circuit upheld the jury's damages award and approved its use of a "reasonable royalty approach." *Id.* at 509-10. The court held that the parties' previous agreements provided sufficient "evidence … that the parties valued the misappropriated trade secrets at $2 million." *Id.* As in *Mid-Michigan and Vitro Corp.*, the proper measure of damages in this case should be based upon the parties' licensing history.[7]

Versata counters that its damages should not be tied to the parties' licensing history. In support, Versata highlights the Sixth Circuit's statement that where, as

---

[7] The Court leaves for another day resolution of whether the relevant licensing history is strictly limited to (1) the license fees previously agreed to by the parties and (2) Versata's final offer to license the software in 2014, or whether the relevant history should be construed more broadly to include fees that Ford agreed to pay for related support and other services throughout the parties' relationship. For the purposes of this ruling, the Court concludes only that Versata's damages model must be tied to the parties' actual prior agreements and negotiations and that Versata may not seek damages based upon the value of benefits Ford obtained by using Versata's software during the period of alleged misappropriation.

here, "the misappropriated trade secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs [] use[] a *number of different methods* of calculation to determine damages." *Avery Dennison Corp. v. Four Pillars Enterprise, Co.*, 45 F. App'x 479, 485 (6th Cir. 2002) (emphasis added). One such method, Versata informs the Court, is awarding damages based upon "the value derived from savings because of increased productivity, or the value derived from savings in research costs." *Id.* at 486 (citing *University Computing,* 504 F.2d at 535-36). But these alternative measures are appropriate only where the trade secret misappropriation damages are not "subject to exact measurement," *University Computing*, 504 F.2d at 539, and the damages here can be measured with exactness. Indeed, as the Fifth Circuit explained in a case on which Versata relies, damages *are* "subject to exact measurement," where, as here, "the parties had previously agreed on a licensing price." *University Computing*, 504 F.2d at 538. Under these circumstances, the substantial flexibility that courts may otherwise have to eschew the reasonable royalty approach and to develop an alternative damages measurement simply does not apply. *See id.* at 538-39.

Notably, Versata does not cite any case in which any court, when presented with the parties' licensing agreements and history, has departed from the reasonable royalty method of calculating damages and has measured damages based upon the

value of benefits obtained by the defendant. Versata cites Sixth Circuit's decision in *Avery Denison*, *supra*, for the proposition that "where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant." (Versata Resp. Br., ECF #416 at Pg. ID 24727, quoting *Avery Dennison*, 45 F. App'x at 485). But the alleged trade secrets misappropriated in *Avery Dennison* were not for sale, and there was no licensing history between the parties. Under those circumstances (which differ sharply from those here), the plaintiff's "theories of damages" appropriately "concentrated on the benefits that [the defendant] derived from the use of the secrets." *Avery Dennison*, 45 F. App'x at 486.

Versata further asserts that its damages should not be based on its licensing history with Ford because (1) its previous and proposed license fees accounted for certain strict conditions that the licenses imposed upon Ford and (2) Ford has not been subject to those conditions during the time of its alleged misappropriation. Thus, Versata contends, Ford has obtained more than Versata offered under the previous and proposed licenses, and the parties' licensing history is insufficient to capture Versata's damages. But Versata has not presented any evidence, and the Court has no reason to believe, that during the time of Ford's alleged misappropriation, Ford has violated conditions that would have been included in Versata's proposed license in a manner that has damaged Versata in any material

28

way.[8]  The Court is not convinced that restricting Versata's damages to the parties' licensing history would fail to compensate Versata for conduct by Ford that would have breached conditions of the license proposed by Versata.

Versata also argues that the Court should not tie its damages to the parties' licensing history because its previous licenses and its last-proposed licensing offer to Ford were all limited to a term of years, and by misappropriating the trade secrets, Ford has secured the opportunity to use Versata's software in perpetuity.  However, if Versata prevails on its trade secrets misappropriation claim, the Court can protect Versata from Ford's continued use of the trade secrets by issuing injunctive relief.

For all of the reasons stated above, the Court will limit Versata to a reasonable royalty model of damages that is based upon the parties' relevant business history, and the Court will not permit Versata to seek damages based upon the alleged value of benefits obtained by Ford through its use of the relevant software.

---

[8] For example, Versata says that its proposal to Ford contained a condition that Ford not share Versata's software and trade secrets with certain third parties.  But Versata has not presented any evidence that Ford has shared the software and/or Versata's trade secrets in a way that is inconsistent with the parties' previous licenses or in a way that has materially injured Versata.  Thus, the parties' licensing history is not insufficient on the grounds that it does not compensate Versata for Ford's alleged sharing of Versata's trade secrets.

**2**

Even if the Court had allowed Versata to pursue the unjust enrichment theory of trade secret misappropriation damages proposed by Elson, the Court would still have excluded Elson's testimony on the ground that it is unreliable.  The Court reaches that conclusion for at least three reasons.

First, Elson made no effort to apportion Versata's claimed damages between those caused by Ford's alleged misappropriation of trade secrets and Ford's other alleged infringements of Versata's intellectual property.  That was a serious error. It is "generally accepted that the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement." *University Computing*, 504 F.2d at 535 (internal quotation marks omitted). *See also Vitro Corp.*, 292 F.2d at 682 ("We had held that the discoverer of a secret suffers damages to the same extent as does the inventor of a patent which had been infringed.").  And, as discussed in detail in section IV(C) above, where, as here, accused products are comprised of both protectable and unprotectable features, expert witnesses must apportion damages such that their analysis "reflect[s] the value attributable to the infringing features of the product, and no more." *Commonwealth* 809 F.3d at 1301. *See also Finjan*, 879 F.3d at 1309-10 (Fed. Cir. 2018) (same).  Here, it is undisputed that the software programs at issue are comprised of both protectable trade secrets and other, non-trade secret elements

30

(such as features protected by publicly-registered copyrights and patents). Yet, Elson did not make any effort to separate the cost savings that Ford allegedly obtained through its use of the trade secrets from the cost savings that Ford achieved through its alleged misappropriation and/or infringement of Versata's other intellectual property. Instead, he opined that Ford saved ███████████ per year from its use of the software *as a whole*. Elson's failure to apportion damages renders his analysis inadmissible at trial.[9]

Versata counters that Elson was not required to apportion damages because the trade secrets are "not merely one piece of a larger system of products" but are, instead, "the product" at issue. (Versata Resp. Br., ECF #416 at Pg. ID 24724.) The Court disagrees. The "product at issue" here includes trade secrets and non-trade secrets, such as patents, copyrights, and other non-protectable features.

Second, Elson failed to apportion Versata's alleged damages on a trade-secret-by-trade-secret basis. More specifically, instead of calculating how much Ford's use of each specific trade secret damaged Versata on an individual basis, Elson calculated a *single* amount of damages that Versata allegedly suffered from Ford's misappropriation of *all* of the trade secrets at issue. But the jury will have to make

---

[9] The report and recommendation of the special master in *MSC Software Corp. v. Altair Engineering, Inc.*, 2015 WL 13273227 (E.D. Mich. Nov. 9, 2015), provides a persuasive explanation concerning why a court should exclude testimony by a trade secret damages expert who has failed to apportion his damages calculation in the same manner as Elson.

an independent determination – on a trade-secret-by-trade-secret basis – as to whether Ford misappropriated each of the relevant trade secrets. Elson's all-or-nothing approach thus does not fit well with the jury's task and poses a substantial risk of confusing and/or misleading the jury. Indeed, if the jury were to conclude that Ford misappropriated less than all of Versata's trade secrets (a distinct possibility, if not a likelihood in a hotly-disputed action like this), then Elson's damages calculation would not assist the jury in calculating damages and could only serve to confuse them.

The United States District Court for the Northern District of California confronted the same flaw in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064 (N.D. Cal. 2005). In *O2 Micro*, the plaintiff accused the defendant of misappropriating eleven distinct trade secrets and sought damages on an unjust enrichment theory. At trial, the plaintiff's expert witness "provided the jury with a damages calculation based on the assumption that all of the trade secrets were misappropriated" *id.* at 1076 – the same 'all or nothing' approach that Elson used here. Following deliberations, "the jury, however, found that only five of the eleven secrets were misappropriated, and that only the misappropriation of one of them resulted in [defendant] being unjustly enriched." *Id.* The jury then awarded the plaintiff $12 million in damages. In a post-trial motion, the defendant moved for judgment as a matter of law on the basis that the plaintiff had failed to sufficiently

prove damages. The court agreed. It held that the expert's failure to provide a reasonable basis to determine damages for each *individual* trade secret rendered the expert's analysis "useless" to the jury:

> After the jury concluded that MPS did not misappropriate all of O2 Micro's trade secrets, Mr. Meyer's expert testimony regarding damages for misappropriation of all trade secret was useless to the jury. The jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages. Thus, the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence. The Court grants MPS' motion for judgment as a matter of law that O2 Micro failed to prove unjust enrichment damages for misappropriation of Trade Secret 1.

*Id.* at 1077.

The court's analysis in *O2 Micro* is instructive here. It underscores the problems that may arise when a trade secret damages expert fails to calculate damages on a trade-secret-by-trade-secret basis. By excluding Elson's all-or-nothing damages calculation the Court properly avoids the appreciable risk of running into those problems in this case.

Versata responds that Elson was not required to assign separate values to each trade secret because his analysis assumed that each trade secret was "independently necessary to achieve the benefit of the software" at issue. (Versata Resp. Br., ECF #416 at Pg. ID 24725.) In other words, Versata contends that Elson did not need to allocate damages between the various trade secrets because he concluded that no

matter how many of the secrets Ford misappropriated, Versata's damages would be the same. But Elson lacked reliable support for that conclusion.

As support for that conclusion, Elson cited the opinion of Versata's technical expert, Dr. Malek. (*See*, *e.g.* Elson Rpt. at ¶5.9, ECF #347-4 at Pg. ID 17901, relying upon Dr. Malek report.) But Dr. Malek's conclusion that each of the trade secrets was independently necessary was wholly conclusory. Indeed, his analysis was comprised of a single sentence: "Lastly, each of the trade secrets identified above are independently necessary to the functionality of the software, enabling the realization of the benefits described above." (Malek Rpt. at ¶454, ECF #430-3 at Pg. ID 29669.) It was not reliable for Elson to rely on such a conclusory, unsupported assertion by Dr. Malek.

Moreover, Versata has not persuaded the Court that each of the trade secrets is "independently necessary to the functionality of the software" at issue. The trade secrets at issue come from two *separate* software programs – ACM and MCA. And nether Elson nor Dr. Malek has sufficiently explained how the three trade secrets that come from the ACM software are "independently necessary" for the MCA software to function or vice versa.

Furthermore, Elson's opinion is unreliable because he did not limit his calculations to the relevant trade secrets. As described above, Elson purported to determine the amount that the "Versata Technology" saved Ford. (*See*, *e.g.*, Elson

Case 2:15-cv-10628-MFL-EAS ECF No. 535, PageID.40881 Filed 07/09/18 Page 35 of 54
Case 2:15-cv-10628-MFL-EAS ECF No. 557 PageID.49881 Filed 07/09/18 Page 402 of 54

Page 35 of 54

Rpt. at ¶ 5.2.2, ECF #347-4 at Pg. ID 17856, "Significant evidence exists in the record to support the fact that Ford enjoyed significant benefits resulting from the Versata Technology.") But Elson defined the term "Versata Technology" to include four different software programs, including programs not at issue in this lawsuit.[10] (*See id.* at ¶1.1, Pg. ID 17831). Elson's opinions are therefore overbroad, unreliable, and not helpful to the trier of fact.

Finally, Elson relied on outdated and potentially irrelevant data. Much of the evidence that forms the basis of Elson's cost savings analysis are studies and marketing materials that were created in 2002 and 2003. That data is nearly fifteen years old, and the Court is not persuaded that Elson reliably relied upon it to calculate cost savings for the years 2015-2026. Elson defended his reliance on that data on the ground that "the appropriate timeframe for conducting an analysis of cost savings associated with technology deployment would be contemporaneous to the timing of the actual implementation of that technology." (Elson Reply Rpt., ECF #416-13 at Pg. ID 25109.) However, that does not explain why the cost savings achieved at the time of implementation carry forward unabated at the same rate for more than a

---

[10] Elson also repeatedly opined that Ford experienced ███████ per year in cost savings from its use of the "At Issue Technology" (*see, e.g.*, Elson Rpt. at ¶5.8, ECF #347-4 at Pg. ID 17901.) Elson defined the term "At Issue Technology" to include both the Versata Technology and the software that Ford created to replace Versata's software. (*See id.* at ¶1.1, Pg. ID 17831.) Elson made no effort to separate out what software programs, much less what trade secrets, from the broad term "At Issue Technology" caused Ford to experience these cost savings.

dozen years (and potentially up to 25 years). Elson suggests that the initial cost savings became "embedded" in Ford's production process (*Id.* at Pg. ID 25110), but he failed to offer sufficient support for that assertion. Elson simply has not shown how it was reliable for him to calculate damages for the years 2015-2026 based on the old data from 2002 and 2003 referenced in his report. *See Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) (affirming exclusion of expert witness in part because expert relied on "flawed data and impermissible methods" including a "marketing plan" from "a decade-and-a-half ago" without explaining why that data remained relevant).

Moreover, and in any event, several of the 2002-2003 figures on which Elson relied appear to be largely *estimates* and *projections* of *potential* cost savings. (*See id.* at ¶5.2.3, Pg. ID 17859; "The March 2003 Presentation estimated that Ford could avoid approximately ████████ to ████████ in excess annual costs as a result of Global Product Definition ("GPD") / ACM initiatives.") Neither Elson nor Versata has presented sufficient evidence that Ford actually experienced these "estimate[d]" cost savings as a result of its use of the ACM and MCA software.[11] It

---

[11] As described above, James Martin reported that Ford experienced substantial cost savings in the years after it implemented ACM. But Martin did not opine or present evidence that these cost savings *resulted from Ford's use of ACM*. In fact, Versata specifically disclaimed that Martin had offered such an opinion.

was not reliable for Elson to calculate cost savings based, in fairly substantial part, upon unconfirmed, fifteen year-old *estimates*.

For all of these reasons, the Court would have precluded Elson from testifying at trial even if it had allowed Versata to present to the jury its proposed unjust enrichment damages model.

# VI

## A

The Court now turns to Ford's motion to exclude the copyright infringement opinions of technical expert Dr. Samuel Malek.  Dr. Malek is a tenured Associate Professor of Software Engineering in the School of Information and Computer Sciences at the University of California, Irvine, and he has a Ph.D. in Computer Science from the University of Southern California. (*See* Malek Rpt. at ¶¶ 14-15, ECF #430-3 at Pg. ID 29470-71.)  His "research is in the field of software engineering, and to date [his] focus has spanned the areas of software design and architecture, distributed and embedded systems, smartphone and mobile computing, internet and web technologies, middleware, service oriented computing, autonomic computing, and software dependability and security." (*Id.* at ¶17, Pg. ID 29471.)  Dr. Malek also has "several years of experience as a software engineer, software architect, and programmer at a variety of companies" including Boeing and PriceWaterhouseCoopers Consulting. (*Id.* at ¶20, Pg. ID 29473.)

Versata retained Dr. Malek to provide opinions on a variety of subjects relevant to its claims against Ford, including:

- An overview of the technology at issue in this case;
- An overview of Versata's trade secret innovations that were disclosed to Ford;
- Ford's misappropriation of Versata's trade secrets; [and]
- The steps taken by Versata to protect and maintain the secrecy of its trade secrets.

(*Id.* at ¶1, Pg. ID 29469.) Relevant to Ford's motion here, Dr. Malek also opined on "Ford's infringement of Versata's copyrighted software." (*Id.*)

Dr. Malek's copyright opinions take up a small part of his 464-paragraph, 208-page expert report. Dr. Malek began his copyright analysis by identifying the elements of Versata's copyright claims. (*See id.* at ¶33, Pg. ID 29477.) He then said that he "understand[s] that the court will apply a two-step test to determine substantial similarity exists for copyright infringement: (1) determining which aspects of the copyrighted work are protectable and (2) examining the remainder for substantial similarity." (*Id.* at ¶34, Pg. ID 29477.) Next, in the "background" section of the report, Dr. Malek said that from "at least 2012 through at least 2014," Ford "copied" certain files – known as "JAR" files – "from the ACM to the PDO development environment." (*Id.* at ¶70, Pg. ID 29490.) Dr. Malek explained that "JAR files are executable code files that [Versata] delivered [to Ford] as part of the ACM program to enable Ford to implement and install ACM functionality on its

38

servers." (*Id.* at ¶69, Pg. ID 29489.) According to Dr. Malek, "[t]he only reason why a developer would move the .jar files into a development environment is to use the files for development." (*Id.* at ¶71, Pg. ID 29490.) Dr. Malek said that Ford "deliberately used" the JAR files when Ford developed PDO in order to "help ensure that its PDO software functioned and produced the same results as ACM." (*Id.*)

Finally, in paragraphs 426 through 437 of the report, Dr. Malek provided his opinion that Ford infringed Versata's copyrights with respect to the JAR files. In these two pages, Dr. Malek opined that:







(*Id.* at ¶¶ 426-37, Pg. ID 29664-65.)

## B

Ford moves to exclude Dr. Malek's copyright opinions. (*See* Malek Mot., ECF #344.) Ford principally argues that Dr. Malek's opinions are not based on reliable methods because he failed to apply the proper test for determining copyright infringement. (*See id.* at Pg. ID 17213.) More specifically, Ford asserts that Dr. Malek was required to "filter out the unoriginal, unprotectable elements" from Versata's software as part of his analysis, but he failed to do so. (*Id.* at Pg. ID 17212.) The Court agrees.

## C

"To establish copyright infringement, a plaintiff must show '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

41

original.'" *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A plaintiff may prove copying in one of two ways. In some cases, there is "direct evidence" of copying and therefore "it [is] a given that the defendant had copied the plaintiff's work." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). In other cases, where "there is no direct evidence of copying … a plaintiff may establish an inference of copying by showing (1) access to the allegedly-infringing work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Id.* at 854 (internal quotation marks omitted).

Both parties here agree that where there is no direct evidence of copying, a court must conduct what is commonly referred to as a filtration analysis. In that analysis, courts "identify and eliminate those elements [of the disputed work] that are unoriginal and therefore unprotected." *Id.* at 853. Courts engage in a filtration analysis because "[n]ot all copying is actionable," and "it is a constitutional requirement that a plaintiff bringing an infringement claim must prove copying of constituent elements of the work *that are original*." *Id.* (internal quotation marks omitted; emphasis in original).

The parties strenuously disagree as to whether a filtration analysis is necessary where the plaintiff presents direct evidence of copying. Versata insists that a filtration analysis is "not required if there is evidence of direct copying." (Versata

42

Supp. Br., ECF #502 at Pg. ID 40158.)  Versata says that Dr. Malek was not required to conduct a filtration analysis because it (Versata) has presented direct evidence of copying by Ford.[12]  Ford counters that "filtering-out unoriginal and unprotectable elements is the first step in *any* copyright infringement analysis, regardless of whether 'direct' or 'indirect' copying is asserted." (Ford Supp. Br., ECF #501 at Pg. ID 40150; emphasis original.)   Ford is correct.

The Sixth Circuit's decision in *Kohus* makes clear that a filtration analysis is essential even where there is direct evidence of copying.  The court in *Kohus* separately discussed cases involving direct evidence of copying and cases "in which there is no direct evidence of copying." *See Kohus*, 328 F.3d at 853-54.  The court discussed cases involving direct evidence of copying first, and the court cited the Supreme Court's decision in *Feist* as a case involving such direct evidence. *See id*. Indeed, the court stressed that in *Feist*, "it was a given that the defendant had copied the plaintiff's work." *Id*. at 853-54.  The court observed that in *Feist*, the Supreme Court "filtered out the unoriginal, unprotected elements, and then determined that there was nothing original to be protected." *Id*. at 853.  Based upon *Feist* (and while

---

[12] Ford contends that Versata has not presented sufficient direct evidence of copying and that the Court should thus treat this case as one involving only indirect evidence of copying – *i.e.*, as a case in which a filtration analysis in plainly required.  The Court need not determine whether Versata has presented sufficient evidence of direct copying because, even if it has done so, for the reasons explained above, Dr. Malek was still required to conduct a filtration analysis.

discussing cases involving direct evidence of copying), the court concluded that "before comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected." *Id*.

The Sixth Circuit's description and discussion of *Feist* and of cases involving direct evidence of copying in *Kohus* leaves no doubt that a filtration analysis *is* required in cases involving direct evidence of copying.  District courts in this circuit, including another Judge on this Court, read *Kohus* this same way. *See*, *e.g.*, *Integrated Bar Coding Systems, Co. v. Wemert*, 2007 WL 496464, at *4 (E.D. Mich. Feb. 12, 2007) (explaining that, under *Kohus*, "the first step is for the court to identify which aspects of the artist's work, if any, are protectible by copyright," and only "[o]nce the non-protectable elements have been filtered out," then the trier of fact turns to the question of whether the plaintiff has "shown[n] evidence of direct, literal copying of the original elements of the work, or raise[d] an inference of infringement by establishing" access and substantial similarity (internal quotation marks omitted)); *Automated Data Soln's Corp. v. Paragon Data Sys.*, 2012 WL 6026137, at *7 (N.D. Ohio July, 2012), *report and recommendation adopted in part* at 2012 WL 6042408, *affirmed* at 756 F.3d 504 (6th Cir. 2014) (recognizing that under *Kohus*, among other cases, "[a] plaintiff alleging copyright infringement of computer software under either a theory of direct copying or by an inference of copying must *initially* identify those elements of its software that are original and thus entitled to

protection, thereby filtering out [unprotectable] elements" of the software" (internal emphasis added)).[13]

In this case, then, Dr. Malek was required to conduct a filtration analysis even though Versata purportedly presented direct evidence of copying, and his analysis was flawed because he did not conduct that essential analysis. He did not make any effort to identify the elements of the software at issue that are not original, nor did he eliminate those unprotected elements before concluding that Ford infringed Versata's copyrights. And his failure to do so was not a *de minimis*, inconsequential error. On the contrary, as Versata concedes, not all parts of the software that it alleges Ford copied is protectable under the relevant copyright laws,[14] and thus it was critical for Dr. Malek to include a filtration step in his copyright infringement analysis.

Because Dr. Malek did not apply the correct legal standard, his copyright opinions are not based on reliable principles and methods, and the Court will exclude them. *See Mayo Clinic v. Elkin*, 2010 WL 5421322, at *6 (D. Minn. Dec. 27, 2010)

---

[13] The court in *Automated Data* did not cite *Kohus* directly for this proposition. Instead, it cited the Sixth Circuit's later decision in *R.C. Olmstead*, *Inc. v. CU Interface, LLC*, 606 F.3d 262, 275 (6th Cir. 2010). But the court recognized that the portions of *R.C. Olmstead* on which it relied cited to, and relied upon, *Kohus*. *See Automated Data*, 2012 WL 6026137, at *7.

[14] *See* Seth Kraus Dep. Tr. at 187, ECF #155-2 at Pg. ID 7044, in which former Versata software engineer Seth Krauss acknowledges that the ACM software incorporated publicly-available, "open source" software. *See also* Versata Interrog. Resp., ECF #357-3.

(striking copyright infringement expert and concluding that expert's infringement opinion was "not based on reliable principles" where expert failed to conduct filtration analysis when analyzing copyright claim involving computer software); *cf. Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 17, 2018) ("Expert testimony [] should be excluded when it applies the wrong legal standard"); *United States Gypsum Co. v. Lafarge North America*, *Inc.*, 670 F.Supp.2d 737, 745 (N.D. Ill. 2009) (excluding expert witness from testifying where expert "applied the incorrect legal standard in formulating damages").[15]

For all of the reasons explained above, the Court concludes that Dr. Malek's copyright infringement opinions are not the product of reliable principles and methods, and those opinions are therefore excluded.

---

[15] Dr. Malek's failure to conduct a filtration analysis is especially puzzling here because he acknowledged that the Court *would* need to apply that test to Versata's copyright claim. Indeed, in Dr. Malek's expert report, he recognized that the Court would "apply a two-step test" to Versata's copyright infringement claim that included "determining which aspects of the copyrighted work are protectable." (Malek Rpt. at ¶33, ECF #345-1 at Pg. ID 17231.) Moreover, Dr. Malek's suggestion that the Court *would* conduct a filtration analysis conflicts with Versata's current contention that the Court need *not* conduct such an analysis because it has presented direct evidence of copying. These additional red-flags weigh against a finding that Dr. Malek's analysis is reliable.

# VII

## A

The Court finally addresses Versata's motion to strike portions of the expert opinions of Monty Myers, an expert witness Ford retained to rebut the patent and trade secret opinions offered by Dr. Malek. (*See* Myers Mot., ECF #352.) Myers is the founder and Chief Executive Officer of Eureka Software Solutions, Inc., a "recognized project-oriented, custom software development company based in Austin, Texas." (ECF #415-5 at ¶3, Pg. ID 24324.) During the past thirty-two years, "Eureka has built software products and business solutions for a client list that includes members of the Global 1000, Fortune 500, notable private companies, and numerous high-profile start-up organizations." (*Id.*) Myers has substantial experience "conceiving, planning, architecting, building, and launching software/automation systems configuration management including several projects involving automotive/vehicle configuration functionality." (*Id.* at ¶8, Pg. ID 24326.)

Myers offered his opinions through three different reports: (1) an October 26, 2017, patent rebuttal report (the "Myers Patent Report"), (2) an October 27, 2017, trade secret rebuttal report (the "Myers Trade Secret Report"), and (3) a December 14, 2017, supplemental report (the "Myers Supplemental Report"). In the Myers Patent Report, Myers reviewed the source code for the PDOR1 software. He concluded that PDOR1 does not infringe any of the patents-in-suit. (*See* Myers

Patent Rpt., ECF #353-1.)  In the Myers Trade Secret Report, Myers countered Dr.

Malek's conclusion that PDOR1 uses trade secrets that belong to Versata. (*See*

Myers Trade Secret Rpt., ECF #353-2.)  Finally, Myers expressed two opinions in

the Myers Supplemental Report. (*See* Myers Supp. Rpt., ECF #353-3.)   Both

opinions in that report related to Dr. Malek's conclusion that Versata had taken

reasonable efforts to maintain the secrecy of its alleged trade secrets, an element of

its trade secret claim.  First, Myers said that he had found an ACM user guide on the

internet, and he opined that Dr. Malek should have considered the public availability

of this guide when he concluded that Versata had taken reasonable measures to

protect its trade secrets. (*See id.* at Pg. ID 18621.)  Second, Myers commented on

Versata's alleged failure to produce confidentiality agreements between itself and

certain third parties.   Myers opined that if Versata did not use confidentiality

agreements to protect its trade secrets, that fact would "be an important part of any

consideration of the reasonableness of the efforts to maintain the secrecy of any

alleged trade secrets." (*Id.* at Pg. ID 18624.)  Thus, Myers believed that Dr. Malek

should have considered the absence of these agreements when he concluded that

Versata took reasonable measures to maintain the secrecy of its trade secrets. (*See*

*id.*)

## B

## 1

Versata first asserts that Myers provided either no citation or overly-broad citations to the PDOR1 source code that he reviewed in the Myers Patent Report and the Myers Trade Secret Report. (*See* Myers Mot., ECF #352 at Pg. ID 18404-09.) According to Versata, "[t]he failure to Myers to identify the portions of the [source] code upon which he relies renders his opinions unhelpful to the trier of fact." (*Id.* at Pg. ID 18404.) Versata therefore asks that the Court "strike the portions of the [Myers Patent Report and the Myers Trade Secret Report] in which Meyers relies on unidentified source code." (*Id.* at Pg. ID 18401.)

The Court concludes that Myers citations are sufficient. For example, Versata identifies several instances where Myers referred to and cited generally to the PDOR1 source code examined by Dr. Malek. (*See*, *e.g.*, *id.* at Pg. ID 18407-08.) However, it does not appear unreasonable that Myers, as a rebuttal expert, would review and rely upon the same sections of code as Dr. Malek. And Versata is well aware of what parts of the source code Dr. Malek relied upon. Furthermore, many of Myers' citations that Versata claims were overbroad were simply citations to lines of code that together comprised a particular function. (*See*, *e.g.*, Myers Rpt. at ¶186 n.21, ECF #352-1 at Pg. ID 18443, citing "FORD-SOURCECODE_086486-489, 412-555" related to PDOR1's consistency checking function.) In other cases, Myers

appears to have reasonably referred to the software generally, and he cited the relevant lines of code that he relied upon. (*See id.* at ¶337 n.115, Pg. ID 18468, citing in an introductory summary paragraph several citations to different lines of code).

In sum, the Court does not believe that Myers' citations to the PDOR1 source code rendered his expert report and testimony unreliable. And to the extent Versata believes that Myers has not reviewed the relevant lines of code, it may elicit that information on cross-examination at trial. For all of these reasons, the Court declines to strike the portions of the Myers Patent Report and the Myers Trade Secret Report that rely upon Myers' review of the PDOR1 source code.

## 2

Next, Versata argues that the Court should strike the opinions that Myers offered in the Myers Supplemental Report. It insists that Myers has failed to provide sufficient information about how he obtained the ACM user guide he claims to have found on the internet and about how the guide became available on the internet. (*See* Myers Mot., ECF #352 at Pg. ID 18410-16.) Versata further maintains that Myers' conclusions with respect to Versata's use of confidentiality agreements is outside of his expertise. (*See id.*) The Court agrees with Versata that Myers' opinions related to the ACM user guide are irrelevant and should be excluded from trial, but it disagrees that it should strike Myers' opinions about the confidentiality agreements.

As to the ACM user guide, Myers has not sufficiently explained how the existence of the guide on the internet creates an inference that Versata did not take reasonable measures to protect its trade secrets. Myers did not explain who uploaded the guide to the internet, how the guide was initially obtained (*i.e.*, was it stolen or was it posted in violation of a confidentiality agreement), or why the guide was uploaded. These subjects are essential to any analysis of whether Dr. Malek should have considered the public existence of this guide when performing his trade secret analysis. Without answers to these questions, the Court cannot conclude that Myers' opinion based on the existence of the user guide on the internet is reliable.

More importantly, Myers did not opine that the user guide actually contained any alleged trade secrets. Myers provided a table that he said "provides examples of whether the ACM User Guide published on the Internet references information *similar to* the information cited by [Dr.] Malek (including user manuals) in his trade secret report." (Myers Supplemental Rpt., ECF #353-5 at Pg. ID 18620; emphasis added.) But information that is merely "similar to" a trade secret is not a trade secret. And if the information in the user guide is not a trade secret, and is instead only "similar to" a trade secret, then Myers' entire analysis and conclusion has no bearing on the trade secret claim in this action. Myers' opinion with respect to the user guide is therefore not useful to the trier of fact and could potentially confuse the jury.

Accordingly, Myers' opinions related to the user guide are unreliable and thus inadmissible.

Next, the Court concludes that Myers has provided a sufficient foundation for his opinion that if Versata did not use confidentiality agreements every time it disclosed its software, that fact is relevant to whether Versata took reasonable measures to protect its trade secrets. Myers' opinion and underlying analysis on this subject is based on his over thirty-years of experience in the software development industry. Myers' long history in the software industry qualifies him to offer opinions on the use of confidentiality agreements in that business. To the extent that Versata believes that Myers' qualifications to offer this opinion are insufficient, it may cross-examine him on this topic at trial.

### 3

Finally, Versata argues that Myers impermissibly relied on evidence outside the record, including an undisclosed product presentation. (*See* Myers Rpt., ECF #352 at Pg. ID 14819-25.) Versata asks the Court to strike the portions of Myers' expert reports that rely on this undisclosed evidence. (*See id.*)

The focus of Versata's complaint in this regard appears to be principally related to a product demonstration provided to Myers but allegedly not disclosed to Versata. (*See* 4/24/18 Hearing Tr. at 177, ECF #472 at Pg. ID 39245.) At the hearing on the expert motions, Ford's counsel stated on the record that the product

demonstration in question was provided to Versata. (*See id.* at 196-97, Pg. ID 39265.) If Ford has indeed produced the demonstration to Versata, then Myers may rely on that demonstration. If the demonstration has not been produced, then Versata would not have had a sufficient opportunity to test the reliability of his opinions based on that demonstration. In that case, Myers would be precluded from relying on the demonstration. At some point before trial, the Court will give the parties an opportunity to present evidence on the question of whether the demonstration was, in fact, produced to Versata, and the Court will make a final determination about whether Myers may rely on that demonstration in his trial testimony.

## VIII

For all of the reasons stated above, **IT IS HEREBY ORDERED** as follows:

- Ford's motion to exclude the expert testimony of James Martin (ECF #348), Ford's motion to exclude the testimony of Christopher Bokhart (ECF ## 346, 351), Ford's motion to exclude the trade secret damages opinions of Craig Elson (ECF ## 347, 349), and Ford's motion to exclude the copyright infringement opinions of Dr. Samuel Malek (ECF #345) are **GRANTED**; and

- Versata's motion to exclude the expert testimony of Monty Myers (ECF #352) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

s/Matthew F. Leitman

MATTHEW F. LEITMAN

UNITED STATES DISTRICT JUDGE

Dated: July 9, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 9, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764