UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR COMPANY,

     Plaintiff,

v.

VERSATA SOFTWARE, INC. *et al.*

     Defendants.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11624*)
Hon. Matthew F. Leitman

_____/

**ORDER (1) ADOPTING IN PART RECOMMENDED DISPOSITION OF
SPECIAL MASTER'S REPORT AND RECOMMENDATION (#551); (2)
SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS'
OBJECTIONS TO THE REPORT AND RECOMMENDATION (ECF #565);
(3) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT (ECF ## 354, 358); AND (4)
GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF ## 379, 380)**

**I**

In this action, Plaintiff Ford Motor Company seeks a declaratory judgment

that it did not infringe and/or misappropriate certain patents, copyrights, and trade

secrets belonging to Defendant software developers Versata Software, Inc., Versata

Development Group, Inc., and Trilogy, Inc. (collectively, "Versata"). (*See* Sec. Am.

Compl., ECF #226.)  Versata has filed counterclaims related to the same patents,

copyrights, and trade secrets. (*See* Sec. Am. Counterclaims, ECF #244.) The

intellectual property at issue relates to computer software used in vehicle

configuration.

1

On March 31, 2016, the Court, with the consent of the parties, entered an order appointing attorney Larry Graham as a special master to oversee the patent claim construction portion of this action. (*See* ECF #101.) The parties jointly selected Mr. Graham for this role. (*See id.* at Pg. ID 3093.)

Ford and Versata have filed cross-motions for summary judgment. (*See* Ford Mot., ECF ## 354, 358; Versata Mot., ECF ## 379, 380.) The motions raise, among other things, complex issues of patent law that tie directly to Mr. Graham's previous ruling on claim construction. In a written order dated July 10, 2018, the Court referred the patent portions of the summary judgment motions to Mr. Graham for a report and recommendation.[1] (*See* ECF #509.)

Mr. Graham held a hearing on the patent portions of the summary judgment motions on September 13, 2018. (*See* 9/13/18 Hearing Tr., ECF #545.) On October 16, 2018, he issued a report and recommendation (the "R&R"). (*See* R&R, ECF #551. The R&R reflects that Mr. Graham gave the issues presented very careful and thorough consideration. In the R&R, Mr. Graham recommended the following disposition with respect to the patent issues raised in the summary judgment motions:

---

[1] The Court ruled on the non-patent portions of the summary judgment motions in a separate written order dated September 7, 2018. (*See* ECF #534.)

Ford's motion for summary judgment of invalidity of the asserted claims of U.S. Patent No. 7,200,582 and U.S. Patent No. 7,646,064 for violation of the onsale bar [should be] granted.

The motions of Ford and Versata as to the infringement or noninfringement of the '582 and '064 patents, and also as to the novelty and obviousness of the asserted claims of these patents, [should be] denied.

Ford's motion for summary judgment of noninfringement of U.S. Patent No. 7,739,080 [should be] granted.

Ford's motion for summary judgment of noninfringement of U.S. Patent No. 6,405,308 and U.S. Patent No. 6,675,294 [should be] denied.

Ford's motion that the asserted claims of U.S. Patent No. 7,882,057 are invalid as being directed to patent-ineligible subject matter under Section 101 [should be] granted. Versata's cross-motion for patent eligibility of the '057 patent [should be] denied.

Versata's motion that the asserted claims of U.S. Patent No. 7,739,080 are not invalid under Sections 102 and 103 [should be] granted. Ford's declaratory judgment claims asserting invalidity of U.S. Patent No. 5,825,651 and U.S. Patent No. 8,805,825 [should be] dismissed for lack of subject matter jurisdiction. Versata's motion that the dismissed or non-asserted claims of the '308, '294, '582, '064, '057, and '080 patents are not invalid under Sections 102 and 103 [should be] denied.

Versata's motion that its asserted patents are valid under Section 101 as being directed to patentable subject matter is withdrawn except as applied to the '057 patent, referred to above.

> Versata's motion that the asserted claims of the '057 patent are valid under Sections 102 and 103 in view of the prior art is withdrawn.

(R&R, ECF #551 at Pg. ID 42249-50.)

Versata filed timely objections to the R&R on November 28, 2018.[2] (*See* Objections, ECF #565.)   Versata raises objections to three of Mr. Graham's recommendations:

> Versata objects to the Special Master's recommendation that the Court grant summary judgment that (1) the '582 and '064 patents are invalid under the 'on-sale' bar of 35 U.S.C. § 102(b); (2) the asserted claims of the '080 patent are not infringed; and (3) that the asserted claims of the '057 patent are invalid under 35 U.S.C. § 101.

(*Id.* at Pg. ID 42360.)

The Court held a hearing on Versata's objections on February 26, 2019. (*See* 2/26/19 Hearing Transcript, ECF #623.)   For the reasons that follow, the Court **SUSTAINS** Versata's objections with respect to the '582, '064, and '080 patents and **OVERRULES** Versata's objections with respect to the '057 patent.

## II

Federal Rule of Civil Procedure 53(f) governs a court's review of a special master's report and recommendation.   Under that rule, a district court must conduct a *de novo* review of the portions of a special master's report and recommendation to

---

[2] Ford did not file any objections to the R&R.

which a party objects. *See* Fed.R.Civ.P 53(f)(3) and (4). *See also Hockstein v. Microsoft Corp.*, 730 F.Supp.2d 714, 717 (E.D. Mich. 2010) ("The Court reviews *de novo* factual findings and legal conclusions of the Special Master to which a specific objection has been made. *See* Fed.R.Civ.P. 53(f)"), *aff'd* 430 F. App'x 898 (Fed. Cir. 2011). Upon review of the report and recommendation, a court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed.R.Civ.P 53(f)(1).

To the extent that the parties have not filed specific objections to the recommended dispositions that Mr. Graham proposed in the R&R, the Court **ADOPTS** those recommendations.

### III

As described above, Versata has raised three specific objections to the R&R. The Court will review each in turn.

### A

Versata first objects to Mr. Graham's recommendation that Ford is entitled to summary judgment with respect to the asserted claims of the '582 and '064 patents on the basis that the patents are invalid under the "on-sale" bar. (*See* Objections, ECF #565 at Pg. ID 42360-75.) While the Court appreciates and respects Mr. Graham's thoughtful analysis of the on-sale bar issues, the Court **SUSTAINS** this

objection and **DENIES** Ford's motion for summary judgment based upon the on-sale bar.

**1**

"A person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1331 (Fed. Cir. 2019) (quoting 35 U.S.C. § 102(b) (2002)). This rule is commonly referred to as the "on-sale bar." *Id.* The on-sale bar "encourages prompt disclosure of new inventions and in particular limits commercial exploitation of an invention prior to filing for a patent application." *August Technology Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1288 (Fed. Cir. 2011).

Under the Supreme Court's decision in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55 (1998), courts apply a two-part test when determining whether a patent is invalid under the on-sale bar. "The on-sale bar applies" where, one year before what is known as the critical date, (1) "the product [is] the subject of a commercial offer for sale" and (2) "the invention [is] ready for patenting" *Id.* at 67. The "critical date" is "[t]he date exactly one year prior to the date of application for the patent." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1327 (Fed. Cir. 2001).

Under the "commercial offer for sale" prong of the *Pfaff* test, "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party

could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Id.* at 1328. "To determine if the offer is sufficiently definite, one must examine the language of a proposal in accordance with the principles of general contract law." *Id.* "The offer or contract for sale must unambiguously place the *invention* on sale, as defined by the patent's claims." *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 855 F.3d 1356, 1366 (Fed. Cir. 2017) (emphasis in original).

The "ready for patenting" requirement in the second-prong of the *Pfaff* test "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68. "Under the test for a reduction to practice, [a party challenging a patent] must show that the inventor (1) constructed an embodiment or performed a process that met all the limitations and (2) determined that the invention would work for its intended purpose." *Barry*, 914 F.3d at 1322. *See also Robotic Vision Sytstems, Inc. v. View Engineering, Inc.*, 112 F.3d 1163, 1167 (Fed. Cir. 1997) (noting that "application of the on-sale bar requires consideration of whether 'the invention was in fact complete and was known to work for its intended purpose'") (quoting *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 98 F.3d 1318, 1322 (Fed. Cir. 1996)). "An

invention is said to work for its intended purpose when there is a demonstration of its workability or utility." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1367 (Fed. Cir. 2008).

An alleged infringer challenging the validity of a patent must prove invalidity by "clear and convincing evidence." *Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 97 (2011). *See also Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2011) (The "moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise"). Therefore, it is the alleged infringer's burden to "prove the facts underlying both prongs of the *Pfaff* test by clear and convincing evidence." *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002). At the hearing on Versata's objections to the R&R, Ford acknowledged that in order to establish its entitlement to summary judgment on its on-sale bar defense, it would have "to establish that every reasonable juror would find by clear and convincing evidence that both prongs of the on-sale bar test are satisfied." (2/26/2019 Hearing Tr., ECF #623 at Pg. ID 48038-39.)

## 2

In January 2002, Ford and Versata executed a software subscription agreement known as the SSA under which Versata agreed to "license[] a version of [its ACM automotive-configuration software] to Ford." (R&R, ECF #551 at Pg. ID

42170.)  That version, "ACM 3.2," was not yet complete when the parties executed the SSA. (*Id.*)  As part of the development of ACM 3.2, Versata employee Shawn Smith conceived, developed, and internally tested a consistency-checking function for potential inclusion in the software. (*See* Smith Decl. at ¶¶ 5-6, ECF #434-4 at Pg. ID 31825-26.) Smith conducted this work in February and March 2002. (*See id.*) After Smith completed his testing, Versata added the consistency checker to its working version of ACM 3.2. (*See id.* at ¶8, ECF #434-4 at Pg. ID 31826.)  On March 29, 2002, Doug Fearing of Versata sent that version of ACM 3.2 to Ford for "Integration and Testing." (ECF #431-8 at Pg. ID 30855.)  One month later, on April 29, 2002, Versata delivered a final, "production" version of ACM 3.2 to Ford. (Smith Decl. at ¶9, ECF #434-4 at Pg. ID 31825.) This final version also included the consistency-checking invention.

**3**

The consistency-checking invention became the subject of the '582 and '064 patents.  Versata filed its application for the '582 patent on March 31, 2003. (*See* R&R, ECF #551 at Pg. ID 42176.)  "The '064 patent is a divisional of the '582 patent, and [it] has the same effective filing date." (*Id.*)  Accordingly, the "critical date" for purposes of the on-sale bar is March 31, 2002.

In the R&R, the Special Master first concluded that Ford had proved by clear and convincing evidence that the consistency-checking invention claimed in the '582 and '064 patents was the subject of a commercial offer for sale before the critical date. (*See id.* at Pg. ID 42188-95.) The Special Master initially found that "the parties understood" that the version of ACM 3.2 that Versata would deliver under the SSA would include "a consistency checker." (*Id.* at Pg. ID 42179.) He then concluded that, prior to the critical date, Versata had "objectively decided to include [the consistency-checking invention claimed in the '582 and '064 patents] in the final version" of ACM 3.2 that it would deliver under the SSA. (*Id.* at 42195.) Based in large part upon that finding, the Special Master determined that the invention was the subject of a commercial offer for sale before the critical date. (*See id.*)

Next, the Special Master determined that the consistency-checking invention was "ready for patenting" before the critical date. (*Id.* at Pg. ID 42195-201.) He rested that finding on his conclusion that the consistency-checking invention "was reduced to practice before the delivery [of ACM 3.2 for test and integration] on March 29, 2002." (*Id.* at Pg. ID 42201.)

The Special Master found that the consistency-checking invention was on sale and ready for patenting even though Versata planned to test ACM 3.2 – which contained the invention – in Ford's environment before delivering the final version

of the software to Ford. (*See id.* at 42198-200.) The testing to be done at Ford did not "affect his conclusion" with respect to the on-sale bar because, as he viewed the evidence, (1) Versata had already completed its own internal testing before the testing to be done at Ford and (2) based upon that testing, Versata had satisfied itself that the invention worked for its intended purpose and would be sold to Ford. (*Id.* at 42198-99.)

**5**

The Court respectfully disagrees with the Special Master's view that every reasonable juror would necessarily find, by clear and convincing evidence, that the consistency-checking invention was offered for sale and ready for patenting before the critical date.

First, there is evidence in the record that raises at least some doubt as to whether the consistency-checking invention was offered for sale before the critical date. The evidence in question suggests that Versata would not have offered (and did not offer) the consistency-checking invention for sale unless and until (1) Versata had a sufficient opportunity to test that invention on site at Ford *and* (2) both Ford and Versata were satisfied with the results of that on-site testing at Ford.[3] This

---

[3] It is undisputed that the testing period for ACM 3.2 would not have been completed until *after* the critical date of March 31, 2002. Versata did not deliver the test candidate of ACM 3.2 to Ford until March 29, 2002, and it did not conclude the testing period and deliver the production version of the software until April 29, 2002.

evidence includes the sworn declaration of Dr. Keyanoush Efatpenah, a former Senior Manager at Versata who has "personal knowledge of [Versata's] practices regarding development and delivery of software to Ford." (Efatpenah Decl. at ¶5, ECF #431-9 at Pg. ID 30857.)  Dr. Efatpenah said that the version of ACM 3.2 that Versata delivered on March 29, 2002 – a version that included the claimed consistency-checking invention – was a "test candidate." (*Id.* at ¶12, Pg. ID 30859.) He added that the "inten[tion]" of the delivery of the test candidate was "to permit the Ford IT group *and [Versata]* to test the software in the Ford IT group's simulated environment to determine if it had any technical issues that needed to be addressed before it would have been released into production." (*Id.* at ¶¶ 12, 14, Pg. ID 30859; emphasis added.)

According to Dr. Efatpenah, Versata was "actively involved in the Ford test implementation," and Versata, among other things, could "monitor and solicit feedback about whether Ford's internal testing encountered performance and/or functionality issues resulting from the newly added functionality" in the software. (*Id.* at ¶11, Pg. ID 30857.)  Dr. Efatpenah also said that Versata "would recommend the [final, production version of ACM 3.2] be released to Ford's production servers" only if both Ford *and* Versata did not "detect[]" any issues with the test candidate of the software "and it was determined that the ACM [test candidate] did perform its intended purpose…." (*Id.* at ¶13, Pg. ID 30859.)  If, on the other hand, "[Versata] or

Ford determined that the [test candidate] was not working as expected, [Versata] would correct any identified issues if necessary. In the meantime, Ford would continue to use the prior version of ACM until these issues were resolved." (*Id.*)

Dr. Efatpenah's declaration is at least some evidence that could persuade a reasonable juror to find a lack of clear and convincing that the claimed consistency-checking invention was the subject of a commercial offer for sale before the critical date. Dr. Efatpenah's sworn statements evidence Versata's intent to be actively involved in the on-site testing at Ford and to use the results of that testing to determine which specific inventions would be included in the final, production version of ACM 3.2 that Versata was offering for sale. (*See generally* Efatpenah Decl. at ¶¶ 4-14, ECF #431-9 at Pg. ID 30857-59; *see also* Smith Decl. at ¶¶ 8-10, ECF #434-4 at Pg. ID 31826.) If a juror accepted Dr. Efatpenah's version of events, the juror could reasonably find that there is not clear and convincing evidence that, prior to the critical date, Versata offered for sale the version of ACM 3.2 that included the consistency-checker invention. The Court therefore concludes that Ford is not entitled to summary judgment on its on-sale bar defense.

Ford counters that under the Federal Circuit's decision in *Atlanta Attachment*, *supra*, the consistency-checker invention was offered for sale prior to the critical date even though Versata intended to test the invention further after that date. (*See* Ford Supp. Br., ECF #625 at Pg. ID 48167-70). However, contrary to Ford's

argument, *Atlanta Attachment* does not stand for the proposition that Versata's intent to test ACM 3.2 (the software that included the consistency-checking invention) is irrelevant to whether the invention was offered for sale. In *Atlanta Attachment*, the Federal Circuit held that an invention was offered for sale even though it would be tested after delivery. But the testing in that case was different from the testing here. The testing in *Atlanta Attachment* was to be done *by the purchaser*, not by the inventor and its agents, and that was an important reason that the Federal Circuit found the testing "immaterial" to whether the invention was offered for sale. *Atlanta Attachment*, 516 F.3d at 1366. Here, in contrast, there is evidence in the record from which a jury could reasonably conclude that, as Dr. Efatpenah stated in his declaration, Versata planned (1) to be actively involved in the testing along with Ford and (2) to consider the results of the testing when deciding which version of the software to finally sell to Ford.[4] *Atlanta Attachment* does not hold that testing under these circumstances is immaterial to whether an invention is offered for sale

Moreover, the circumstances in *Atlanta Attachment* are materially different from the circumstances that existed between Ford and Versata with respect to the testing of the ACM 3.2. In *Atlanta Attachment*, Atlanta Attachment developed an

---

[4] Ford has further contended that testing by anyone other than the inventor himself is irrelevant to the question of whether the on-sale bar applies. But Ford has not cited any authority for that proposition. And in *Atlanta Attachment*, the Federal Circuit noted that testing could be completed by an inventor or "*his agents*." *Atlanta Attachment*, 516 F.3d at 1366 (emphasis added).

invention "in response to a request from Sealy, Inc. to create an automatic gusset ruffler machine." *Id.* at 1363. "Atlanta Attachment developed a total of four prototypes which they presented for sale to Sealy along with offers to sell production models" of the prototypes. *Id.* Atlanta Attachment invoiced Sealy for each prototype, Sealy paid for each protype, and Sealy tested and/or inspected each prototype and provided feedback about them to Atlanta Attachment. *See id.* "Ultimately, Sealy decided not to purchase [production model] machines from Atlanta Attachment." *Id.* at Pg. ID 1364.

The Federal Circuit held that under those circumstances, the prototype at issue – which included the claimed invention – was the subject of a commercial offer for sale for at least two reasons – because (1) "Atlanta Attachment sent Sealy an invoice for the machine (an offer), and Sealy paid for the machine (an acceptance)" and (2) Atlanta Attachment had presented a commercial offer for sale of the invention *en masse*." *Id.* at 1365. Here, Ford has not presented clear and convincing evidence that Versata ever invoiced Ford for the *test* candidate of ACM 3.2 and/or that Ford ever paid for that test candidate. And there is evidence that Ford was purchasing the *final*, production version of the ACM 3.2. Likewise, this case does not involve a commercial offer for an "*en masse*" sale of the invention. For all of these reasons, *Atlanta Attachment* does not control here.

Second, Ford has not persuaded the Court that every reasonable juror would necessarily find by clear and convincing evidence that the consistency-checking invention was ready for patenting before the critical date. As explained above, an invention is "ready for patenting" when the inventor "determine[s] that the invention would work for its intended purpose." *Barry*, 914 F.3d at 1322. "Testing is required to demonstrate reduction to practice in some instances because without such testing there cannot be sufficient certainty that the invention will work for its intended purpose." *Z4 Technologies*, *Inc. v. Microsoft Inc.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007). "[T]he necessity and sufficiency of such testing are factual issues." *Id. See also Streck, Inc. v. Research & Diagnostic Systems, Inc.*, 659 F.3d 1186, 1195 (Fed. Cir. 2011) ("The sufficiency of testing to show an invention works for its intended purpose is a factual issue").

Here, Versata has identified evidence that raises at least some question as to whether, prior to the critical date, Versata believed that the consistency-checking invention would work for its intended purpose. For example, Dr. Efatpenah said in his sworn declaration that at the time Versata delivered the "test candidate" version of the ACM 3.2 software to Ford, "it was not clear if the [software] … would work for its intended purpose." (Efatpenah Decl. at ¶12, ECF #431-9 at Pg. ID 30859.) Thus, "[f]urther testing [of the software] in a Ford environment was necessary to determine if [the software] would perform its intended purpose and was ready for a

production release."[5] (*Id.* at ¶10, Pg. ID 30858.)  Moreover, Shawn Smith, the Versata employee who conceived and developed the consistency-checking invention, said in a sworn declaration that he "could not be certain that [his] consistency checking invention would work until it was tested in Ford's environment." (Smith Decl. at ¶5, ECF #634-1 at Pg. ID 48689.[6])  Given this

---

[5] While Dr. Efatpenah referred in his declaration to testing the software generally, and not to testing any particular features of the software, a jury could reasonably conclude that the testing referred to by Dr. Efatpenah would include testing of the specific inventions included within the software, including the consistency-checker invention at issue here.

[6] Versata filed Smith's declaration as an exhibit to its most-recent supplemental brief rather than as an exhibit to its original summary judgment response, but the Court will nonetheless exercise its discretion to consider the declaration.  The Court also recognizes that there is some arguable tension between the statement in Smith's declaration that he "could not be certain" that his consistency-checking invention "would work until it was tested in Ford's environment" (Smith Decl. at ¶5, ECF #634-1 at Pg. ID 48689) and his testimony at his deposition that he tested the invention and concluded that it led to a "really big improvement in performance." (Smith Dep., ECF #523-3 at Pg. ID 40671-72.)  But while these statements may perhaps be in some tension with one another, the Court does not believe that they directly contradict one another.  An invention could achieve a "big improvement in performance" yet still not work as intended.  Because Smith's declaration does not directly contradict his deposition testimony, the Court may consider the declaration on summary judgment. *See*, *e.g.*, *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (explaining that the sham-affidavit rule bars court from considering affidavit on summary judgment only where the affidavit "directly contradicts prior sworn testimony").  Furthermore, Smith's declaration may be in some tension with an email he sent on February 11, 2002, in which he wrote that the consistency-checking invention "seems to work extremely well," "all tests pass," and "production run comparisons look very promising." (2/11/02 email, ECF #523-4 at Pg. ID 40674.)  That arguable tension does not prohibit the Court from considering the declaration on summary judgment and may be explored on cross-examination.  Finally, even without Smith's declaration, the Court would still deny summary judgment on Ford'

evidence, a reasonable juror could conclude that there is not clear and convincing evidence that the claimed invention was ready for patenting before the critical date.

The Court readily acknowledges that Ford has presented its own evidence – evidence that a jury may well find persuasive – that the claimed consistency-checking invention was the subject of a commercial offer for sale and was ready for patenting before the critical date.  But the Court respectfully disagrees with the Special Master and Ford that this evidence is so compelling that every reasonable juror would have to find by clear and convincing evidence that Versata had decided to include the invention "in the *final* version [of the software] prior to the critical date." (R&R, ECF #551 at Pg. ID 42195; emphasis added.)  Accordingly, the Court **SUSTAINS** Versata's objections and **DENIES** Ford's motion for summary judgment of invalidity of the asserted claims of the '582 and '064 patents for violating the on-sale bar.

## B

Versata next objects to Mr. Graham's recommendation that Ford is entitled to summary judgment with respect to the '080 patent on the basis that Ford did not infringe that patent. (*See* Objections, ECF #565 at Pg. ID 42375-83.)  The Court

---

on-sale bar defense for all of the other reasons explained above and based upon the other evidence discussed above.

**SUSTAINS** this objection and **DENIES** Ford's motion for summary judgment of non-infringement of the '080 patent.

**1**

"Determining infringement is a two-step process. First, the court determines the scope and meaning of the asserted claim. Then, the court compares the properly construed claims with the accused device or product to reach a finding regarding infringement." *AFG Industries, Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367, 1372 (Fed Cir. 2004). "In the context of summary judgment, this court reviews the second determination for genuine disputes of material facts that would preclude a grant of summary judgment.  In particular, *a trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary*." *Id.* (internal citation omitted; emphasis added.) *See also Wi-LAN USA v. Ericcson, Inc.*, 675 F. App'x 984, 995 (Fed. Cir. 2017) (reversing summary judgment and holding that "[t]he District Court erred in entering summary judgment because it ignored conflicting evidence in the record").

**2**

"The '080 patent relates to combining multiple product definition models together … An objective of the patent is to combine the multiple models in a way that detects and automatically resolves [] conflicts" that may result when the models

are combined. (R&R, ECF #551 at Pg. ID 42208-09.) Ford moved for summary judgment on the basis that its automotive configuration software does not infringe the '080 patent. "Ford acknowledge[d] that its [] software includes the ability to combine models and resolve conflicts in them, but [Ford] contend[ed] that it does so in a different manner than that taught and claimed by the '080 patent." (*Id.* at Pg. ID 42209.)

The Special Master recommended that the Court grant Ford summary judgment with respect to its claim of non-infringement of the '080 patent because "Versata ha[d] not demonstrated the existence of a genuine issue of material fact in support of its assertion of infringement of [that] patent." (*Id.* at Pg. ID 42218.) More specifically, the Special Master found that Versata's claim that Ford's software infringed the '080 patent was "unsupported by anything beyond the conclusory statement of Versata's expert Dr. Malek." (*Id.* at Pg. ID 42214.) The Special Master reviewed the portions of Dr. Malek's opinion that Versata relied upon and concluded that "Dr. Malek's opinion [was] entirely conclusory, asserting [infringement of the '080 patent] but without citing to underlying facts in support." (*Id.* at Pg. ID 42215.) The Special Master also faulted Dr. Malek for not providing "any meaningful explanation" for his analysis and for not citing "documents or source code" that supported his conclusions. (*Id.*) Finally, the Special Master found that Dr. Malek's

"assertions [were] inconsistent" with a *Superconfiguator Generator* document that explained how Ford's software worked. (*Id.* at Pg. ID 42216.)

**3**

Versata objects to this recommendation of the Special Master on the basis that, among other things, the Special Master wrongly rejected the opinion of its expert Dr. Malek and thereafter "impermissibly resolved genuine disputes of material facts against Versata." (Objections, ECF #565 at Pg. ID 42383.) The Court appreciates the Special Master's careful analysis of the infringement issues, but it agrees with Versata. The Court has reviewed the record and concludes that summary judgment is not appropriate on this claim.

The Court respectfully disagrees with the Special Master that Dr. Malek's opinions with respect to the '080 patent are so conclusory and so contrary to the other evidence in the record that there is not a genuine issue of material fact for trial. In Dr. Malek's expert report and his reply report, he opined that Ford's replacement automotive-configuration software infringed Versata's '080 patent. (*See* ECF #429 at Pg. ID 29040-42.) The relevant portions of Dr. Malek's reports included citations to numerous lines of source code from Ford's own software which Dr. Malek indicated supported his analysis. For example, in paragraphs 435-437 of Dr. Malek's expert report, Dr. Malek explained how Ford's replacement software identifies and avoids conflicts in a manner that infringes the '080 patent. (*See* ECF

#366-9 at ¶¶ 435-37, Pg. ID 20366.) Those paragraphs include citations to 15 separate portions of the source code of Ford's software that support Dr. Malek's analysis.[7] (*See id.*)

The Court concludes that a jury could give at least some weight to Dr. Malek's opinions that Ford has infringed the '080 patent. Thus, this is a case in which "the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary." *AFG Industries*, 375 F.3d at 1372. Under these circumstances, summary judgment is inappropriate. *See id.* The Court therefore **SUSTAINS** Versata's objections and **DENIES** Ford summary judgment on its claim of non-infringement of the '080 patent.

## C

Finally, Versata objects to Mr. Graham's recommendation that Ford is entitled to summary judgment with respect to the asserted claims of the '057 patent on the basis that the claims are invalid under *Alice v. Corp. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). (*See* Objections, ECF #565 at Pg. ID 42384-94.) The Court **OVERRULES** this objection and **GRANTS** Ford's motion that the asserted claims of the '057 patent are invalid.

---

[7] This Court is satisfied that Versata sufficiently identified and cited to these paragraphs of Dr. Malek's report in its summary judgment motion papers.

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. In *Alice*, "the Supreme Court articulated a two-step test for examining patent eligibility under § 101." *Data Engine Technologies, LLC v. Google, LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018). In the first step, courts "determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* (quoting *Alice*, 134 S.Ct. at 2355. For example, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Id.* (quoting *Alice*, 134 S.Ct. at 2355.) "The abstract ideas category embodies the longstanding rule that an idea of itself is not patentable." *Alice*, 134 S.Ct. at 2355. "If claims are directed to a patent-ineligible concept," courts move to step-two of the *Alice* test. *Data Engine Technologies*, 906 F.3d at 999. "In [that] step, [courts] consider 'the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (quoting *Alice*, 134 S.Ct. at 2355) (internal quotation marks omitted). "This second step is 'a search for an inventive concept – *i.e.*, an element or combination of elements that it sufficient to ensure that the patent in practice amounts to significantly more than a patent upon

the ineligible concept itself." *Id.* (quoting *Alice*, 134 S.Ct. at 2355) (internal punctuation marks omitted).

With respect to computers and computer software, courts must ask at step one of the *Alice* inquiry whether "the focus of the claims is on the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). In other words, the question is whether the asserted claims solve a problem with computer functionality (and thus the claims are not directed at an abstract idea) or whether the asserted claims use computers to solve a problem (and thus the claims are directed at an abstract idea). *See id.* At step two of the *Alice* analysis, "the 'mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Data Engine Technologies*, 906 F.3d at 1012 (quoting *Alice*, 134 S.Ct. at 2358). "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Id.* (internal punctuation omitted). "Thus, if a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility." *Alice*, 134 S.Ct. at 2358 (internal punctuation and citation omitted). *See also Versata Development Group, Inc. v. SAP*

*America, Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) ("Examination of the claims –

as a whole and in terms of each claim's limitations – reveals that the claims are not

directed to improving computer performance and do not recite any such benefit. The

claims are directed to price determination and merely use a computer to improve the

performance of that determination – not the performance of a computer").

**2**

The claims of the '057 patent at issue here are claims 1, 18, 19, 21, 22, 23, 25,

and 27. (R&R, ECF #551 at Pg. ID 42231.) The primary claim, claim 1, provides

that:

> A method for using a computer system, Wherein the
> computer system includes computer assisted configuration
> technology to respond to one or more configuration
> queries using configuration sub-models, the method
> comprising: receiving one or configuration queries
> representing one or more questions involving parts and
> part relationships in a configuration of a configurable
> product; and performing With the computer system:
> dividing one or more configuration queries into multiple
> configuration sub-queries, Wherein the multiple
> configuration sub-queries represent the one or more
> configuration; processing each sub-query using at least
> one configuration sub-model per sub-query, Wherein each
> configuration sub-model collectively models the
> configurable product and each configuration sub-model
> includes data to define compatibility relationships
> between parts included in the configuration sub model and
> each configuration sub-model (i) represents a portion of a
> configuration model of the configuration product and (ii)
> allows answers from each configuration sub-model to be
> combined to provide a consolidated answer to the one or
> more configuration queries; generating a response to the

one or more configuration queries based upon the
processing of each sub-query using at least one
configuration sub-model per sub query; and providing the
response to the one or more configuration queries as data
for display by a display device.

(ECF #462-4 at Pg. ID 38388.)

The Special Master found that the patented invention "seeks to reduce
processing requirements by breaking configuration problems into a set of smaller
problems, solving them individually, [and] then combining the results." (R&R, ECF
#551 at Pg. ID 42233.) He then concluded that the asserted claims were invalid
because they were directed at non-patentable subject matter under the *Alice* test.

At step one of the *Alice* inquiry, the Special Master found that the asserted
claims were not directed at an improvement in computer functionality. Instead, he
concluded that they were "directed to the abstract idea of dividing a large problem
into a number of smaller problems in order to solve the smaller ones separately and
then combine the results to solve the larger problem." (*Id.* at Pg. ID 42234.) He
further rejected Versata's arguments that "the claims [were] directed to
improvements in computer technology" as "superficial." (*Id.* at Pg. ID 42237.) He
determined that while "[d]ividing larger problems into smaller ones undoubtedly
will improve the ability to solve configuration problems using a computer … this
advantage is not truly directed to the computer." (*Id.* at Pg. ID 42238.) He therefore
concluded that "the asserted claims are directed at an abstract idea" because "the

claims use the computer 'merely as a tool,' requiring a computer to be used to solve a problem." (*Id.* at 42239-40.)

At step two of the *Alice* analysis, the Special Master found that "[t]he claim limitations do not supply an inventive concept that renders any of them 'significantly more' than an abstract idea to which the claims are directed." (*Id.* at Pg. ID 42243.) He therefore concluded that the claims "are not patent-eligible as a matter of law." (*Id.*)

### 3

The Court agrees with the Special Master that at step one of the *Alice* inquiry, the asserted claims are not "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. Instead, they are directed at using a computer as a tool to solve a problem. Therefore, the asserted claims are directed at an abstract idea.

The language of the claims at issue confirm that the invention uses a computer as a tool and is not directed at improving computer functionality. For example, in claim one of the '057 patent, which is asserted here, the patent provides that the claimed method uses "a computer system" to, among other things, "divid[e] one or more configuration queries into multiple configuration sub-queries" and "generat[e] a response to one more configuration queries based upon the processing of each sub-query." (ECF #462-4 at Pg. ID 388388.) This claim does not appear to solve a

problem with computer functionality; instead, it appears to use computer functionality to solve a problem more quickly. The claim is therefore directed at an abstract idea at step one of the *Alice* inquiry.

Claim one stands in sharp contrast to claim eleven of the '057 patent, which is not asserted here. That claim specifically references "dividing the configuration model *so that complexity of each configuration sub-model allows processing using available data processing capabilities of the computer assisted configuration technology* while still representing the relationships included in the consolidated configuration models." (ECF #462-4 at Pg. ID 38388; emphasis added.) Likewise, claim twenty-six of the '057 patent references "dividing the configuration model *so that complexity of each configuration sub-model allows processing using available data processing capabilities of the computer system* while still representing the relationships included in the consolidated configuration model." (*Id.* at Pg. ID 38889; emphasis added.) Thus, these non-asserted claims appear to be "directed to a specific improvement in computer functionality" rather than "adding conventional computer components to well-known [] practices" or "recit[ing] generalized steps to be performed on a computer using conventional computer activity." *Enfish*, 822 F.3d at 1338. The contrast between these non-asserted claims and the asserted claims underscores that the asserted claims are not directed at improving computer functionality.

Moreover, the Court agrees with the Special Master that the asserted claims are directed at an abstract idea because "[a]ll of [the claim's] steps can be performed in the human mind, or by a human using a pen and paper." *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("[A] method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101"). Here, the asserted claims of the '057 patent apply only to "one or more configuration queries." (ECF #462-4 at Pg. ID 38388.) And there are no limitations that require that "one" query to be overly complex. Thus, the Court agrees with the Special Master that the asserted claims "present a manageable mental problem … [that] could be performed by a human." (R&R, ECF #551 at Pg. ID 42237.)

This is the same result that the Federal Circuit reached in *Planet Bingo, LLC v. VKGS, LLC*, 576 F. App'x 1005 (Fed. Cir. 2014). In *Planet Bingo*, the plaintiff alleged that the defendant infringed certain patent claims related to "computer-aided methods and systems for managing the game of bingo." *Id.* at 1006. At step one of the *Alice* inquiry, the Federal Circuit concluded that the asserted claims were directed at an abstract idea because they "[could] be carried out by a human using pen and paper." *Id.* at 1007 (internal quotation marks omitted). It further rejected the defendant's argument that the asserted claims were not directed at an abstract idea because the invention was "complex" and addressed "thousands, if not millions" of

combinations in a manner that required the use of a computer. *Id.* at 1008. That court held that "the claimed inventions do not require as much. At most, the claims require two sets of Bingo numbers, a player, and a manager." *Id.* Likewise here, the asserted claims require *only* "one or more configuration queries" (ECF #462-4 at Pg. ID 38388) and are not limited "to the large number context." (R&R, ECF #551 at Pg. ID 42240.) *See also Planet Bingo*, 576 F. App'x at 1008 ("We need not, and do not, address whether a claimed invention requiring many transactions might tip the scales of patent eligibility, as the claims fall far short of capturing an invention that necessarily handles 'thousands, if not millions' of bingo numbers or players"). For all of these reasons, the Court concludes that the asserted claims are directed at an abstract idea at step one of the *Alice* inquiry.

At step two of the *Alice* inquiry, the Court also agrees with the Special Master that the elements of the asserted claims, both individually and "as an ordered combination" do not "'transform the nature of the claim into a patent-eligible application.'" (R&R, ECF #551 at Pg. ID 42240, quoting *Alice*, 134 S.Ct. at 2355). The Court acknowledges that the asserted claims reference computers and computer systems. But where, as here, "a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on a computer, that addition cannot impart patent eligibility" at step two of the *Alice* inquiry. *Alice*, 134 S.Ct. at 2358 (internal citation and punctuation omitted). *See also Data Engine Technology*, 906 F.3d at

1012 ("The mere recitation of a generic computer [does not] transform [a] patent-ineligible abstract idea into a patent-eligible invention"). Indeed, "in order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Versata Development Group v. SAP America, Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015). In this case, as in *Versata Development Group*, the asserted "claims do not meet this test, and instead function solely as a mechanism for permitting [a solution] to be performed more quickly" using a computer as a tool. *Id. See also Data Engine Technologies*, 906 F.3d at 1012 ("For the role of a computer in a computer computer-implemented invention to be deemed meaningful in this context of this analysis, it must involve more than performance of well-understood, routine, and conventional activities previously known to the industry") (internal punctuation omitted). Thus, as explained above, and as explained by the Special Master, the Court concludes that the elements of the asserted claims simply do not "supply an inventive concept that renders any of them significantly more than an abstract idea." (R&R, ECF #551 at Pg. ID 42240-43.)

For the reasons explained above, and for all of the reasons offered by the Special Master, the Court **OVERRULES** Versata's objections and **GRANTS** Ford summary judgment on its claim of invalidity of the asserted claims of the '057 patent.[8]

## IV

For all of the reasons stated in this Opinion and Order, the Court **SUSTAINS IN PART AND OVERRULES IN PART** Versata's Objections to the R&R; **ADOPTS IN PART** the recommended disposition of the R&R; and **GRANTS IN PART AND DENIES IN PART** the parties' pending summary judgment motions as follows:

---

[8] In the R&R, the Special Master framed his analysis around claim one of the '057 patent. However, he further determined that his analysis with respect to claim one "applie[d] equally to all of the claims at issue" because each of those claims, like claim one, took "the concept of dividing larger problems into smaller ones and apply it to problems in the configuration environment." (R&R, ECF #551 at Pg. ID 42240.) The Special Master also noted that Versata did not "offer any arguments seeking to treat some of the claims differently from others." (*Id.*) In Versata's objections to the R&R, it argues that the Special Master wrongly "purported to invalidate all eight asserted claims of the '057 patent based on a superficial and improper reading of just one claim, stopping his analysis after Claim 1 and totally ignoring the other seven claims." (Versata Reply Br., ECF #597 at Pg. ID 46582.) But just as Versata did in its summary judgment motion papers, Versata has not explained in its objections *why* the asserted claims should be treated differently from one another. Therefore, Versata has not shown the Special Master erred when he concluded that his analysis for claim one applies to all of the asserted claims. And, even if the Special Master erred in that regard, Versata has not shown why that error warrants relief from the recommendation made in the R&R.

- Ford's motion for summary judgment of invalidity of the asserted claims of U.S. Patent No. 7,200,582 and U.S. Patent No. 7,646,064 for violation of the onsale bar is **DENIED**;

- The motions of Ford and Versata as to the infringement or noninfringement of the '582 and '064 patents, and also as to the novelty and obviousness of the asserted claims of these patents, are **DENIED**;

- Ford's motion for summary judgment of noninfringement of U.S. Patent No. 7,739,080 is **DENIED**;

- Ford's motion for summary judgment of noninfringement of U.S. Patent No. 6,405,308 and U.S. Patent No. 6,675,294 is **DENIED**;

- Ford's motion that the asserted claims of U.S. Patent No. 7,882,057 are invalid as being directed to patent-ineligible subject matter under Section 101 is **GRANTED;** Versata's cross-motion for patent eligibility of the '057 patent is **DENIED**;

- Versata's motion that the asserted claims of U.S. Patent No. 7,739,080 are not invalid under Sections 102 and 103 is **GRANTED**. Ford's declaratory judgment claims asserting invalidity of U.S. Patent No. 5,825,651 and U.S. Patent No. 8,805,825 **ARE DISMISSED** for lack of subject-matter jurisdiction. Versata's motion that the dismissed or non-asserted claims of the '308, '294, '582, '064, '057, and '080 patents are not invalid under Sections 102 and 103 is **DENIED**;

- Versata's motion that its asserted patents are valid under Section 101 as being directed to patentable subject matter is **WITHDRAWN** except as applied to the '057 patent, referred to above; and

- Versata's motion that the asserted claims of the '057 patent are valid under Sections 102 and 103 in view of the prior art is **WITHDRAWN**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 27, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764