## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**Ford Motor Company,**

      Plaintiff/Counter-Defendant,

**v.**

**Versata Software, Inc., f/k/a Trilogy Software, Inc., Versata Development Group, Inc. and Trilogy, Inc.,**

      Defendants/Counter-Plaintiffs.

**Case No. 15-10628-MFL-EAS**
***(Consolidated with Case No. 15-cv-11624)***

**Hon. Matthew F. Leitman**
**JURY TRIAL DEMANDED**

## <u>VERSATA DEFENDANTS' RESPONSE TO FORD'S MOTION FOR SUMMARY JUDGMENT ON VERSATA'S TRADE SECRET MISAPPROPRIATION CLAIMS AGAINST PDO R2</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   ARGUMENT ...............................................................................................2

      A.  PDO R2 is the Next Release of PDO ...........................................2

          1.  Ford Planned for R2 to be the Next "Release" of PDO ................2

          2.  R2 is Visually Integrated to Users of PDO ...................................5

          3.  R2 is Technically Integrated as Part of PDO ...............................7

          4.  R1 and R2 had a Common Development Team ..........................10

      B.  R2 Misappropriates through use of Versata's Trade Secrets ..................11

      C.  Damages for R2 are included in Versata's Damages Model ..................15

III.  CONCLUSION ...........................................................................................17

## RESPONSE TO ISSUES PRESENTED

Is Ford entitled to summary judgment on Versata's trade secret claims against PDO R2 where (1) R2 is part of PDO and uses Versata's trade secrets and (2) damages for R2 are included within Versata's damages model?

Versata answers:   **No**

## CONTROLLING AUTHORITY

*BladeRoom Group Ltd. v. Facebook, Inc*.,
     No. 5:15-cv-01370, 2018 WL 514923 (N.D. Cal. Jan 2, 2018)

*Cognis Corp. v. Chemcentral Corp.*,
     430 F.Supp.2d 806 (N.D. Ill. 2006)

*GlobeRanger Corp. v. Software AG United States of America Inc.*,
     836 F.3d 477(5th Cir. 2016)

Defend Trade Secrets Act (18 U.S.C. § 1836)

Michigan Uniform Trade Secrets Act (MCLS § 445)

# INDEX OF AUTHORITIES

**Cases**

*American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*,
  114 F.3d 108 (8th Cir. 1996).................................................................14

*BladeRoom Group Ltd. v. Facebook, Inc.*,
  No. 5:15-cv-01370,  2018 WL 514923 (N.D. Cal. Jan 2, 2018) ........................12

*Cognis Corp. v. Chemcentral Corp.*,
  430 F.Supp.2d 806 (N.D. Ill. 2006).....................................................12

*GlobeRanger Corp. v. Software AG United States of America Inc.*,
  836 F.3d 477 (5th Cir. 2016) .............................................................12

*Next Comms., Inc. v. Viber Media, Inc.*,
  No. 14-cv-8190, 2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ........................12

*Stratienko v. Cordis Corp.*,
  429 F.3d 592 (6th Cir. 2005) .............................................................13

**Statutes**

Defend Trade Secrets Act (18 U.S.C. § 1836)................................................... 1, 11

Michigan Uniform Trade Secrets Act (MCLS § 445)…………………………1, 11

## I.    INTRODUCTION

Ford's motion is based on the false premise that PDO R2 (or R2) is an entirely new and independent program from PDO R1.   However, the evidence clearly demonstrates the opposite: in fact, PDO R2 is "Release 2" of PDO and simply the next development of PDO R1.   R2 is visually integrated with R1; R2 is technically integrated with R1 at the source code level; Ford documents and witnesses confirm that R2 is the next phase, or extension, of R1.   Given this degree of integration, Ford unsurprisingly utilized ████████████████ when creating R2.   R2 in reality is an extension and enhancement of PDO and not a separate downstream application as Ford claims.

Ford's motion also is defective because it is based on the incorrect legal premise that trade secret misappropriation is limited to R2 features that entirely "include" Versata's trade secrets.   Misappropriation is not so narrowly limited and encompasses "use" of a trade secret, as set forth in the federal Defend Trade Secrets Act (18 U.S.C. § 1836) and the Michigan Uniform Trade Secrets Act (MCLS § 445).   Based on this legal standard, Versata identified two features in R2, "Change Management" and "Mix-Rate," that misappropriate by using two of the Versata trade secrets asserted in this case, as explained in detail by Versata's technical expert, Dr. Malek.   *See* Ex. A, Malek R2 Report.

Contrary to Ford's motion, Versata is seeking damages for R2.   Versata's

1

damages model includes the right for Ford to develop other applications that use the trade secrets.  Ford's development of R2 is precisely the type of improvement contemplated by the damages model.  Thus, while Versata does not seek an additional amount of damages for R2, Ford's continued development of the trade secrets in R2 is contemplated in Versata's damages model.  If anything, R2 confirms the value of Versata's trade secrets by showing that Ford created additional functionality based on Versata's trade secrets.

## II.   ARGUMENT

### A.   PDO R2 is the Next Release of PDO

R2 is part of PDO and refers to the next release in the development of the software to add additional functionality, as confirmed by the deep level of integration between R1 and R2.  Ford planned for R2 to have this architecture from the outset of the design of PDO.  Thus, Ford blatantly mischaracterizes the true nature of R2 by calling it merely a downstream system.

#### 1.   Ford Planned for R2 to be the Next "Release" of PDO

As early as 2011, Ford Motor Company hatched a plan to secretly replace Versata's ACM Software that was at the time under license and was the key software used for product definition company wide. Ex. B, James Beardslee 7/13/2017 depo. at 40:17 - 41:8.  The replacement software, eventually called Product Definition Offer ("PDO") was slated to undergo several phases of development with specific

releases planned by November 2012 that included two initial releases, PDO R1 and PDO R2. *See* Ex. C, FV0050369 - 0050382 at FV0050376; Ex. D, FV0050615-25 at 619.

The accused features within R2, Change Management and Mix-Rate, were always part of the PDO development plan, as shown in a ▮▮▮ document from Ford.



Ex. C, FV0050369 - 0050382 at FV0050376 (emphasis added in red to show the accused R2 features).  Notably, Ford contemplated i▮▮▮▮▮▮▮▮▮▮▮▮▮▮t

███████████ which further evidences that Ford's attempt to characterize R2 as an independent downstream application is false.

Consistent with the above plan, Ford referred to PDO R2 as "Release 2" of

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██ Ex. L, FV0094135-7 at 135; *see also* ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ ); Ex. A, Malek R2 Report at ¶¶19-20.

Ford's own internal documentation does not describe PDO R2 as a separate downstream system. *See* Ex. L, FV0094135-0094137; Ex. A, Malek R2 Report, at ¶¶75-76.  These internal documents discuss plans for expanded development of PDO into further releases and does not characterize the expanded development as separate downstream systems.

Ford relies on self-serving declarations from a Ford employee in an attempt to provide evidence that R2 is simply another downstream system of R1.  Ford Mtn. at 2.  However, Ford cites no evidence in support of this false premise.  To the contrary, Ford's own employees Paul Seiler and Fredrick Wilkinson admit that R2 is an extension of R1.  Ex. F, Paul Seiler 12/12/18 depo. at 30████████████████

████████████████████████████████████████████ ); Ex. G,

Fred  Wilkinson  12/12/18  depo.  at  304:2-4 ████████████████████████

4

████████████████████████████████████████████████████████

████████).  Both describe various other downstream systems but do not identify PDO R2 as one of them.  Ex. F, Paul Seiler 12/12/18 depo. at 339:10 - 340:11; Ex. G, Fred Wilkinson 12/12/18 depo. at 286:2-16.

### 2.    R2 is Visually Integrated to Users of PDO

Consistent with Ford's plan for R2 to be the next release of R1, R2 is visually integrated to users of PDO.  The R2 features are presented to users without any distinction to R1, as confirmed by a live demonstration of PDO R2 that Ford provided to Versata's technical experts.  As shown in the screenshots taken from the demonstration, the user accessing PDO is presented with a single user interface to access both PDO R1 and PDO R2 functionality.  Ex. A, Malek R2 Report at ¶73; Ex. H, FV135478 - 135568 at 478.  When a user logs in, t██████████████████

████████████████████████████████████████████████████████



*Id*. (emphasis added in red to show the accused R2 features).



Ex. I, FV135430 – 135477 at FV135471 (emphasis added in red to show the

accused R2 features).

Nowhere does the user see "R1" or "R2," nor is the user required to open separate applications to use the features within R1 and R2. The user is presented with PDO and all of its features, including those found in R1 and R2.

### 3. R2 is Technically Integrated as Part of PDO

In addition to being user integrated, R2 software is technically integrated as part of PDO and cannot function apart from PDO R1. Ex. A, Malek R2 Report at ¶6. The source code for R2 was originally developed and stored in the same repository as R1, w███████████████████████████████ *Id*. at ¶¶28 & 35. For example, ████████████████████████████████████████████████ ████████████████████████ *See* Ex. S.2, FSC088311-22.

R2 source code also uses the same "namespace" as PDO R1, whereas Ford's true downstream systems do not. *See* Ex. A, Malek R2 Report at ¶¶26 & 34-36. Namespace identifies categories of code. *Id* at ¶36. By comparison, the source code for Ford's ███████████████████████████████████████████. Ex. S.1, FSC5681-702.

The source code also shows that R2 developed functionality is built on PDO developed functionality and source code. For example, shared code exists in ████████████████████████████████████████████████████████ ███████████████████████████ *See, e.g.,* Ex. S.3, FSC108592-610; Ex. S.4,

7

FSC116514-16; Ex. S.5, FSC116761-69.  Java EAR files from PDO also show connection between R1 and R2. Ex. A, Malek R2 Report at ¶¶ 83-92.

In addition to integration at the source code level, Ford's own architectural documents in the form of Ford UML diagrams demonstrate the fundamental interaction between R2 components and the other PDO components.  Ex. A, Malek R2 Report at ¶¶ 78-79.  UML is a modeling language used to visualize the design of a software system.  *Id*. at ¶ 78.



Ex. S.6, FSC117402-404 (emphasis added to show PDO R1 functionality in Red interacting with PDO R2 functionality in blue and combined to display as a complete single image); Ex. A, Malek R2 Report at ¶¶ 78-79.

9

The UML diagram above shows that ███████████████████████

███████████████████████████████████████████████████████

███████  Ex. A, Malek R2 Report at ¶64.  In one example of this close interaction,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████  *Id*. at ¶¶67, 102, 103.

PDO R2 also leverages buildable configurations from R1. Ex. A, Malek R2

Report at ¶ 98. The source code that ███████████████████████████████

████████████████████████.  Ex. S.6, FSC117402-404; Ex. H, FV135478

- 135568 at FV135541.

### 4.    R1 and R2 had a Common Development Team

Given the full integration of R2 and R1 as part of PDO, it is not surprising

that Ford utilized a common team of developers between the two releases.  The

Accurev logs for the source code repositories identify user names who worked on

the software.  An evaluation of names common to both the R1 and R2 logs identifies

███████████████████ who worked on both releases.  Ex. J, Ford Developers

Common to R1 and R2; *See* Ex. S.7, FSC014167-103177 (PDO Accurev Log); Ex.

S.8, FSC126772-149954 (PDO R2 Accurev Log).[1]

### B.   R2 Misappropriates through use of Versata's Trade Secrets

Release 2 of PDO, or R2, includes two features that misappropriate Versata's trade secrets found in the first release of PDO, or PDO R1.  Specifically, R2's Mix-Rate feature misappropriates Versata's buildability trade secret by using buildable configurations generated by PDO.  Ex. A, Malek R2 Report, at ¶¶8, 95-99.  R2's Change Management feature misappropriates Versata's workspaces trade secret through R2's use of ███████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████. *Id* █████████████████████████████ ███████████████████████████████████████████ *Id.* Accordingly, Mix-Rate and Change Management misappropriate two of Versata's trade secrets by using the trade secrets in PDO.

Ford attempts to dismiss these trade secret misappropriation claims against R2 is based on false grounds.  Ford first argues that R2 is an independent software package that is functionally distinct from R1.  However, R2 is integrated with R1 as part of PDO software, as confirmed by the PDO user screens, the integration of the

---

[1] Due to length, only the relevant pages of the PDO and PDO R2 Accurev Logs are attached as exhibits.

software, and Ford's own documents and witnesses. *See, supra*. This alone creates

a genuine issue of material fact that is sufficient to deny Ford's motion.

However, even proceeding under the false premise that R2 is independent of

R1, Ford's motion is based on a nonexistent trade secret misappropriation standard

that the R2 features must "include" the asserted trade secrets. Ford Mtn. at i. That

is not the standard for trade secret misappropriation under either the federal Defend

Trade Secrets Act (18 U.S.C. § 1836) and the Michigan Uniform Trade Secrets Act

(MCLS § 445). Both statutes define misappropriation to include "use" of another

person's trade secret without their consent:

> "Misappropriation" means either of the following:
> .....
> (ii) Disclosure or **use of a trade secret of another without express or implied consent** by a person who did 1 or more of the following:
>
> **(A) Used improper means to acquire knowledge of the trade secret.**
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

MCLS § 445.1902(b). Similarly, Mix-Rate and Change Management use Versata

trade secrets found in PDO.

In reality, Ford is attempting to impose a patent infringement framework by

alleging that Mix-Rate and Change Management must independently misappropriate

12

the entirety of Versata's trade secrets. However, the scope of "use" of a trade secret is broader than that of a patent. *BladeRoom Group Ltd. v. Facebook, Inc*., No. 5:15-cv-01370, 2018 WL 514923 at *9 (N.D. Cal. Jan 2, 2018). This is consistent with courts consistently acknowledging that the scope of "use" of a trade secret is broad when determining misappropriation. *Cognis Corp. v. Chemcentral Corp.*, 430 F.Supp.2d 806, 812 (N.D. Ill. 2006) ("'use' [of a trade secret] is a very broad concept"); *GlobeRanger Corp. v. Software AG United States of America Inc.*, 836 F.3d 477, 498 (5th Cir. 2016) (trade secret "use" is defined broadly to mean any "commercial use by which the offending party seeks to profit from the use of the trade secret."); *Next Comms., Inc. v. Viber Media, Inc.*, No. 14-cv-8190, 2016 WL 1275659 at *5 (S.D.N.Y. Mar. 30, 2016) (plaintiff sufficiently alleged a misappropriation claim based on the defendant's use of the trade secret to develop its own software app feature).

Ford's attempt to criticize Dr. Malek's November 17, 2017 trade secret report is entirely misplaced. Ford Mtn. at 7. Dr. Malek provided this report ***prior*** to Ford providing limited discovery into R2, including prior to Ford making R2 source code available for inspection. Ford eventually provided such discovery, and Dr. Malek subsequently provided his R2 report on December 10, 2018. In this report and at his deposition, Dr. Malek addressed the alleged uncertainty raised by the Special Master and made it clear that R2 applications misappropriate by using the trade secrets

13

found in other parts of PDO.  Ford inexplicably argues that this uncertainty still exists yet cites to Dr. Malek's deposition as evidence that R2 relies on certain capabilities within R1.  Ford Mtn. at 14 & 16.

The authority on which Ford relies in support of its argument that the R2 applications must independently practice Versata's alleged trade secrets misses the mark. Ford Mtn. 12.

Nowhere does the court in *Stratienko* postulate that the alleged trade secret must be "actually incorporated into the accused product," as Ford alleges. *Stratienko v. Cordis Corp.*, 429 F.3d 592 (6th Cir. 2005).  The trial court in that case granted summary judgment against the plaintiff because the plaintiff's expert simply averred that the defendant's accused device shared "all salient features found in [plaintiff's device.]," but failed to identify the relevant features or the trade secret.  *Id.* at 601-602.  In affirming the lower court's ruling, the Sixth Circuit held that the plaintiff failed to show a sufficient basis for the jury to find an inference of trade secret use. *Id.* The court further explained that a product-to-product feature comparison was simply "irrelevant" to such inquiry. *Id.*

Here, unlike the expert in *Stratienko*, Versata's expert has identified the trade secrets that Ford's R2 application misappropriates by using these trade secrets in PDO.

14

Likewise, the *American Airlines* case has nothing to do with trade secret use, as Ford alleges. *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 110-112 (8th Cir. 1996). The lower court in *American Airlines* granted summary judgment for the defendant because "the record conclusively established" that the defendant never received the combination trade secret in its entirety. *Id.* at 110. Instead, the defendant was only provided with four out of the five constituent elements of the trade secret, without the necessary algorithm for using them. *Id.* Thus, the lower court held – and the Eighth Circuit affirmed – that the defendant in *American Airlines* did not misappropriate the plaintiff's trade secret because it never acquired it to begin with. *Id.* at 111-112.

There is no dispute in the instant case that Ford had access to and acquired Versata's alleged trade secrets in their entirety under the license. Accordingly, Ford's reliance on *American Airlines* is completely misplaced.

### C.    Damages for R2 are included in Versata's Damages Model

Ford attempts to minimize the importance of R2 based upon Versata's damages model and the parties' earlier attempt to simplify this case by removing R2. However, now that Ford has provided discovery into R2, it only serves to confirm the importance and value to Ford of the continued use of Versata's trade secrets, such as through the development of additional features like R2.

Versata's supplemental damages model includes damages for extended use of

Versata's trade secrets. Ex. K, Expert Report of Craig Elson Regarding PDO R2, at ¶16. This allows Ford "significant control over the use of Versata's otherwise protected trade secrets," such as the ability to develop other applications that use the trade secrets like Ford accomplished with R2. *Id.* at ¶15. Before implementing PDO, Ford was required to seek Versata's assistance to develop these types of features and pay for such services. Versata's damages model allows Ford to develop additional features on its own.

As a result, there was no need to separately quantify damages for R2, even though R2 is in fact included within the scope of the damages that Versata is seeking. Notably, Ford does not argue that Versata's trade secrets claim against R2 should be dismissed based on the damages model.

Ford also mischaracterizes the nature of the parties' discussions to drop R2 from the case. Versata proposed that if R2 was to be removed, it should be removed for all purposes. Otherwise, as counsel for Versata explained at the March 9, 2018 hearing, Ford could "use PDOR2 as both a sword and a shield where they're shielding discovery" while at the same time, for example, using it to attack Versata's damages model. Dkt. #444, 3/9/18 Hearing Trans. At 118:16-20. However, the parties were unable to reach agreement on removing R2, and Versata's prior attempt to streamline the case has no bearing on whether R2 should now be dismissed.

### III.  CONCLUSION

Ford's motion is based on a strawman argument that R2 is a standalone piece of software that is independent of PDO R1.  However, all evidence points to exactly the opposite conclusion.  R2 integrated with R1 as part of PDO in every possible way, from the user experience down to the architectural source code level. Moreover, Dr. Malek applies the proper trade secret misappropriation standard to explain how the R2 Change Management and Mix-Rate features use Versata's trade secrets.  For these reasons and as explained above, Versata respectfully submits that Ford's motion should be denied.

May 2, 2019

**AHMAD, ZAVITSANOS, ANAIPAKOS,**
**ALAVI & MENSING, P.C.**
*/s/ Steven J. Mitby*
Demetrios Anaipakos
danaipakos@azalaw.com
Amir Alavi
aalavi@azalaw.com
Steven J. Mitby
smitby@azalaw.com
Kyung (Drew) Kim
dkim@azalaw.com
Scott W. Clark
sclark@azalaw.com
Jane Robinson
jrobinson@azalaw.com
Kyril Talanov
ktalanov@azalaw.com
Masood Anjom
manjom@azalaw.com
Michael McBride
mmcbride@azalaw.com
Justin Chen
jchen@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062

Daniel K. Webb
DWebb@winston.com
Matthew R. Carter
MCarter@winston.com
**WINSTON & STRAWN, LLP**
35 W. Wacker Drive
Chicago, IL 60601
Phone (312) 558-5600
Facsimile (312) 558-5700

18

Rodger D. Young
Jaye Quadrozzi
**YOUNG & ASSOCIATES**
27725 Stansbury Blvd., Suite 125
Farmington Hills, MI 48334
248.353.8620
efiling@youngpc.com

Sharoon Saleem
**JONES & SPROSS, PLLC**
Sharoon.saleem@jonesspross.com
1605 Lakecliff Hills Ln., Suite 100
Austin, TX 78732-2437

**ATTORNEYS FOR PLAINTIFFS
VERSATA SOFTWARE, INC. f/k/a
TRILOGY SOFTWARE, INC.,
VERSATA DEVELOPMENT GROUP,
INC., AND TRILOGY, INC.**

19

## <u>PROOF OF SERVICE</u>

Steven J. Mitby certifies that on May 2, 2019, he served the above response

and this Proof of Service upon all counsel of record via electronic filing.

I declare under the penalty of perjury that the statements made above are true

to the best of my knowledge, information, and belief.

*/s/ Steven J. Mitby*
Steven J. Mitby
smitby@azalaw.com
**AHMAD, ZAVITSANOS, ANAIPAKOS,**
**ALAVI & MENSING P.C.**
1221 McKinney St., Suite 2500
Houston, TX  77010
Telephone: 713-655-1101
