## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**Versata Software, Inc. f/k/a Trilogy Software, Inc., Versata Development Group, Inc., and Trilogy, Inc.,**

        Plaintiffs/
        Counter-Defendants,

v.

**Ford Motor Company,**

        Defendants/
        Counter-Plaintiffs.

**Case No. 15-10628-MFL-EAS**
***(consolidated with Case No. 15-cv-11624)***

**Hon. Matthew F. Leitman**

**JURY TRIAL DEMANDED**

## VERSATA'S ANTICIPATORY RESPONSE
## TO FORD'S MOTION FOR JUDGMENT AS A MATTER OF LAW

# TABLE OF CONTENTS

**Page**

CONCISE STATEMENT OF ISSUES PRESENTED ...........................................1

INTRODUCTION ............................................................................................2

ARGUMENT ....................................................................................................4

    I.    Ford is not entitled to JMOL on Versata's trade secret claims............4

        A.    The evidence presented supports a finding that Versata owns four valid combination trade secrets. ................................5

        B.    The evidence presented supports a finding that Ford misappropriated each component of each combination trade secret. ..............................................................................11

        C.    The evidence presented supports a finding that Versata suffered damages from Ford's misappropriation......................17

        D.    The result is the same under the DTSA and MUTSA. .............20

    II.    Ford is not entitled to JMOL on Versata's contract claims. ..............21

        A.    The evidence presented supports a finding that Ford breached the MSSA. ................................................................21

        B.    The evidence presented supports a finding that Versata suffered damages resulting from Ford's MSSA breach. ..........24

    III.    Ford is not entitled to JMOL on its own contract claim. ....................28

CONCLUSION .................................................................................................29

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*B&P Littleford, LLC v. Prescott Mach., LLC*,
   2021 U.S. App. LEXIS 25590 (6th Cir. Aug. 24, 2021) ....................................11

*Caldwell v. Fox*,
   394 Mich. 401 (1975) ...............................................................................4, 21, 25

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
   150 F.3d 1354 (Fed. Cir. 1998) ................................................................26, 27

*Eagle Harbor Holdings, Inc. v. Ford Motor Co.*,
   2015 U.S. Dist. LEXIS 17478 (W.D. Wash. Feb. 11, 2015)............................10

*Ford Motor Co. v. InterMotive, Inc.*,
   2019 U.S. Dist. LEXIS 168197 (E.D. Mich. Sep. 30, 2019)............................10

*Ghaleb v. Am. S.S. Co.*,
   684 F. App'x 545 (6th Cir. 2017) ....................................................................29

*Hanover Am. Ins. Co. v. Tattooed Millionaire Entm't, LLC*,
   974 F.3d 767 (6th Cir. 2020) .............................................................................3

*Hayes-Albion v. Kuberski*,
   421 Mich. 170 (1984) ........................................................................................7

*Innovation Ventures, Ltd. Liab. Co. v. Custom Nutrition Labs, Ltd.
   Liab. Co.*,
   912 F.3d 316 (6th Cir. 2018) ...........................................................................27

*K & T Enters. v. Zurich Ins. Co.*,
   97 F.3d 171 (6th Cir. 1996) ...............................................................................4

*Kasuri v. St. Elizabeth Hosp. Med. Ctr.*,
   897 F.2d 845 (6th Cir. 1990) .............................................................................3

*Mosby-Meacham v. Memphis Light, Gas & Water Div.*,
   883 F.3d 595 (6th Cir. 2018) ...............................................................2, 3, 19, 20

*Oakwood Labs. LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021) ................................................................15

*Stratienko v. Cordis Corp.*,
    429 F.3d 592 (6th Cir. 2005) ..............................................................14

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
    617 F. Supp. 2d 938 (N.D. Cal. 2007).................................................16

*Veritas Operating Corp. v. Microsoft Corp.*,
    2008 U.S. Dist. LEXIS 112135 (W.D. Wash. Feb. 26, 2008).....................26, 27

**Statutes**

18 U.S.C. § 1839 ...........................................................................5, 11, 16

**Other Authorities**

Federal Rule of Civil Procedure 50 ..........................................................3

## CONCISE STATEMENT OF ISSUES PRESENTED

Is Ford entitled to judgment as a matter of law on any claim in this case?

Versata answers: No.

## INTRODUCTION

The jury has now received testimonial and documentary evidence supporting each element of Versata's claims: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and the Michigan Uniform Trade Secrets Act ("MUTSA"); and (2) breach of the parties' Master Subscription and Services Agreement ("MSSA"). The jury has also received testimonial and documentary evidence showing that Ford's claim for breach of contract is unfounded. This evidence is more than sufficient to support a jury verdict in Versata's favor on all counts. As a result, Ford is not entitled to a judgment as a matter of law ("JMOL").

Judgment as a matter of law is appropriate "only if reasonable minds could not come to a conclusion other than one favoring the movant." *Mosby-Meacham v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018) (affirming JMOL denial). Versata has presented ample evidence to support its claims, which should now proceed to jury deliberations and verdict. This Court should deny Ford's motion.[1]

---

[1] By filing this brief now, Versata is anticipating the arguments Ford is likely to raise. To the extent Ford raises additional arguments or challenges in its JMOL motion, Versata respectfully requests the opportunity to brief those issues and/or address them in open court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides that if a "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim." Fed. R. Civ. P. 50(a)(1).[2]

Judgment as a matter of law is an extreme remedy. In evaluating such a request, the court "should not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury." *Mosby-Meachem*, 883 F.3d at 602 (citations omitted). Instead, the court must "view the evidence in the light most favorable to the nonmovant, granting all reasonable inferences in their favor." *Id.* The court may grant judgment as a matter of law "only if reasonable minds could not come to a conclusion other than one favoring the movant." *Id.* (citation omitted).

The same standard applies under Michigan law, too—Versata's MUTSA and breach of contract claims are before the court on pendent jurisdiction; thus, Michigan law applies in evaluating Ford's request for a directed verdict there too. *See Kasuri*

---

[2] "The term 'motion for judgment as a matter of law' under Federal Rule of Civil Procedure 50 amalgamates the old terms 'directed verdict' and 'verdict JNOV.'" *Hanover Am. Ins. Co. v. Tattooed Millionaire Entm't, LLC*, 974 F.3d 767, 779 (6th Cir. 2020) (citation omitted).

*v. St. Elizabeth Hosp. Med. Ctr.*, 897 F.2d 845, 851 (6th Cir. 1990).[3] Specifically, under Michigan law, "the trial judge must accord to the non-moving party the benefit of viewing the testimony and all legitimate inferences that may be drawn therefrom in a light most favorable to the non-moving party. If the evidence, when viewed in this manner, establishes a prima facie case, the motion for a directed verdict must be denied." *Caldwell v. Fox*, 394 Mich. 401, 407 (1975).

Here, the trial evidence presented to date is more than sufficient to support Versata's claims and defenses and to defeat Ford's claim for breach of contract.

## ARGUMENT

**I.     Ford is not entitled to JMOL on Versata's trade secret claims.**

To prove its misappropriation claim under the DTSA/MUTSA with respect to any one of the four combination trade secrets asserted, Versata must prove by a preponderance of the evidence that: (1) Versata owns a valid trade secret; and (2) Ford misappropriated the trade secret. *See* Dkt. 941, Agreed Proposed Jury Instruction No. 29 (part 2). There is ample evidence to support this claim for each combination trade secret.

---

[3] But federal law applies to the evaluation of Ford's request for a directed verdict on Versata's DTSA claim, as well as any request for a directed verdict on purely legal grounds. *See K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 175–76 (6th Cir. 1996) ("Legal determinations, whether made in a diversity case or in a federal question case, will always be reviewed *de novo*.").

**A.     The evidence presented supports a finding that Versata owns four valid combination trade secrets.**

First, the evidence presented supports a finding that Versata owns four valid combination trade secrets.

The DTSA defines "trade secret" by reference to two elements: reasonable measures to maintain secrecy, and independent economic value deriving from that secrecy. *See* 18 U.S.C. § 1839(3) (imposing those two requirements). The jury will be instructed that a "trade secret may take many forms, including (but not limited to) all forms and types of financial, business, scientific, technical, economic, or engineering information. A trade secret may include (but is not limited to) patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." Dkt. 941, Agreed Proposed Jury Instruction No. 29 (part 2).

The jury will also be instructed that in a *combination* trade secret case like this, "even if some or all of the individual characteristics, components, or features are in the public domain or well known to others, so long as the unified process or design is not generally known to the public or to people who could obtain value from knowing it and affords an actual or potential competitive advantage to persons possessing the information[,]" that combination qualifies as a combination trade secret. Dkt. 941, Agreed Proposed Jury Instruction No. 31.

The trial record shows that (i) Versata identified for the jury the information that it contends constitutes four combination trade secrets (the Grid, Buildability, Workspaces, and MCA), including the 17 sub-components thereof; (ii) Versata took reasonable measures to keep that information secret at the time of disclosure to Ford; and (iii) each combination derives "independent economic value" from that secrecy. Thus, each combination qualifies as a trade secret. Supporting evidence includes (among other things) the following:

<u>Contract Protections / Confidentiality Practices</u>. Multiple Versata witnesses testified to Versata's contractual protections and confidentiality practices, including Kenneth Ratton and Danielle Royston.[4] As Versata's trade secret expert, Dr. Sam Malek, summed up:

> Based on my own experiences both as a software engineer at companies but also as a professor . . . some of the things that [Versata] did that I found to be relevant is the fact that they ask all their employees and contractors to sign confidentiality agreements . . . [and] in the contract with Ford, they had confidentiality clauses which required Ford to maintain the secrecy and confidentiality of that information. Versata [] continually told Ford and others that its information is confidential, and -- and this is evident in all of the documents that I've reviewed. They have the confidentiality markings on them. So they clearly did all they could, in my opinion, to keep this -- these trade secrets confidential.

---

[4] Dkt. 953, Vol. 2-B Trial Tr. at 108:11–25, (Ratton); Dkt. 956, Vol. 3-A Trial Tr. at 105:11–109:23 (Ratton); Dkt. 961, Vol. 4-A Trial Tr. at 103:8–122:12 (Royston testimony walking through Versata's confidentiality practices).

Dkt. 967, Vol. 6-B Trial Tr. at 52:23–54:2. The record supports a finding that Versata took reasonable measures to keep its information secret at the time of disclosure to Ford.

License Payments / Value Admissions. On the "independent economic value" side of the equation, the evidence is undisputed: Ford paid Versata millions of dollars each year for software containing Versata's ACM/MCA trade secrets in the context of the parties' confidential relationship. Dkt. 953, Vol. 2-B Trial Tr. at 41:19–25 (testimony from Mr. Price confirming that Ford paid "over $150 million" to license ACM and MCA from 2000 – 2014). Multiple trial exhibits confirm the value that Ford received from those products licensed under a confidential relationship (*e.g.*, PX-568, PX-437, PX-576, PX-781), giving Ford a competitive advantage in the marketplace.[5] This is more than sufficient to permit a finding that Versata's trade secret information derived independent economic value from its secrecy. *See, e.g.,*

---

[5] Any quibbling about temporary performance issues does not controvert this proof, much less show that Ford is entitled to JMOL. *See* Dkt. 961, Vol. 4-A Trial Tr. at 89:18–90:13 (Nichols testimony that Versata implemented a fix "[e]very single time. We delivered performance, we delivered improvements, we add[ed] innovations all delivered to Ford . . . Ford continually, during my time Trilogy, increased the demand and usage of ACM"); Dkt. 956, Vol. 3-A Trial Tr. at 42:13–43:20 (Ratton testimony that these were common issues experienced when a new software is rolled out to a major enterprise; that Versata worked to solve them; that none impacted the overall benefit that ACM and MCA provided to Ford; and that he was confident the issues "did not affect the end value" because Versata "successfully made it through all of those issues, as you can see, by the success calls and things like that, later" and Ford "continue[d] to expand usage.").

*Hayes-Albion v. Kuberski*, 421 Mich. 170, 182–83 (1984) (affirming trade secret status when the plaintiff "expended time, money and effort to develop the processes and equipment" and the processes and equipment gave the party a "competitive edge").

Ford's anticipated "contribution" or "ownership" arguments miss the mark. Ford has previously suggested, for example, that Versata cannot establish ownership of a trade secret because (according to Ford) certain concepts underlying and/or reflected in combinations like the Grid or Buildability were Ford's ideas; therefore, Versata does not "own" those combination trade secrets. That is factually wrong, as multiple witnesses (including Ford witnesses) have testified:

- **Mr. Krauss**: "As I said before … [Ford] had no contribution to the design and development of the trade secret elements; excuse me, of the combination elements." Dkt. 966, Vol. 5-B Trial Tr. at 23:7–10; *see also* Dkt. 968, Vol. 5-A Trial Tr. at 73:4–6 ("Q. And how can you be so sure that Ford didn't contribute to this functionality known as the Grid? A. Because I was a key member of the team developing it.").

- **Mr. Nichols**: "The how, of how we designed and innovated, created inventions to solve those problems, the implementation of the technology, all of that was done by Trilogy . . . For the decisions of what goes into the Trilogy Software, Trilogy makes those decisions, and my team, ultimately, was responsible for deciding what went into the product and what did not go in the product . . . It was not a Ford decision." Dkt. 961, Vol. 4-A Trial Tr. at 20:7–21:2.

- **Mr. Little**: "But as far as specific solutions, no, that was done by our development team back in Austin because we're talking about configuration problems and you needed deep expertise in configuration to know how to solve these problems." Dkt. 962, Vol. 4-B Trial Tr. at 40:12–20; *see also* Dkt. 961, Vol. 4-A Trial Tr. at 128:7–19 ("I would take that understanding [from

Ford] and bring it back to Trilogy, where I work with our software developers and our designers, and, you know, our job was to bring our expertise that would produce a product that would help the customer with the problems that they presented to us.").

- **Mr. Ratton**: "Q. Are you personally aware of suggestions, solutions, improvements, corrections and other contributions that Ford made to Versata's ACM or MCA software? A. No." Dkt. 956, Vol. 3-A Trial Tr. at 105:7–10. *See also id.* at 104:9–13 ("Q. Mr. Ratton, did anyone at Ford ever tell you that what I am providing to you at Versata is a suggestion, solution, improvement, correction, or other contribution to Versata's ACM/MCA software? A. No.").

- **Yakov Fradkin (Ford)**: "Q. Can you name one specific feature of ACM that Ford developed? A. I don't have this knowledge." Designated Dep. Testimony of Y. Fradkin, Tr. 223:12–16; *see also id.* at 224:6–10 ("Q. Okay. Can you think of any part of ACM that Ford developed or jointly developed? A. I don't have either examples. I don't know.").

Equally important, Ford's position on this issue is legally irrelevant. Even if Ford had made "contributions" at the component level within the meaning of MSSA § 7.6, that does not mean that Ford owns the entire combination trade secret, particularly given the overriding catch-all language in § 7.4 ("Nothing in this Agreement shall be construed to convey any title or ownership rights to the Software or other Trilogy Confidential Information to Ford or to any patent, copyright, trademark, or trade secret embodied therein"). Indeed, after testifying that he was not aware of any Ford "contributions" under § 7.6, Mr. Ratton—who negotiated the MSSA with Ford—testified that § 7.4 was an important ownership provision and was "the catchall [provision] that kind of protects the crown jewels, if you will." Dkt. 956, Vol. 3-A Trial Tr. at 106:1–5. As he explained, this provision "effectively

9

says, across this entire agreement, you can't, no matter what the words are, construe the conveyance of ownership." *Id.* at 106:6–10.

Furthermore, even if certain concepts (like a trie or a DAG) were academic concepts and/or were disclosed in public patents, the combination functionality claimed by Versata was not. *See, e.g.*, Dkt. 968, Vol. 5-A Trial Tr. at 77:20–21 (Mr. Krauss: "Q. Did Trilogy disclose the Grid in any of its patents? A. No, Trilogy did not."); Dkt. 966 Vol. 5-B Trial Tr. at 84:21–25 (Mr. Krauss: "Q. Well, okay. [The patent] acknowledges the use of a trie in the context of buildability, correct? A. No. It acknowledges a data structure called a buildability trie but not the use of that trie to solve buildability operations."). And in any event, a "trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere." *Eagle Harbor Holdings, Inc. v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 17478, at *11 (W.D. Wash. Feb. 11, 2015); *see also Ford Motor Co. v. InterMotive, Inc.*, 2019 U.S. Dist. LEXIS 168197, at *53 (E.D. Mich. Sep. 30, 2019) ("It is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain.") (citation omitted).

Finally, Ford has suggested that Versata's combination trade secrets are a "made-for-litigation" variety. For example, Ford has tried to elicit testimony that "if you take one component out of the combination, it's no longer the same combination." *E.g.*, Dkt. 972, Vol. 7-B Trial Tr. at 27:1–28:18 (Dr. Malek cross-

examination). It is unclear what Ford is getting at, but this type of admission (even if made) does not defeat Versata's claim to ownership over four combination trade secrets. *See, e.g.*, *B&P Littleford, LLC v. Prescott Mach., LLC*, 2021 U.S. App. LEXIS 25590, at *20 (6th Cir. Aug. 24, 2021) ("the determination of whether disclosed information is a trade secret is a fact-specific inquiry").

### B. The evidence presented supports a finding that Ford misappropriated each component of each combination trade secret.

As explained above, the evidence presented supports a finding that Versata owned four combination trade secrets. The record also supports a finding that Ford misappropriated each component of each combination trade secret.[6]

The DTSA defines misappropriation to mean the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, *knew or had reason to know* that the knowledge of the trade secret was . . . acquired under *circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.*" 18 U.S.C. § 1839(5) (emphases added); *see also* Dkt. 941, Agreed Proposed Jury Instruction No. 34. The evidence presented to date supports the following findings on the misappropriation standard:

---

[6] Versata reiterates that the law does not require a jury to find misappropriation of every component of a combination trade secret, but we recognize that such an instruction is compelled by the Court's prior estoppel order.

*First*, Versata provided Ford with confidential information that Ford was obligated to keep confidential and use only within the scope of its license. *See* PX-100 (MSSA).[7] That confidential information included, among other things, manuals, user guides, presentations, other technical documentation, and (according to the contract) "trade secrets." *See id.* §§ 7.1.1, 7.1 ("Nothing in this Agreement shall be construed to convey any title or ownership rights to the Software or other Trilogy Confidential Information to Ford or to any . . . trade secret embodied therein."). This means that Ford, the alleged misappropriator, had actual or constructive notice that the knowledge embodied in the trade secret was acquired under circumstances giving rise to a duty of secrecy or limited use. This meets the "knowledge of a duty" standard under the DTSA.

*Second*, testimony and documents confirm that each component of each trade secret was disclosed to Ford in these confidential materials. As Versata's witness Mr. Seth Krauss testified:

> **Q**. [D]id Versata disclose the elements of the Grid, the elements of Buildability, the elements of Workspaces, and the elements of MCA to Ford?
>
> **A**. Yes.
> …
> **Q**. Now, how did Versata disclose all of these combination trade secrets, including all of their elements, to Ford?

---

[7] Sections 1.5 ("Use"), 1.6 ("Authorized Users"), 1.7 ("Additional Restrictions"), 3.3 ("Marking"), 7 ("Confidentiality"), 7.2 ("Marking"), 7.5 ("Non-Disclosure").

> **A.**    We disclosed the -- all of the information in manuals, in technical documentation, our functional walkthroughs, launch acceptance documents, system requirement specifications, presentations such as the ones that we previously reviewed, e-mails that we sent, discussions that we had onsite and the software, itself.
>
> **Q.**    Did you help me prepare a demonstrative that shows the written documentation in which you disclose the four combination trade secrets and all of their elements?
>
> **A.**    I did.

Dkt. 968, Vol. 5-A Trial Tr. at 103:23–104:21; *see also id.* at 113:21–24 ("Q. So are you absolutely certain that all the elements of the four Versata combinations were disclosed to Ford in the documents that you identified for the jury? A. Yes, I am."). Versata's technical trade secret expert Dr. Malek likewise reviewed (and testified to) the component-by-component disclosures in the user guides, technical documents, education sessions, .jar files, and release notes. Dkt. 967, Vol. 6-B Trial Tr. at 54:3–16.[8]

    *Third*, Dr. Malek's expert testimony confirmed that each component of each trade secret was "misappropriated"—that is, improperly disclosed or used—within Ford. For one, he explained, multiple Ford PDO developers had improper access to ACM/MCA materials, had ACM code on their computers, or actually used ACM

---

[8] *See also* Dkt. 961, Vol. 4-A Trial Tr. at 59:12–19, 93:11–21 (Mr. Nichols testifying to ACM disclosures); Dkt. 962, Vol. 4-B Trial Tr. at 62:2–9 (Mr. Little testifying to MCA disclosures).

code to develop PDO. *See* Dkt. 967, Vol. 6-B Trial Tr. at 54:17–96:9 ("That, my understanding, is a classical example of reverse engineering."). The testimony of Ford's own developers supports this. *See, e.g.*, Designated Dep. Testimony of Y. Fradkin, Tr. 88:05–08 (testifying that he had access to ACM manuals while developing PDO); *id.* at 95:22–25 (testifying that he was unaware of any attempt to keep Ford ACM users off the PDO team); *id.* at 95:08–11 (stating that he was never instructed he could not use information that he learned about ACM in the course of his work on PDO); *id.* at 95:15–20 (stating he was never told not to use Versata's information while working on PDO).

The record reveals that Versata's technical trade secret expert Dr. Malek walked the jury through evidence of Ford's misappropriation on a component-by-component basis, for each of the 17 components. Dkt. 974, Vol. 7-A Trial Tr. at 14:16–111:15. This testimony (among other evidence) is more than sufficient to permit a finding that Ford misappropriated Versata's combination trade secrets, as a whole and on a component-by-component basis. This is particularly true considering that the jury may infer misappropriation on the basis of circumstantial evidence. *See, e.g.*, *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) ("courts may properly consider circumstantial evidence concerning similarity of design plus access to the design to imply use by a defendant of a trade secret.") (collecting cases).

14

The Court should reject any argument that Ford can escape liability by pointing out negligible differences between its PDO product and Versata's software. First, as Dr. Malek testified, PDO is remarkably similar to Versata's software, with derivations (if not exact copies) of each of the 17 ACM/MCA components found in PDO. Dkt. 974, Vol. 7-A Trial Tr. at 14:16–111:15. Second, Ford mistakenly assumes that there is only one way to "misappropriate" a trade secret component: by practicing it, without even the slightest modification, in a competing product like PDO. That is not the law.

Misappropriation by "use" includes any unauthorized exploitation of a trade secret component, including its use as a starting point or guide in developing a process. *See e.g.*, *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021) (courts give "use" an "expansive interpretation" under the DTSA and state analogues); *see also id.* at 909 n.18 (citing cases on this point, including *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005)). As the trial record reflects, Ford improperly used or disclosed each component of Versata's combination trade secrets in its development of PDO. Ford cannot secure JMOL by using an extreme view of "misappropriation" that has no basis in the law.

Nor can Ford secure JMOL by arguing that the evidence does not establish that Versata told Ford the precise contours of each combination trade secret in a single communication, and thus, Ford did not have "knowledge of the trade secret"

15

under 18 U.S.C. § 1839(5). This, too, is a misreading of the law, as explained in Versata's trial brief regarding trade secret disclosure. Dkt. 963. "[I]t is not true as a matter of law that [a plaintiff's] claim will survive only if it disclosed to [the defendant] the exact combinations that make up its trade secrets." *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 942 (N.D. Cal. 2007). And "[i]nsisting on a unified description in a single integrated document," as Ford does, "is unnecessary." *Id.* at 943. Furthermore, even if Ford is right on the law (it is not), the evidence supports a finding that Versata disclosed each combination trade secret (including their components) on a single occasion or in single documents. *See, e.g.*, Dkt. 961, Vol. 4-A Trial Tr. at 93:22–94:14 (Nichols testimony about Workspaces disclosure "on one occasion"); Dkt. 962, Vol. 4-B Trial Tr. at 25:3–27:3 (Little testimony about MCA disclosure in one document, PX-4882); Dkt. 969, Vol. 6-A Trial Tr. at 54:25–55:14 (Krauss testimony about disclosing all of Versata's combination trade secrets in two documents: the engineering manual from 2009 and the Trie presentation). Ford's arguments on this point are unavailing.

Ford has similarly suggested during trial that it cannot be liable because Versata's contemporaneous written disclosures to Ford were not all identical to each other, or those documents sometimes discussed software functionalities or details *beyond* the 17 components identified now, during litigation. Wrong. Black-letter law provides that a party can refine its trade secret identification through litigation. *See*

16

*id.* at 3, 9, 13, 20–21 (citing cases). And in any event, the trial record shows that these 17 components are the key features driving the success of ACM and MCA. *See, e.g.*, Dkt. 962, Vol. 4-B Trial Tr. at 14:4–15 (testimony from Mr. Little identifying the three "key pieces of the MCA product that allowed [Versata] to deliver the business value" to Ford); Dkt. 968 Vol. 5-A Trial Tr. at 114:24–117:13 (Krauss testimony apportioning the amount of value each of those key features provided relative to the overall ACM and MCA products).

The trial evidence shows that Ford acquired trade secret information under statutorily specified circumstances, and Ford misused that information. The liability question should go to the jury.

### C. The evidence presented supports a finding that Versata suffered damages from Ford's misappropriation.

To the extent that Ford challenges the sufficiency of evidence to support a damages claim under DTSA/MUTSA, the Court should reject it. Versata's damages expert (Renee McMahon) has testified that Versata's trade secret damages are $59.927 million based on a reasonable royalty damages methodology. That opinion draws from Ms. McMahon's expert analysis, is grounded in the evidence, and applies Mr. Krauss's reasonable apportionment methodology as well as Dr. Malek's "design-around period" conclusion. Ms. McMahon also testified to two alternative conclusions, using two different royalty bases supported by the record (amounting

to $52.772 million and $38.486 million, respectively). There is ample evidence to support Versata's trade secret damages case.

Ford has signaled an intent to move for JMOL on the basis that (according to Ford) no evidence supports the $17 million annual base figure supporting Ms. McMahon's first conclusion ($59.927 million). That is not true. The trial record shows at least three things:

1. Versata offered Ford a proposal on September 2, 2014 through which Ford could license Versata's software for $17 million each year for five years, with an evergreen period after that. PX-0537. That offer was not immediately rejected. PX-1792 (Oct. 29, 2014 email from Ford asking questions about Versata's proposal).

2. Versata was not willing to accept anything less than $17 million each year. Dkt. 975, Vol. 8-A Trial Tr. at 78:2–16 (Richards testimony); Dkt. 969, Vol. 6-A Trial Tr. at 135:14–17 (Mr. Baxter: "Q. Versata had told you they wanted $17 million per year, that's what they told you; is that correct? A. Yes."); *see also id.* at 136:7–10 (Mr. Baxter: "Q. And so Versata had just notified you that they're not interested in a one-year renewal; is that correct? That's what the termination notice told you? A. Yes.").

3. Ford needed ACM and could not afford for Versata to walk away. Dkt. 969, Vol. 6-A Trial Tr. at 122:20–21 (Mr. Baxter: "In my [negotiating] role, I knew that we needed the ACM software."); *id.* at 125:22–126:6 (testifying that Ford "needed a solution" and if it didn't "get PDO developed on time, [it] couldn't afford to have Versata walk away."). Other Ford exhibits confirm as much. *See, e.g.*, PX-822 (Oct. 2012 email noting that Ford has "no alternative" and stating that "Versata's GPD/ACM application is essentially the 'engine' that provides all of the feature content mapping . . . If GPD/ACM were to go down, these systems would essentially come to a grinding halt.").

On this record, it is more than reasonable for the jury to infer that Ford would have had to accept Versata's final $17 million-per-year offer had Ford not

improperly developed PDO by misappropriating Versata's trade secret information and breaching the MSSA. This $17 million per year figure is supported.[9] And in any event, as noted above, Ms. McMahon presented multiple damages scenarios to be weighed by the jury (each of which has support in the trial record).[10] Any nitpicking around these numbers is a jury issue. *See e.g.*, *Mosby-Meachem*, 883 F.3d at 602 (in reviewing a request for JMOL, a court " should not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury.").

Similarly, the record supports a finding of willfulness (and thus an award of exemplary damages). Versata has presented evidence that (among other things) Ford knowingly shared confidential ACM/MCA materials with their PDO developers as they built their replacement product (Designated Dep. Testimony of M. Sullivan, Tr. 72:2–7; Designated Dep. Testimony of Y. Fradkin, Tr. 88:05–08); Ford misled

---

[9] Although she has not given trial testimony yet, Ford's own damages expert Julie Davis also uses the $17 million per year figure as the upper boundary of her damages model. Internal Ford documents support this number, too. *See* PX-0412 (valuing PDO at $17 million per year in future license avoidance fees).

[10] The second scenario assumes a $14.95 million royalty base (Ford's 2014 payment to Versata for the ACM/MCA product suite; supported by the parties' contracts, invoices, and related documentation). *See* PX-142 (Subscription Schedule 4); PX-107 (Addendum #1 to SS4); PX-2617 (Versata's November 8, 2012 Invoice to Ford), PX-3974 (Versata's 2013 and 2014 sales invoices to Ford); PX-800 (Ford's revenue spreadsheet from 1999 to 2016). The third scenario assumes a $10.95 million royalty base (base license fees for ACM and MCA, as evidenced by Ford's unsolicited check, PX-4746, and by the parties' contracts, PX-142, PX-103 (Subscription Schedule #121031)).

Versata into thinking that Ford had implemented policies to guard against the misappropriation of Versata's trade secret information (*e.g.*, Dkt. 975, Vol. 8-A Trial Tr. at 73:5–18 (Richards discussing the "Chinese wall" during the December 2014 meeting)); Ford deliberately concealed its competing development plans from Versata for years (*e.g.*, Dkt. 969, Vol. 6-A Trial Tr. 118:12–19 (Baxter stating that Ford saw no advantage in disclosing the project)); and Ford surreptitiously mailed a check to Versata to dupe it into another year of license renewal until Ford's infringing product actually worked (*e.g.* Dkt. 975, Vol. 8-A Trial Tr. at 58:22–59:19 (Richards discussing Versata's receipt of Ford's "suspicious" $8.45 million check)). Viewed in the light most favorable to Versata, with all reasonable inferences drawn in its favor, *see Mosby-Meachem*, 883 F.3d at 602, this evidence (and more) supports a finding of willfulness.

Damages evaluation is quintessentially a jury function. The Court should deny any JMOL request directed to it.

### D.    The result is the same under the DTSA and MUTSA.

Ford has conceded that the elements for trade secret misappropriation under MUTSA are the same as under DTSA. Dkt. 941, Agreed Proposed Jury Instruction No. 29 (part 1) at 16 (Ford's objection to separate DTSA/MUTSA instructions: "The test for the existence of a trade secret and for misappropriation are identical for the two statutes."). And because the JMOL standard is the same under Michigan law as

under federal law, *see Caldwell*, 394 Mich. at 407, Ford's motion fails as to both trade secret claims.

## II.   Ford is not entitled to JMOL on Versata's contract claims.

To prevail on its breach of contract claim, Versata must prove that: (1) Ford breached the contract; and (2) Versata suffered damages as a result of the breach. *See* Dkt. 941, Agreed Proposed Jury Instruction No. 21.[11] Ample evidence supports Versata's contract claim.

### A.   The evidence presented supports a finding that Ford breached the MSSA.

First, the evidence supports a liability finding. Versata brought one count for breach of contract. Versata has always pursued three breach theories (Dkt. 67 (Am. Answer & Counterclaims ¶¶ 127–29)), and it continues to pursue three breach theories today. Those are as follows.

*First*, Ford breached the MSSA by reverse engineering and/or copying Versata's licensed software in violation of MSSA § 1.7 (PX-100). As discussed above, Dr. Malek's trial testimony squarely supports a finding that Ford breached this provision.

*Second*, Ford breached the MSSA by distributing "Confidential Information" outside the bounds permitted by the MSSA. *See* MSSA § 7.4 (the parties "shall not

---

[11] There is no dispute that the MSSA is a valid, enforceable contract.

copy, reproduce, or distribute the Confidential Information except as expressly permitted in this Agreement"); *id.* at § 7.5 ("Each party agrees at all times to use Reasonable Care in preventing the disclosure of Confidential Information belonging to the other party. Each party agrees to restrict access to the other party's Confidential Information only to those employees . . . who (i) require access in the course of their assigned duties and responsibilities and (ii) have agreed in writing to be bound"). It is beyond dispute that Ford received confidential ACM/MCA information over the course of the parties' relationship. The misappropriation evidence cited above supports a finding that Ford breached this provision through its improper disclosures and misuse of that information.[12]

*Third*, Ford breached the MSSA by failing to return or destroy all Confidential Information to Versata on contract termination and by failing to allow the agreed-upon audit and inspection process. *See* MSSA §§ 11.4, 3.5, 12.2. The testimony of Versata's witnesses Michael Richards and Kenneth Ratton (among others) supports a finding that Ford breached these provisions. Dkt. 956, Vol. 3-A Trial Tr. at 101:24–112:25, 114:22–119:14 (Ratton); Dkt. 975, Vol. 8-A Trial Tr. at 77:8–11 (Richards).

---

[12] Ford might argue that its confidentiality obligations do not extend to "material or information" that is "independently developed" by it. MSSA § 7.3(ii). That argument does not help Ford for multiple reasons. For one, by its plain terms, Section 7.3(ii) only protects Ford if its "independent development" is done "without using [Versata's] Confidential Information." *Id.* The trial record establishes that Ford's development was tied to Versata's confidential information.

As Mr. Ratton explained, there is an "interplay" between these provisions in the software licensing industry for a reason: an audit/inspection process is the "only way to verify" that the customer has complied with its termination obligations. Dkt. 956, Vol. 3-A Trial Tr. at 118:21–119:14. And in fact, the three sets of contractual protections (as a whole) interrelate, forming "most critical, if you will, part of protecting the software and the intellectual property of the company selling it. So… those all kind of play together. You can't reverse engineer and then you need to be able to inspect if the contract is terminated." *Id.* at 119:15–25. As the trial record shows, Ford did not abide by those termination-related obligations, and thus Versata continues to suffer from the misuse of its property—even today. *See, e.g.*, Dkt. 969, Vol. 6-A Trial Tr. at 153:7–17 (testimony from Mr. Baxter (Ford) acknowledging that Ford did not permit Versata to audit PDO).

As set out in this response, the trial record more than supports a finding that Ford breached the MSSA. If Ford believes that its conduct was justified under different provisions of the MSSA, the jury can receive and weigh that evidence. But for now, the Court should deny any request for JMOL on contract liability.

In fact, JMOL on contract liability is particularly inappropriate because both parties have argued that damages are not an essential element of a breach of contract claim; a party can recover nominal damages if a breach is proven but the jury determines that damages are not measurable. *See* Dkt. 423 (Ford arguing at summary

judgment that it could recover "'nominal damages' for breach of contract [u]nder Michigan law"); Dkt. 712 at 16 (Versata arguing at summary judgment that it "can still prove liability for breach and recover at least nominal damages"). This Court has agreed more than once. Dkt. 534 at 14 ("[E]ven if Ford did not suffer actual damages from Versata's [alleged breach], [Ford] is still entitled to seek 'nominal damages' for breach of contract under Michigan law."); Dkt. 723 at 96 (The Court: "And now you [Ford] want summary judgment on the ground that they can't seek nominal damages. In the words of Keyshawn Johnson, C'mon Man!"). And both parties proposed a jury instruction related to nominal damages, further demonstrating that JMOL is unwarranted.[13] Ford is not entitled to judgment as a matter of law on the issue of contract liability.

## B. The evidence presented supports a finding that Versata suffered damages resulting from Ford's MSSA breach.

The Court should likewise deny any request for JMOL on contract damages. Versata is entitled to receive the "benefit-of-the-bargain" had Ford paid Versata for its continuing use of Versata's confidential information: specifically, damages of at

---

[13] *See* Dkt. 941, Agreed Proposed Jury Instruction No. X ("You would award nominal damages if you conclude that there was a breach but that the breach did not result in any financial damage. You may also award nominal damages if, upon finding that some injury resulted from a breach, you find that you are unable to compute monetary damages except by engaging in pure speculation and guessing.").

least $17 million per year from January 15, 2015 through trial. There is ample evidentiary support for this claim.

First, the plain text of the MSSA reveals that there are no temporal limits on Ford's contractual obligations. *See* MSSA (PX-100) § 13.5 (noting that several provisions "shall survive termination or expiration of this Agreement and any applicable license hereunder," including Section 7 ("Confidentiality"), Section 3.5 ("Verification"), and Section 11.4 ("Termination of Licenses")). And even for the provisions not captured by the "Survival" provision (*e.g.*, Section 1.7's prohibition on "reverse engineering"), Versata continues to suffer commercial injury resulting from Ford's breach.

Second, Versata's presentation of a $17 million per year figure is supported by the evidence, as discussed in detail above. That damages figure is also causally-linked to Ford's breaching conduct. "But for" Ford's breaching conduct (reverse-engineering Versata's software; improperly disclosing confidential information to PDO developers; failing to return the trade secrets embedded within Ford's copycat software), Ford would have renewed the MSSA at a rate of at least $17 million per year. Ford may dispute its ultimate willingness to pay that number, but that dispute does not entitle it to JMOL. In fact, it only shows that this issue is ripe for jury resolution. *See Caldwell*, 394 Mich. at 407 ("The jury, not the trial judge, is the trier

of fact. Whenever a fact question exists, upon which reasonable persons may differ, the trial judge may not direct a verdict.").

Third, there is no rule of law that precludes a party from using a "reasonable royalty" methodology as a measure of contract damages. In fact, some courts have endorsed it in cases involving trade secret and contract issues, like this one. *See, e.g.*, *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1359 (Fed. Cir. 1998) ("After [plaintiff] disclosed its proprietary technology to [defendant], [defendant] was faced with two legitimate choices: it could have used the technology and entered into a licensing agreement with [plaintiff] or it could have refrained from using technology. It chose instead to use the technology without compensating [plaintiff]. To compensate [plaintiff] for the breach, the jury properly determined the license fee [defendant] would have paid had it not breached the agreement."). The *Celeritas* court further observed that while trade secret damages may be limited to the "head start" period, "liability for breach of contract is not so limited." *Id.* at 1359–60. And in that case, as here, "the jury did not know what licensing arrangement might have been worked out [in the future], but such uncertainty does not bar contract recovery." *Id.* at 1360.

Other courts are in accord with the use of a reasonable royalty methodology to determine contract damages. *See, e.g.*, *Veritas Operating Corp. v. Microsoft Corp.*, 2008 U.S. Dist. LEXIS 112135, at *15 (W.D. Wash. Feb. 26, 2008) ("If

Microsoft did breach the Agreement, Veritas has the reasonable expectation of being compensated for Microsoft's use of Veritas' confidential information. Microsoft points to no authority disallowing testimony regarding the use of a reasonably royalty measurement to show what a fair compensation might be for unauthorized use."). Cases like *Celeritas* and *Veritas* confirm that Versata is entitled to present the jury with contract damages numbers based on hypothetical license fees.[14]

At minimum, cases like *Celeritas* and *Veritas* make clear that JMOL is inappropriate. Ultimately, the jury may award whatever damages it determines were "naturally arising from the breach." Dkt. 941, Agreed Proposed Jury Instruction No. 26 ("Benefit of the Bargain" instruction citing Michigan Model Civil Jury Instructions § 142.31). Ford is not entitled to the extreme remedy of JMOL with respect to Versata's contract damages.

---

[14] The Sixth Circuit has not "reach[ed] the issue of whether a jury can base its [contract] damages calculation on a reasonable royalty" under Michigan law. *See Innovation Ventures, Ltd. Liab. Co. v. Custom Nutrition Labs, Ltd. Liab. Co.*, 912 F.3d 316, 345–47 & n.4 (6th Cir. 2018) (making a case-specific determination that reasonable royalties were unavailable in that case, when there was no pairing with trade secret or patent claims and no licensing history to examine). But *Innovation Ventures* does not preclude the use of such a methodology here.

## III.   Ford is not entitled to JMOL on its own contract claim.

Finally, to the extent that Ford is asking for judgment as a matter of law on its own affirmative claim for breach of contract, the Court should deny that request.

According to Ford, Versata agreed not to terminate Ford's ACM license before December 31, 2015 but breached this agreement when it required Ford to cease using the ACM software after January 14, 2015. The trial evidence presented to date defeats this claim.

The trial record shows that Versata's two 2014 termination letters (PX-094; PX-537) were valid and consistent with the contracts. Specifically, Versata's October 7 letter was timely and terminated *the next Annual Renewal Period*, which began on January 1, 2015. PX-094; PX-100, MSSA at §11.2. Because of the Addendum #1 to Subscription Schedule #4, however, Ford was guaranteed *use* of the software through January 14, 2015, in exchange for $3 million. PX-107. Thus, Versata's November 13 letter incorporated the Annual Renewal Period termination in the October 7 letter and terminated Ford's use of the software on January 15, 2015. PX-537. The trial testimony of Price (among others) walks through this and shows that Versata's conduct was proper and entirely consistent with the contracts. *See* Dkt. 953, Vol. 2-B Trial Tr. at 42:1–51:4 (Price testimony).

Given this testimony and the plain language of the contracts, Ford cannot show that the evidence in its favor "is so powerful that no reasonable jury would be

28

free to disbelieve it." *Ghaleb v. Am. S.S. Co.*, 684 F. App'x 545, 547–48 (6th Cir. 2017); *see also id.* ("It is rarely appropriate to grant a directed verdict or judgment n.o.v. in favor of the party having the burden of proof") (collecting cases). Ford's JMOL request on its affirmative breach claim (to the extent it makes one) should be denied.

## CONCLUSION

There is ample evidence to support a liability and damages finding on each of Versata's claims and to defeat Ford's singular breach of contract claim. The Court should deny Ford's motion for judgment as a matter of law in its entirety.

Dated: October 17, 2022                    Respectfully submitted,

                                            */s/ Matthew R. Carter*

                                            Dan K. Webb
                                            DWebb@winston.com
                                            Matthew R. Carter
                                            MCarter@winston.com
                                            **WINSTON & STRAWN LLP**
                                            35 W. Wacker Drive
                                            Chicago, IL 60601
                                            Telephone: (312) 558-5600

                                            Steven J. Mitby
                                            smitby@mitbylaw.com
                                            Timothy Johnson
                                            tjohnson@mitbylaw.com
                                            **MITBY PACHOLDER JOHNSON PLLC**
                                            Telephone: (713) 234-1446

Jaye Quadrozzi
quadrozzi@youngpc.com
**YOUNG, GARCIA & QUADROZZI, PC**
27725 Stansbury Blvd., Suite 125
Farmington Hills, MI 48334
Telephone: (248) 353-8620

Sharoon Saleem
Sharoon.saleem@jonesspross.com
**JONES & SPROSS, PLLC**
1605 Lakecliff Hills Ln., Suite 100
Austin, TX 78732-2437

**ATTORNEYS FOR PLAINTIFFS
VERSATA SOFTWARE, INC. f/k/a
TRILOGY SOFTWARE, INC.,
VERSATA DEVELOPMENT GROUP,
INC., AND TRILOGY, INC.**

## **PROOF OF SERVICE**

Samuel M. Zuidema certifies that on October 17, 2022, he served Versata's

Anticipatory Response to Ford's Motion for Judgment as a Matter of Law upon all

counsel of record via electronic filing.

I declare under the penalty of perjury that the statements made above are true

to the best of my knowledge, information, and belief.

> */s/ Samuel M. Zuidema*
> SZuidema@winston.com
> **WINSTON & STRAWN LLP**
> 35 W. Wacker Drive
> Chicago, IL 60601
> Telephone: (312) 558-5600