UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERSATA SOFTWARE, INC. *et al.*,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11264*)
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER (1) GRANTING FORD MOTOR COMPANY'S MOTION FOR JUDGMENT AS A MATTER OF LAW (ECF No. 1030) AND (2) TERMINATING AS MOOT FORD'S MOTION FOR ORDER REQUIRING PLAINTIFFS TO MAKE AN ELECTION OF REMEDIES (ECF No. 1018)

In this action, Plaintiffs Versata Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (collectively, "Versata") brought breach of contract and trade secret misappropriation claims against Defendant Ford Motor Company.  The case proceeded to trial, and a jury awarded Versata $82,260,000 in breach of contract damages and $22,386,000 in trade secret misappropriation damages.  Ford has now moved for judgment as a matter of law in its favor. (*See* Mot., ECF No. 1030.)  Ford argues that Versata failed to present sufficient evidence to support (1) the jury's finding of liability on Versata's trade secret misappropriation claims and (2) either of the jury's damages awards.

The Court agrees with Ford that the jury's damages awards are not supported by sufficient evidence.  Thus, even though the Court's review of the damages awards is highly deferential, the Court cannot permit those awards to stand.  The Court will therefore **GRANT** Ford's motion.[1]

## I

## A

Versata is a computer software company based in Austin, Texas.  Ford is one of the world's largest automakers.  Ford hired Versata to develop computer software that would allow Ford to more efficiently configure the millions of cars that it manufactures each year. Versata created that software and called it "ACM."  Versata licensed ACM and other related software (including a software program called "MCA") to Ford through an agreement that was called the Master Subscription and Services Agreement (the "MSSA").  The parties entered into the MSSA in 2004.

---

[1] During trial, Ford made both an oral motion for judgment as a matter of law and filed a written motion requesting the same relief. (*See* Mot., ECF No. 999, 1001. *See also* Ford's motion for leave to file an oversized brief, ECF No. 998.)  The Court did not rule on the motions at that time and instead submitted the case to the jury. (*See* 10/18/2022 Trial Tr., ECF No. 989, PageID.64460.)  Those motions were superseded by Ford's post-trial motion for judgment as a matter of law. Accordingly, the Court **TERMINATES** the motions Ford filed during the trial as **MOOT**.  Versata also made an oral motion for judgment as a matter of law during trial on Ford's counterclaim for breach of contract.  The Court took Versata's motion under advisement and submitted Ford's counterclaim to the jury. (*See* 10/12/2022 Trial Tr., ECF No. 996, PageID.65232.)  The jury then ruled in favor of Versata on Ford's counterclaim.  Thus, the Court **TERMINATES** Versata's oral motion for judgment as a matter of law without prejudice **AS MOOT**.

Under the MSSA (and subsequent addendums to the MSSA), Ford agreed to pay Versata fees (1) to license ACM and MCA and (2) for support and software enhancement services related to those programs.  In the final year of the MSSA, Ford paid Versata $14.95 million to license the software and for certain enhanced support services.

The MSSA was set to expire in 2014.  Prior to the expiration of that agreement, the parties attempted to negotiate an extension.  Those negotiations were not successful.

Instead of renewing the MSSA, Ford developed and implemented its own automotive configuration software program to replace ACM and MCA.  Ford called this software "PDO."  Ford had been working on PDO for several years before the MSSA expired.

**B**

At trial, Versata claimed that Ford breached the MSSA and misappropriated its (Versata's) trade secrets when Ford developed PDO.  Versata told the jury that Ford breached the MSSA in three ways: by misusing and disclosing Versata's confidential information; by reverse engineering ACM and MCA as part of the effort to develop PDO; and by denying Versata the right to enter Ford's premises to verify Ford's compliance with the provisions of the MSSA.

Versata also claimed at trial that Ford misappropriated four of Versata's trade secrets when Ford developed PDO.  The four trade secrets were called (1) the Grid, (2) Buildability, (3) Workspaces, and (4) MCA.  Each of these trade secrets were combination trade secrets made up of several different elements.

At the conclusion of Versata's case in chief, Ford made an oral motion for judgment as a matter of law.   It thereafter filed a written motion seeking the same relief. (*See* Mot., ECF Nos. 999, 1001.)  The Court heard argument on the motion, but it did not rule on it at that time.   Instead, the Court took the motion under advisement and submitted Versata's claims to the jury. (*See* 10/18/2022 Trial Tr., ECF No. 989, PageID.64460.)

The jury returned a verdict mostly in Versata's favor. (*See* Verdict Form, ECF No. 1004.)  The jury first concluded that Ford breached the MSSA in all three ways identified by Versata.  It awarded Versata $31,350,000 in damages for Ford's misuse and disclosure of Versata's confidential information; $50,160,000 in damages for Ford's reverse engineering of Versata's software; and $750,000 in damages for Ford's refusal to permit Versata to exercise its verification rights. (*See id.*, PageID.65558-65559.)  Next, the jury concluded that Ford misappropriated the Grid, Buildability, and Workspaces combination trade secrets. (*See id.*, PageID.65560-65563.)  It awarded Versata $10,185,000 in damages for Ford's misappropriation of the Grid; $4,494,000 in damages for Ford's misappropriation of Buildability; and

$7,707,000 in damages for Ford's misappropriation of Workspaces. (*See id.*) Finally, the jury concluded that Ford did not misappropriate MCA. (*See id.*, PageID.65563.)

On February 17, 2023, Ford filed a renewed motion for judgment as a matter of law. (*See* Mot., ECF No. 1030.)  The Court will discuss the bases on which Ford seeks judgment in its favor in substantial detail below.

## II

Ford brings its motion under Federal Rule of Civil Procedure 50.  That rule provides that " [i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may resolve the issue against the party; and grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1).  The rule further provides that, where, as here, a party files a motion for judgment as a matter of law before the case is submitted to the jury, and the court does not rule on the motion at that time, the party "may file a renewed motion for judgment as a matter of law" after the trial has concluded. Fed. R. Civ. P. 50(b).

The standards governing a Rule 50 motion are well settled.  "[J]udgment as a matter of law is appropriate when viewing the evidence in the light most favorable

to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006) (internal quotation marks omitted).  "[T]he verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable."  *Mosby-Meacham v. Memphis Light, Gas, & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018).  Moreover, when reviewing such a motion, a "court should not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury." *Id.* (internal punctuation omitted).

Finally, a court's review of a jury's damages award under Rule 50 "is extremely deferential." *Mike's Train House*, 472 F.3d at 413 (internal quotation marks omitted).  Such an award must stand unless "the award is contrary to all reason." *Id.*

### III

The Court begins with Ford's motion for judgment as a matter of law on Versata's breach of contract claim.  The Court will grant that motion, reduce Versata's contract damages to $1 in nominal damages for each of the three breaches found by the jury, and will enter judgment in favor of Versata on its breach of contract claims in the amount of $3.

**A**

Before turning to the merits of Ford's motion, the Court pauses to provide some important context as to how Versata presented its contract damages theory during discovery and how Versata's trial presentation on contract damages differed from its position on contract damages during discovery.

During discovery, Versata said that it would prove its breach of contract damages in two ways, but it did not present either methodology at trial.  Versata identified these methodologies in response to an interrogatory from Ford.  In that interrogatory, Ford asked Versata to "identify each category of damages Versata [was] seeking (*i.e.*, actual or compensatory damages, unjust enrichment, entitlement to a reasonable royalty, and/or any other form of damages), and further state the theories of recovery, factual support for those theories, and computations of damages within each category, and identify the evidence Versata will rely upon in support." (Versata Supp. Interrogatory Resp., ECF No. 803-15, PageID.56570.)

Versata first responded that "[d]amages calculations and evidence material to those calculations [were] the domain of expert testimony." (*Id.*, PageID.56571.)  But Versata did not provide any expert opinions concerning contract damages at that time.  Instead, Versata said that it would "supplement its response in accordance with the court's deadline for the submission of expert reports." (*Id.*)

However, Versata's later-served reports from its damages experts said very little about contract damages.  Rather, the reports focused almost exclusively on trade secret misappropriation damages.  For instance, a 2017 report authored by Dr. Craig Elson, one of Versata's damages experts, devoted 61 pages to Versata's trade secret damages and addressed breach of contract damages in a single footnote. (*See* Dr. Elson Rpt., ECF No. 347-4, PageID.17849-17910.)  That footnote stated, in relevant part, that "[q]uantitatively, the damages associated with certain of Versata's breach of contract claims (assuming liability) are subsumed in the trade secret misappropriation damages quantified herein." (*Id.*, PageID.17833 at fn.4.) Likewise, in a second damages report that Dr. Elson jointly authored with Christopher Bokhart (another of Versata's experts) in 2018, the experts addressed Versata's trade secret damages over the course of 52 pages and again addressed Versata's breach of contract damages in a lone footnote. (*See* Dr. Elson and Bokhart Rpt., ECF No. 573-2, PageID.43186-43238.)   In relevant part, that footnote said that "if [Ford's] unauthorized use [of Versata's software] is alternatively (or additionally) considered a breach of existing license agreements, reasonable royalty damages as calculated herein would also be reflective of damages under that construct." (*Id.*, PageID.43168 at fn. 11.)

As trial approached, Versata attempted to augment the sparse expert contract damages opinions offered by Dr. Elson and Bokhart.  In July of 2022, Versata served

a joint supplemental expert reply report on damages drafted by Bokhart and new Versata damages expert Renee McMahon.[2] In that report, the damages experts presented a never-before-disclosed breach of contract damages model based on Versata's lost profits. (*See* Versata Supp. Reply Rpt., ECF No. 860-2.)

Ford moved to exclude Versata's new lost profits model of contract damages as untimely and unreliable (*see* Mot., ECF No. 860), and the Court granted the motion. (*See* Order, ECF No. 916, PageID.60219.)  The Court ruled that because Versata had not previously and timely disclosed the lost profits damages model to Ford, and because there was not time for Ford to conduct new discovery on that damages model prior to trial, Versata could not present that model to the jury. (*See* 9/12/2022 Hr'g Tr., ECF No. 919, PageID.60381-60387.)  The Court also held that the lost profits model Versata disclosed was not sufficiently reliable because it did not distinguish between Ford's different alleged breaches of contract and did not "provide the jury any way to calculate damages if it found that Ford breached the contract in some ways, but not in others." (*Id.*, PageID.60385-60386.)

At trial, Versata did not present any expert testimony on contract damages. McMahon provided expert testimony on damages, but she confined her opinions to Versata's trade secret damages. (*See* 10/17/2022 Trial Tr., ECF No. 979,

---

[2] McMahon replaced Dr. Elson when health challenges prevented Dr. Elson from being available to testify at trial.

PageID.64127.)  She did not testify, as Dr. Elson and Bokhart had opined in their earlier reports, that (1) Versata's trade secret damages were "reflective" of its breach of contract damages or (2) Versata's breach of contract damages were "subsumed" within its trade secret damages.

In Versata's second response to Ford's interrogatory about breach of contract damages, Versata said that it would present evidence that "Ford was willing to pay $17 million for a one-year extension of its license to ACM and MCA under the MSSA," and Versata asserted that it was "entitled to recover at least [that] amount for every year or part of a year that Ford continued to use Versata confidential information in violation of its license." (Versata Supp. Interrogatory Resp., ECF No. 803-15, PageID.56571.)  In a hearing before the Court, Versata said that evidence of Ford's willingness to pay $17 million per year would come from witness Mike Richards, a former Versata employee.  Versata explained that Richards would testify at trial that during negotiations with Ford over the renewal of the MSSA, a representative of Ford told him (Richards) that Ford would agree to pay $17 million for a one-year extension of the MSSA:

> So there will be evidence at trial, it is not in the record, but Mike Richards will testify that in the back and forth discussion that he had with David Baxter, from Ford, that Ford initially rejected the idea of $17 million per year as part of a three or five-year deal, but that when they were talking Baxter, expressed a willingness to consider $17 million for one year, for only one year. He will testify to that. That's why this is a fact issue that depends on the evidence presented at trial.

10

(4/8/2022 Hr'g Tr., ECF No. 815, PageID.57002.)

But Richards did not offer that testimony at trial. Instead, Richards testified only that Versata had offered to license the software to Ford for $17 million per year and that Versata would not accept any amount less than $17 million per year to license ACM and MCA to Ford.   In fact, no witness testified that Ford was willing to pay $17 million per year to renew the MSSA for any period of time.

**B**

The Court instructed the jury on contract damages after the proofs had closed but before the parties presented their closing arguments.  The Court told the jury that if it found that Ford had breached the MSSA, it should award damages in an amount that would put Versata in the same – but not a better – position that Versata would have been in if there had been full performance under the MSSA:

> If you find that Ford is liable to Versata for breach of contract, then you must decide the amount of money, if any, to award to Versata as contract damages. If you find that Ford is not liable, then you do not award Versata contract damages.
>
> [….]
>
> The parties seeking damages must prove by a preponderance of the evidence the amount of any damages to be awarded. However, that party does not need to prove its damages with – with mathematical precision because it is not always possible that a party can prove the exact amount of its damages. Therefore, it is necessary only that Versata [] prove its damages to a reasonable certainty or a reasonable probability. However, you may not award damages on the basis of guess, speculation or conjecture.

[….]

> Contract damages are intended to give the non-breaching party the benefit of the party's bargain by awarding it a sum of money that will, to the extent possible, *put it in as good a position as it would have been in had the contract been fully performed*. The non-breaching party should receive those damages naturally arising from the breach. [] *Versata [] can[not] recover a greater amount in damages than it could have gained by the other party's full performance of the contract*.

(10/24/2022 Trial Tr., ECF No. 1006, PageID.65596-65598; emphasis added.)

## C

During closing arguments, Versata's counsel asked the jury to award Versata $17 million per year as damages for each of Ford's three alleged breaches of contract. He said that $17 million per year was the appropriate amount because the evidence showed that (1) Versata would not accept anything less than $17 million per year to renew the MSSA and (2) Ford had no choice but to accept that offer because it could not survive without Versata's software. (*See id.*, PageID.65690-65692.) As support for his claim that Ford was compelled to accept Versata's $17 million per year offer, counsel cited testimony from Ford employee Dave Baxter that Ford "ha[d] to have [automotive] configuration software" and "didn't think [it was] going to get PDO done in time" to replace ACM and MCA. (*Id.*, PageID.65690-65692.)

Versata's counsel then asked the jury to multiply $17 million per year by seven and one-half years. (*See id.*) That was the amount of time that counsel said

Ford had been in breach of the MSSA.  The total amount came to $127,500,000.

Counsel asked the jury to award that amount for each of the three individual breaches

of contract. (*See id.*, PageID.65692: "I think it's reasonable to conclude that the best

evidence of what the license fee would be would be $17 [million] per year times 7.5

years for each breach of contract.")  Counsel never attempted to explain for the jury

how that damages amount was tied to each individual breach.  Instead, he told the

jury to award the same $127.5 million amount for all three breaches and not to

"worry about rendering duplicative damages" because the Court would adjust the

jury's verdict after trial. (*Id.*, PageID.65699.)

In the alternative, Versata's counsel provided the jury with two other amounts

that he said the jury could use as Versata's annual damages for each of the three

breaches of contract.  Those alternative amounts were $14.95 million per year and

$10.95 million per year. Counsel told the jury the following about those differing

amounts:

> Now, I also, though, recognize that you as the jury, you get to
> determine this, I don't. And you've heard the evidence. Another
> number -- so I put -- I put alternative numbers on here if you want
> to consider it. You can ignore my recommendation, that's up to
> you. But I think 17 million based on the evidence is the right
> amount, but another number would be 14.95. That -- you heard
> that from the evidence from the damage expert, Renee
> McMahon. This is the total that Ford actually paid for ACM and
> MCA software in 2014, the last year of the contract. So you
> would assume that Ford would have been willing to pay the same
> amount for future years that it paid in 2014, which would be
> $14.95 million

> Now, if you didn't want to accept that as far as -- there's another number for 2014. If you take out basically what are called support and maintenance payments, the number could come down to 10.95 for 2014. So if you strip out -- but that's not really realistic because if they're going to use our software, they're going to want our -- they're going to want our support and maintenance that they would -- that they paid for every year.

(*Id.*, PageID.65692-65693.)

As noted above, the jury ultimately concluded that Ford breached the MSSA in each of the three ways identified by Versata. It awarded Versata $31,350,000 in damages for Ford's misuse and disclosure of Versata's confidential information; $50,160,000 in damages for Ford's reverse engineering of Versata's software for Ford's commercial use; and $750,000 in damages for Ford's refusal to permit Versata to exercise its verification rights. (*See* Verdict Form, ECF No. 1004, PageID.65558-65559.)

## D

Ford argues that the Court must set aside the jury's contract damages awards for two reasons: because Versata did not sufficiently prove causation of contract damages and because Versata did not present sufficient evidence to enable the jury to determine its contract damages with reasonable certainty. The Court disagrees with the first contention but agrees with the second. The Court addresses each assertion below.

**1**

The Court begins with the issue of causation.  According to Ford, Michigan law requires a plaintiff alleging breach of contract to "establish a causal link between the asserted breach of contract and the claimed damages." (Mot., ECF No. 1030, PageID.66627, quoting *Gorman v. Am. Honda Motor Co.*, 839 N.W.2d 223, 227 (Mich. App. 2013).)  And Ford insists that at trial, "Versata did not even try to prove actual contract damages, let alone try to prove a causal link between any alleged breach and damages." (*Id.*, PageID.66628.)  More specifically, Ford asserts that "no Versata witness testified that because of the inspection-provision breach, Versata in incurred $X of damages; that as a result of the misuse-provision breach, Versata incurred $Y of damages; or that as a result of the reverse-engineering provision breach, Versata incurred $Z in damages." (*Id.*)

Ford has, indeed, identified a serious problem with Versata's damages case (more on that below), but it is not one of causation.  Ford conflates two *separate* components of a breach of contract claim: proof of causation of damages, on one hand, and proof of the amount of damages, on the other hand.  The causation component focuses on whether the defendant's alleged breach has resulted in any damage to the plaintiff, while the amount component focuses, as the name suggests, on the quantification of the plaintiff's damages.  Because these components are separate, "courts have always distinguished between proof of *causation* of damages

and proof of the *amount* of damages." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081, 1161 (7th Cir. 1983) (emphasis in original).

Ford has not cited any Michigan authority holding that a plaintiff must present
evidence that a particular breach caused a particular dollar amount of damages in
order to satisfy its burden *on causation*. The sole Michigan decision it cites as
authority for that assertion – *Gorman*, *supra* – does not support it. The plaintiff in
*Gorman* brought a breach of warranty claim against an automobile manufacturer and
a car dealer. However, the "undisputed evidence show[ed] that defects brought to
defendants' attention during the warranty period were repaired within a reasonable
period of time and that the vehicle was returned to service without any further
complaints from plaintiff." *Gorman*, 839 N.W.2d at 226-27. Because there was "no
evidence" that the defendants "failed to honor" the warranty, the Michigan Court of
Appeals held that the plaintiff could not prevail on her breach of warranty claim. *Id.*

In the portion of the decision cited by Ford, the Michigan Court of Appeals
rejected the plaintiff's argument that she could establish a breach of warranty based
upon evidence that she needed to repair her vehicle after the warranty expired:

> Plaintiff's reliance on the vehicle's postwarranty repair history is
> misplaced because there is no evidence of a causal link between
> them and an unrepaired defect that plaintiff brought to
> defendants' attention during the warranty period. In a breach of
> contract case, the plaintiff must establish a causal link between
> the asserted breach of contract and the claimed damages. See
> *Miller–Davis Co. v. Ahrens Constr., Inc. (On Remand),* 296
> Mich.App. 56, 71–72, 817 N.W.2d 609 (2012). In this case, there

16

is no evidence the same repairs were made during and after the warranty period, and if they were the same, there was no evidence that the postwarranty repairs were not normal maintenance items as opposed to an unrepaired defect, or that the postwarranty repairs were not necessitated by poor workmanship by nonparty Suburban Acura, which performed all the warranty repairs. "'There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only.'" *Kaminski v. Grand Trunk W. R. Co.,* 347 Mich. 417, 422, 79 N.W.2d 899 (1956) (citation omitted). "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Skinner v. Square D Co.,* 445 Mich. 153, 164, 516 N.W.2d 475 (1994). Simply put, the postwarranty repair history creates only speculation and conjecture that defects disclosed to defendants during the warranty period went unrepaired; this is insufficient to create an issue of material fact to survive a motion for summary disposition. *MEEMIC Ins. Co. v. DTE Energy Co.,* 292 Mich.App. 278, 282, 807 N.W.2d 407 (2011).

*Id.* at 227-28 (internal footnote omitted).

As this quoted excerpt makes clear, nothing in *Gorman's* discussion of causation suggests, as Ford seems to contend, that a plaintiff alleging breach of contract must present evidence that a particular breach caused a particular amount of damages. The issue in *Gorman* simply had nothing to do with whether the plaintiff had sufficiently proved the amount of her claimed damages.

In order to satisfy its burden on causation under Michigan law, Versata had to present evidence that its claimed damages arose "naturally [] from [Ford's] breach" of the MSSA. (10/24/2022 Trial Tr., ECF No. 1006, PageID.65598.) Versata carried that burden. Versata sought damages for Ford's non-renewal of the MSSA, and it

17

presented evidence that those damages arose naturally from Ford's breaches of the MSSA.   More specifically, Versata presented evidence that Ford breached the MSSA by disclosing Versata's confidential information to the Ford employees who were developing PDO and by reverse engineering ACM and MCA; that those two breaches allowed Ford to develop PDO as a replacement for ACM and MCA; and that if Ford had not developed PDO, Ford would have had no choice but to renew, and would have renewed, the MSSA.   That evidence, when viewed in the light most favorable to Versata, was sufficient to satisfy Versata's burden on the causation element of its breach of contract claim.

## 2

While Versata did show that Ford's breaches caused it (Versata) to suffer damages, it did not present sufficient evidence to permit the jury to quantify those damages in compliance with Michigan law.   For that reason, the jury's award of contract damages cannot stand.

## a

Under Michigan law, "damages are not presumed in relation to contracts." *Doe v. Henry Ford Health System*, 865 N.W.2d 915, 922 (Mich. App. 2014). Instead, a plaintiff alleging breach of contract must "prove the measure of damages with reasonable certainty." *Id.* (internal quotation omitted).   "[I]t is not necessary that damages be determined with mathematical certainty." *Chelsea Inv. Grp., LLC*

*v. Chelsea*, 792 N.W.2d 781, 792 (Mich. App. 2010). But "damages that are speculative or based on conjecture are not recoverable." *Id.*  Simply put, as this Court explained in *Stonemen Grp., Inc. v. Metalforming Techs., Inc.*, 362 F.Supp.2d 896, (E.D. Mich. 2005), a decision that Versata finds persuasive (*see* Versata Resp., ECF No. 1038, PageID.66774-66775), "[a] plaintiff must produce a *method* by which damages can be calculated with reasonable certainty." *Stonemen*, 362 F.Supp.2d at 902 (emphasis added).

Versata did not do that.  Versata's experts never explained to the jury how to calculate the amount of Versata's breach of contract damages.  Nor did any lay witness for Versata ever testify that Versata suffered a particular amount of contract damages.  In fact, no Versata witness offered even a rough approximation as to the amount of contract damages that Versata suffered.  Likewise, Versata did not introduce into evidence any documents reflecting a calculation of its breach of contract damages.  Without any of this evidence, the jury had no way to calculate Versata's claimed breach of contract damages with reasonable certainty.

**b**

Instead of presenting testimony from a witness identifying its amount of contract damages, Versata presented its theory of contract damages to the jury in the closing argument by its attorney.  As noted above, Versata's counsel asked the jury to award breach of contract damages of $17 million per year for seven and one-half

19

years based upon the theory that (1) Versata offered to license ACM and MCA to Ford for that amount, (2) Versata was not willing to accept any lower amount to license ACM and MCA to Ford, (3) Ford had no alternative but to accept that amount, and (4) Ford was in breach for 7.5 years.

This model for calculating damages was inconsistent with Michigan law – as reflected in the Court's jury instructions – that an award of contract damages must put the non-breaching party "in as good a position as it would have been in had the contract been fully performed" while not giving that party "a greater amount in damages than it would have gained" absent the breach. (10/24/2022 Trial Tr., ECF No. 1006, PageID.65596-65598.)   More specifically, this method necessarily *overcompensated* Versata because it did not account for any of the costs of performance that Versata would have incurred if Ford had accepted its $17 million per year offer and the parties had thereafter performed under the terms of that offer. Stated another way, the $17 million per year would have been Versata's *gross* revenue under the terms of its offer, not Versata's net earnings in the event of full performance under the offer, and Versata's damages model based upon the $17 million per year offer thus sought to recover more from Ford than Versata would have gained absent a breach by Ford.   Versata's damages model is therefore inconsistent with Michigan law. *See*, *e.g.*, *Goodwin v. Coe*, 233 N.W.2d 598, 603 (Mich. App. 1975) (explaining that when calculating breach of contract damages,

"[t]he injured party is not [] entitled to be placed in a better position than he would have been if the contract had not been broken, *i.e.*, the measure of damages is the actual loss sustained by reason of the breach. Thus, deduction of any saving to the injured party must be made.") (internal citations omitted).

The failure of Versata's damages model to account for Versata's costs cannot be dismissed as a minor flaw because Versata had meaningful performance obligations under the terms of its offer.   For instance, Versata's offer required Versata to provide "4 managed maintenance releases per year [….,] error resolution and patch releases, [and] customer support services (ticketing system, triage meetings, phone, email, and web based support, etc.)." (Plaintiff's Trial Ex. 537, Bates No. FORD_VERSATA 11619.)  Versata's costs in providing these products and services could not have been *de minimis*.[3]  By failing to deduct those expenses, Versata's damages model necessarily yielded a damages award that put Versata in a better position than it would have been in had the contract been fully performed.

---

[3] Versata's own damages expert – in an opinion not expressed to the jury (because the Court excluded it, see above at Section (III)(A)) – pegged Versata's annual costs of performance at $1.1 million per year. (*See* McMahon Expert Rpt. at ¶¶ 60-61 and Ex. 5, ECF No. 860-2, PageID.58779-58780, 58809.)   Ford would presumably contend that Versata's costs were higher – and thus that Versata's available damages were lower – but Ford never conducted discovery into Versata's costs because Versata did not disclose during discovery any theory of damages that included a consideration of its costs.

Moreover, even if the jury had attempted to correct for the overcompensation inherent in Versata's model, it could not have done so on a reliable basis.   That is because Versata did not present the jury with any evidence of any specific cost or expense that it would have incurred when performing under the terms of its offer. Thus, the jury could only have speculated as to the amount of Versata's costs that it would have needed to subtract out of its contract damages awards in order to put Versata in the same position that it would have been in if the parties had performed under Versata's offer.  But a damages award may not rest on speculation. *See*, *e.g.*, *Chelsea Inv. Grp.*, 792 N.W.2d at 792.  For all of these reasons, Versata's damages model was contrary to Michigan law and could not have been the basis of a proper contract damages award.

Moreover, the two alternative contract damages models proposed by Versata's counsel during his closing argument suffered from the same flaws as the primary model.  As noted above, the first of those alternative models called for the jury to award $14.95 million per year for 7.5 years.   That is the amount that Ford actually paid Versata in the final year of the MSSA. (*See* 10/17/2022 Trial Tr., ECF No. 979, PageID.64156-64157.)  The $14.95 million consisted of the "base" license fee of $10.95 under the MSSA million plus an additional $4.0 million for, among other things, "extended support and maintenance services" provided by Versata. (10/17/22 Trial Tr., ECF No. 985, PageID.64274-64275.)  Those extended support

services included "provid[ing] engineers to support" Ford's use of ACM, releasing several software updates each year, agreeing to "investigate" and "provide resolution for Errors identified" in ACM, attending "a weekly meeting with Ford personnel […] to review the status" of its error investigations, and providing Ford "telephone, email, and web-based support." (Addendum #1 to ACM Subscription Schedule #4 of the MSSA, ECF No. 421-1, PageID.26502-26505.)  Because the $14.95 million per year figure – like the $17 million per year figure in Versata's primary damages model – included payments for services and support that Versata provided at some cost to itself, that number is a gross revenue number.  It is not a net figure that accurately represents the amount that Versata actually gained by performing its obligations during the final year of the MSSA. Thus, as with Versata's primary damages model, any award of damages using the $14.95 million per year figure necessarily would have overcompensated Versata.  And, again, the jury could not have corrected for that overcompensation because it had no evidence concerning Versata's costs.

Versata's second alternative damages model called for the jury to award $10.95 million per year in contract damages for 7.5 years.  The $10.95 million was the "base" license fee under the MSSA.  As its name suggests, the "base" license did not require Versata to provide an enhanced level of service and support to Ford. Thus, Versata's costs under the base license would have been less, and an award

based upon the base license fee of $10.95 million per year – as opposed to an award based upon the alternative figures of $17 million or $14.95 million per year – would admittedly have been closer to a proper award of Versata's net revenue.

But even though the base license required Versata to provide less service and support, it did require Versata to provide *some* level of technical support.   For example, under the MSSA's base license, Versata was obligated to perform "support and enhancement services" that included "replicating and diagnosing Errors reported by Ford." (Plaintiff's Trial Ex. 100, Bates No. VRS00004809.)   Thus, Versata incurred some costs under the base license, and the base license fee therefore represented gross revenue to Versata rather than net gain.   And, once again, because Versata introduced no proof of its costs, the jury had no evidence from which it could have determined Versata's net gain if it (the jury) had used the base license fee as the foundation for its damages award.   Furthermore, Versata's costs of performance under the base license – *i.e.,* its cost to correct errors, among other things – cannot be dismissed as a mere *de minimis* expense because Ford presented evidence at trial that it experienced frequent errors while using Versata's software.   And even Versata's own damages expert, Renee McMahon, estimated (in her report, but not at trial, *see* footnote three above) that Versata would have incurred $1.1 million in "incremental expenses" under the "base" license. (Ex. 4 to McMahon Expert Rpt., ECF No. 860-2, PageID.58808.)   For all of these reasons, if the jury used the base

24

license fee to calculate Versata's contract damages, that would have resulted in the overcompensation of Versata, and the jury could not have reliably accounted for the overcompensation in its award.[4]

**c**

Versata offers several additional arguments as to why the Court should not disturb the jury's award of contract damages, but none persuade the Court that the award may stand under Michigan law.

Versata initially argues that the Court may uphold the contract damages award on the theory that the jury properly awarded those damages as a "reasonable royalty." (Versata Resp., ECF No. 1038, PageID.66772-66773.)  The Court declines to uphold the award on that basis for two reasons.  First, it is not clear that Michigan recognizes a reasonable royalty theory of contract damages. *See Innovation Ventures, LLC v. Custom Nutrition Lab'ys., LLC*, 912 F.3d 316, 347 (6th Cir. 2018)

---

[4] The Court cannot solve the problem created by Versata's use of a gross figure to calculate its contract damages by subtracting from the jury's award of contract damages the $1.1 million per year in costs identified by McMahon in her report. That is because, as explained above in footnote three above, Ford did not conduct any discovery into Versata's costs (because Versata never revealed during discovery a contract damages theory that included consideration of its costs), and thus it would be unfair to Ford treat McMahon's figure as accurate.  For much the same reason, the Court may not simply say that Versata's costs under the base license would have been so insubstantial that any award of damages using the base license fee would not materially overcompensate Versata.  That, too, would be unfair to Ford given that Ford, through no fault of its own, is in no position to challenge the level of Versata's costs under the base license.

25

(noting that "no controlling authority from either this court or any Michigan court holds that damages in the form of a reasonable royalty may be assessed in a breach of contract case").  Second (and more importantly), even if Michigan did recognize such a theory of contract damages, the theory would be of no help to Versata here because Versata presented no evidence at trial to support a reasonable royalty theory of contract damages.  The only Versata witness who testified about the amount of a reasonable royalty was Versata's damages expert, Renee McMahon, and she said nothing about contract damages.  When asked by Versata's counsel "what [she was] here to testify about," McMahon responded "I'm here to talk about Versata's damages associated with trade secret misappropriation[]." (10/17/2022 Trial Tr., ECF No. 979, PageID.64127.)  Finally, the Court never instructed the jury that it could award breach of contract damages based on a reasonable royalty model; instead, the Court mentioned reasonable royalty only in its instructions on trade secret damages.  For all of these reasons, the jury's contract damages award cannot be sustained as a proper award of reasonable royalties.

Versata next argues that the jury may have properly "followed a lost-profits approach" when calculating breach of contract damages. (Versata Resp., ECF No. 1038, PageID.66774.)  This argument fails for at least two reasons.  First, Versata never disclosed a lost profits theory of contract damages during discovery, and thus it would be unfairly prejudicial to Ford to uphold the contract damages award on

that basis. Second, Versata did not present sufficient evidence at trial to permit an award of lost profits. Under Michigan law, "[d]amages for lost profits are based on the loss of *net rather than gross profits*. Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred." *Lawton v. Gorman Furniture Corp.*, 282 N.W.2d 797, 801 (Mich. App. 1979) (emphasis added; internal citation omitted). And here, as described in detail above, Versata never presented any evidence of its costs and expenses that would have been essential to a determination of its net profits. For these reasons, the contract damages award cannot be sustained on a lost profits theory.[5]

Finally, Versata argues that even if its evidence at trial left some uncertainty as to the amount of its damages, the Court must nonetheless permit the damages award to stand "because the rule in Michigan is that the risk of uncertainty is cast upon the wrongdoer, not the injured party." (Versata Resp., ECF No. 1038, PageID.66775; internal punctuation omitted; quoting *Stonemen Grp.*, 362 F.Supp.2d at 903.) But the flaw in Versata's contract damages case was not a mere uncertainty as to the amount of its damages. Rather, the flaw was that, as described in detail above, in several key respects Versata's damages case was supported by *no* evidence

---

[5] Versata counters that under Michigan law, "juries can calculate lost profits in circumstances like these without direct evidence of costs." (Versata Resp., ECF No. 1038, PageID.66774.) But for the reasons explained in detail in Ford's Reply, the cases cited by Versata do not support that proposition. (*See* Ford Reply, ECF No. 1041, PageID.66847-66849.)

– *e.g.*, *no* testimony as to the amount of those damages, *no* documents reflecting the calculation or amount of those damages, and *no* evidence concerning its costs and expenses.   Simply put, Versata's contract damages case crossed the line from uncertainty to speculation, and the jury's contract damages award therefore cannot stand.

### d

Even though Versata failed to prove its actual contract damages with reasonable certainty, it is nonetheless entitled to an award of nominal damages for each of the three breaches of contract found by the jury. *See, e.g., Kolton v. Nassar*, 99 N.W.2d 362, 364 (Mich. 1959) (confirming that a plaintiff who proves a breach of contract becomes "entitled to nominal damages").   The Court will therefore enter judgment in favor of Versata in the amount of $1 for each of the three breaches found by the jury, for a total of $3.

### IV

The Court next turns to Ford's arguments that it is entitled to judgment as a matter of law on Versata's trade secret misappropriation claims.   The Court will address each of Ford's arguments separately below.

### A

Ford first argues that Versata failed to produce sufficient evidence that it (Versata) disclosed the combination trade secrets to Ford.   The Court disagrees.

The Court instructed the jury on Versata's burden of proof with respect to the disclosure issue.  It told the jury that "[t]o prove its claim with respect to any one of these alleged combination trade secrets," Versata had to establish, among other things, that it "sufficiently disclosed each of its alleged combination trade secrets to Ford such that Ford had knowledge of each trade secret under the totality of the circumstances.  In making this determination, you should consider whether, taking into account all of Versata's relevant disclosures and the circumstances under which they were made, it would be reasonable to infer that Ford had knowledge of each of the alleged combination trade secrets." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65599, 65603-65604.)

Ford says that Versata failed to satisfy its burden of proof on the disclosure issue because "[n]o witness testified that Versata identified the elements of any asserted combination *as a combination* to Ford." (Mot., ECF No. 1030, PageID.66639; emphasis in original).  Instead, according to Ford, Versata only "pointed over and over to a mountain of user guides and other documents and asserted that all the elements [of each combination] were [individually] in there somewhere." (*Id.*)  Thus, Ford asks, "[h]ow could Ford possibly have known which features were alleged trade secrets and which were not?" (*Id.*, PageID.66640.)

The Court finds real merit in Ford's argument.  And if this Court had been sitting as a juror, the Court would have found that Versata did *not* sufficiently

disclose each combination trade secret to Ford for the reasons Ford identified.  The Court was convinced during trial, and continues to believe, that Versata did not persuasively establish that it ever meaningfully disclosed the trade secrets – as the combinations identified at trial – to Ford.  But this Court's personal view of the disclosure issue is not dispositive.  The question before the Court, at this stage of the proceedings, is not whether the Court would have found sufficient disclosure if sitting as a trial juror.  Instead, the question is whether the evidence, taken in the light most favorable to Versata, was sufficient to support a finding that Versata disclosed the combination trade secrets to Ford.  It was.

The primary evidence that Versata disclosed the combination trade secrets to Ford came from Versata's technical expert, Dr. Samuel Malek.  He repeatedly testified at trial that Versata disclosed the trade secrets *as combinations* to Ford through its user guides and presentations to Ford.[6]  For example, Dr. Malek testified that Versata "disclose[d] *the entire Grid*, as well as every element of the Grid" to Ford in this manner. (10/13/2022 Trial Tr., ECF No. 974, PageID.63808; emphasis

---

[6] At the hearing before the Court, Ford's attorney suggested that Dr. Malek was not an expert on the disclosure of trade secrets and that he could not have, and did not, offer any opinions concerning disclosure.  But Ford never objected to any of Dr. Malek's testimony concerning disclosure on the ground that it exceeded the scope of his expertise or was improper for any other reason.  On the contrary, Ford choose to challenge Dr. Malek's testimony regarding disclosure during cross-examination. (*See, e.g.*, 10/13/2022 Trial Tr., ECF No. 972, PageID.63571-63572, 63596-63606, 63611-63612.)

added.)   Dr. Malek further testified that Versata disclosed "*Workspaces and the elements* of Workspaces to Ford." (*Id.*, PageID.63871; emphasis added.)   And he told the jury that Versata's "user guides and Trie presentations" disclosed "*all of Buildability* to Ford." (*Id.*, PageID.63849; emphasis added.)   Additional testimony on the disclosure issue came from former Versata employee Seth Krauss.   Versata's counsel asked Krauss, "how did Versata disclose *all of these combination trade secrets, including all of their elements*, to Ford," and Krauss responded that Versata "disclosed [] all of the information in manuals, in technical documentation, our functional walkthroughs, launch acceptance documents, system requirement specifications, presentations […], e-mails that we sent, discussions that we had onsite and the software, itself." (10/11/2022 Trial Tr., ECF No. 968, PageID.63322; emphasis added.)   Moreover, Versata presented evidence that its manuals and presentations were given to Ford's engineers and other employees with technical expertise.   From all of this testimony and evidence, taken in the light most favorable to Versata, the jury reasonably could have concluded that Versata disclosed the combination trade secrets to Ford in a manner that Ford, through its technically-proficient employees, would have been able to understand.

## B

Ford next argues that Versata failed to produce evidence that each of its combinations had "synergistic" value – *i.e.*, evidence that each combination trade

secret had a value that was greater than the sum of its parts. (*See* Mot., ECF No. 1030, PageID.66647-66649.)  The Court disagrees.

The Court addressed the issue of synergistic value in its instructions to the jury.  It told the jury that "[a] combination qualifies as a trade secret only when the combination creates value beyond the sum of its individual parts." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65602.)

Ford says that Versata "offered no evidence that the value of any specific combination of elements [of Versata's asserted trade secrets] exceeded the value of the individual elements" and that "[n]o document [presented at trial] explained that these elements combine[d] to produce a synergistic effect." (Mot., ECF No. 1030, PageID.66647-66648.)  Ford insists that "[b]ecause the jury had no evidence that any of Versata's combinations created value beyond the sum of the individual parts, the Court should enter judgment in Ford's favor that Versata did not prove its combinations were trade secrets." (*Id.*, PageID.66649.)

While Versata's witnesses did not use the term "synergistic value" or phrases like "the whole has greater value than the sum of its parts," their testimony was sufficient to support a finding that the combination trade secrets had value beyond the value of their individual elements.  Versata's witnesses told the jury that, *when assembled into the combinations in question*, the elements of Versata's trade secrets were *collectively* able to perform complex functions.  From that testimony, the jury

could have reasonably inferred that the combination of the elements in each trade secret had value above and beyond the sum total of the value of the elements individually.

Versata witness Seth Krauss provided much of the relevant testimony. He explained that the "components" of the Grid "work[ed] together to provide a valuable technology" by, among other things, providing Ford "a much more intuitive user interface, [] a much faster to use interface, and [… a] user interface that prevented errors from being introduced that would cause a lot of time researching and understanding how to fix in the previous systems that were used [by Ford]." (10/11/2022 Trial Tr., ECF No. 968, PageID.63277-63279.)  Krauss likewise told the jury that the "Buildability trade secret" (*i.e.*, the *combination* of the elements of Buildability) was the "core computing brain, the big processor behind many of the key operations in ACM." (*Id.*, PageID.63297.)   And he explained how the "elements" of the Buildability trade secret "work[ed] together" to "confer a benefit on Ford":

> [T]he benefit to Ford was the ability, in realtime, during the modelling exercise, to implement these extremely complex operations that would allow models to be created in a manner that matched what they wanted to both engineer and what they wanted to market. Without Buildability, there would have been no capability to provide modelers, at the point of entering data to create models like that, that could go downstream, without lots of quality assurance and verification checks in turn.

(*Id.*, PageID.63301.)

33

Krauss also provided similar testimony with respect to the Workspaces trade secret.  When Krauss was asked to describe how the Workspaces "combination trade secret" allowed Ford to solve problems with its production, he explained that Workspaces "allowed each of the individual users [at Ford] to make edits within their own workspace or sandbox, and then merge those edits together, guarantee that they are consistent, allow users to sync or update their own views as the production workspace changed" in a manner "that guaranteed that no inconsistencies got introduced into production." (*Id.*, PageID.63312.)

In sum, from Krauss' testimony (and other testimony offered by Versata witnesses), the jury could reasonably have concluded that Versata's combination trade secrets had synergistic value because, *when assembled as combinations of the elements*, the trade secrets allowed users of ACM to perform complex operations.[7]

---

[7] During the hearing before the Court, Ford's counsel offered a helpful example that illustrates how the synergistic value requirement applies in the context of combination trade secrets.  Counsel's example involved a bike manufacturer.  He said that if the manufacturer placed all of the individual parts of a bike into a box without assembling them into a bike, the value of the contents of the box would be the sum total of the value of each individual part – and no more.  But if the bike manufacturer assembled those same parts into a finished bicycle and placed that into a box, then the value of the contents of the box would far exceed the sum total of the value of each individual part.  That is because the parts, when assembled into the bike, could perform an important function that the parts, individually, could not perform.  This bike analogy helps Versata, not Ford, here because Krauss' testimony, quoted above, shows how the combination of the elements in the Versata trade secrets – like the assembled parts of the bike – worked together to perform functions that the elements, individually, could not have performed.

For all of these reasons, Ford is not entitled to judgment as a matter of law on Versata's trade secret claims on the ground that Versata failed to prove a lack of synergistic value.

C

Next, Ford argues that Versata failed to present evidence that it (Ford) "misappropriated every element" of the Grid and Buildability trade secrets. (Mot., ECF No. 1030, PageID.66649-66652.)   This argument relies on the Court's instruction to the jury that "[f]or each alleged combination trade secret, Versata must prove that Ford misappropriated *every element of that combination* or else there is no misappropriation of that combination." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65600; emphasis added.)   The Court concludes that Versata presented sufficient evidence to satisfy its obligation under this instruction for both the Grid and Buildability combinations.

1

The Court begins with the Grid.   Ford argues that Versata failed to prove misappropriation of every element of the Grid because Versata did not present evidence that Ford's PDO screens use the "{ALL} notation" – a notation that

35

appeared as part of the Grid on the ACM screens.[8] (Mot., ECF No. 1030, PageID.66649-66651.)   Ford contends that it is, in fact, "undisputed" that "PDO's screens do not use or include an {ALL} notation." (*Id*., PageID.66650.)  The Court disagrees.

While Ford presented some evidence that its PDO screens did not use the "{ALL} notation" (*see, e.g.*, testimony of Ford employee Darlene Coomer denying that PDO used the {ALL} notation at all, ECF No. 991, PageID.64790), Versata presented contrary evidence.  For instance, Dr. Malek testified that Ford "cop[ied] the *entire* Grid" *including* "*every element* of the Grid." (10/13/2022 Trial Tr., ECF No. 974, PageID.63808; emphasis added.)  Because the "{ALL} notation" was an element of the Grid that appeared on the ACM screens, this testimony supports a finding that the PDO screens used that notation.  Dr. Malek also offered even stronger testimony on this point.  He testified that "*just like ACM*, PDO also has the All notation." (*Id.*, PageID.63677; emphasis added.)  From that testimony, the jury reasonably could have concluded that the PDO screens – "just like ACM" – have the "{ALL} notation."

---

[8] The "{ALL} notation" on the screen was an element of the Grid trade secret in ACM because (1) one of the elements of the Grid was the Dynamic Grid and (2) the Dynamic Grid required the display of the "{ALL} notation." (ECF No. 1002, PageID.65545.)

**2**

The Court next turns to Buildability.  According to Ford, Versata failed to prove that Ford misappropriated each element of that trade secret because Versata did not present evidence that PDO utilizes Buildability's "minimize trie" data structure. (*See* Mot., ECF No. 1030, PageID.66651-66652.)  Ford says that Versata could not have made that showing because it is undisputed that PDO relies upon "an MDD data structure, not a trie or a minimized trie." (*Id.*, PageID.66651.)

Ford's argument rests upon an unduly cramped understanding of "misappropriation."  Ford wrongly assumes that in order to misappropriate Versata's minimized trie, it had to incorporate that structure into PDO.  But the Court instructed the jury that "misappropriation" includes using a trade secret to "assist or accelerate [a party's own] research and development." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65604.)  And Versata presented evidence from which the jury could have reasonably inferred that Ford used the minimized trie element of Buildability in the process of developing PDO.  That evidence came from Dr. Malek. He testified at length about the close similarities between the minimized trie structure of Buildability and the MDD data structure of PDO:

> Q. I would like to talk to you about your investigation now, into Ford's misappropriation of this component, the Trie component. Ford claims that it is using a data structure called an MDD, that's what they call it. What is an MDD?

A. So MDD is a closely related data structure to Trie, because it's also tree-based data structure, and that is a data structure that Ford used for its Buildability analysis.

[….]

Q. Are the data structures very similar?

A. They are. So as I mentioned, MDD and Tries are both very closely related data structures in computer science. Both are tree-based data structures. And once you minimize a Trie, which is what Versata was doing, then what you get is, essentially, an MDD, meaning that a minimized Trie is practically an MDD. And I have -- I'm showing you here a scientific article on the left-hand side, this is PX 885. And on the right-hand side, I'm showing you portions of this article, which is not authored by me, it is authored by other computer scientists, where it describes, in the highlighted text, that a minimized Trie is an MDD.

[….]

Q. Can you tell us, in more detail, why Versata's minimized Trie and Ford's MDD are functionally the same?

A. Sure. So I have prepared this table which walks you through why and how they are similar. So the purple column is the Trie, and the gray column is Ford's MDD. As I said, they are both tree data structures. They both represent families at different levels, so each level of the tree corresponds to one feature family. Then both perform Buildability using set operations, and, specifically, they both represent features in the form of binary data, and that just means they are represented in the form of zeros and ones, and then they do set operations on these binaries, which allow it to be efficient. They both are used for Buildability and they both can be used for Buildability analysis.

[….]

Q. So the Ford's MDD -- what Ford calls the MDD, and Versata's minimized Trie, function in the same way?

38

A. They do.

[….]

Q. So to sum up, did Ford copy and misappropriate the minimized Trie feature of Buildability?

A. They did.

(10/13/2022 Trial Tr., ECF No. 974, PageID.63817-63821.)

From this and other testimony presented at trial (including the evidence that the developers of PDO had access to ACM's technical manuals), the jury could reasonably have concluded that Ford based its MDD data structure on – and thus misappropriated – Versata's minimized trie design from Buildability. And while Ford presented evidence that PDO (and the MDD component of PDO) were developed independently of Buildability and its minimized trie structure (*see*, *e.g.*, 10/17/22 Trial Tr., ECF No. 985, PageID.64343-64346), the jury was free to weigh the competing evidence and to credit Versata's evidence over Ford's. Thus, for all of these reasons, there was sufficient evidence for the jury to conclude that even if PDO does not include a minimized trie data structure, Ford nonetheless used that structure to assist in the development of PDO and thereby misappropriated that element of Buildability.

**D**

Ford next argues that the jury's award of trade secret damages cannot stand because Versata did not introduce evidence that would enable the jury to calculate

39

damages if it found, as it did, that Ford had misappropriated less than all of Versata's trade secrets. (*See* Mot., ECF No. 1030, PageID.66652-66653.)  The Court agrees.

1

At trial, the Court instructed the jury that any award of trade secret damages "must be limited to the amount of time you decide it would have taken Ford to independently develop the alleged combination trade secrets you found were misappropriated." (10/24/2022 Trial Tr., ECF No. 1006, PageID.65605.)   This instruction underscores that in order to return a properly-supported award of trade secret damages, the jury needed proof as to how long it would have taken Ford to develop any trade secret that Ford misappropriated.  Versata did not provide the jury with that essential evidence.

With respect to the development-time issue, Versata presented testimony from Dr. Malek.  He explained that he used two commonly-used software tools to determine how long it would have taken Ford to independently develop Versata's trade secrets. (*See* 10/13/2022 Trial Tr., ECF No. 974, PageID.63890-63894.) These tools estimate how long it would take to develop software products (like Versata's combination trade secrets) by, among other things, counting lines of software code, considering the novelty of the to-be-designed software, and evaluating whether the software would need to perform "mission critical" or "safety critical" functions. (*Id.*) Dr. Malek told the jury that based upon his use of the development-time tools, he

concluded "that without copying Versata's trade secrets, it would have taken Ford approximately 8.3 years to implement an equivalent software as ACM and Versata's MCA." (*Id.*, PageID.63889.)  In other words, according to Dr. Malek, it would have taken Ford 8.3 years to develop *all four* of Versata's trade secrets.

But Dr. Malek said nothing about how long it would have taken Ford to develop less than all of the trade secrets.  Nor did he tell the jury how long it would have taken Ford to develop any of the trade secrets individually.  And he did not give the jury the tools to make those determinations.  For instance, he did not tell the jury how many lines of code were in each individual trade secret, nor did he explain how any of the other factors considered by the development-time tools he used would apply to each of the individual trade secrets.

Without this information, the jury had no way to reliably determine how long it would have taken Ford to develop the three (out of four) trade secrets that it found to have been misappropriated.  Under these circumstances, any development-time figure used by the jury – after it found that Ford misappropriated the Grid, Buildability, and Workspaces, but *not* MCA – would necessarily have been pure speculation.  For that reason, the jury's award of trade secret damages lacks a sufficient evidentiary foundation and cannot stand.

The United States District Court for the Northern District of California reached a similar conclusion under similar circumstances in *O2 Micro Int'l Ltd. v.*

*Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064 (N.D. Cal. 2005).  In *O2 Micro*, the plaintiff accused the defendant of misappropriating twelve distinct trade secrets and sought damages on an unjust enrichment theory.  Prior to trial, the plaintiff disclosed that its damages expert planned to opine that plaintiff suffered a single amount of damages based upon the defendant's misappropriation of all twelve trade secrets.  During a pre-trial conference, the court "warned [the plaintiff] of the dangers of bundling all of its alleged trade secrets damages together." *Id*. at 1086. The court explained that if the jury found that the defendant misappropriated less than all of plaintiff's trade secrets, then the expert's all-or-nothing damages opinion would provide "no basis" for a damages calculation, and plaintiff's damages case would fail as a matter of law. *Id*.

Despite the court's warning, at trial, the plaintiff's expert witness "provided the jury with a damages calculation based on the assumption that all of the trade secrets were misappropriated." *Id*.  Following deliberations, the jury "found that only five of the [] secrets were misappropriated, and that only the misappropriation of one of them resulted in [defendant] being unjustly enriched." *Id*. The jury then awarded the plaintiff $12 million in damages.  In a post-trial motion, the defendant moved for judgment as a matter of law on the basis that the plaintiff had failed to sufficiently prove damages.  The court granted the motion.

The court held that because the plaintiff's expert "took an all-or-nothing approach" that "turned on misappropriation of all the trade secrets without offering the jury a way to attribute value to each individual trade secret," the jury had no evidentiary basis upon which to award damages. *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.,* 53 F.4th 368, 389 (6th Cir. 2022) (describing *O2 Micro*). The court further concluded that the expert's testimony was "useless to the jury" because it forced the jury to use "speculation and guesswork to determine damages":

> After the jury concluded that [defendant] did not misappropriate all of [plaintiff's] trade secrets, [plaintiff's expert's] expert testimony regarding damages for misappropriation of all trade secret was useless to the jury. The jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages. Thus, the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence.

*O2 Micro*, 399 F.Supp.2d at 1077.  The plaintiff appealed that ruling to the United States Court of Appeals for the Federal Circuit (*see* Brief for O2 Micro Int'l Ltd., *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc*, 2006 WL 3368775 (C.A. Fed. Oct. 23, 2006)), and the Federal Circuit affirmed – albeit without an opinion. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys.*, 221 F. App'x 996 (Fed. Cir. 2007).

The reasoning of *O2 Micro* is sound, and it applies here.  First, as in *O2 Micro*, Versata was on notice that pursuing an all-or-nothing approach on damages questions could fatally undermine an award of damages if the jury found that Ford

43

misappropriated less than all of Versata's trade secrets.  Indeed, more than four years ago, the Court excluded opinions by two of Versata's damages experts on the ground that they "fail[ed] to calculate damages on a trade-secret-by-trade-secret basis" and instead used an "all-or-nothing damages calculation." *Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, at *11 (E.D. Mich. July 9, 2018).  In support of that holding, the Court relied heavily upon and followed the decision in *O2 Micro*.  *See id*.

Second, like the expert in *O2 Micro*, Dr. Malek provided the jury an "all or nothing" model that left the jury without any evidence from which it could determine how long it would have taken Ford to develop just the three misappropriated trade secrets.  Thus, as in *O2 Micro*, the jury's award of damages necessarily rests upon speculation, and Ford is therefore entitled to judgment as a matter of law on Versata's trade secret claims.  *Cf. Vertellus Holdings LLC v. W.R. Grace & Co.—Conn.*, 2021 WL 3883597, at *16 (D. Conn. 2021) (collecting cases for proposition that "courts have cautioned that in quantifying damages in one lump sum for all claims, plaintiffs assume risk that the damages calculation could be excluded in its entirety if they are unsuccessful in proving all of their claims," and excluding testimony of damages expert who offered lump sum damages calculation where plaintiffs did not prevail on all claims); *Liveperson Inc. v. [24]7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018) (excluding expert testimony on trade

secret where expert, among other things, "offer[ed] no methodology for the jury to calculate trade secret misappropriation damages on fewer than all of the 28 alleged trade secrets in the case").

## 2

Versata offers several counterarguments, but none persuade the Court that the jury's trade secret award rests upon a sufficient evidentiary foundation. First, Versata suggests that the Sixth Circuit has rejected the approach of the court in *O2 Micro*. (*See* Versata Sur-Reply, ECF No. 1045, PageID.66911.)  In support of that contention, Versata directs the Court to the Sixth Circuit's statement in *Caudill*, *supra*, that *O2 Micro* "is not as persuasive as [the defendant] thinks." *Caudill*, 53 F.4th 389.  But the Sixth Circuit meant that *O2 Micro* did not provide persuasive support *for the defendant's position on the facts of that case*, not that the reasoning of *O2 Micro* was unpersuasive.  That much is clear from the context of the Sixth Circuit's statement.  Immediately after making the statement, the Sixth Circuit highlighted the key difference between the expert's all-or-nothing damages opinion in *O2 Micro* and the expert's damages opinion in the case before it.  The court stressed that *unlike* in *O2 Micro*, the plaintiff's expert in the case before it "gave the jury options" that "allowed the jury to calculate the value of Trade Secret 1 even while finding no misappropriation of Trade Secrets 2 and 6." *Id.*  Given this context,

the Court declines to read *Caudill* as generally disapproving of the reasoning from *O2 Micro*.

Second, Versata argues that the lack of evidence concerning how long it would have taken Ford to develop less than all of the trade secrets is not fatal because Versata was only required "to prove its damages to a reasonable probability, not mathematical precision." (Versata Resp., ECF No. 1038, PageID.66792.)  But the issue here is *not* a lack of "mathematical precision."  Instead, the problem here is that there was a *complete lack of evidence* on the critical issue of how long it would have taken Ford to develop less than all of Versata's trade secrets.

Third, Versata argues that the jury heard competing development-time estimates from Dr. Malek and from Ford's technical expert, Monty Myers, and that the jury was free to "land somewhere in between." (*Id.*, PageID.66793.)  But that assertion starts from a faulty premise.  Contrary to Versata's suggestion, Myers never testified at trial about how long it would have taken Ford to develop all four of Versata's trade secrets (or any of Versata's trade secrets).  Ford's damages expert, Julie Davis, predicted that Myers would offer such testimony (*see* 10/22/2022 Trial Tr., ECF No. 994, PageID.64998-65000), but he did not end up doing so.  In any event, even if Myers had testified as to how long it would have taken Ford to develop all of Versata's trade secrets, that testimony would not be enough to sustain the jury's trade secret damages award.  That testimony, if it had been offered, would suffer

from the same problem as Dr. Malek's development-time testimony: namely, it would not have fit with the jury's finding that Ford misappropriated less than all of Versata's trade secrets. For these reasons, the Court rejects Versata's argument that the jury could have reliably resolved the development-time question by landing "in between" competing expert testimony on that issue.

Finally, Versata argues that the jury did have evidence from which it could have determined how long it would have taken Ford to develop just the Grid, Buildability, and Workspaces. According to Versata, that evidence came from witness Nate Little, a former Versata employee. (*See* Versata Ltr. Br., ECF No. 1047, PageID.66919.) Versata highlights Little's testimony about Versata's development of MCA, the one trade secret that the jury found Ford did not misappropriate. In that testimony, Little told the jury that (1) during the "2003/2004" time frame, he (Little) was "involved in discussions with Ford that led to the development of [MCA]" (10/7/2022 Trial Tr., ECF No. 961, PageID.62510); and (2) MCA launched in the "summer" of 2005. (10/8/2022 Trial Tr., ECF No. 962, PageID.62551.) Versata says that the jury could have concluded from that testimony that it took Versata "1.5-2.5 years" – *i.e.*, the interval between the first discussions about MCA and the rollout of MCA – to develop MCA. (Versata Ltr. Br., ECF No. 1047, PageID.66919.) Versata suggests that the jury could then have concluded that it would taken Ford roughly the same 1.5-2.5 years to develop its MCA equivalent.

Finally, Versata implies that the jury could have subtracted those 1.5-2.5 years from Dr. Malek's 8.3 years (for Ford to develop all four trade secrets) to arrive at a time period of 6.8-7.8 years for Ford to develop just the Grid, Buildability, and Workspaces.

The Court does not believe that Little's testimony gave the jury a reliable foundation on which to determine the time it would have taken Ford to develop the Grid, Buildability, and Workspaces.  While that testimony arguably says something about how long it may have taken *Versata* to develop MCA, Versata has not identified any evidence in the trial record suggesting that that information sheds any light on how long it would have taken *Ford* to develop the same trade secret.  Moreover, Versata's own expert, Dr. Malek, did not tell the jury that there is any link between Versata's development time and Ford's development time.  On the contrary, he identified a number of factors that would be relevant to calculating Ford's development time – *i.e.*, counting lines of code, *etc*. – and did not include Versata's development time in that list.[9]

Moreover, there is a timing problem with Little's testimony.  As noted above, Little told the jury that Versata developed the MCA trade secret between 2003-04

---

[9] In his expert report, Dr. Malek did seem to suggest that there was a link between the time it took Versata to develop its trade secrets and the time it would have taken Ford to develop the same secrets. (*See* ECF No. 430-3, PageID.29670-29671.)  But he did not make that point to the jury at trial.

and 2005, but Ford did not begin developing its MCA replacement until six years later, at the earliest. (*See* 10/17/2022 Trial Tr., ECF No. 979, PageID.64149, where McMahon testifies that the "date of [Ford's] first misappropriation" was in October 2011.) Versata has not identified any evidence in the record from which the jury could have determined that the time to develop a software application like MCA in the 2003-2005 time frame provides any reliable guidance as to how long it would take to develop a similar application at least six years later – which seems to be a "lifetime" in the rapidly-evolving world of software innovation. Simply put, Versata has not shown that it presented sufficient evidence to enable the jury to reliably utilize Little's testimony about the time it took Versata to develop MCA to determine Ford's development time for the remaining three trade secrets.

For all of these reasons, Versata did not provide the jury sufficient evidence to determine how long it would have taken Ford to develop just the ACM, Buildability, and Workspaces trade secrets. Without that evidence, there was no reliable foundation for the jury's award of trade secret damages. The Court will therefore grant Ford judgment as a matter of law on Versata's trade secret claims.

## V

Finally, on December 8, 2022, Ford filed a motion asking the Court to order Versata to make an election of remedy. (*See* Mot., ECF No. 1018.) In that motion, Ford argues that "Versata cannot recover duplicative damages for a singular alleged

harm" – *i.e.*, "Ford's use of Versata's confidential information, including trade secrets, after January 2015 without paying to do so." (*Id.*, PageID.66521.)  Ford therefore insists that Versata must "choose either the trade secret misappropriation damages or one of the breach of contract awards, each of which reflect the jury's assessments of the value of Versata's injury caused by Ford declining to enter into a new contract." (*Id.*, PageID.66546.)

In light of the Court's rulings above, the Court **TERMINATES AS MOOT** Ford's motion to require Versata to elect a remedy.  There is no longer an election for Versata to make.

## VI

The Court recognizes that, as Versata points out, "[o]verturning a jury verdict is difficult by design." (Versata Resp., ECF No. 1038, PageID.66765.)  But here, as explained in detail above, the lack of evidence presented by Versata forced the jury to rest its damages awards on nothing more than speculation.  For that reason, the damages awards cannot stand.  The Court therefore **GRANTS** Ford's motion for judgment as a matter of law.  The Court will enter judgment in favor of Versata on its breach of contract claims in the amount of $3, and it will enter judgment against Versata on its trade secret claims.  The Court also **TERMINATES AS MOOT** the additional motions discussed above.

The Court directs Ford to submit a proposed Judgment reflecting the Court's ruling herein by not later than **May 19, 2023**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 1, 2023


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 1, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126
