UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERSATA SOFTWARE, INC. *et al.*,

      Plaintiffs,

v.

FORD MOTOR COMPANY,

      Defendant.

Case No. 15-cv-10628
(*consolidated with Case No. 15-11264*)
Hon. Matthew F. Leitman

_____/

## ORDER (1) DENYING PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION OR AN ONGOING ROYALTY (ECF No. 1056) AND (2) DIRECTING PARTIES TO SUBMIT JOINT STATUS REPORT

In this action, Plaintiffs Versata Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (collectively, "Versata") alleged that Defendant Ford Motor Company misappropriated Versata's trade secrets and breached the parties' software license agreements. The case proceeded to trial. A jury found that Ford misappropriated three of Versata's trade secrets and breached the parties' license agreements in several ways. Versata has now moved for a permanent injunction barring Ford from, among other things, using its trade secrets and confidential information. (*See* Mot., ECF No. 1056.) In the alternative, Versata asks the Court to award it an ongoing royalty for each year that Ford continues to use its trade secrets. (*See id.*) For the reasons explained below, Versata's motion is **DENIED**.

**I**

**A**

The Court has repeatedly recited the background of this action, most recently in its Opinion and Order granting Ford's motion for judgment as a matter of law. (*See* Op. and Order, ECF No. 1054, PageID.67183-67186.)  The Court incorporates that background here.  In summary, Ford hired Versata to develop computer software that would allow Ford to more efficiently configure the millions of cars that it manufactures each year.  Versata created that software and called it "ACM."  Versata then licensed ACM and other related software to Ford through a series of licensing agreements.  In 2014, the parties were unable to agree on a renewed software license, and Ford implemented its own automotive configuration software program to replace ACM.  Ford called this software "PDO."

At trial, Versata claimed that Ford breached the parties' license agreements and misappropriated its (Versata's) trade secrets when Ford developed PDO.  The jury agreed and returned a verdict in Versata's favor. (*See* Verdict Form, ECF No. 1004.)  The jury first concluded that Ford breached the parties' license agreements by, among other things, misusing and disclosing Versata's confidential information and reverse engineering Versata's software. (*See id.*, PageID.65558-65559.)  Next, the jury concluded that Ford misappropriated three of Versata's trade secrets. (*See id.*, PageID.65560-65563.)

2

**B**

On May 11, 2023, Versata filed a motion for a permanent injunction pursuant to the federal Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836(b)(3)(A), and Michigan's Uniform Trade Secrets Act (the "MUTSA"), Mich. Comp. Laws § 445.1903. (*See* Mot., ECF No. 1056, PageID.67251.)  Versata also says that it is entitled to an injunction based on Ford's breach of the license agreements. (*See id.*) In its motion, Versata seeks a permanent injunction that "(1) prohibits Ford from continuing to use PDO; (2) prohibits Ford from continuing to use Versata's trade secrets and confidential information; (3) requires that Ford return or destroy all confidential and trade-secret information in its possession, and (4) prohibits Ford employees and contractors with former or current access to Versata's trade secrets and confidential information from developing or implementing other configuration software at Ford." (*Id.*, PageID.67246.)  In the alternative, Versata asks the Court to award it "an ongoing royalty of at least $13,555,000 for every year that Ford continues to use Versata's trade secrets and confidential information." (*Id.*)  Ford denies that it is currently using any of Versata's trade secrets, and it opposes all of Versata's requested relief. (*See* Ford Resp., ECF No. 1068.)  The Court held a hearing on Versata's motion on October 2, 2023.

## II

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  *See also Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) ("A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction") (quoting *eBay*, 547 U.S. at 391).

## III

Versata is not entitled to permanent injunctive relief for two independent reasons.  First, Versata has not shown that it would suffer irreparable harm in the absence of an injunction.  Second, the so-called "head start" period – the length of time it would have taken Ford to independently develop a non-infringing alternative without the benefit of Versata's trade secrets – has expired, and thus even if Versata

4

could potentially have been entitled to injunctive relief at some point, it is not entitled to that relief now (or going forward).

## A

The Court begins with Versata's failure to show irreparable harm. While courts have often described the four elements of injunctive relief described above as factors that need to be balanced, the *sin qua non* of injunctive relief is irreparable harm. Indeed, the Supreme Court in *eBay* confirmed that, to be entitled to permanent injunctive relief, a plaintiff "*must demonstrate* […] that it has suffered an irreparable injury." *eBay*, 547 U.S. at 391 (emphasis added). Likewise, the Sixth Circuit has repeatedly held that "in order to obtain [… a] permanent injunction, a party *must demonstrate* that failure to issue the injunction is likely to result in irreparable harm." *U.S. v. Miami University*, 294 F.3d 797, 816 (6th Cir. 2002) (emphasis added; internal punctuation removed). *See also Audi AG*, 469 F.3d at 550 (same). Simply put, a court may not grant injunctive relief unless the moving party demonstrates that it would suffer irreparable harm absent that relief. Here, Versata has not identified any irreparable harm that it would suffer without its requested permanent injunction.

## 1

Versata first says that the Court may "presume[]" the existence of irreparable because it proved at trial that Ford misappropriated its trade secrets. (Mot., ECF No.

1056, PageID.67253-67254.)  The Court disagrees.  While federal courts may once have presumed that the victim of trade secret misappropriation would suffer irreparable harm without an injunction, that presumption did not survive the Supreme Court's decision in *eBay*.

In *eBay*, the Supreme Court rejected a similar presumption that had been applied by the United States Court of Appeals for the Federal Circuit in patent cases. The Federal Circuit described that presumption as a "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *eBay*, 547 U.S. at 391 (quoting *MercExchange, LLC v. eBay*, 401 F.3d 1323, 1339 (Fed. Cir. 2005)).  The Supreme Court disapproved of the Federal Circuit's approach because it was inconsistent with "traditional equitable considerations" that do not lend themselves to categorical rules. *Id.* at 392-93.

Given the logic of *eBay*, several courts of appeals have concluded that it is no longer permissible to presume the existence of irreparable harm.  In the words of the Federal Circuit, *eBay* "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). *See also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) ("[W]e conclude that our longstanding rule that a showing of a reasonable likelihood of success on the merits in a copyright infringement claim raises a presumption of irreparable harm is clearly

irreconcilable with the reasoning of the [Supreme] Court's decision in *eBay* and has therefore been effectively overruled").  And the Second Circuit has held that after *eBay*, it is inappropriate to presume irreparable harm where, as here (and as described in more detail below), "a [trade secret] misappropriator seeks only to use [the misappropriated] secrets—without further dissemination or irreparable impairment of value—in pursuit of profit." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009).  The Court concurs with these courts of appeals and concludes, in light of *eBay*, that it may not presume that Versata would suffer irreparable harm absent an injunction.

**2**

Versata next argues that apart from any presumption, it has made an actual showing that it will suffer irreparable harm without injunctive relief.  The Court disagrees.

**a**

Versata identifies the "loss of control" of its trade secrets as one type of irreparable harm that it is facing. (Mot., ECF No. 1056, PageID.67256-67257.) According to Versata, "[a]s things stand, Versata has no way to oversee Ford's misuse of Versata's information" or any way to "dictate" Ford's "future use" of its trade secrets. (*Id.*)  Simply put, Versata seems to suggest that Ford will misuse its trade secrets and/or confidential information in new ways going forward and that

these new misuses will cause new harms to Versata. But Versata has not shown that there is any meaningful risk that Ford will make any new or additional uses of Versata's confidential information and/or trade secrets. While Versata presented evidence at trial that Ford used Versata's confidential information and secrets to develop PDO, Versata has not presented persuasive proof that Ford has used the confidential information and/or trade secrets for other purposes – or that Ford intends to do so in the future.

Versata also claims that it needs an injunction to protect against Ford's future "disclosure" of its confidential information and/or trade secrets. (*Id.*) But Versata has not presented any persuasive evidence that there is a meaningful risk of such disclosure moving forward. The evidence at trial showed that Ford misappropriated Versata's trade secrets to develop PDO internally at Ford, and Versata did not make a convincing showing at trial that Ford ever took steps that created a significant risk that Versata's trade secrets and/or confidential information would be disclosed to Versata's competitors. Moreover, there is no proof before the Court that, going forward, Ford will be sharing either Versata's trade secrets (or the portions of PDO the embody those trade secrets) or Versata's confidential information with anyone outside of Ford. Nor is there any persuasive evidence that on a going-forward basis, Ford will take any steps that would create a meaningful risk that Versata's trade secrets (and/or the relevant portions of PDO) or Versata's confidential information

could be inadvertently disclosed outside of Ford.  For these reasons, Versata has failed to persuade the Court that it faces a "lack of control" over its trade secrets and confidential information on a going-forward basis that rises to the level of irreparable harm.

Versata's claimed "loss of control" falls short of the loss of control that was deemed to constitute irreparable harm in *UniRAM Tech. Inc. v. Taiwan Semiconductor Mfg. Co.*, 2008 WL 11515597 (N.D. Cal. Apr. 17, 2008), the primary case Versata cites in support of its loss-of-control argument.  The plaintiff in *UniRAM* developed memory macros for computer chips and consulted with the defendant to manufacture some of its designs.  At trial, the jury found that the defendant had misappropriated the plaintiff's trade secrets and disclosed them to a third party (in which the defendant owned an interest).  The third party then hired the defendant to manufacture products containing the plaintiff's trade secrets so that the third party could sell those products in the marketplace.  The evidence at trial further established that several of the defendant's employees had "close ties" with the third party to whom the plaintiff's trade secrets had been disclosed. *Id.* at *3. The court in *UniRAM* held that under those circumstances – where the defendant had actually disclosed the plaintiff's trade secrets to a third-party competitor of the plaintiff, where the defendant's employees were linked to the third-party competitor, and where the defendant had a continuing interest in being hired by third parties to

manufacture products containing plaintiff's trade secrets – the claimed "loss of control" posed a risk of irreparable harm.  None of these circumstances are present here.

**b**

Next, Versata says that without its requested injunctive relief, it will suffer irreparable harm from "lost goodwill." (Mot., ECF No. 1056, PageID.67257-67258.) The Court disagrees for several reasons.

First, there is a disconnect between Versata's requested injunctive relief and the claimed harms to its goodwill.  The "goodwill" that Versata claims to have lost includes (1) the "reputational advantage and business that might have flowed from its publicized relationship with a major automotive company"; (2) its business relationship with "another significant ACM customer, Jaguar Land Rover"; and (3) "the expectancy of continued patronage" with Ford. (*Id.*, PageID.67257-67258.) But the injunction sought by Versata would not remedy these claimed harms to Versata's goodwill.  As described above, Versata primarily seeks an injunction barring Ford from using and/or disclosing its trade secrets and/or confidential information.  Such an injunction would not restore a "publicized relationship" between Versata and Ford, nor would it reinstate Jaguar Land Rover as a Versata customer.  Moreover, it is hard to see how an injunction prohibiting Ford from using or disclosing Versata's trade secrets or confidential information would enhance and/or restore Versata's

10

reputation any more than Versata's resounding victory at trial has already accomplished.[1]

Second (and relatedly), Versata has failed to present persuasive evidence that it will suffer the type of harm to its goodwill that injunctive relief is intended to protect against in the trade secret misappropriation (and/or misuse of confidential information) context.  For instance, as many courts have recognized, an injunction may appropriately issue to protect a company's goodwill where that company has been the victim of trade secret misappropriation and where the misappropriator uses (or intends to use) the secrets to compete against the company in the marketplace and/or to use the secrets in a way that may undermine the company's standing/reputation in the market and/or with its customer base. *See*, *e.g.*, *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) ("The

---

[1] Indeed, there appears to be a strong argument that, as Versata stands before the Court today, its reputation (and the corresponding value of its goodwill) has been materially enhanced because of these proceedings.  Versata persuaded a jury that its trade secrets were so revolutionary that a sophisticated company like Ford resorted to stealing them, and Versata's attorneys then trumpeted Versata's victory to the world. *See*, *e.g.*, "Mitby Pacholder Johnson PLLC: $104 Million Trial Win for Versata Software, Inc.," https://www.prnewswire.com/news-releases/mitby-pacholder-johnson-pllc-104-million-trial-win-for-versata-software-inc-301661651.html; "Winston Secures Tremendous Victory in Jury Trial of High-Stakes Contract and Trade Secrets Dispute," https://www.winston.com/en/insights-news/client-success/winston-secures-tremendous-victory-in-jury-trial-of-high-stakes-contract-and-trade-secrets-dispute.  Versata's well-publicized vindication in this forum has seemingly done more to restore its good name than an injunction against Ford would ever do.

loss of consumer goodwill and the weakened ability to fairly compete that would result from disclosure of trade secrets […] does establish irreparable injury"). But Versata has not shown that that will happen here – or that there is even a meaningful risk of that happening – without its requested injunction.

Finally, at least some of Versata's claimed losses of goodwill are speculative. For instance, at the hearing before the Court, Versata conceded that it had no evidence (aside from timing) that Ford's actions played any role in Jaguar Land Rover's decision to stop doing business with Versata.[2]

For all of these reasons, Versata has failed to persuade the Court that its claimed injury to goodwill warrants the injunctive relief that it has requested.

### c

Versata has not cited any decision in which a court has found that a victim of trade secret misappropriation suffered irreparable harm under circumstances like those present here. During the hearing before the Court, Versata identified the decisions in *Cajun Services Unlimited, LLC v. Benton Energy Service Co.*, 2020 WL 375594 (E.D. La. Jan. 23, 2020) and *SiOnyx LLC v. Hamamatsu Photonics K.K.*,

---

[2] The "timing" evidence cited by Versata was the fact that Jaguar Land Rover chose to stop doing business with Versata while this action was pending. The Court does not find that to be persuasive proof that any of Ford's acts or omissions played any role in Jaguar Land Rover's decision to terminate its relationship with Versata.

981 F.3d 1339 (Fed. Cir. 2020), as its strongest authority in support of its claimed irreparable harm, but both decisions are materially distinguishable.

The dispute in *Cajun Services* was over "a technology used for drilling oil." *Cajun Services*, 2020 WL 375594, at *1. The plaintiff in that case claimed that it developed and owned the technology; that it rented tools containing the technology to the defendant; and that during the rental period, the defendant reverse engineered, copied, and misappropriated the technology by developing its own tools containing the technology. *See id.* at *3. The plaintiff said that after the defendant developed its own competing tools with the stolen technology, the defendant began "rent[ing] the infringing tools to its customers while also failing to pay [plaintiff] the amounts due under the [parties' rental agreement]." *Id.* A jury found in the plaintiff's favor. *See id.* After trial, the plaintiff moved for permanent injunctive relief to stop the defendant from using its trade secrets.

The court held that plaintiff was entitled to that relief because it had shown, among other things, that it would suffer irreparable harm without the protection of an injunction. *See id.* at *6. The irreparable harm flowed from the fact that the defendant had been competing against the plaintiff by "rent[ing] the infringing tools to its customers." *Id.* at *3. As the court explained, the plaintiff faced irreparable harm because defendant's use of the trade secrets had "forced [the plaintiff] to compete in a two, rather than one, source market against its former customer." *Id.*

13

In sharp contrast here, Ford is not using Versata's trade secrets to compete against Versata in the marketplace.  Thus, the key circumstance that supported the finding of irreparable harm in *Cajun Services* is not present here.

Versata counters that Ford did, in fact, become one of its (Versata's) competitors when Ford misappropriated Versata's trade secrets.  In Versata's words, "Ford went from being one of Versata's major customers to being, in effect, Versata's direct competitor in the automotive configuration business." (Mot., ECF No. 1056, PageID.67255.)  Versata's theory is that Ford's "IT unit became Versata's competitor" because Ford's IT department competed with Versata to be the supplier of configuration software for the rest of Ford. (*Id.*)  But Versata has not cited any decision in which any court has recognized this novel theory of competition – one that treats an internal division of a trade secret misappropriator as a competitor for the misappropriator's own business.  The Court is not persuaded that Ford – through its IT department or otherwise – competed (or may compete) with Versata in the automotive configuration marketplace in a way that would constitute irreparable harm under the theory recognized in *Cajun Services*.

Versata's reliance on *SiOnyx* is likewise misplaced.  In *SiOnyx*, the Federal Circuit affirmed a district court order permanently enjoining the defendant from using the plaintiff's confidential information.  But in *SiOnyx*, the parties sold competing products in the same marketplace. *See SiOnyx*, 981 F.3d at 1349-50.  And

the Federal Circuit relied heavily upon the fact that the defendant's "*entry into the relevant markets* was aided and accelerated by its improper use of [the plaintiff's] confidential information." *Id.* (emphasis added).   Thus, "because [the plaintiff] would have otherwise had [the relevant] markets to itself for some period of time" if not for the defendant's use of the plaintiff's confidential information, the Federal Circuit "agree[d] with [plaintiff] that [...] it was difficult to quantify the harm [to plaintiff] due to [defendant's] premature entry into those markets." *Id.* at 1350.   As explained above, these circumstances do not exist here.   Versata's harm here is thus not irreparable under *SiOnyx*.

Aside from the fact that the cases cited by Versata do not support its claim of irreparable harm, other decisions confirm that it has not suffered such harm.   The decision in *Titan Manufacturing Solutions, Inc. v. National Cost, Inc.*, 2019 WL 5265271 (D. Colo. Oct. 17, 2019), is analogous and instructive.   The plaintiff in *Titan* was a developer of "proprietary tax solutions for," among other things, a "particularly complex" Research and Development Tax Credit. *See id.* at *1.   The plaintiff licensed its software platform related to the tax credit to the defendant for a monthly fee. *See id.* at *2.   About a year later, the defendant decided to create its own software platform that had the same functionality as plaintiff's software. *See id.* Plaintiff then accused the defendant of stealing its trade secrets when the defendant developed this replacement software. *See id.*   Prior to trial, the plaintiff moved for

15

an injunction, but the district court concluded that the plaintiff had "fail[ed] to demonstrate irreparable harm." *Id.* at *3. As the district court explained, one of the primary reasons the plaintiff could not show irreparable harm was because there was "no evidence" that the defendant planned to use the plaintiff's trade secrets to compete in the marketplace:

> The problem for Plaintiff is that it has presented no evidence that Defendants are competing in the market for R&D Tax Credit software. Rather, on this record, the evidence shows only that Defendants created, or attempted to create, an in-house duplicate of Armor so that Defendants can continue to service their taxpayer clients without paying Plaintiff. There is no evidence that Defendants intend to license their database to others. Moreover, given that Defendants commissioned only an Access database (rather than a cloud-based system, for example), it seems unlikely that they have any intent to license it. There is also no evidence that Defendants intend to teach their clients to calculate the R&D Tax Credit on their own—or in other words, to undercut Defendants' own business.

*Id.*

Here, too, there is no evidence that Ford intendeds to "undercut" Versata's business or "compet[e] in the market for [automotive configuration] software." *Id.* Instead, the evidence produced at trial was that Ford wanted to create "an in-house duplicate of [Versata's software] so that [Ford could] continue to [use that software] without paying [Versata]." *Id.* The Court agrees with the court in *Titan* and

16

concludes that, under these circumstances, Versata will not suffer irreparable harm without an injunction.  Versata is therefore not entitled to injunctive relief.

3

For all of the reasons explained above, Versata has failed to carry its burden of showing that it would suffer irreparable harm without a permanent injunction. That failure alone is fatal to Versata's request for such an injunction. *See eBay*, 547 U.S. at 391; *Audi AG*, 469 F.3d at 550.

B

The Court declines to enter a permanent injunction for a second and independent reason: any right Versata could potentially have had to such relief has now expired because the so-called "head start" period – the length of time it would have taken Ford to independently develop a non-infringing alternative without the benefit of Versata's trade secrets – has ended.  As the leading treatise on trade secret misappropriation explains, "[u]sually the duration of an injunction is designed to protect the plaintiff's interests; *the period of time that would be required for independent development [of a non-infringing alternative] is the most commonly employed standard*." 4 *Milgrim on Trade Secrets* § 15.02(1)(d) (2023) (emphasis added).  In other words, a "trade secret injunction [should] last[] only so long as is necessary to negate the advantage the misappropriator would otherwise obtain by foregoing independent development" of a non-infringing alternative. *Nite Glow*

17

*Industries, Inc. v. Central Garden & Pet Co.*, 2021 WL 2945556, at \*7 (Fed. Cir. July 14, 2021) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1266 (3d Cir. 1985)).  *See also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained"); *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 961 (8th Cir. 2007) (explaining that the head-start rule "provides that by misappropriating [] trade secrets, a defendant is able to cut short the time it would normally take to produce and market a competitive product," noting that "[a] defendant should be enjoined only for the time it would take to produce and market the competitive product, absent the misappropriation," and affirming injunction that "consisted of the period it would have taken appellants to independently develop both the scientific and sales data it misappropriated").

Here, Versata presented evidence at trial that absent Ford's misappropriation, it would have taken Ford 8.3 years from the date of Ford's first misappropriation – October 10, 2011 – to independently develop a non-infringing alternative. (*See* 10/17/2022 Trial Tr., ECF No. 979, PageID.64147-64149.)  The 8.3 year head-start period identified by Versata expired on January 23, 2020. (*See* Versata Trial Ex., ECF No. 1070-1.)  Accordingly, any injunction that the Court could potentially have entered would have terminated on January 23, 2020, and would not be in place today.

For this additional reason, the Court declines to enter Versata's requested injunction now.

Versata counters that "independent development time may be viewed as wholly irrelevant if plaintiff's article is not publicly available." (Versata Reply, ECF No. 1074, PageID.67813, quoting 4 *Milgrim on Trade Secrets* § 15.02(1)(e) (2023).) But the full quote from Milgrim on which Versata relies provides that "independent development time may be viewed as wholly irrelevant if plaintiff's article is not publicly available *and the sole disclosures to defendant were tortious disclosures*." 4 Milgrim on Trade Secrets § 15.02(1)(e) (2023) (emphasis added). And Versata does not argue in its request for a permanent injunction that the "sole disclosures" of its trade secrets to Ford were "tortious disclosures." Thus, the provisions from Milgrim on which Versata relies do not apply here.

Because the "head start" period here expired nearly four years ago, Versata is not entitled to an injunction.

## IV

Finally, as an alternative form of relief, Versata asks the Court to order Ford to pay an "ongoing royalty of at least $13,555,000 for every year that Ford continues to use Versata's trade secrets and confidential information." (Mot., ECF No. 1056, PageID.67246.) The Court declines to do so.

Versata seeks such a royalty under both the DTSA and the MUTSA. But under both statutes, a court may not require the payment of a royalty for any longer "than the period of time the use could have been prohibited." 18 U.S.C. § 1836(b)(3)(A)(iii). *See also* Mich. Comp. Laws § 445.1903(3) (same). Simply put, an order compelling the payment of a royalty for use of a trade secret may last no longer than an injunction prohibiting the use of the secret could have remained in effect. *See* Comment to Section 2 of the Uniform Trade Secret Act[3] (explaining that an order compelling the payment of a royalty may be an acceptable alternative to an injunction and providing that a royalty order, like a prohibitive injunction, may remain in effect "only for the duration of [the] competitive advantage" obtained as a result of the misappropriation).[4]

---

[3] "Both the Federal Defend Trade Secrets Act [] and the Michigan Uniform Trade Secrets [] were modeled on the Uniform Trade Secrets Act [], which had been adopted in forty-seven states and the District of Columbia by 2016." *B&P Litterford, LLC v. Prescott Machinery, LLC*, 417 F.Supp.3d 844, 851 (E.D. Mich. 2019) *rev'd on other grounds*, 2021 WL 3732313 (6th Cir. Aug. 24, 2021). *See also Compuware Corp. v. Int'l Bus. Machines*, 2003 WL 23212863, at *8 (E.D. Mich. Dec. 19, 2003) ("Michigan has adopted the Uniform Trade Secrets Act [], which provides a statutory action and remedies for misappropriation of trade secrets"); *Deerpoint Group, Inc. v. Agrigenix, LLC*, 345 F.Supp.3d 1207, (E.D. Cal. 2018) ("The DTSA is largely modelled after the Uniform Trade Secrets Act").

[4] In its reply brief, Versata purported to quote this same comment from the Uniform Trade Secrets Act in support of its argument that the Court could order Ford to pay an ongoing royalty. But Versata did not fully quote the comment, and its interpretation is not faithful to the comment.

Here, for all of the reasons explained above, the Court may no longer enjoin Ford from using Versata's trade secrets because the head-start period has expired. Therefore, the Court may not now compel Ford to pay royalties on a going-forward basis.

V

Finally, the Court takes this opportunity to respond to two last points made by Versata in its request for an injunction or royalty.  First, Versata reminded the Court that during the course of these proceedings, the Court told Ford (on several occasions) that the Court could issue an injunction against Ford if the jury found in favor of Versata. (*See* Mot., ECF No. 1056, PageID.67246.)   While Versata accurately recounts the Court's statements, it makes too much of them.  The Court's repeated references to injunctive relief were not a promise or guarantee that the Court would issue an injunction against Ford if the jury found in favor of Versata.  Instead, the Court's statements are more accurately viewed as an admonition to Ford that if it lost at trial, the Court would not hesitate to issue an injunction *if Versata demonstrated an entitlement to such relief.*  Since (for all of the reasons explained above), Versata has not shown that it would be proper to issue an injunction, the Court's prior statements do not guide the way here.

Second, Versata insists that "[e]quity … demands" that the Court enter an injunction and/or grant an ongoing royalty. (Versata Reply, ECF No. 1074,

21

PageID.67810.)  It would be grossly unfair to withhold that relief, Versata suggests, because the Court previously overturned the jury's substantial damages award, and without an injunction or royalty, Versata would be left with essentially *no* relief even though it proved at trial that Ford both misappropriated its trade secrets and breached the parties' contract. (*See id.*)  The Court respectfully disagrees that this result is unfair to Versata.

The lack of relief for Versata is not unfair because, as the Court has previously explained at length (*see* Op. and Order, ECF No. 1054), it stems from Versata's failure to prove its claimed damages at trial.  The Court gave Versata a full and fair opportunity to prove its damages case, and Versata came up short.  Under these circumstances, equity does not "demand" that the Court issue an injunction or award a royalty in order to ensure that Versata walks away from these proceedings with something.

VI

For all of the reasons explained above, **IT IS HEREBY ORDERED** that Versata's motion for a permanent injunction or an ongoing royalty (ECF No. 1056) is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall meet and confer to discuss what steps, if any, are left to conclude this litigation.  By no later than **November 6, 2023**, the parties shall submit a joint status report to the Court

22

reflecting each parties' position on what actions, if any, need to be taken to conclude this case.

     **IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 19, 2023

     I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 19, 2023, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126